UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN J. O'BRIEN,<br>ELIZABETH V. TAVARES, and<br>WILLIAM H. BURKE, III,<br><br>Defendants. | ) | Crim. No. 12CR40026 FDS<br><br>Violations:<br>18 U.S.C. §§ 1962(c); 1962(d); 1341 and 2. |

INDICTMENT

THE UNITED STATES GRAND JURY in and for the District of Massachusetts charges that:

COUNT ONE
(Racketeering Conspiracy)

At all times relevant to this Indictment,

THE ENTERPRISE

1. The Administrative Office of the Trial Courts (hereinafter referred to as "AOTC") is the administrative arm of the trial courts of the Commonwealth of Massachusetts. The Chief Justice for Administration and Management (hereinafter referred to as "CJAM") oversees the Commonwealth's trial court system. The Office of the Commissioner of Probation (hereinafter referred to as "OCP") is a department within AOTC, and the CJAM has oversight responsibility over the OCP.

2. OCP is comprised of the Office of the Commissioner, the Massachusetts Probation Service (hereinafter referred to as the "Probation Department") and the Office of

Community Corrections (hereinafter referred to as "OCC"). The Office of the Commissioner is responsible for administrative functions and oversight of the Probation Department and OCC, such as hiring, promotion and discipline of employees; budget matters; training, drafting and tracking legislation related to the Probation Department; and overseeing the electronic monitoring of probationers, among other responsibilities. OCP, therefore, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a legal entity which engaged in, and the activities of which affected, interstate and foreign commerce. OCP affected interstate and foreign commerce by, among other things, the use of goods and services in interstate commerce. OCP also operated an "Interstate Compact" Department which accepted probationers from outside the Commonwealth and transferred local probationers to sister states.

3. The Probation Department has approximately 1,800 employees in approximately 180 offices located in each of the Superior, District, Juvenile, Probate and Family and Boston Municipal Courts. Within the various offices, probation officers supervise criminal defendants placed on probation as a condition of sentenced imposed by a court. Within each probation office in a particular court, a chief probation officer supervises the functions and employees of that office. Depending upon the number of probation officers assigned to a given office, a particular office could have a First Assistant Chief Probation Officer as well as Assistant Chief Probation Officers assigned to the court. The probation officers' work includes supervising probationers, reporting findings and making recommendations to the court, enforcing court orders, and electronic monitoring of certain probationers. In the probate and family courts, probation officers serve more as investigators and mediators on contested probate and family court issues, such as child custody and divorce disputes.

4. OCC has 21 Community Corrections Centers throughout Massachusetts and employs approximately 100 people. Community Corrections Centers are community-based supervision sites where offenders must check-in regularly. Individuals assigned to the Community Corrections Centers must also perform community service projects. Community Corrections Centers are manned by probation officers with the title "probation officer in charge."

THE MASSACHUSETTS TRIAL COURT'S HIRING SYSTEM

5. AOTC had a merit-based hiring system for all of its employees, including those within the Probation Department, governed by Massachusetts General Laws, Chapter 211B, § 8 and the *Personnel Policies and Procedures Manual* of AOTC promulgated thereunder (hereinafter "the Manual"). For example, Section 4.000 of the Manual stated that "*the objective of the hiring process is to select the most qualified individuals who can carry out their responsibilities in a competent and professional manner*" in order to ensure the successful operation of the Trial Court. Similarly, Section 4.304 of the Manual, which addressed nepotism and favoritism in hiring, stated that "[i]*t is the policy of the Trial Court that all appointments be made solely on the basis of merit*. The practice and appearance of nepotism *or favoritism* in the hiring process are to be avoided." (Emphasis added.)

a. The Manual also stressed the importance of conducting interviews based upon objective standards and criteria. For example, Sections 4.302(A) and (C) of the Manual stated that:

> (A) all applicants meeting the minimum qualifications for the position must be interviewed.
>
> * * *

> (C) Interviews must be objectively tailored to measure the applicant's knowledge, skills and abilities for the position under consideration. To achieve this, the appointing authority must develop a standard set of questions designed to measure the knowledge, skills and abilities of applicants based on the job description for the specific position.

