UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
v.                                      )          Criminal Action No. 12-40026-FDS
                                        )
JOHN J. O'BRIEN,                        )
                                        )
                  Defendant.            )
_____)

ORDER ON MOTION TO COMPEL

March 13, 2013

SOROKIN, C.M.J.

The defendants seek an order compelling the government to produce more than three

dozen categories of documents and information pursuant to Brady v. Maryland, 373 U.S. 83

(1963), Rule 16 of the Federal Rules of Criminal Procedure, and Local Rule 116.2.  Doc. Nos.

83, 84.[1]  Upon consideration of the parties' briefs, as well as the arguments presented at a

February 28, 2013 hearing on the motion, the Court will ALLOW in part and DENY in part the

defendants' motion.[2]

---

[1]The motion to compel (Doc. No. 83) was filed under seal, with a redacted version placed
on the public docket (Doc. No. 84).

[2]The Court notes one timing issue at the outset.  During the Fall, the government pressed
vigorously to move the case forward and for the defendants to conclude their review of 180
boxes of documents made available to them.  Thereafter, the parties briefed extensively the
defendants' motion to compel.  No party requested that the Court delay ruling on the pending
motion, although the government opaquely stated in its opposition that it has withheld some
information due to ongoing grand jury investigations.  It now appears that, at some unspecified
point in the future, and possibly within sixty days, some of the current disputes as to certain
requests may become moot.  The totality of the circumstances, however, warrant resolution of the
motion now, issuance of the final status report, and return of the case to the district judge
assigned to this matter.

THE INDICTMENT'S ALLEGATIONS

The Indictment charges the former state Commissioner of Probation and two of his

deputies with racketeering and mail fraud offenses arising from the hiring practices of the state

Probation Department.  The racketeering charges are predicated upon "multiple acts of mail

fraud."  Indictment at Count 1, ¶ 12.[3]

Count 1 of the Indictment alleges the defendants formed a racketeering conspiracy.  Id. at

Count 1, ¶ 11.  The Indictment alleges that the Administrative Office of the Trial Courts

("AOTC") "had a merit-based hiring system for all of its employees, including those within the

Probation Department, governed by Massachusetts General Laws, Chapter 211B, § 8 and the

*Personnel Policies and Procedures Manual* of AOTC promulgated thereunder."  Id. at Count 1,

¶ 5.  For the duration of the alleged conspiracy, per the Indictment, state law required the Chief

Justice for Administration and Management ("CJAM") to "establish and promulgate standards

for the appointment, performance, promotion, continuing education and removal of all personnel

within the trial court."  Id. at Count 1, ¶ 6.  The relevant statute provided that "[a]ny appointment

that is governed by standards promulgated under the provisions of this section shall forthwith be

certified in writing for compliance with such standards to the chief justice for administration and

mangement[, who] shall have the power to reject any such appointment . . . [but only for] non-

compliance with the standards for appointment."  Id. (quoting Mass. Gen. Laws ch. 211B, § 8).

According to the Indictment, the AOTC's Personnel Manual ("the Manual") stated that

"the objective of the hiring process is to select the most qualified individuals who can carry out

their responsibilities in a competent and professional manner," that the "the policy of the [AOTC

---

[3]Citations to the Indictment will reference both the count and the paragraph number, as
the government restarted numbering the paragraphs with "1" at the start of each count.

is] that all appointments be made solely on the basis of merit," and that "[t]he practice and appearance of nepotism or favoritism in the hiring process are to be avoided."  <u>Id.</u> at Count 1, ¶ 5 (italics in original omitted).  The Indictment also alleges that the Manual "stressed the importance of conducting interviews based upon objective standards and criteria," and required interviews of "all applicants meeting the minimum qualifications for the position."  <u>Id.</u> at Count 1, ¶ 5(a).  Interviews were to be "objectively tailored to measure the applicant's knowledge, skills and abilities," using a "standard set of questions."  <u>Id.</u>

The Manual, according to the Indictment, contained a subsection specifically applying to the Probation Department.  <u>Id.</u> at Count 1, ¶ 5(b).  This provision stated that, when hiring probation officers or filling various supervisory positions in the Probation Department:

> the Commissioner of Probation . . . or his/her designee, the Chief Probation Officer of the Division, and a representative of the Chief Justice of the Department shall interview applicants consistent with the guidelines set forth in this section.  Each candidate selected for an interview shall be evaluated and determined to be recommended or not recommended.  A list not to exceed 8 names of recommended candidates for each open position shall be forwarded to the First Justice.