b. Subsection (E) of 4.302 specifically applied to hiring within the Probation Department. It adopted broad guidelines for hiring and interviewing and provided further specifics with respect to the composition of the interview panel and the number of candidates who may be recommended by the interview panel for appointment to the Commissioner. It stated that

> In the case of a Probation Officer, Probation Officer In Charge, Assistant Chief Probation Officer, or First Assistant Chief Probation Officer vacancy, an interview committee consisting of the Commissioner of Probation (Chair) or his/her designee, the Chief Probation Officer of the Division, and a representative of the Chief Justice of the Department shall interview applicants consistent with the guidelines set forth in this section. Each candidate selected for an interview shall be evaluated and determined to be recommended or not recommended. A list not to exceed 8 names of recommended candidates for each open position shall be forwarded to the First Justice.

By letter of November 22, 2004, the Chief Justice modified the last sentence of Section 4.302(E) to read, "A list not to exceed 8 names of recommended candidates for each open position shall be forwarded to the Commissioner of Probation for appointment subject to the approval of the Chief Justice of Administration and Management."

6. The requirement to establish and promulgate standards for the appointment, performance, promotion, continuing education and removal of all personnel within the trial court

was codified in Massachusetts General Laws, Chapter 211B, § 8 which stated, in pertinent part,

> Any appointment that is governed by standards promulgated under the provisions of this section shall forthwith be certified in writing for compliance with such standards to the chief justice for administration and management. The chief justice for administration and management shall have the power to reject any such appointment within fourteen days after receipt of the certification of compliance by the appointing authority but such power to reject any such appointment shall be limited to non-compliance with the standards for appointment.

7. In 2001, the Massachusetts legislature amended Massachusetts General Laws, Chapter 276, § 83 to vest hiring authority for employees of the enterprise in the Commissioner of Probation. This authority had previously been held by the CJAM and First Justices of the trial courts. After the 2001 amendment, the CJAM retained authority to reject any appointment not in compliance with the standards set forth in the Manual.

THE DEFENDANTS

8. The defendant **JOHN J. O'BRIEN** served as the Commissioner of OCP from approximately 1998 to May 24, 2010. **O'BRIEN** previously served as the Chief Probation Officer in Suffolk County Superior Court. O'Brien had worked in the Probation Department since approximately 1980 as a probation officer and in other managerial positions.

9. The defendant **ELIZABETH V. TAVARES** served as the First Deputy Commissioner of OCP from approximately 2008 to approximately 2010. Prior to that position, **TAVARES** served as the Second Deputy Commissioner from 2001 through 2008. Tavares had worked in the Probation Department since approximately 1980 and had also served as associate legal counsel and Deputy Commissioner of Programs.

10. The defendant **WILLIAM H. BURKE, III,** served as Deputy Commissioner of

OCP from approximately 1999 to approximately 2009 when he retired. Prior to that position, **BURKE** had served as Regional Administrator for western Massachusetts since approximately 1992. **BURKE** had worked in the Probation Department in other capacities since approximately 1972.

THE RACKETEERING CONSPIRACY

11. From in or before 2000 and continuing through April 2010, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

**JOHN J. O'BRIEN,**
**ELIZABETH V. TAVARES,** and
**WILLIAM H. BURKE, III**

and others known and unknown to the Grand Jury, being persons employed by and associated with the Office of the Commissioner of Probation, which enterprise engaged in, and whose activities affected, interstate and foreign commerce, did unlawfully and knowingly conspire, confederate and agree to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as set forth in paragraph 12 below.

12. The pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and 1961(5), through which the defendants and their coconspirators agreed to conduct and participate directly and indirectly in the conduct of the affairs of the enterprise, consisted of multiple acts of mail fraud indictable under Title 18, United States Code, Section 1341.

13. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

OBJECTS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

14. To maintain their positions within the enterprise, to increase the budget and resources of the enterprise, to gain tighter control over the conduct of the enterprise, and to aggrandize power to themselves, the defendants and their co-conspirators sought to curry favor with members of the Massachusetts legislature and others who were in a position to impact the enterprise through legislation, budget authorizations, and in other ways, by instituting a rigged hiring system that catered to requests from state legislators and others to employ and promote candidates for employment with the enterprise.