<u>Id.</u>  In 2004, "the Chief Justice[4] modified the last sentence of [the provision quoted above] to read, 'A list not to exceed 8 names of recommended candidates for each open position shall be forwarded to the Commissioner of Probation for appointment subject to the approval of the Chief Justice of Administration and Management.'"  <u>Id.</u>  According to the Indictment, the hiring authority for probation employees was held "by the CJAM and the First Justices of the trial courts" until 2001, when the governing statute was amended "to vest hiring authority for

---

[4]The Indictment does not explain expressly whether "Chief Justice" refers to the Chief Justice of Administration and Management, to whom the Indictment refers as the "CJAM," <u>see</u> Indictment at Count 1, ¶ 1, or the Chief Justice of the Commonwealth's Supreme Judicial Court. This difference has no bearing on the resolution of the pending motion.

3

employees of the enterprise in the Commissioner of Probation."[5]  <u>Id.</u> at Count 1, ¶ 7.  The

Indictment alleges that, even "[a]fter the 2001 amendment, the CJAM retained authority to reject

any appointment not in compliance with the standards set forth in the Manual."  <u>Id.</u>[6]

      Against this backdrop, Count 1 alleges the defendants committed racketeering conspiracy

from "in or before 2000 and continuing through April 2010" in violation of 18 U.S.C. § 1962(d).

<u>Id.</u> at Count 1, ¶ 11.  The pattern of racketeering activity "though which the defendants and their

coconspirators agreed to conduct and participate directly and indirectly in the conduct of the

affairs of the enterprise, consisted of multiple acts of mail fraud."  <u>Id.</u> at Count 1, ¶ 12.

      Both the racketeering conspiracy alleged in Count 1 and the racketeering alleged in Count

2 of the Indictment are described as a "scheme to defraud."  <u>See id.</u> at Count 1, headings

preceding ¶¶ 14, 17; <u>id.</u> at Count 2, heading preceding ¶ 3.  The Office of the Commissioner of

Probation ("OCP") is identified as the racketeering "enterprise."  <u>See id.</u> at Count 1, ¶¶ 2, 11.

The Indictment defines the object of the racketeering conspiracy as follows:

> 14.    To maintain their positions within the enterprise, to increase the budget
> and resources of the enterprise, to gain tighter control over the conduct of the
> enterprise, and to aggrandize power to themselves, the defendants and their co-
> conspirators sought to curry favor with members of the Massachusetts legislature
> and others who were in a position to impact the enterprise through legislation,
> budget authorizations, and in other ways, by instituting a rigged hiring system that
> catered to requests from state legislators and others to employ and promote
> candidates for employment with the enterprise.

---

[5]The statute, as revised in 2001, read "the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial court as he deems necessary."  Mass. Gen. Laws ch. 276, § 83 (2001) (amended 2011).

[6]The Supreme Judicial Court has emphasized the breadth of the CJAM's "ultimate authority over [Probation Department] hiring," even in the face of the statutory grant of hiring authority to the Commissioner of Probation.  <u>Anzalone v. Admin. Office of Trial Ct.</u>, 932 N.E.2d 774, 782, 782 n.12 (Mass. 2010) (noting the 2001 amendment "did not dislodge the CJAM's 'broad' and 'substantial' authority . . . to supervise the selection of probation officers").

15.     Accordingly, it was an object of the conspiracy to carry out a scheme and artifice to defraud and to obtain money and property, by means of false and fraudulent pretenses and representations, by obtaining employment and promotions for individuals who were not the most qualified, but who the defendants understood to be best politically connected or "sponsored."

16.     Through hiring and promoting individuals who were sponsored by members of the legislature, while also maintaining the facade of a merit-based hiring system, the defendants and their co-conspirators sought to increase their ability to obtain favorable votes on their budget requests and other interests.

Id. at Count 1, ¶¶ 14-16.

To carry out these objects, the Indictment alleges that "the enterprise obtained from" legislators and "other influential individuals, the names of candidates for employment . . . whom the legislators and others sought to sponsor." Id. at Count 1, ¶ 17. "The enterprise then organized this information and maintained records known as 'sponsor lists' to ensure that the sponsored candidates obtained employment." Id.