15. Accordingly, it was an object of the conspiracy to carry out a scheme and artifice to defraud and to obtain money and property, by means of false and fraudulent pretenses and representations, by obtaining employment and promotions for individuals who were not the most qualified, but who the defendants understood to be best politically connected or "sponsored."

16. Through hiring and promoting individuals who were sponsored by members of the legislature, while also maintaining the facade of a merit-based hiring system, the defendants and their co-conspirators sought to increase their ability to obtain favorable votes on their budget requests and other interests.

MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

17. It was a part of the conspiracy that the enterprise obtained from members of the Massachusetts legislature, legislators' staff members, and other influential individuals, the names of candidates for employment with the enterprise whom the legislators and others sought to sponsor. The enterprise then organized this information and maintained records known as "sponsor lists" to ensure that the sponsored candidates obtained employment.

18. It was a part of the conspiracy that, in order to conceal the true nature of the enterprise's hiring decisions, the defendants created a sham hiring system which included, among other things:

a. The "posting" of employment and promotion opportunities over the Internet on the enterprise's web site as well as over a telephone "hot line." These postings invited prospective candidates to submit applications and resumes to the enterprise. Applications for employment were frequently submitted to the enterprise by mail.

b. A series of panel interviews for prospective candidates which included: (1) an initial interview for all candidates who met the minimum qualifications; (2) a second round interview for candidates who passed the initial round; and (3) a final round interview generally for the top eight candidates.

c. Scoring sheets and forms containing the candidates' answers to a set of standardized questions were created and maintained.

d. Rejection letters and postcards were routinely mailed to unsuccessful candidates after each round of interviews.

e. The defendant **O'BRIEN** made written certifications to the CJAM that the successful candidate had been hired in compliance with the standards set forth in the Manual.

19. This sham system was used by the defendants and other members of the conspiracy to conceal the fact that the hiring decisions were pre-determined and not based upon merit, but based upon the nature and extent of the sponsorship. In fact, the defendant **O'BRIEN** routinely selected the name or names of a "preferred" candidate for each position from the sponsor lists and provided those names to the defendants **TAVARES** and **BURKE** and other

members of the interview panels. By pre-selecting the preferred candidate, the defendants sought to ensure that the preferred candidate reached the final round and was also awarded the highest score at the final round interview. The scoring sheets were falsified and other methodology skewed to achieve this result. This sham system created the aura of a legitimate merit-based hiring process.

20. In order to achieve the goals of the conspiracy, when the defendant **O'BRIEN** falsely certified to the CJAM that the candidate for employment had been hired pursuant to the procedures mandated by the Manual, he often included or caused to be included other documents containing false statements and misrepresentations that were created during the rigged hiring process.

21. Unsuccessful candidates were routinely notified by mail that they had not received the desired employment with the enterprise. These letters were regularly signed by the defendant **TAVARES,** and, at times by the defendant **O'BRIEN.** It was the usual practice of the enterprise to mail interview packages containing the applications of prospective candidates to the members of the interview panels. On other occasions, these interview packages were obtained by panel members at the enterprise's office.

All in violation of Title 18, United States Code, Section 1962(d).

COUNT TWO
(Racketeering)

1. Paragraphs One through Ten and Fourteen through Twenty-one of Count One of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or before 2000 and continuing through April 2010, in the District of Massachusetts and elsewhere, the defendants herein,

**JOHN J. O'BRIEN,** and
**ELIZABETH V. TAVARES,**

and others, including the defendant **WILLIAM H. BURKE, III**, who is not named in this Count, known and unknown to the Grand Jury, being persons employed by and associated with the enterprise, did unlawfully and knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the Office of the Commissioner of Probation (OCP), which was engaged in and the activities of which affected interstate and foreign commerce, through the pattern of racketeering activity particularly described below in paragraphs 3 through 27.