Per the Indictment, "in order to conceal the true nature of the enterprise's hiring decisions, the defendants created a sham hiring system which included, among other things:" posting employment opportunities and inviting applications from prospective candidates; conducting a series of panel interviews for prospective candidates; creating scoring sheets and forms containing the candidates' answers to a set of standardized questions; and routinely mailing rejection letters or postcards to unsuccessful candidates. Id. at Count 1, ¶ 18.

The Indictment further alleges:

This sham system was used by defendants and other members of the conspiracy to conceal the fact that the hiring decisions were pre-determined and not based upon merit, but based upon the nature and extent of the sponsorship. In fact, [defendant] O'Brien routinely selected the name or names of a "preferred" candidate for each position from the sponsor lists and provided the name to [his co-defendants] and other members of the interview panels. By pre-selecting the preferred candidate, the defendants sought to ensure that the preferred candidate reached the final round and was also awarded the highest score at the final round

interview.  The scoring sheets were falsified and other methodology skewed to achieve this result.  This sham system created the aura of a legitimate merit-based hiring process.

In order to achieve the goals of the conspiracy, when the defendant O'Brien falsely certified to the CJAM that the candidate for employment had been hired pursuant to the procedures mandated by the Manual, he often included or caused to be included other documents containing false statements and misrepresentations that were created during the rigged hiring process.

Id. at Count 1, ¶¶ 19-20.

Count 2 includes more allegations regarding the "scheme to defraud" and charges defendants O'Brien and Tavares with racketeering in violation of 18 U.S.C. § 1962(c).  Id. at Count 2, ¶ 2.  All three defendants are accused of "devis[ing] a scheme and artifice to defraud and to obtain money and property, by means of false and fraudulent pretenses and representations," whereby they allegedly "award[ed] employment and promotions to individuals who were solicited from and sponsored by members of the state legislature and others when those sponsored individuals were not the most qualified candidates who had applied."  Id. at Count 2, ¶ 3.  The "money and property" allegedly obtained pursuant to the "scheme to defraud" were "jobs and salaries for individuals who were not the most qualified candidates, but who had the sponsorship of a member of the state legislature or some other individual of significance to members of the enterprise."  Id.

The Indictment proceeds to allege twenty-three specific instances in which named individuals were hired or promoted by the Probation Department even though they were "not the most qualified candidate[s]."  Id. at Count 2, ¶¶ 4-26.  In setting forth the specific racketeering acts of mail fraud, Count 2 also alleges that the defendants, for purposes of executing the scheme to defraud, "provide[d] materially false documents to the CJAM to make it appear that those individuals were the most qualified candidates and were hired pursuant to a merit-based system."

Id. at Count 2, ¶ 27.

Counts 3 through 12 charge mail fraud based on ten dates when rejection letters were mailed to candidates who applied for positions that were given to sponsored applicants.  In light of these facts as they are alleged in the Indictment, as well as the applicable legal standards, the Court considers each of the disputed discovery requests in turn.

## DISCUSSION

I.      Uncontested Requests

The discovery requests at issue here were divided by the defendants into requests (a) through (*l*), made pursuant to Brady, and requests (1) through (31), made pursuant to Rule 16 and the related Local Rule.[7]  In response to the defendants' motion, the government has produced or agreed to produce the information sought by the following requests: (4), (7), (8), (9),[8] (12), (18), (19), and (20).  To the extent  the government has not already done so, it shall produce the information responsive to those requests within fourteen days of this Order.

II.     Contested Requests

A.      Scope of the Government's Discovery Obligations

The defendants seek to require the government to produce information maintained by the AOTC, the CJAM, and other state agencies like local courts.  Some requests specifically seek information held by such entities (e.g., requests 2 and 10), and all of the requests implicitly do so, to the extent that the state entities possess responsive information that they have not turned over

---

[7]The parties resolved request (25) before the defendants filed their motion; accordingly, that request is not before the Court.

[8]The government has agreed to produce spreadsheets containing only "some" of the information responsive to request (9), without explaining any basis for doing so.  If the government has in its possession "all" of the requested information, it shall provide "all" of the information to the defendants.

to the government.  The government denies that such information is in its possession, arguing

that the AOTC and other relevant state entities are "clearly not . . . member[s] of the prosecution

team because they are not participants in the investigation or prosecution of the defendants."

Doc. No. 87 at 10.  The defendants disagree, suggesting that the government's ability to request

and obtain information from the relevant state agencies when it wishes to do so demonstrates that

the information sought is within the government's "control."  See Doc. No. 84 at 15-16.