THE SCHEME TO DEFRAUD

3. Between 2000 and 2010, the defendants **JOHN J. O'BRIEN, ELIZABETH V. TAVARES,** and **WILLIAM H. BURKE, III,** devised and intended to devise a scheme and artifice to defraud and to obtain money and property, by means of false and fraudulent pretenses and representations, in that the defendants and their co-conspirators did award employment and promotions to individuals who were solicited from and sponsored by members of the state legislature and others when those sponsored individuals were not the most qualified candidates who had applied for the employment or promotion. In so doing, the defendants obtained money and property, to wit, jobs and salaries for individuals who were not the most qualified candidates,

but who had the sponsorship of a member of the state legislature or some other individual of significance to members of the enterprise.

*The employment of P.L.*

4. P.L. was the son of a member of the state judiciary and was sponsored for employment by the President of the Senate as a probation officer at the Plymouth County Probate and Family Court. P.L. was not the most qualified candidate, but was hired in or about June 2008. Rejection letters were mailed to unsuccessful candidates on or about May 29, 2008.

*The employment of M.M.*

5. M.M. was an acquaintance of the District Attorney for the Cape & Islands and was sponsored for employment by the President of the Senate as a probation officer at the Plymouth District Court. M.M. was not the most qualified candidate, but was hired in or about May 2008. Rejection letters were mailed to unsuccessful candidates on or about March 12, 2008.

*The employment of P.M.*

6. P.M. was sponsored for employment by the President of the Senate as a probation officer at the Plymouth District Court. P.M. was not the most qualified candidate, but was hired in or about May 2008. Rejection letters were mailed to unsuccessful candidates on or about March 12, 2008.

*The employment of K.M.*

7. K.M. was sponsored for employment by a member of the Senate as a probation officer at the Bristol County Probate and Family Court. K.M. was not the most qualified candidate, but was hired in or about April 2008. Rejection letters were mailed to unsuccessful candidates on or about April 10, 2008.

*The employment of L.M.*

8. L.M. was sponsored for employment by a member of the state judiciary as a probation officer at the Worcester County Probate and Family Court. L.M. was not the most qualified candidate, but was hired in or about March 2008. Rejection letters were mailed to unsuccessful candidates on or about March 13, 2008.

*The employment of M.W.*

9. M.W. was sponsored for employment by a member of the House of Representatives and the Speaker of the House as a probation officer at the Middlesex County Juvenile Court. M.W. was not the most qualified candidate, but was hired in or about November 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

*The employment of K.O.*

10. K.O. was sponsored for employment by a member of the House of Representatives and the Speaker of the House as a probation officer at the Middlesex County Juvenile Court. K.O. was not the most qualified candidate, but was hired in or about November 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

*The employment of M.S.*

11. M.S. was the daughter of a member of the state judiciary and was sponsored for employment by a member of the House of Representatives and the Speaker of the House as a probation officer at the Middlesex County Juvenile Court. M.S. was not the most qualified candidate, but was hired in or about November 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

*The employment of E.N.*

12. E.N. was sponsored for employment by a member of the Senate as a probation officer at the Taunton District Court. E.N. was not the most qualified candidate, but was hired in or about March 2007. Rejection letters were mailed to unsuccessful candidates on or about March 20, 2007.

*The employment of A.M.*

13. A.M. was sponsored for employment by a member of the Senate and the President of the Senate as a probation officer at the Middlesex County Juvenile Court. A.M. was not the most qualified candidate, but was hired in or about September 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

14. A.M. was sponsored again for employment by a member of the Senate and the President of the Senate as a probation officer at the Peabody District Court. A.M. was not the most qualified candidate, but was hired in or about September 2008. Rejection letters were mailed to unsuccessful candidates on or about October 9, 2008.

*The employment of J.C.*

15. J.C. was sponsored for employment by a member of the Senate as a probation officer at the Suffolk County Probate and Family Court. J.C. was not the most qualified candidate, but was hired in or about November 2006. Rejection letters were mailed to unsuccessful candidates on or about November 10, 2006.

*The employment of B.M.*

16. B.M. was the son of an employee of a member of the House of Representatives, and was sponsored for employment as a probation officer at the Suffolk County Superior Court by that

member who was then Chairman of the House Ways and Means Committee. B.M. was not the most qualified candidate, but was hired in or about December 2005. Rejection letters were mailed to unsuccessful candidates in or about December 2005.