The question of whether evidence is in the government's "possession, custody, or

control" has been approached the same way in the Brady and Rule 16 contexts by courts in the

First Circuit.  See, e.g., United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006) (importing the

phrase "possession, custody, or control" into a Brady analysis); see also United States v.

Cameron, 672 F. Supp. 2d 133, 138-39 (D. Me. 2009) (finding Rule 16 did not obligate

government to obtain from internet company evidence requested by the defendant, where

criminal prosecution was initiated following referral by company and where the government had

requested, received, and disclosed other information from company).[9]  The parties have cited no

decisions of courts in this jurisdiction in which a meaningful distinction has been drawn between

the corresponding "possession" requirements, nor is the Court aware of any.

Although the defendants' argument is not without appeal, in that many of the documents

possessed by the government came from the state entities, the argument is not supported by case

law examining this issue in the Brady and Rule 16 contexts.  See Doc. No. 84 at 15-16 (citing no

cases adopting the reasoning urged by the defendants).  Indeed, those decisions that do address

the issue undermine the defendants' view.  See, e.g., Hall, 434 F.3d at 55 (no obligation to obtain

---

[9]Courts in a handful of other jurisdictions have adopted a slightly broader view of
"control."  E.g., United States v. Libby, 429 F. Supp. 2d 1, 7 n.11 (D.D.C. 2006) (finding Rule 16
requires disclosure "if the government has both knowledge of and access to the [evidence]").

and disclose state-court presentence report); <u>United States v. Josleyn</u>, 206 F.3d 144, 154 (1st Cir.

2000) (same for "cooperating private parties"); <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1178-

79 (same as <u>Hall</u>); <u>Cameron</u>, 672 F. Supp. 2d at 138-39 (same as <u>Josleyn</u>); <u>cf</u>. <u>United States v.</u>

<u>McCurdy</u>, 828 F. Supp. 2d 335 (D. Me. 2011) (denying Rule 16 request and requiring defendant

to obtain copy of probation agreement from U.S. Probation Office).

      In light of such cases, the Court concludes that the AOTC, the CJAM, the Probation

Department, and the state courts at issue here are properly viewed as the equivalent of

"cooperating private parties who have their own set of interests." <u>Josleyn</u>, 206 F.3d at 154.

Simply put, the state entities here are not akin to a local or state law enforcement agency that is

formally participating in the investigation of the charged offenses. <u>See</u> Local Rule 116.8.

Accordingly, information maintained by those entities are beyond the possession, custody, and

control of the government, except to the extent the government already has requested and

received specific information from them (or chooses to do so in the future). Insofar as the Court

allows the defendants' motion with respect to individual requests discussed below, it does so

only to the extent that the government has received, or later receives, the information at issue

from the relevant state entities.

      B.    <u>Individual Requests</u>

      Some general points bear mentioning before addressing the individual contested requests.

First, none of the requests seek job application files or other voluminous quantities of discovery.

The defendants already have received and reviewed approximately 180 boxes of documents,

many of which included applicant files. The requests at issue are aimed at other information.

Second, some information responsive to the requests may qualify as material subject to the

Jencks Act. To the extent such information is exculpatory within the meaning of <u>Brady</u> or Local

Rule 116.2(a), the government must produce the information pursuant to the deadline established in this Order, rather than at the later time of Jencks disclosure.  See United States v. Snell, 899 F. Supp. 17, 19-21 (D. Mass. 1995) (concluding Brady material "must be turned over immediately," notwithstanding the Jencks Act, because "[i]t is inconceivable that a statutory obligation should supersede a constitutional one"); see also United States v. Owens, 933 F. Supp. 76 (D. Mass. 1996) ("Where a defendant's constitutional due process rights under Brady clash with the procedural dictates of the Jencks Act, the [constitutional] rights afforded to the defendant must prevail.").  For information discoverable for other reasons, the Jencks Act dictates the timing of disclosure.