*The employment of D.M.*

17. D.M. was the son of a former member of the Senate and was sponsored for employment by a member of the Senate as a probation officer at the Bristol County Probate and Family Court. D.M. was not the most qualified candidate, but was hired in or about April 2005. D.M's appointment letter was mailed to the Chief Probation Officer in or about April 2005.

*The employment of C.H.*

18. C.H. was sponsored for employment by the defendant **BURKE** as a probation officer at the Hampshire County Superior Court. C.H. was not the most qualified candidate, but was hired in or about December 2005. Rejection letters were mailed to unsuccessful candidates in or about December 2005.

*The promotion of A.P.*

19. A.P. was sponsored for a promotion to an Assistant Chief Probation Officer at the Milford District Court by a member of the House of Representatives and the defendant **BURKE.** A.P. was not the most qualified candidate, but was promoted in or about March 2005. Rejection letters were mailed to unsuccessful candidates on or about March 16, 2005.

*The promotion of F.G.*

20. F.G. was sponsored for a promotion to an Assistant Chief Probation Officer at the Franklin County Superior Court by a member of the House of Representatives and the defendant **BURKE.** F.G. was not the most qualified candidate, but was promoted in or about February

2006. Applications from prospective candidates were mailed to the enterprise in or about December 2005.

*The promotions of J.D.*

21. J.D. was sponsored for a promotion to a First Assistant Chief Probation Officer at the Bristol County Superior Court by a member of the Senate. J.D. was not the most qualified candidate, but was promoted in or about April 2005. Rejection letters were mailed to unsuccessful candidates in or about April 4, 2005.

22. J.D. was sponsored for a promotion to a Chief Probation Officer at the Bristol County Superior Court by a member of the Senate. J.D. was not the most qualified candidate, but was promoted in or about April 2006. Rejection letters were mailed to unsuccessful candidates in or about March 28, 2006.

*The promotion of B.D.*

23. B.D. was sponsored for a promotion to an Assistant Chief Probation Officer at the Worcester District Court by the Speaker of the House of Representatives. B.D. was not the most qualified candidate, but was promoted in or about January 2005. Rejection letters were mailed to unsuccessful candidates on or about February 17, 2005.

*The promotion of E.T.*

24. E.T. was sponsored for a promotion to an Assistant Chief Probation Officer at the Barnstable District Court by a member of the Senate. E.T. was not the most qualified candidate, but was promoted in or about March 2005. Rejection letters were mailed to unsuccessful candidates in or about February 25, 2005.

*The employment of K.P.*

25. K.P. was the wife of a member of the House of Representatives and was sponsored for employment by the Speaker of the House of Representatives for a position as Program Manager for the Electronic Monitoring Program in Springfield. K.P. was not the most qualified candidate, but was hired in or about February 2001. Applications from prospective candidates were mailed to the enterprise in or about November 2000.

*The employment of M.B.*

26. M.B. was the daughter of the defendant **BURKE** and was sponsored by the defendant **BURKE** for the position of Assistant Program Manager for the Electronic Monitoring Program in Springfield. M.B. was not the most qualified candidate, but was hired in or about April 2001.

RACKETEERING ACTS NUMBERS ONE THROUGH TWENTY-TWO

27. On or about the dates set forth below, in the District of Massachusetts, the defendants, **JOHN J. O'BRIEN** and **ELIZABETH V. TAVARES,** aided and abetted by others known and unknown to the Grand Jury, including the defendant **WILLIAM H. BURKE, III**, who is not named in this Count, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did cause to be placed in post offices and authorized depositories for mail matter any matter and thing whatever to be sent and delivered by the Postal Service and any private and commercial interstate carrier, and did cause to take and receive therefrom, for the purposes of executing and attempting to execute said scheme and artifice to defraud, in that the defendants and their co-conspirators did: (1) cause those individuals set forth below to be hired and promoted when they were not the most qualified candidate; (2) provide materially false

documents to the CJAM to make it appear that those individuals were the most qualified candidates and were hired pursuant to a merit-based system; and (3) use the United States Postal Service as well as private and commercial interstate carriers to deliver rejection letters to other unsuccessful candidates and to receive and deliver other documents related to employment with the enterprise in violation of Title 18, United States Code, Sections 1341 and 2.