Finally, the Indictment returned by the Grand Jury does not merely allege substantive mail fraud counts.  The scope of discovery is defined and limited by all of the allegations in the Indictment – including the conspiracy and racketeering charges – and not only by the individual acts of mail fraud set forth in the final ten counts.  The express allegations of the Indictment describe a ten-year racketeering conspiracy during which the defendants are alleged to have: engaged in a "pattern of racketeering"; "institut[ed] a rigged hiring system" so as to "aggrandize power to themselves"; attempted "to obtain money and property, by means of false and fraudulent pretenses and representations, by obtaining employment and promotions for individuals who were not the most qualified"; and sought "to increase their ability to obtain favorable votes on their budget requests and other interests."  Indictment at Count 1, ¶¶ 11, 14-16.

*Request (a)*

Request (a) seeks "[i]nformation that jobs were not given to unqualified candidates, including information that any of the individuals named in the indictment were qualified for the

positions they held."  This information would rebut both the allegation that hiring under the

"sham system" was based on legislative influence, rather than candidate qualifications, and the

allegation that "hiring decisions were . . . not based on merit."  Indictment at Count 1, ¶ 19.

Although the government suggests it has charged the defendants based only on their purported

failure to hire the "most qualified candidate," information that undermines the broader

allegations of the Indictment is exculpatory and material within the meaning of the local rules for

at least two reasons.[10]  First, the information sought "tends to cast doubt" on the intent to defraud,

an essential element of the charges in the Indictment, especially in light of the allegations that

hiring decisions were "not based on merit."  Id.; Local Rule 116.2(a).  Second, the Indictment

alleges the defendants formed a conspiracy, the object and purpose of which was to "maintain[]

the facade of a merit-based hiring system" while "hiring and promoting individuals" based on

"sponsor[ship] by members of the legislature."  Indictment at Count 1, ¶ 16.  The information

sought "tends to cast doubt" on that allegation and the government's proof of the conspiracy

charged in the Indictment.  Accordingly, the motion is ALLOWED with respect to request (a),

insofar as "candidates" means "candidates for jobs in the Probation Department," and provided

the information is limited to the ten-year period at issue.

*Request (b)*

Request (b) seeks "[i]nformation that the hiring process carried out by the Department of

---

[10]The government contends requests (a), (b), and (d) are akin to requests by an alleged
drug dealer for evidence showing that he did not sell drugs on dates other than the days of the
drug sales charged in the Indictment.  Doc. No. 87 at 8.  The analogy is not apt.  Here, unlike the
hypothetical drug case to which the government alludes, the Indictment alleges "a pattern of
racketeering" over a ten-year period and includes specific allegations regarding a "sham" hiring
system, "sponsor lists," and hiring that routinely was "not based on merit."  Such allegations
encompass more than the specific acts of mail fraud identified as predicate acts or alleged in
Counts 3 through 12.

Probation conformed to the policies laid out in [the Manual]."  Information showing that, in the twenty-three specific instances listed in Count 2 of the Indictment, the hiring or promotion process conformed to the policies in the Manual is exculpatory, as it would rebut the elements of the fraud as charged.  The same is true for information showing that the policies in the Manual were followed, during the time period of the conspiracy, when filling any other Probation Department vacancy for which at least one "sponsored" candidate applied.  Such information also would tend to cast doubt on the conspiracy as charged.  Information that the policies were followed when filling vacancies for which no "sponsored" candidates applied is exculpatory and material as well, for the same reasons discussed above with respect to request (a).  Accordingly, the motion is ALLOWED with respect to request (b) as described herein, to the extent the government possesses responsive information.

*Request (c)*

Request (c) seeks "[i]nformation that the hiring process carried out by the Department of Probation conformed to the standard practices of the Trial Court and was known to [the] CJAM." In light of the Court's ruling on the scope of the government's obligations and the government's representation that it possesses no responsive information, the motion is DENIED with respect to this request.

*Request (d)*

Request (d) seeks "[i]nformation that the Department of Probation was permitted to consider recommendations in determining whom to hire."  This request sweeps too broadly. However, information that the policies in the Manual permitted consideration of legislative or other recommendations (or "sponsorship") as a factor when determining which candidate was the "most qualified," within the meaning of the Manual, is exculpatory and material.  Such

12

information bears directly on the specific allegations of a sham hiring system and the alleged

failure to hire the most qualified applicant.  Accordingly, the motion is ALLOWED with respect

to request (d) as described herein.

### Request (e)

Request (e) seeks information that a legislator who "sponsored" a candidate for a position

in the Probation Department did not expect their sponsored candidates to be hired automatically,

would undertake no retribution if sponsored candidates were not hired, and would provide no

rewards if sponsored candidates were hired.[11]  Such information is material and exculpatory

provided the defendants were aware of the legislators' expectations.  If known to the defendants,

such information would at least "tend to cast doubt" on the government's proof of intent, an

essential part of the government's case.  The defendants have not demonstrated, however, that

information responsive to request (e) would be exculpatory if that information was unknown to

them during the conspiracy.