| Racketeering Act | Sponsored Candidate | Date of Mailing in furtherance of Scheme | Documents Mailed in furtherance of Scheme |
|---|---|---|---|
| One | P.L | May 29, 2008 | Rejection letters |
| Two | M.M | March 12, 2008 | Rejection letters |
| Three | P.M | March 12, 2008 | Rejection letters |
| Four | K.M. | April 10, 2008 | Rejection letters |
| Five | L.M. | March 13, 2008 | Rejection letters |
| Six | M.W. | September 19, 2007 | Rejection letters |
| Seven | K.O. | September 19, 2007 | Rejection letters |
| Eight | M.S. | September 19, 2007 | Rejection letters |
| Nine | E.N. | March 20, 2007 | Rejection letters |
| Ten | A.M. | September 19, 2007 | Rejection letters |
| Eleven | A.M. | October 9, 2008 | Rejection letters |
| Twelve | J.C. | November 10, 2006 | Rejection letters |
| Thirteen | B.M. | December 2005 | Rejection letters |
| Fourteen | D.M. | April 2005 | Appointment letter |
| Fifteen | C.H. | December 2005 | Rejection letters |

| | | | |
|---|---|---|---|
| Sixteen | A.P | March 16, 2005 | Rejection letters |
| Seventeen | F.G. | December 2005 | Applications for employment |
| Eighteen | J.D. | April 4, 2005 | Rejection letters |
| Nineteen | J.D. | March 28, 2006 | Rejection letters |
| Twenty | B.D. | February 17, 2005 | Rejection letters |
| Twenty-one | E.T. | February 25, 2005 | Rejection letters |
| Twenty-two | K.P. | November 2000 | Applications for employment |

All in violation of Title 18, United States Code, Section 1962(c).

COUNTS THREE THROUGH TWELVE
(Mail Fraud)

1. Paragraphs One through Ten and Fourteen through Twenty-one of Count One and Three through Twenty-six of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. On or about the dates set forth below, in the District of Massachusetts, the defendants,

**JOHN J. O'BRIEN ,**
**ELIZABETH V. TAVARES,** and
**WILLIAM H. BURKE, III,**

aided and abetted by others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did cause to be placed in post offices and authorized depositories for mail matter any matter and thing whatever to be sent and delivered by the Postal Service and any private and commercial interstate carrier, and did cause to take and receive therefrom, for the purposes of executing and attempting to execute said scheme and artifice to defraud, in that the defendants and their co-conspirators did: (1) cause those individuals set forth below to be hired and promoted when they were not the most qualified candidates; (2) provide materially false documents to the CJAM to make it appear that those individuals were the most qualified candidates and were hired pursuant to a merit-based system; and (3) use the United States Postal Service as well as private and commercial interstate carriers to deliver rejection letters to other unsuccessful candidates and to receive and deliver other documents related to employment with the enterprise.

| Count | Sponsored Candidate | Date of Mailing in furtherance of Scheme | Documents Mailed in furtherance of Scheme |
|---|---|---|---|
| Three | P.L | May 29, 2008 | Rejection letters |
| Four | M.M | March 12, 2008 | Rejection letters |
| Five | P.M | March 12, 2008 | Rejection letters |
| Six | K.M. | April 10, 2008 | Rejection letters |
| Seven | L.M. | March 13, 2008 | Rejection letters |
| Eight | M.W. | September 19, 2007 | Rejection letters |
| Nine | K.O. | September 19, 2007 | Rejection letters |
| Ten | M.S. | September 19, 2007 | Rejection letters |
| Eleven | A.M. | September 19, 2007 | Rejection letters |
| Twelve | A.M. | October 9, 2008 | Rejection letters |

All in violation of Title 18, United States Code, Sections 1341 and 2.

A TRUE BILL

FOREPERSON OF THE GRAND JURY

ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; March 22, 2012.

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

3:50p.