Accordingly, the motion is ALLOWED with respect to request (e), insofar as it seeks

information of which the defendants were aware during the relevant time period.

### Requests (f) and (i)

Request (f) seeks "[i]nformation that there was no quid pro quo between the Department

of Probation and/or any of the defendants, on one hand, and members of the legislature, on the

other hand, regarding hiring at the Department of Probation."  Request (i) seeks "[i]nformation

---

[11]The text of the request is: "[i]nformation that a member of the legislature who made a recommendation to the Department of Probation regarding a candidate did not expect that his/her candidate necessarily would be hired and/or that no retribution (e.g., budget cuts) against the Department of Probation or the defendants would flow from failure to hire recommended candidates, and/or that no benefit to the Probation Department or the defendants was expected or conferred in exchange for hiring recommended candidates."

that no budget or other legislative decisions were made or based on whether a recommended

candidate was hired or promoted by the Department of Probation."

 The defendants have not established the materiality or exculpatory nature of information

showing either the absence of a "quid pro quo," or the nonexistence of favorable legislative

decisions following the hiring of sponsored candidates.  Accordingly, the Motion is DENIED

with respect to requests (f) and (i).

*Request (g)*

Request (g) seeks "[i]nformation that candidate(s) recommended by a member of the

legislature did not receive the specific job for which the candidate(s) were recommended."

Information regarding instances in which "sponsored" candidates were not hired or promoted is

plainly exculpatory, in light of the allegations in the Indictment.  See, e.g., Indictment at Count 1,

¶ 17 (alleging the defendants kept "sponsor lists" in order "to ensure that the sponsored

candidates obtained employment"); see also id. at Count 1, ¶ 16 (alleging the object of the

conspiracy was to "obtain[] employment and promotions for individuals who were not the most

qualified, but who the defendants understood to be best politically connected or 'sponsored'").

Accordingly, the Motion is ALLOWED with respect to request (g).

*Request (h)*

Request (h) seeks "[i]nformation that making recommendations on behalf of constituents

is a legitimate function for members of the state legislature."  The defendants have not

demonstrated how information showing that legislators believe they are obligated to recommend

constituents for jobs in public service is exculpatory.  Accordingly, the Motion is DENIED with

respect to request (h).

*Requests (j), (k), and (l)*

Requests (j), (k), and (*l*) seek information regarding various forms of immunity offered, or other promises made, to witnesses the government anticipates calling at trial in this case.[12] Such information is clearly within the scope of Local Rule 116.2(b)(1)(C).  The fact that certain witnesses in this case might be giving testimony or evidence in connection with another investigation does not automatically excuse the government's obligation to disclose information, the disclosure of which is sought by the defendants and otherwise required under the Local Rules.  If the government wishes to delay or omit disclosure of such information on the basis of an ongoing investigation, it must follow the procedures set forth in Local Rule 116.6.  Because the government has not followed that rule here, the Motion is ALLOWED with respect to requests (j), (k), and (*l*) as described herein.[13]

*Request (1)*

Request (1) seeks "[a]ll documents produced to the government or seized by the

---

[12]Specifically, request (j) seeks "[a]n update of the list contained in [the government's] initial discovery letter dated April 20, 2012, of persons who have testified before the grand jury pursuant to orders issued under 18 U.S.C. § 6001, et seq., and persons who have testified before the grand jury pursuant to letters from the USAO providing protections similar to those provided by 18 U.S.C. § 6001, et seq."  At the hearing on this motion, the defendants clarified that this request was intended to seek information regarding anticipated witnesses only.

Request (k) seeks "[a] copy of all proffer letters, federal letters of immunity, federal statutory immunity orders, [and] state court immunity orders provided to any witness the government anticipates calling in its case-in-chief."

Request (l) seeks "[a] statement of all promises, rewards, or inducements made to any witness the government anticipates calling in its case-in-chief, including without limitation whether any witness who was not prosecuted based upon his/her cooperation in this case would be allowed to continue to collect, or remain eligible to collect, a state pension."

[13]The Court raised this issue with the government at the hearing on this motion.  Although the government conceded at the hearing that Local Rule 116.6 requires submission of an affidavit, it did not request an opportunity to submit such an affidavit to the Court.  To date, the government has not made the filings described in the Local Rule.

government from members or staff of the state senate or house of representatives," including "the complete production that was made to [the government] by [certain listed] legislators," as well as "any additional materials received from legislators subsequent to [the government's] initial disclosures in April, 2012, including those produced or seized in connection with any ongoing investigation."

The defendants have not established that "all" documents the government has obtained from state legislators are exculpatory or material. The Court cannot assume that every document procured from a state senator or representative or her staff is material and subject to disclosure as exculpatory. The government, however, shall review the material in light of the Court's ruling – including its discussion of the Indictment's allegations and its analysis of what constitutes material and exculpatory information in the context of the defendants' other requests – and disclose all material, exculpatory information. Accordingly, the Motion is ALLOWED in part and DENIED in part with respect to request (1).

*Request (2)*

Request (2) seeks "[c]opies of the complete Personnel files for the 21 identified individuals listed in the indictment," including their "local court personnel folder[s]." The government denies that it possesses information responsive to this request. As such, the motion is DENIED as moot with respect to request (2). <u>See</u> discussion § II(A), <u>supra</u>.

*Request (3)*

Request (3) seeks "communications between the government . . . and [a state trial court's clerk] concerning cases involving [an anticipated witness] and his criminal history," including "communications regarding the sealing or unsealing of [the witness's] criminal record." The government concedes that it has, in its possession, information responsive to this request. <u>See</u>

Doc. No. 87 at 11.  Although the government states the information was "at one time sealed" by a state court, the state court has turned the information over the government.  Neither party has provided any further description of the disputed document(s).  Accordingly, the government shall submit the document(s) to the Court for in camera review.

*Request (5)*

Request (5) seeks, to the extent not already produced, "all materials reviewed or possessed by Independent Counsel in connection with his investigation into the hiring practices of the Department of Probation," including "hard drives, raw electronic data, and documents." The government already has permitted the defendants to review "dozens of boxes of material . . . received from the Independent Counsel."  Id.  The defendants suggest the government has withheld information used by the Independent Counsel, the disclosure of which is required by Rule 16.  Doc. No. 84 at 17.  According to the defendants, this information, "[i]n large measure," "is expressly detailed in the Ware Report and its appendices."  Id.  However, the defendants have not identified any specific information detailed in the report that the government has not produced, let alone explained why such information is material.

Accordingly, the Motion is DENIED with respect to request (5).

*Request (6)*

Request (6) seeks "reports, memorandum, and notes of all individuals who were interviewed informally by Independent Counsel."  The government originally declined disclosure on the grounds that any portion of the information that was subject to disclosure fell within the scope of the Jencks Act and would not be disclosed until the time established under Local Rule 116.2(b)(2).  In their motion, the defendants asserted that the reports were neither "verbatim" nor "adopted" and, thus, were not subject to the Jencks Act.  The government's opposition, rather

than disputing this analysis, appeared to accept the defendant's contention, but then argued that no information was discoverable.  Doc. No. 87 at 11.  Neither the documents nor a detailed description of the documents are before the Court.  The Court will defer to the parties' interpretation and characterization of these documents, in their briefs, as outside the scope of the Jencks Act.

Based on the nature of the information, as described by the parties, the Court infers the information is relevant and inculpatory.  Rule 16 does not limit disclosure to information that is exculpatory.  See United States v. Pesaturo, 519 F. Supp. 2d 177, 189 (D. Mass. 2007) ("[U]nder Rule 16 the Defendant is entitled to relevant evidence, even if inculpatory."); see also United States v. Poulin, 592 F. Supp. 2d 137, 143 (D. Me. 2008) ("Rule 16 requires the disclosure of inculpatory and exculpatory evidence alike.").  It does exclude Jencks Act information from its reach, Fed. R. Crim. P. 16(a)(2), but that exclusion is inapplicable here.  Accordingly, the Motion is ALLOWED with respect to request (6).

*Requests (10), (11), (13), (14), (15), (16), (17), (21), and (22)*

The government denies that it possesses information responsive to these requests.[14]  As

---

[14]Request (10) seeks "[d]ocuments maintained by the AOTC, including without limitation documents maintained by [the CJAM], comprising or concerning the hiring policies and practices of the Trial Court and each of its departments."

Request (11) seeks "[d]ocuments maintained by the AOTC, including without limitation documents maintained by [the CJAM], comprising or concerning the hiring policies and practices of the Department of Probation."

Request (13) seeks "[a]ll documents concerning recommendations, including without limitation by members of the legislature, for hiring by departments of the Trial Court other than the Probation Department."

Request (14) seeks "[t]he names and dates of applications of all individuals sponsored by a member of the legislat[ure] who were not hired for any reason."

Request (15) seeks "[a]ll communications, including without limitation email, by [the CJAM] concerning hiring by departments of the Trial Court other than the Probation Department."

Request (16) seeks "[d]ocuments in [the government's] possession, custody, or control

such, the motion is DENIED as moot with respect to requests (10), (11), (13) through (17), (21),
and (22).  See discussion § II(A), supra.  If, however, the government locates the letter sought in
request (17), it shall promptly notify defense counsel.

*Request (23)*

Request (23) seeks "[a]ll documents concerning or comprising communication between
the Department of Probation and members or staff of the state senate or house of representatives,
including any phone records, emails, or correspondence."  This request is similar to request (1).
The defendants have not established that "all" communications between the Probation
Department and state legislators are exculpatory or material.  The Court enters the same ruling
and order as to request (23) as it did with respect to request (1), supra.

*Requests (24), (26), (27), and (28)*

Request (24) seeks information concerning a meeting between a particular state legislator
and the CJAM.  Requests (26) through (28) seek personnel files for three individual candidates
identified by initials in Count 2 of the Indictment.  Two of the files sought are "kept by AOTC,"
and one is "kept by OCP."  The government denies that it possesses information responsive to
these requests.  As such, the motion is DENIED as moot with respect to requests (24), and (26)
through (28).  See discussion § II(A), supra.

---

concerning the hiring practices of Massachusetts state agencies or departments other than the
Trial Court, including documents related to the role that recommendations play in the hiring
process."
    Request (17) seeks a "[l]etter from [an anticipated witness]," bearing a particular date and
referenced in a document previously disclosed by the government.
    Request (21) seeks "[a]ll communications, including emails, between the Human
Resources Department of the AOTC and the Department of Probation."
    Request (22) seeks "[a]ny documents concerning the procedure for amending the Trial
Court Personnel Policies and Procedures Manual."

*Requests (29), (30), and (31)*

Request (29) seeks, "[a]s to each individual candidate identified in the indictment, . . . the factual basis for the government's allegation that the candidate was not the 'most qualified.'" Request (30) requests the identity of "the most qualified candidate who, the government believes, should have received each of the jobs and/or promotions identified in the indictment."  Request (31) seeks "a complete list of 'legislative sponsors' of Probation job candidates ranked in the order of their 'power,'" as well as "information concerning any and all occasions upon which a position was filled by a candidate who did not have the most powerful legislative sponsor."

These final three requests are styled as interrogatories, which is not an avenue of discovery available to the defendants pursuant to the federal or local criminal rules.  See United States v. Mehta, 236 F. Supp. 2d 150, 155 (D. Mass. 2002).  At the motion hearing, defense counsel deftly reframed them as requests for a bill of particulars.  The government, however, had no notice of such a theory, and the Court declines to consider it in support of this motion.

Insofar as the requests seek information in the government's possession showing that any person identified in the Indictment was not the most qualified candidate for the relevant position, such information is material evidence subject to disclosure under Rule 16 now (to the extent it has not already been produced), unless the information falls within the scope of the Jencks Act. In addition, insofar as the requests seek information in the government's possession showing that an available position within the Probation Department was filled by a candidate with a "weaker" sponsor, when another candidate with a "more powerful" sponsor had applied, such information is material and exculpatory and subject to disclosure under Rule 16 and Brady.

Accordingly, the Motion is ALLOWED with respect to requests (29) through (31) only insofar as those requests seek the two categories of information identified above.  In all other

respects, the Motion is DENIED as to the final three requests.

III.     Conclusion

      Within fourteen days, the government shall produce the information responsive to the requests allowed, to the extent it has not already done so, as well as review (and produce if necessary) the information it is directed to review.  Within seven days, the government shall produce to the Court for in camera review the documents responsive to request (3).

      A final status report will issue in a separate order.


SO ORDERED.


  /s/ Leo T. Sorokin               
Leo T. Sorokin
Chief U.S. Magistrate Judge