**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
UNITED STATES OF AMERICA,       . CRIMINAL NO. 12-cr-40026-FDS
        Plaintiff               .
                                . BOSTON, MASSACHUSETTS
            v.                  . FEBRUARY 28, 2013
                                .
O'BRIEN et al,                  .
        Defendant               .
. . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEO T. SOROKIN
UNITED STATES CHIEF MAGISTRATE JUDGE

APPEARANCES:

For the Government:          UNITED STATES ATTORNEY'S OFFICE
                             BY: Robert A. Fisher, AUSA
                             One Courthouse Way, Suite 9200
                             Boston, MA 02210
                             617-748-3612
                             Robert.Fisher2@usdoj.gov

                             UNITED STATES ATTORNEY'S OFFICE
                             BY: Fred M. Wyshak, Jr., AUSA
                             One Courthouse Way, Suite 9200
                             Boston, MA 02210
                             617-748-3201
                             Fred.Wyshak@usdoj.gov


For Defendant:
(1) John J. O'Brien          William W. Fick, Esq.
                             Federal Defender Office
                             51 Sleeper Street, 5th Floor
                             Boston, MA 02210
                             617-223-8061
                             William_fick@fd.org

                             Stylianus Sinnis, Esq.
                             Federal Defender Office
                             51 Sleeper Street, 5th Floor
                             Boston, MA 02210
                             617-223-8061
                             stelleo_sinnis@fd.org


*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**

1  (2) Elizabeth V. Tavares  R. Bradford Bailey
                              Denner Pellegrino LLP
2                             Four Longfellow Place
                              Suite 3501, 35th Floor
3                             Boston, MA 02114
                              617-227-2800
4                             bbailey@dennerpellegrino.com

5

   (3) William H. Burke, III John A. Amabile
6                             Amabile & Burkly, P.C.
                              380 Pleasant Street
7                             Brockton, MA 02401
                              617-559-6966
8                             john.amabile@amabileburkly.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

        Court Reporter:
24

        Proceedings recorded by electronic sound recording,
25      transcript produced by transcription service.

*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**

1   COURT CALLED INTO SESSION

2   (3:47:43 p.m.)

3           THE CLERK:  Today's February 28.  The case of the

4   United States v. O'Brien et al, Criminal Action 12-40026,

5   will now be heard before this Court.

6           Counsel, please identify themselves for the

7   record.

8           MR. FISHER:  Good afternoon, Your Honor.  Rob

9   Fisher and Fred Wyshak for the United States.

10          THE COURT:  Good afternoon.

11          MR. FICK:  Good afternoon, Your Honor.  William

12  Fick and Stellio Sinnis for Mr. O'Brien who's here.

13          MR. BAILEY:  Good afternoon, Your Honor.  Brad

14  Bailey for Elizabeth Tavares who's not present.

15          MR. AMABILE:  John Amabile.  I represent William

16  Burke.  He's not present either.

17          THE COURT:  All right.  I have the defendant's

18  motion, and so I'll hear from you first.

19          MR. FICK:  Thank you, Your Honor.

20          In putting the motion together, I suffered a

21  certain kind of cognitive dissidence which I think is unique

22  in cases that I've done; dissidence both between the words

23  of the indictment and what the government now seems to be

24  saying the case is about or isn't about, and dissidence

25  between what the discovery rules in cases say and the

1 positions the government's taken here.

2          As the Court knows, the indictment expressly

3 alleges that the defendants set up a systemic rigged hiring

4 scheme -- those are the words used -- to curry favor with

5 and obtain benefits from the legislature in exchange for

6 hiring recommended candidates who were not quote/unquote

7 "the most qualified," whatever that means.

8          By way of example it identifies twenty-two

9 instances where a particular person who was hired is alleged

10 not to have been the most qualified.

11          In the course of litigating the motion the

12 government seems to be backing away from that at some level.

13 They say, "Oh, well, we don't allege a *quid pro quo*.  We

14 don't have to prove one.  Maybe some of the people were

15 qualified or even the most qualified."

16          That, I think, in itself is confusing.  Maybe the

17 government will clarify those positions today.  But the

18 bottom line is that the indictment says what it says, and

19 the requested materials are discoverable even if the

20 government is somehow successful in backing away from the

21 allegations it's made.

22          And I guess without going through every single one

23 in excruciating detail, I'd start with the exculpatory

24 information requests first and sort of go through those, at

25 least the highlights.

1          The first series of requests which are -- I'll

2 take it in the order that we took it in the papers -- A, B

3 and D sought, for example, information that jobs were not

4 given to unqualified candidates --

5          THE COURT:  Does that basically mean information

6 that jobs were given to qualified candidates?

7          MR. FICK:  Yes.

8          THE COURT:  The same thing.

9          MR. FICK:  And that the particular candidates here

10 who are alleged -- who are listed in the indictment were

11 qualified or perhaps even most qualified.

12          THE COURT:  Suppose there are three categories of

13 jobs:  Those jobs in which somebody who was sponsored

14 applied and obtained the job, and a second category in which

15 there was somebody who was -- maybe another category where

16 there was somebody who was sponsored who did not get the

17 job, and a third category in which there was a job, and

18 there just was nobody who was sponsored who even applied.

19          It would seem logically that based on what I read

20 -- i don't know that -- how many fall in each category, but

21 it would seem logical that at least all three of those

22 categories exist.

23          MR. FICK:  Potentially.  Although, I would note

24 that at least from the government's point of view as

25 expressed in the indictment, they talk about a rigged hiring

1  scheme that is systemic.  And so if not every job's treated

2  that way, there is certainly an allegation that the usual

3  course of business in probation was to hire recommended

4  people who were not the most qualified.

5           THE COURT:  But if there were --

6           Does anybody know how many job openings we're

7  talking about?

8           You're essentially -- are you asking for here the

9  applicant -- the file about each opening; that is, the

10 applicant's information, all of the information about each

11 applicant and the successful candidate for each opening

12 during the twelve-year period?

13          MR. FICK:  We've actually had access essentially

14 to all the applicant materials at the Williams Building.

15          What we're asking for here is more pointed

16 information.  For example, testimony or statements to

17 investigators that particular people --

18          THE COURT:  So you don't -- this is not seeking

19 any applicant --

20          MR. FICK:  This is not seeking information about

21 every applicant.  We've gone through that and have, you

22 know, made what conclusions we would from that information.

23          This is asking for more pointed information,

24 information suggesting that --

25          THE COURT:  Well, what is it it's asking for?

1        MR. FICK:  Well, information including testimony

2 and statements that jobs were not given to unqualified

3 candidates, information that the individuals in the

4 indictment were qualified for their jobs.  That's sort of --

5        That, at least, captures what's asked for in

6 Request A.

7        And the response -- the government's response

8 saying, well, we don't allege that nobody qualified who was

9 ever hired, et cetera; I mean, that's really --

10        THE COURT:  So the 150 or 180 boxes or whatever it

11 was you went through, that's all the applicant information.

12        MR. FICK:  Right.

13        THE COURT:  So you're saying even if I allowed

14 this exactly as you requested it, you wouldn't be expecting

15 to suddenly receive information about hundreds of job

16 openings.  That's not what this request is even about.

17        MR. FICK:  Right.

18        THE COURT:  This is about an interview report that

19 somebody said we hired a qualified guy or --

20        MR. FICK:  Or we don't hire unqualified people."

21        THE COURT:  Or we don't hire unqualified --

22        MR. FICK:  Or the particular people who are named

23 in the indictment are qualified for their jobs.

24        THE COURT:  Okay.

25        MR. FICK:  And, you know, that this sort of -- the

1 straw man the government puts up, it says, well, we didn't

2 -- we don't allege that nobody qualified was ever hired.  I

3 mean, that's not the point.

4          A brick is not a wall, in other words.  Evidence

5 is relevant if it has a tendency to make a fact in issue

6 more or less probable.

7          The notion that the people in the indictment are

8 not the most qualified is made less probable if we can show

9 that, well, at least they were qualified.  It's made less

10 probable if we can show that as a rule or as a policy

11 unqualified people were not hired.

12          THE COURT:  So not probability but favorability.

13 Don't you have to show it's exculpatory as opposed to

14 relevant?

15          MR. FICK:  Well, it would be both relevant and

16 exculpatory.  I mean, it's relevant to show an exculpatory

17 fact.

18          I mean, an exculpatory fact would be unqualified

19 people were not hired.  The people alleged in the indictment

20 -- named in the indictment were qualified.  Right?  It makes

21 less likely the government's notion here that this is all

22 just a rigged system, it's all about the sponsorship, it has

23 nothing to do with qualifications.

24          Again, we're dealing with something that's -- the

25 allegation here is peculiar in the sense that it's very

1 amorphous.  Right?  The government is saying, well, you

2 didn't hire the most qualified person.  What is the most

3 qualified person?

4        Some other requests -- 29 through 30 -- in the

5 numbered requests attempted to get at that information, and

6 I'll turn to those I think perhaps a bit later.

7        But it's very, very difficult if not impossible to

8 defend a charge like this without knowing the government's

9 position on, okay, you say this person wasn't the most

10 qualified.  Who was?

11        And certainly in terms of defending the case it

12 would be critical for us to at least be able to show the

13 people named in the indictment were qualified.  So if

14 somebody thinks they're qualified, there's evidence that

15 they do a good job, that their qualifications were

16 essentially commensurate with others who were in the same

17 pool of applicants; all of that would be both relevant and

18 exculpatory in this situation.

19        So the next category sort of as a block I would

20 talk about is Requests E through I, and this is the section

21 where we requested information --

22        THE COURT:  Before you get to that.

23        MR. FICK:  I'm sorry.

24        THE COURT:  On B, C and D --

25        MR. FICK:  Yes.

1            THE COURT:  -- what exactly are you seeking there?

2            MR. FICK:  Okay.  So B requested --

3            I want to make sure I don't confuse my letters.

4            THE COURT:  B, C and D.  B is information.

5            MR. FICK:  All right.  So B was information that

6 the probation department's hiring process conformed to the

7 policies in the Trial Court Personnel Policies and

8 Procedures manual.

9            THE COURT:  So what would that be?

10            MR. FICK:  So if a witness says that what

11 probation did was consistent with the merit hiring policy as

12 everyone understood it.

13            THE COURT:  So again, you're not looking for the

14 applicant information here, or you're not looking for the

15 score sheets or whatever forms were filled out and all that

16 process.  That, you saw in the 180 boxes.

17            MR. FICK:  Yes.

18            THE COURT:  You're looking for here the witness

19 who said this is what we did.

20            MR. FICK:  "This is what we did.  It was proper.

21 There was nothing wrong with it.  Whatever the policy said,

22 our practice was this, and everyone in the Trial Court knew

23 it."

24            Because, for example --

25            Essentially the government's allegation of fraud

1   or misrepresentation here boils down to -- as we understand

2   it, at least -- Mr. O'Brien signing a form that goes to

3   Chief Justice Mulligan that says, you know, these people are

4   being hired in accordance with the standards of the Trial

5   Court's hiring policy.

6           Well, a whole separate question of what those

7   standards are, what they mean, and whether they're binding

8   or not.  But certainly if Chief Justice Mulligan and others

9   in the Trial Court have an understanding about the way

10  things are done, and the hiring that was done was consistent

11  with those practices --

12          THE COURT:  Why does the rest of the Trial Court

13  matter other than the probation department?

14          MR. FICK:  Because the Trial Court policies that

15  are supposedly being violated here are applicable across the

16  Trial Court, and it's Chief Justice Mulligan who is the

17  person who is supposedly being deceived.

18          And so if the rest of the Trial Court does

19  everything the same way, and if everybody knows that, and

20  everyone believes it to be consistent with the policy --

21          THE COURT:  Well, I see why --

22          I see why if Chief Justice Mulligan knew that, it

23  would be important information whether or not the rest of

24  Trial Court did it.

25          MR. FICK:  Well, whether or not the rest of the

1  Trial Court did might not necessarily be dispositive of the

2  issue of whether Chief Justice Mulligan was "deceived,"

3  quote/unquote; but it would certainly be relevant to the

4  intent of the defendants here.

5          And there's also separate from the materiality

6  element of the alleged misrepresentation the defendants have

7  to have an intent to defraud, an intent to deceive.  And if

8  the common understanding across the Trial Court is that this

9  is the way things are done and it's proper, that would go

10 toward defeating the intent to defraud element.

11         THE COURT:  All right.

12         MR. FICK:  All right.  Request C -- or I'm sorry

13 -- D was for information that the probation department was

14 permitted to consider recommendations in determining whom to

15 hire, and that's sort of of the same ilk.  And the

16 government responds, well, we're not saying they couldn't

17 consider recommendations.  Although at the same --

18         You know, in the same breath they're saying, well,

19 here you consider recommendations too much or too

20 exclusively.

21         In any event, if witnesses have given statements,

22 testified to the grand jury, said things like it's perfectly

23 appropriate for probation to consider recommendations, it's

24 perfectly appropriate for any agency of state government to

25 consider recommendations; that's relevant and exculpatory

1  both as to the defendants' and as to potentially Chief

2  Justice Mulligan's understanding of what's going on.

3         Since we're sort of going through all of them in

4  order, I'll touch briefly on C, and this is also a sort of

5  related request for information suggesting that the

6  probation department's hiring process conformed to standard

7  Trial Court practices and was known to Chief Justice

8  Mulligan.  And so that's sort of a different -- a slightly

9  different wrinkle on the same idea.  Whatever the policies

10 and procedures say, if the practice is a different --

11         THE COURT:  I get it now.

12         MR. FICK:  If everyone knows what the practice is,

13 then that's similarly exculpatory.

14         E through I sought information that go toward

15 essentially the *quid pro quo* issue in different ways trying

16 to make sure we captured the whole idea, so these are for

17 requests --

18         THE COURT:  Why do they have to show *quid pro quo*?

19         MR. FICK:  Well, the indictment alleges a *quid pro*

20 *quo*, so certainly the defense is entitled to defeat

21 allegations in the indictment.  The *quid pro quo* is

22 ostensibly the motive for the offense.  Right?  The reason

23 supposedly the defendants have a rigged hiring scheme is so

24 they can get something back from the legislature.

25         THE COURT:  Maybe they just hoped to get it back

1 and didn't get it back.

2          MR. FICK:  Well, again, --

3          THE COURT:  They'd still have the intent.

4          MR. FICK:  Again, a brick is not a wall, and the

5 exculpatory evidence and relevant information is not

6 necessarily the wall.  I mean, a piece of evidence that

7 supports a defense theory or tends not to support a

8 government allegation can be relevant and exculpatory.

9          So if legislators have made statements, for

10 example, to the effect that there was no *quid pro quo*, we

11 didn't have any expectation of our people getting hired, if

12 there are people in probation who say we didn't necessarily

13 have any expectation of getting anything back from the

14 legislature; it may not like end the case, but it's

15 certainly relevant evidence that would tend to be

16 exculpatory.

17          THE COURT:  Does that matter whether or not the

18 defendants knew of it?

19          MR. FICK:  On which end?  Well --

20          THE COURT:  The legislators.

21          MR. FICK:  Again --

22          THE COURT:  A legislator or somebody like that

23 says I didn't -- it didn't matter to me, does that matter --

24          MR. FICK:  What potential --

25          THE COURT:  Is that exculpatory, or only if it's

1 exculpatory and that it was communicated to one or more of

2 the defendants?

3          MR. FICK:  Again, I mean, the government might

4 come back against that evidence to say, well, whatever the

5 legislator thought, the defendants thought they were going

6 to get something.  They can try to say that.  They can try

7 to put evidence in to support that.

8          But again, a brick is not a wall.  I hate to be a

9 broken record on that.  But if the legislators are saying we

10 didn't offer any benefit, no benefit was provided; that's a

11 piece of the defense.  Right?

12          Whether or not the defendants knew what the

13 legislators were going to do, if there are witnesses who say

14 there was no *quid pro quo* on this side, if there are

15 witnesses who say on this side we weren't expecting anything

16 back from the legislature; that is --

17          THE COURT:  I understand your argument.

18          MR. FICK:  It goes to the core of the allegations.

19          I mean, again, I quote in the allegations sort of

20 *ad nauseam* both in the header of the reply brief and

21 throughout the pleadings.  I mean, the indictment squarely

22 alleges a *quid pro quo*.  Whether or not they have to prove

23 it -- and that may be a subject of jury instructions, motion

24 to dismiss, whatever.  That may be a more complicated

25 question, but they have squarely alleged it now.

1        Even if they didn't allege it now, there's ample

2  authority that says motive/lack of motive is relevant, and

3  lack of motive is exculpatory.  So there's sort of no

4  principle reason that I can imagine not to turn over this

5  evidence.

6        And again, in response to these requests E through

7  I, the government has said in its letters that numerous

8  witnesses have provided such information.

9        THE COURT:  I think they said it wasn't

10  exculpatory, though.

11        MR. FICK:  Well, they claim it's not exculpatory;

12  but again, given what the indictment alleges, squarely, and

13  given the importance of showing that there was no *quid pro*

14  *quo* --

15        THE COURT:  Maybe the people said that they

16  expected something in return.

17        MR. FICK:  Well, if they said they expected

18  something in return, then that would be inculpatory

19  obviously.

20        What my understanding is and what I think the

21  government in responding to this is saying that witnesses

22  have made statements like no *quid pro quo*, this is a normal

23  practice, it's constituent services, we try to get people

24  jobs all over state government, and nothing is expected in

25  return, it's perfectly acceptable.

1           And those go to both the motive issue.  It goes to

2   the intent issue.  And for example, if a witness gets up and

3   says, "Jack O'Brien is squeaky clean," that's a relevant

4   character trait under 404 in addition to everything else.

5           THE COURT:  Uh-huh.  All right.  Keep going.

6           MR. FICK:  And so it's difficult for me to

7   understand how the government can say, yes, witnesses have

8   told us these things, but we're not going to give them to

9   you, and it's not exculpatory.  It, I would suggest, defies

10  common sense.

11          The next category of exculpatory evidence is I and

12  J, and this is information about witnesses given promises,

13  rewards or inducements specifically --

14          THE COURT:  J, K, L you mean.

15          MR. FICK:  I'm sorry.  J through L.  I'm not

16  seeing --

17          THE COURT:  My only question about that is just

18  this.  I understood that request, but you asked in J for a

19  list of people who'd received immunity and the like, but it

20  wasn't limited to those persons who are witnesses or

21  anticipated witnesses.

22          MR. FICK:  Well, okay.  So the context of the

23  request was the government initially made a disclosure of

24  certain people who received immunity who I guess are

25  anticipated witnesses.  If there's anyone else since then,

1 we would ask that it be supplemented.

2         I understand that in terms of the local rule and

3 their obligations there the obligations are for purposes of

4 rewards and inducements are centered on anticipated

5 witnesses.  So the request should be construed with that

6 limitation, I guess is what I'm saying.

7         THE COURT:  I see.  Okay.

8         MR. FICK:  The interesting thing or what again

9 puzzles me to no end is that in response to request I think

10 it was L --

11         I'm sorry.  Let me just make sure I'm not getting

12 my letters wrong here.

13         Right, l asked for -- I'm sorry.  K and L --

14         THE COURT:  Okay.

15         MR. FICK: K.  I'm sorry.  K, yes.

16         So K asks for, okay, you disclosed that certain

17 people got immunity agreements or immunity orders.  We

18 understand that some of these same people and perhaps others

19 also got state court -- state immunity from prosecution.

20 Please give us the actual writings, the actual orders, the

21 actual letters, whatever they are.

22         The government says they have.  I don't know where

23 --

24         I mean, we -- as far as we know, we have not

25 received that information.  That's squarely part of what the

1  local rules requires production of, and we don't have it:

2  the actual immunity letters, the documents, the writings.

3          THE COURT:  Do you view the lettered requests as

4  exculpatory and the numbered requests as Rule 16

5  materiality, or is it not so clearly divided?

6          MR. FICK:  There is certainly overlap.  I guess,

7  in initially writing the letter in terms of the way we

8  categorized these things in our heads, yes.  I mean, that

9  was the sort of --

10          THE COURT:  I see.

11          MR. FICK:  -- the basis of division.  But I think

12  there's certainly overlap as has evolved in the briefing

13  back and forth about this.

14          THE COURT:  Many -- not all, but many of the

15  numbered requests seem to ask for information that in all

16  likelihood would be in the possession of some form of the

17  state government.  It could be the Trial Court.  It could be

18  a subdivision of the Trial Court.  But not the kind of

19  information that ordinarily would be in the possession of

20  the United States Attorney's Office.  That's why you all

21  argued about what's the scope of the government's

22  obligation.

23          MR. FICK:  To some extent.  So some of the

24  requests -- and I think it's pretty clear from the papers

25  what they are -- that is the case.

1              I mean, what makes this situation unusual and

2 troubling from the defendants' perspective is that -- I

3 mean, clearly they're not a law enforcement agency, but the

4 nature of the relationship between the government and the

5 Trial Court here is quite peculiar.

6              As to some requests, the government responded, oh,

7 well, we'll go ask the Trial Court and get back to you if we

8 have anything or if we can give you anything, and they have.

9              As to other requests, they say, well, you know, we

10 don't care about that.  That's the Trial Court, so we're not

11 going to go get it for you.  We're not even going to

12 inquire.

13              That's troubling.  I mean, I guess in theory,

14 right, we can get a subpoena for the Trial Court and

15 litigate issues about that.  But it seems to me where the

16 relationship is such as it is here and where in the same

17 breath they're getting some things and refusing to get

18 others; the constructive possession, the control, the

19 ability to get things it seems to me clearly exists.

20              And the one area of requests for this is

21 particular, I think, striking is in regard to Request No. 2,

22 for example, which is the local Trial Court personnel files

23 of the actual people named in the indictment.  So as we have

24 come to understand it, probation officers' personnel records

25 are kept in three different places:  the trial court where

1  they work, the Office of the Commissioner of Probation, and

2  the Trial Court itself.

3          And so for, I think, as to almost everybody we

4  have the Office of the Commissioner of Probation and Trial

5  Court files, but we are looking for and I think we're

6  missing in certain specific cases at least were the local

7  court files.

8          And again, this is important, because the

9  government is alleging that these people named in the

10  indictment were not the most qualified.  Whatever that

11  means.  Well, things like performance evaluations showing

12  that these people do their jobs well are clearly important

13  and very relevant to defending against that allegation.

14          And for the government to say, well, we'll get you

15  part of their personnel file, but the ones that are out in

16  local offices we're not going to -- you know, we don't think

17  we have to get you that, for something that's that central

18  and critical to the case, and where contents of those files

19  to the extent they show these employees are good employees,

20  would be exculpatory; that just seems to me untenable.

21          THE COURT:  But what's the basis to say that it's

22  in their possession, custody or control?  Not in their

23  physical possession.

24          MR. FICK:  Right.  So I think constructively it is

25  in their custody and control.

1          THE COURT:  Certainly because if they want to ask,

2 they could ask; and if they did ask, the state Trial Court

3 might say yes.

4          MR. FICK:  Well, it seems to me that there's a

5 relationship where whatever they need from the state Trial

6 Court they get.

7          THE COURT:  And I know that how?

8          MR. FICK:  Because --

9          THE COURT:  I can infer that there are things here

10 they've received from the state court.  I don't know that

11 every request they made has been honored.

12          MR. FICK:  All right.  Even as to the discovery

13 responses, though, for some of them they said, okay, we'll

14 go get it from the Trial Court, and they do.

15          And again, these are not -- some of the requests

16 for things from the Trial Court, okay, maybe it's not

17 something one would expect the government to have or they'd

18 have an obligation to look into; but at least as to the

19 employment performance of individual people who are named in

20 the indictment, it seems beyond question that that's

21 something that constructively is in their control.

22          And our understanding is --

23          THE COURT:  If you got a Rule 17 subpoena for

24 that, who would receive the documents if it was upheld?

25          MR. FICK:  Who --

23

1          THE COURT:  If you sought a Rule 17 subpoena, and

2 if the Court allowed it, and if you got the documents, and

3 whatever objections were resolved, and if you prevailed on

4 that; then do you both get it, or just you get the

5 documents?

6          MR. FICK:  I mean, Rule 17 somewhat depends on how

7 the Court orders it.  I mean, typically if there's a Rule 17

8 subpoena, especially if it's *ex parte* it could just go to

9 us.  The Court could make different arrangements.

10          THE COURT:  I see.  Okay.

11          MR. FICK:  That's my understanding of Rule 17(c)

12 and the way that those things are typically played out.

13          THE COURT:  All right.

14          MR. FICK:  So again, the bottom -- our

15 understanding is that the performance information

16 specifically about how people are doing their jobs is the

17 information kept at the local court; whereas, the OCP and

18 Trial Court files tend to be more administrative in nature,

19 just about salary and that sort of thing.

20          So a couple of other things I want to highlight in

21 terms of the numbered requests.

22          Number one was for the documents produced to the

23 government by legislators and their staffs.  That was the

24 one where, you know --

25          And we've come to understand from base numbers and

1 from other information that subpoenas or other requests were

2 issued to legislators and their staffs, thousands of pages

3 of documents in some cases from each were produced to the

4 government, and then we have received from the government in

5 discovery a sprinkling of a few other -- a limited -- a much

6 more limited category of the information from the

7 legislators.

8          As an initial matter, it's hard to understand how

9 a request that was initially conceived to address probation

10 hiring issues, if something is responsive to that request,

11 it's difficult to understand how the government can take a

12 position as a broad matter --

13          THE COURT:  You mean requests that the government

14 made --

15          MR. FICK:  To the legislators.

16          It's hard to conceive how the government can sort

17 of glibly say much of it is not relevant if the initial

18 request was geared toward this investigation of probation.

19          The other thing I can represent is that we've had

20 conversations with counsel for various legislators and

21 legislative staff members; and among other things, for

22 example, we understand that they have produced to the

23 government, for example, letters of recommendation by

24 legislators to probation for people who weren't hired,

25 correspondence with legislators to the effect that hiring in

1 probation is no different from hiring elsewhere in state

2 government, press briefing materials related to the

3 probation hiring allegations.  And so --

4          And we don't have those things.

5          So again, you know, we have the Donald Rumsfeld

6 problem as I think I called it in the reply papers.  We

7 don't know what we don't know.

8          But we've been able to gather some information at

9 least about what legislators and their staffs have produced

10 to the government in the auspices of this investigation, and

11 it seems clear to us that a lot more has been produced that

12 is relevant and potentially even exculpatory than what has

13 been turned over.

14          And so, you know, to the extent --

15          And again, sort of in the big picture we've had

16 the cognitive dissidence where the government's positions as

17 to what is exculpatory and to what is relevant just really

18 seem to be extraordinarily jaundiced and narrow.  And so to

19 even begin to assess in a fair way what else might be

20 relevant out there, our suggestion was that we or perhaps

21 just the Court could at least get a log perhaps in some

22 descriptive way that shows what else is out there.  And so

23 if they have a case that something isn't relevant, well,

24 fine.  But at least there's a way for an impartial trier of

25 fact -- yourself -- to test that and for us --

 1          THE COURT:  It would have to be material or

 2 exculpatory, wouldn't it?

 3          MR. FICK:  Yes, absolutely.

 4          But again, we're dealing with a universe of

 5 information that in the first instance as far as we

 6 understand is requests for materials for the purpose of

 7 investigating probation hiring.  Those materials come back,

 8 and then we get a sprinkling of them in the discovery here

 9 and have good information that there are other things out

10 there that we think are both material and exculpatory.  But

11 who knows what else is there.  Right?  So that's request

12 number one of the numbered requests.

13          Number three of the numbered requests is also, I

14 think, sort of a category unto itself.  One of the

15 individuals named or listed by initials in the indictment,

16 our understanding is the government is going to allege that

17 this person was not qualified for the job, because this

18 person had a criminal record.  And so we also understand

19 that at some point all or some of this individual's criminal

20 cases were sealed by the New Bedford District Court.

21          And so to the extent a criminal record is sealed,

22 there would be a defense to say, look, you know, you can't

23 consider somebody's criminal record if it's been sealed, or

24 at least that's a position internally that could have been

25 taken in probation that would be used to rebut the

1 allegation that the convictions render this person

2 unqualified.

3          THE COURT:  If it was sealed, how do people know

4 it existed?

5          MR. FICK:  Well, good question.  And that would be

6 a complicated question during the course of the trial

7 potentially about what probation knows about sealed records

8 and can they act on it and this sort of thing.

9          But the bottom line is this request gets to -- we

10 understand from the initial discovery produced that the

11 government made a request to the New Bedford District Court

12 for information related to this person's cases.  We said

13 please give us a copy of that correspondence and the stuff

14 that the New Bedford District Court produced.  We've gotten,

15 I think, one letter back and forth but none of the

16 underlying materials.

17          The response in the government's opposition papers

18 was, well, you know, we don't think it's relevant.  These

19 things were sealed at some point by a state court judge.

20          It seems to me that's not an answer.  I mean, if

21 the government has the materials in their possession, they

22 are, in our estimation, exculpatory in terms of the way the

23 allegations about this individual are likely to play out.

24          There's a protective order in place in this case.

25 I don't see any reason why the government has some privilege

1 against producing it to us; and in fact, the evidence is

2 clearly material and exculpatory.

3          THE COURT:  Okay.  You don't have to go through

4 each of them.

5          MR. FICK:  No.  In fact, I want to sort of hit a

6 couple of the highlights.  I mean, most of the rest of them

7 are rather self-explanatory or self executing, I guess I

8 would say.

9          The other three that I would talk about are the

10 final -- the final three supplemental requests that were

11 made --  Numbers 29, 30 and 31 -- asking for the government

12 to disclose who is --

13          You know, to the extent they allege these

14 twenty-two situations resulted in the hiring of not the most

15 qualified person; well, who was most qualified?  What's the

16 factual basis for saying that the person hired was not the

17 most qualified?

18          THE COURT:  Do you want them -- are you asking for

19 them in response to that, for example, to respond and say

20 Bill Jones, James Smith or -- a specific name?

21          MR. FICK:  Yes.

22          THE COURT:  Doesn't that make it like an

23 interrogatory?

24          MR. FICK:  Well, maybe the word might be a bill of

25 particulars rather than interrogatory in the context of the

1 criminal case, and so that's something that -- if that's the

2 way the Court wants to treat it constructively, it's

3 something that's allowed.  It's not something that's

4 procedurally improper.

5          And again, just the nature of the allegation here

6 is very peculiar, right, because the government says the

7 most qualified person was not hired.  We have no idea by

8 what criteria the government is making that judgment, and we

9 are going to have to defend against that in the course of

10 the trial as to each of twenty-two individual situations.

11          And so it has the potential to be a moving target

12 as to which we can't defend.  Right?  If we can try and --

13          You know, what are we going to have to do?  Sit

14 down and go through each of the other potentially dozens of

15 people who applied for these jobs and show that the person

16 who was hired was actually more qualified than they were?

17 On what standards can we do that?

18          And so it's not an unreasonable request to make

19 the government identify and specify on what basis -- what

20 factual basis they are making the allegation.

21          THE COURT:  Okay.

22          MR. FICK:  And then the last one sort of is a

23 slightly different angle on a similar point, in that, the

24 government has said throughout its motion papers and in the

25 indictment as well that, well, what usually happened is the

1  most powerful legislative sponsor would get their person

2  hired in a situation where, for example, lots of people in

3  the pool had different recommendations from different

4  legislators.  And that's also a kind of an amorphous moving

5  target to try and defend against; because, okay, well, what

6  is in your estimation the power ranking of the legislators?

7  How can we show that, in fact, the most powerful

8  legislator's person didn't get hired; somebody else's

9  recommendation got hired?

10         And that is critical to being able to defend the

11  sort of nuts and bolts of each one of those charges.

12         THE COURT:  Okay.

13         MR. FICK:  So with that I think the rest of them

14  are largely self-explanatory, and I will -- I'll leave it at

15  that.

16         THE COURT:  All right.  The rest of you are

17  relying on Mr. Fick.  Right?

18         MR. BAILEY:  Yes, Your Honor.  This has been filed

19  on behalf of all three defendants.  We rely on Mr. Fick's

20  eloquence and erudition.

21         THE COURT:  Fine.  Thank you.

22         MR. FISHER:  Your Honor, I'd like to start with,

23  you know, he made the reference to a brick does not make a

24  wall.  We have provided enough evidence in this case in

25  discovery to build the Great Wall of China.  There have been

1  180 boxes, thousands of pages of material.

2           And frankly, as I was going through this list,

3  over the past few weeks we have provided most of this

4  information.  If you read my response --

5           THE COURT:  Yeah -- I know there's a fair number

6  of requests that in the opposition or response you say we're

7  giving this, this and this; and so my view of those is

8  they're resolved, and the most I'm likely to do is say if

9  you haven't already done it --

10           Because sometimes you say you're going to do it

11  two weeks.

12           MR. FISHER:  And sometimes there are timing

13  issues.

14           THE COURT:  Right.

15           MR. FISHER:  And I'd like to bring to the Court's

16  attention one --

17           And I wanted to speak to them before we came in

18  here.  I didn't have the chance to.

19           One item in particular that I agree to hand over

20  is the approximately 150,000 e-mails that we had gotten from

21  the Attorney General's Office that I think had originated

22  from the Ware Report.

23           We have those on disks.  However, some of the

24  disks turned out to be corrupted, so we're in the process

25  now -- we're backtracking back with Goodwin Procter to make

1  sure we can get uncorrupted copies of those disks.  My

2  understanding is that we will be able to, but it took a bit

3  longer than I thought to get them.

4          THE COURT:  Well, let me ask you just this.  As to

5  all the ones you agree to, the ones that in your response

6  you said we're giving that, either we have done it or we

7  will do it, how -- is fourteen days from whenever I finish

8  --

9          I'm going to take this under advisement.

10          Is fourteen days from whenever I issue this going

11  to be enough to do those or not enough time?  Is it enough

12  time; and if it isn't, you could then come ask me for more

13  --

14          MR. FISHER:  It should be.  Originally I said two

15  weeks, because I thought, you know, we have the disks.  I

16  thought we had already burned copies for them.  We tried to

17  burn copies, and it turned out some were corrupted.

18          THE COURT:  So two weeks from whenever I finish

19  this ought to be to be enough time; and if it isn't, then

20  you can tell me you're having this problem, and we'll work

21  that out-

22          MR. FISHER:  Sure.

23          But then just to clarify the record, the hires

24  that we mentioned in the indictment we walked --

25          And I believe we've told you this before.

1          We walked each of the defense attorneys on two

2   different occasions through the hot documents related to

3   each of those hires -- what we expect would be some of the

4   exhibits, some of the evidence -- and made sure they didn't

5   have any questions.  We gave them copies of that disk.  I

6   think the presentation took about three hours each time.

7   And of course we provided 180 boxes of underlying

8   applications and materials.  They have the list of the

9   recommended -- the sponsored candidates.

10          So a lot of this is busy work that they want us to

11   do for them.  A lot of it -- we're being forced down rabbit

12   holes to try to put together charts and graphs and lists of

13   things which is in the universe of material which have been

14   provided to them.

15          To respond to the allegation that we are

16   controlling what AOTC does, that's completely ridiculous.

17   They are not part of the prosecution team.  Do we ask them

18   for items that they may have in their possession from time

19   to time or serve subpoenas on them or write letters to them

20   requesting certain materials that were provided to Goodwin

21   Procter or to the Attorney General's Office at some point --

22          THE COURT:  Goodwin Procter was the independent

23   counsel?

24          MR. FISHER:  That was the Ware Report.

25          THE COURT:  The Ware Report, which was some sort

1  of independent investigation.  Maybe that's not the right --

2          MR. FISHER:  Chosen by the SJ --

3          Yeah, Paul Ware was chosen by the SJC to do an

4  independent investigation.  He produced a report.  He

5  gathered a lot of information.  Some of that -- we have most

6  of it.  If we have trouble recreating whatever they have,

7  sometimes we will ask AOTC, sometimes we issue subpoenas.

8          We review that evidence.  If it's exculpatory, we

9  turn it over.  A lot of the material is 21-day Jencks

10 material which we will in time produce.

11         The other major issue here, the other elephant in

12 the room is that there's an ongoing grand jury

13 investigation.  I respond to that in my response to the

14 motion, our brief.

15         THE COURT:  Let me ask you this --

16         MR. FISHER:  So a lot of this is timing.  A lot of

17 this is going to be a timing issue.

18         THE COURT:  There are certain predicates to get to

19 my question.  But assuming for the moment just for this

20 question that there are some things they ask for that

21 they're entitled to, and that -- but that the reason --

22         And you've articulated in some places in your

23 papers that the reason you're not giving certain things to

24 them now is because there's an ongoing grand jury -- there's

25 other investigation or investigations.

1          But if you want to decline to produce something

2 that is otherwise subject to production now, don't you have

3 to follow the local rule of -- you can't -- can't -- don't

4 you have to more simply say in a memo I decline to do it,

5 because there's another investigation?  Don't you have to

6 under the local rule file an affidavit?

7          I think that's 116.6 or 8, one of those rules.  I

8 don't remember the number off the top of my head.

9          And don't you have to follow that procedure?

10          I mean, not if you talk to them, and they say

11 fine.  But if they don't say fine -- which they haven't so

12 far at least just to the things they set forth, don't you to

13 follow that rule?

14          MR. FISHER:  I guess I should have filed an

15 affidavit.  We were -- we were up-front with them about the

16 timing of this.  We have communicated to them the timing

17 that we anticipate we'll be able to provide some of the

18 information which they're looking for.

19          And again, that is information which has been

20 generated by a current grand jury investigation, some of

21 which they have.

22          THE COURT:  How much -- let me ask you this.  How

23 much of this goes away -- how much of this dispute goes away

24 sometime in the next thirty or sixty days?

25          MR. FISHER:  I anticipate closer to sixty but a

1 good portion of it.

2          THE COURT:  I mean, so some of it -- like --

3          MR. FISHER:  Yeah, some of the stuff at the end

4 like the compiling of who the most powerful legislator, that

5 --

6          THE COURT:  No, I understand you're not --

7          MR. FISHER:  That's not going to go away.

8          THE COURT:  Just a practical question.  Would -- I

9 mean, you both have spent a lot of time and energy briefing

10 what are hotly disputed legal and factual issues about the

11 scope of discovery and the scope of the obligation and how

12 does it apply.  There's some complicated legal issues there.

13          And if, you know, in a relatively short period of

14 time with respect to three defendants who aren't in custody

15 it goes away because something's going to happen and the

16 dispute -- it sounds like not all the dispute goes away, but

17 maybe some substantial portion, that might bear on whether I

18 should wait and just see what happens.

19          MR. FISHER:  I think a substantial portion to be

20 honest with you, and that's to the categories for which we

21 decline.  Now, to the categories --

22          THE COURT:  That's the ones you said -- not

23 decline to give, but the ones you said there might be other

24 investigations or the like.

25          MR. FISHER:  Correct.

1              And I think the balance, however, are items that

2    they're looking for from AOTC like these personnel folders

3    that may or may not be in each individual district, superior

4    court, probate court, juvenile court across the state.

5    They're not in our possession.  If they were, they'd in the

6    Williams Building.  They could copy them if they like.

7              THE COURT:  Uh-huh.

8              MR. FISHER:  We're not even sure if they exist.

9    They may be in individual courts; they may not be.

10             THE COURT:  Why is it --

11             Going to another question.  Suppose somebody --

12   there was an opening in probation, and one of the candidates

13   was sponsored by a legislator.  But we're now not talking

14   about one of the twenty something that are set forth in the

15   indictment.  Okay?  A different opening during the time

16   period alleged in the indictment.  And as to that opening,

17   there was a candidate who was in the vernacular of the

18   indictment "sponsored" by a legislator or other influential

19   person, and that candidate was not hired.  Why isn't that

20   exculpatory?

21             It might not defeat your case.  I see that.  I see

22   why it doesn't mean that you lose.  Even if the jury

23   credited that evidence fully, the jury could still credit

24   the other evidence and convict.

25             But why isn't it nonetheless exculpatory?

1          MR. FISHER:  Well, they have that information,

2   because we've given them the sponsor list.  They have the

3   list.  They can see who was sponsored and by what

4   legislator.

5          THE COURT:  But the sponsor list is what's

6   referred -- that document referred to in the indictment.

7          MR. FISHER:  Yeah.  And there's multiple versions

8   of it.  It spanned -- they essentially spanned approximately

9   ten years.  There were different versions of the list.  We

10  have provided those lists to them.

11         Then all you have to do is go to the -- not all

12  you have to do, but then you go to the 180 boxes over at

13  Williams, and you find the interview files for who

14  interviewed for that job.  And you can see, well, this

15  person was sponsored; it turns out they didn't get the job.

16         That is most likely what they were doing over

17  there in the months they took looking through those boxes.

18  So that information is there.  Have we necessarily compiled

19  it?  No.  So they most likely have that information, because

20  that's where the evidence resides.

21         To the extent that anybody have testified to

22  something like that in the current grand jury, that will be

23  satisfied within approximately sixty days.

24         THE COURT:  I see.  All right.

25         MR. FISHER:  So.

1          THE COURT:  So you're not really disputing that

2 it's exculpatory; you're more saying they've got it.

3          MR. FISHER:  Well, I'm not --

4          Well, I'm just saying they have it.  Whether or

5 not --

6          Is it exculpatory that a legislator wrote a letter

7 and, therefore, it ended up on the list?  No.  The letter's

8 --

9          The letters being wrote didn't mean much at all.

10 It was the phone call made to Jack O'Brien who's sitting

11 here.  That's what meant something.  So just to say that,

12 hey, this person was sponsored for this job that only one

13 person was sponsored for, but it was a letter written.  Was

14 a form letter written --

15          THE COURT:  All right.  Suppose there was evidence

16 where the rubber meets the road.  There's that kind of

17 sponsorship in the form of the phone calls that you just

18 described or whatever form it took, and that person wasn't

19 hired for that job.  Is not that evidence exculpatory?

20          MR. FISHER:  That may be.  But they'll have --

21          Again, I'm getting back to where the evidence is.

22 The evidence is in the materials that were provided to them.

23          Because, again, the phone call's also going to be

24 on the list.

25          THE COURT:  What do you mean?  Is the list

1  something more than just a set of names?

2           MR. FISHER:  In some respects it is.  Sometimes

3  there's a separate column for calls or letter.  Not in all

4  of them.  But for the most part it's going to just have a

5  name of the legislator and the person that was sponsored.

6  It won't always break down whether or not it was a phone

7  call or a letter.

8           The ones that were letters, for the most part they

9  were form letters.  They didn't mean much.  The folks that

10 were the -- I feel the true recommended candidates were the

11 ones that there was a phone call made on their behalf.

12          THE COURT:  So as to the true recommended

13 candidates, if as to that group of people -- if that group

14 is larger than the twenty-three or twenty whatever it is in

15 the indictment, and they were one of those, and somebody --

16 and the person wasn't hired for an opening for which the

17 candidate applied; then they know it --

18          I guess my question, (A), is it exculpatory; and

19 (B), do they know it?

20          MR. FISHER:  Well, they would know it, because

21 it's going to be in the applicant files which --

22          THE COURT:  Well, clearly --

23          MR. FISHER:  -- are in the 180 boxes.

24          THE COURT:  -- they'd know that the person

25 applied, but how do they know that the person was truly

1 sponsored?

2          MR. FISHER:  Well, their name will be on the

3 sponsorship list.  Their name will be on the list.

4          THE COURT:  Is everybody who's truly sponsored on

5 the sponsorship list?

6          MR. FISHER:  Excuse me?

7          THE COURT:  Is everybody who was truly sponsored

8 on the sponsorship list?

9          MR. FISHER:  Yeah, people that were sponsored

10 either by phone call or letter they're going to be on the

11 list.

12          THE COURT:  So nobody who was truly sponsored is

13 not on the list.  I'm sorry.  Let me put it --

14          MR. FISHER:  Well, no.  No, they're --

15          I didn't put the lists together obviously, so.

16 Yeah, there could be some folks that if a legislator called

17 Jack O'Brien directly, they could have been hired and not --

18 their name may not be on the list.  That's -- there's a

19 possibility of that.

20          THE COURT:  If that's not exculpatory?

21          That is, you've carefully responded to each of my

22 questions, but not wanted to say whether or not it's

23 exculpatory.

24          And the thing I'm wondering about since really in

25 the first instance the determination of exculpatory evidence

1 is made by the government.  You have the information; I

2 haven't reviewed any information.  I've just read the

3 briefs.  You go through it.  You make a determination about

4 what's exculpatory.

5          So my question is if that's not a --

6          That seems like it might be exculpatory when I

7 read the indictment.  If that's not exculpatory -- if that

8 is exculpatory but they have it, that's one thing.  If it's

9 not exculpatory, that's something else.

10          What would be helpful to me is if it's not

11 exculpatory, understanding why it's not exculpatory.

12 Because I need to figure out all of these requests and, in

13 part, they turn on what's exculpatory and what's not.

14          MR. FISHER:  Well, let me get right to the point.

15 My understanding is we don't have information right now that

16 someone placed a call, and that they were not, therefore, on

17 the sponsorship list and then did not get hired.  So that we

18 don't have our own list saying, okay, here's a call that we

19 know of.

20          THE COURT:  There may be people not on the list

21 who got sponsored, but you don't know about them.

22          MR. FISHER:  Yeah.  We have not compiled that

23 information, correct.

24          THE COURT:  Yes.  I'm not asking --

25          MR. FISHER:  We don't have our own separate list

1  of, --

2           THE COURT:  Right.

3           MR. FISHER:  -- hey, this is the list we provided.

4  This is the list we put together, though.

5           THE COURT:  No, I understand.

6           MR. FISHER:  And we know they weren't -- they

7  weren't hired.  We have not compiled that information.

8           THE COURT:  But to the extent that somebody is not

9  hired who is sponsored, is that exculpatory?

10          I mean, you didn't write a -- you could have

11  written a brief that said, Judge, they ask for all these

12  things.  But you don't even need to think about these

13  requests, because we gave them -- they have the raw

14  information, and they can go through it and figure it out.

15  So it doesn't really matter whether it's exculpatory or not,

16  because they have it all.  You didn't respond in that way.

17          Had you responded in that way, I would say, oh,

18  okay.  I would ask Mr. Fick, well, he says you have it all.

19  Why do you think you don't have it all?  Why do I need to

20  even consider whether it's exculpatory or not?

21          But, in part, you responded by saying, no, a lot

22  of this is not exculpatory.  And so that's what's making me

23  wonder about it, because I may have to decide my view of

24  whether it's exculpatory or not.

25          MR. FISHER:  Well, for purposes of whether -- for

1 what we indicted these three defendants for --

2        THE COURT:  Right.

3        MR. FISHER:  -- and what we're going to be

4 presenting at trial for the twenty-two hires we did charge,

5 I'm not sure it is relevant at all that someone who wrote a

6 letter back in 2003 for a particular candidate that is not

7 one of these twenty-two and their person -- their candidate

8 did not get a job.

9        THE COURT:  What, if anything -- maybe nothing.

10 But what, if anything, distinguishes this indictment from an

11 indictment that set forth twenty-six or twenty-two counts of

12 mail fraud, each count arising from say a rejection letter

13 and just said -- you know, all the indictment said was in

14 the -- this was a fraud to deceive the CJAM, that the person

15 had complied with the standards, the property to be obtained

16 was the job awarded to not the most qualified person; and

17 that that's the fraud, and there are twenty-six instances or

18 twenty-two or whatever it is, and the mailing is a rejection

19 letter to somebody.

20        Is this indictment that?  It seems like this

21 indictment is more than that.

22        MR. FISHER:  You know, well, it's a bit more than

23 that in terms of the scheme we've alleged:  that this was

24 wide ranging, it took place over approximately a decade.

25 These are the twenty-two hires that we have to prove,

1 though.

2          THE COURT:  Sure.  But doesn't that fact that it's

3 wide ranging and the fact that it also includes racketeering

4 and racketeering conspiracy broaden the scope of discovery

5 or broaden the scope of what might be exculpatory?

6          MR. FISHER:  Well, it broadens the scope of

7 discovery.  I'm not sure for what -- you know, for --

8          In terms of us building their --

9          THE COURT:  Were they required to rebut the

10 allegations of the indictment?

11          MR. FISHER:  I think they are, and we provided

12 them the information to do that.  They have all these hire

13 records.  They've had people sitting there for hours upon

14 hours over a course of --

15          THE COURT:  Right.

16          MR. FISHER:  They can easily rebut our allegations

17 by pointing to potentially maybe other hires where they're

18 going to suggest that the person that no one was

19 recommending got a job; and therefore, someone else was

20 hired.  They could do that.  They have the materials to do

21 that.  That's in there.  That's for them to present in their

22 case.

23          THE COURT:  Who were the victims of the fraud --

24 of the mail fraud?

25          MR. FISHER:  The victims of --

1            Well, the victims of this are the citizens -- as I

2 said in my brief, are the citizens.

3            I think you have in a micro sense the other people

4 that applied for these jobs thinking they actually had a

5 shot at getting them.  People that drove from out of state

6 from Connecticut, New York, from Georgia who wanted to be

7 probation officers, and they thought they had the chance to

8 become a probation officer.  Little did they know that they

9 were never going to make the final cut, because the

10 defendants here were telling the interviewers who was going

11 to be on the final list to be hired from.

12            THE COURT:  So is the person defrauded the CJAM?

13            MR. FISHER:  Well, he was the person that received

14 the notice from Jack O'Brien and the other defendants here

15 that we have complied with the hiring policies and

16 procedures, that they have done everything according to that

17 booklet; when, in fact, they didn't, and they knew they

18 didn't.

19            Of course the citizens of the Commonwealth are

20 also victims, because you have probation officers paying --

21 who were being paid hundreds of thousands of dollars a year

22 --

23            THE COURT:  The false representations, though,

24 were to the CJAM or to others?

25            MR. FISHER:  Well, I think they're directly to

1  him, but anybody who looked at what was occurring is going

2  to be duped by the fraud.  They were --

3            Jack O'Brien was telling the media when this --

4  when the *Globe* first wrote their article in Commonwealth

5  Magazine that they were --

6            THE COURT:  But it's not a case with individual

7  victims, or it is?

8            MR. FISHER:  In terms of at trial are we going to

9  say this person is the victim for this hire?

10           THE COURT:  No.  I'm thinking about the victim

11 statute in terms of like, for example, at a bail hearing if

12 there's a victim of the offense, the victims are entitled to

13 notice of the bail hearing.  And we have certain obligations

14 to notify those people or to make sure that your -- usually

15 your office discharges that obligation and --

16           Or is this more an offense which there aren't

17 identifiable individual victims; it's the public at large?

18           MR. FISHER:  It's society at large without a

19 doubt.

20           THE COURT:  All right.

21           MR. FISHER:  But if you look at an individual

22 hire, say one of these twenty-two hires, there are other

23 people that interviewed for these jobs.

24           THE COURT:  Yes.

25           MR. FISHER:  Now, they didn't receive the

1 certification from Jack O'Brien saying I followed the

2 policies and procedures --

3         THE COURT:  What do you think of Mr. Fick's

4 argument that if the CJAM knew how they were doing it, if

5 they -- the defendants -- were doing what you say they were

6 -- allege they were doing, and if the CJAM knew what they

7 were doing, that then there's no fraud?  That seems to be

8 what he's saying, in part.

9         MR. FISHER:  If the CJAM --

10        THE COURT:  Knew.

11        MR. FISHER:  -- knew that this scheme was

12 occurring the way it was?

13        THE COURT:  Yes.

14        So in other words, essentially part of what you

15 allege is that the most qualified person wasn't being hired.

16 Right?  That, in fact, what they were doing was hiring

17 somebody who was sponsored by a legislator or other powerful

18 person, and that person was predetermined.  According to the

19 indictment that that person was going to be hired, and the

20 process was something of a sham -- was a sham.  That's what

21 the indictment says.

22        MR. FISHER:  Yes.

23        THE COURT:  So if the CJAM -- and at the end was a

24 certification from Defendant O'Brien that it was -- followed

25 the Trial Court policies and practices.  If, in fact, --

1          I'm not saying that the CJAM had any idea, but he

2   seems to be suggesting that if the CJAM knew what was going

3   on in the probation office or commissioner's office in this

4   hiring process, then there's not a fraud, because he knew.

5          MR. FISHER:  Well, number one, he didn't -- I

6   don't -- he didn't --

7          THE COURT:  You don't think he did.  I understand

8   that.

9          MR. FISHER:  But whether or not he had suspicions

10  of what was going on, he wasn't -- he wasn't a member of the

11  conspiracy.

12         THE COURT:  No, no.  I'm not suggesting.

13         MR. FISHER:  But if he did know what was going on,

14  then he'd be part of the conspiracy.

15         THE COURT:  Well, he'd have to have more than

16  knowledge, wouldn't he?

17         MR. FISHER:  If he spoke with Jack O'Brien about

18  exactly what was going on in terms of people being put on

19  the list and being bumped ahead of other candidates who were

20  qualified --

21         THE COURT:  Wouldn't he have to form an agreement

22  to join a conspiracy?

23         MR. FISHER:  Well, he'd be receiving -- he would

24  be essentially signing off on these hires.

25         THE COURT:  I see.  And at that point that he was

1 signing off that they were --

2          MR. FISHER:  Not only does the certification go to

3 him, he then writes a letter --

4          THE COURT:  Who's the person who creates the

5 manual, if you know?

6          MR. FISHER:  Who creates the manual?

7          THE COURT:  Yeah.

8          MR. FISHER:  It's AOTC.  Essentially it was the

9 CJAM's prior to Judge Mulligan.

10          THE COURT:  But I don't mean personally.  I don't

11 mean what person; I mean what office.

12          Is it the CJAM that would have the authority to

13 create and change the personnel manual and practices?

14          MR. FISHER:  That's my belief.  AOTC.

15          I think there was one other issue that I wanted to

16 address.  It regarded the New Bedford District Court and the

17 items that were requested from there that were under seal.

18          THE COURT:  Yes.

19          MR. FISHER:  My understanding of that is we

20 provided the records of that individual, the CORI --

21          THE COURT:  Except for one document.  Or it seems

22 to be one document at least from the papers.  It might be

23 more, but.

24          MR. FISHER:  That file was requested from the

25 Court.  The Court informed us that they thought it was under

1 seal; however, they sent us the documents that were found in

2 there:  motions for new trial, judgments by various judges,

3 convictions, --

4           THE COURT:  If it was under seal, meaning that

5 they can't then give it to you?

6           MR. FISHER:  At one point they said that, "This

7 may be under seal."  However, then we received it in a Fed

8 Ex package.

9           But my understanding is that the CORI record was

10 not sealed, because we gave them a copy of the CORI record

11 for that individual, so.  It may have been that the motions

12 for a new trial were sealed at some point.

13           THE COURT:  So my question is only this.  I'm

14 sorry.  I understand generally what you're saying, but I'm

15 not sure I can follow as to each document.

16           Is there now a document that they have requested

17 that you have, and do you want to give it to them, or don't

18 you want to give it to them?

19           MR. FISHER:  No.  We don't want to give them the

20 underlying court docket from New Bedford District Court.

21           THE COURT:  It's a docket.

22           MR. FISHER:  Well, it's a docket.  It's motions

23 that were filed.

24           THE COURT:  I see.  All right.

25           MR. FISHER:  But they have the underlying

1 convictions.  They have the CORI document.

2         THE COURT:  I see.  All right.  And you don't want

3 to give it to them, because it was sealed by the state court

4 or because you feel for some reason they're not entitled to

5 it?

6         MR. FISHER:  Well, number one, it's not relevant;

7 number two, --

8         THE COURT:  Okay.

9         MR. FISHER:  -- the clerks office told our office

10 that their belief was that it had been sealed at one point.

11         THE COURT:  And if it were sealed, then that would

12 mean what?

13         MR. FISHER:  I'm not sure --

14         THE COURT:  That would mean that they can't have

15 it, or you can't have it, or none of you can have it, or

16 what?

17         MR. FISHER:  Then I can't disclose it to them.

18         THE COURT:  I see.

19         MR. FISHER:  They could get it on their own.  I

20 guess they could file a motion for it.

21         THE COURT:  A motion there.

22         MR. FISHER:  In New Bedford District Court,

23 correct.

24         THE COURT:  Do either of you remember which

25 request number this is?

1           MR. FICK:  I believe it was number 3, if I want to

2 say.  Yes.

3           THE COURT:  I'll go back and look at that.

4           All right.  Anything else?

5           MR. FISHER:  No, I think I covered everything.

6           THE COURT:  All right.

7           MR. FICK:  Very briefly, Your Honor, if I could?

8           THE COURT:  Very briefly.

9           MR. FICK:  So --

10          THE COURT:  Hold on one second.  Maria?

11          Proceed.

12          MR. FICK:  So in terms of the government's

13 argument about Jencks and the grand jury investigation,

14 neither of those things is a shield to the obligations to

15 disclose exculpatory information.  Period.

16     The real problem that we have in terms of those

17 requests -- the letter requests is at least on the papers

18 the government's position on what is exculpatory and not

19 exculpatory strikes -- struck us as completely wrong,

20 jaundiced, whatever phrase you want to use.

21     Now, the government says you can find out who was

22 sponsored and didn't get hired by looking at the stuff in

23 the William's building.  That's actually not true.  There

24 are a lots of sponsors -- there are multiple different

25 sponsor lists.  It's not entirely clear from what temporal

1  period they come.  There are application files over the

2  period of almost a decade in the Williams Building, and from

3  those files it's not even entirely clear in each round who

4  was actually hired.  And the temporal comparison of those

5  things -- of those files to the sponsor list is also far

6  from clear.

7       We can make some inferences from it, but it certainly

8  is not possible to simply establish with certainty and

9  quickly who got recommended that wasn't hired.

10      In any event, to the extent the government has

11  witnesses --

12           THE COURT:  If you can't do it, why can they do

13  it?

14           MR. FICK:  Well, we're not asking them to go make

15  some compilation or comparison of these two things.

16           But what we believe from information and belief is

17  that witnesses have said things like this didn't happen,

18  there was no *quid pro quo*.  We didn't expect people to get

19  hired.  We recommend people in particular situations who

20  didn't get hired.

21           There's information given both to investigators

22  and in interviews and potentially to the grand jury about

23  these things.  I mentioned, for example, we know that

24  legislators have provided letters of recommendation that

25  were -- passed on information in the past for people who

1  didn't turn out to be hired.

2          So whatever information we might be able to glean

3  ourselves from comparing the sponsor lists and the Williams

4  Building files, it doesn't mean the government doesn't also

5  have to give us other things that are exculpatory on the

6  same theory.

7          Let's say if witnesses are saying to people Jack

8  O'Brien was squeaky clean.  Jack O'Brien had no financial

9  incentive to do this.  The legislators didn't give anything;

10 Jack O'Brien didn't expect anything.

11          The allegations in the indictment and some of the

12 other papers about sort of having pencil -- pencil being

13 used on application and evaluations so that can be erased,

14 if witnesses are saying that that's not true -- and I

15 believe that's happened, that would be exculpatory.

16          All of these things we believe and things like

17 those things have been said in various contexts, and that

18 information has not been disclosed to us.

19          And regardless of whether it might be Jencks

20 material, regardless of whether it might be from this grand

21 jury as opposed to the old grand jury that resulted in this

22 indictment and is now done; it's exculpatory.  It should be

23 produced.  Period.

24          The other thing -- two other things very briefly.

25 The government -- there was a discussion of victims which I

1 thought was very interesting.  I mean, in one sense the way

2 the government has alleged the twenty-two individual hires

3 here, there would be a victim of each individual hire.  The

4 victim would be the person who was the most qualified and

5 should have been hired in the government's view.

6          So, in fact, that notion of identifying victims

7 would support the specific request we made for the

8 government to tell us, okay, you say this person wasn't the

9 most qualified.  Who is?

10          That's actually a great idea.  That's another

11 reason why that is pertinent information that should be

12 disclosed.  If there is a victim, it should be identified to

13 us.  It seems to me the person who ought to have been hired

14 is in some sense a victim.

15          The final thing is with regard to this criminal

16 record, I just -- my head is really spinning in terms of

17 government's position here.

18          Yes, we have the CORI of this person that shows

19 that at certain points in time this person had criminal

20 convictions.  What we also understand is that at various

21 points along the way some or all of those cases were sealed

22 by the local district court.  So in terms of defending

23 whether it was appropriate to hire this person because they

24 had a record or not, I think there's a defensible position

25 to be taken and will be taken at trial that says whatever

1 might be on the CORI, whatever probation knew about what

2 convictions this person might have had, if those convictions

3 were sealed by the local district court, it was a reasonable

4 thing -- position to take to say, well, those are no longer

5 disqualifying.  They're sealed.  We may know about them, but

6 as a matter of the Court, the place where the conviction

7 came from, they don't exist anymore.

8           And to the extent there are documents that the

9 government has received with no apparent express restriction

10 -- I mean, they asked for them.  They got them as far as

11 I've been able to understand from the district court with

12 those dockets that suggest at various times those cases

13 either were sealed or were not sealed, that is absolutely

14 pertinent to the question of whether this person's qualified

15 to be employed, and that's the core of the government's

16 allegations as to that person.

17           THE COURT:  All right.

18           MR. FISHER:  Your Honor, to get back to the issue

19 of who was the most qualified and who should have been

20 hired, it's not who's qualified.  Anybody who made it to the

21 interview round was qualified.  They had either a bachelor's

22 degree -- they met the minimum qualifications.

23           The problem is once they started interviewing,

24 Jack O'Brien and the co-defendants were telling the

25 interviewers these are the people that must make it to the

1  next round.  These are the people that must make the final

2  round.

3          So therefore, you know, there are scoring sheets,

4  but you'll never really -- it's difficult to say that is the

5  most qualified person, because they rigged the interview

6  process.  We can't go back and re-interview these people

7  based upon what happened years ago.

8          They rigged it.  They told the interviewers who

9  were supposed to objectively weigh the credentials of these

10 individuals these are the ones that must make it on.  And

11 that was based upon the recommendations coming from the

12 legislature.  So that is the --

13         For us to identify, well, this is the exact person

14 that should have gotten the job, now that misses the point.

15         THE COURT:  Which point?

16         MR. FISHER:  The point they're trying to make.

17 That we should tell them, well, this is the person that

18 should have gotten the job.

19         THE COURT:  I see.

20         MR. FISHER:  Because the person that got the job

21 in these twenty-two was the person that Jack O'Brien said

22 should be hired even though he never interviewed them and

23 before the interviews took place.  That is the problem.

24         THE COURT:  No scoring sheets and the like are in

25 the hundred some odd boxes that are over in the Williams

1 Building?

2          MR. FISHER:  There are -- 180 boxes, correct.

3          THE COURT:  I see.  All right.

4          Yes?

5          MR. FICK:  Just that position seems to me

6 astonishing.  If the government is alleging the most

7 qualified person wasn't hired but they don't know who was

8 the most qualified; it's unclear to me how the case can be

9 proven.

10          And, in fact, what they seem to be saying even if

11 accidentally the most qualified person was hired, there's

12 still a crime.  And that's stunning.  Especially in this

13 particular building where I would venture to guess that

14 everyone who works in here in one way or another at some

15 point along the way was recommended for their job by

16 somebody influential.  And to say that we're going to Monday

17 morning quarterback now and say that the most qualified

18 person wasn't hired, and they had a recommendation, and we

19 can't even say who was -- who should have been hired; it

20 just seems to me the case falls into quicksand.

21          MR. WYSHAK:  May I speak for a moment, Your Honor?

22          THE COURT:  I haven't prohibited you, Mr. Wyshak.

23          MR. WYSHAK:  Just that I think that this argument

24 from Mr. Fick is a bit disingenuous.

25          We, as Mr. Fisher related, walked them through

1   every hire in the indictment, and we showed them exactly how

2   we made the strategic decision.  Which we don't have to do,

3   but we -- this is --

4           A lot of this is evidentiary, what they're asking

5   for.

6           We showed them how we analyzed each particular

7   hire.  And the scoring sheets for the twenty-two or

8   twenty-three hires in the indictment clearly reflect that

9   the people who were finally hired were poorly ranked not

10  only -- almost always by the judge who participated in what

11  we call the second round interview, but sometimes even by

12  the probation officials who had received the names of the

13  sponsored candidates.

14          So they know exactly how we came to our decision

15  about why to charge those particular hires.  To stand up and

16  say that they don't know is really misrepresenting to the

17  Court, you know, what we patiently walked them through.

18  They know the theory of the prosecution.  They have the same

19  documents we have.

20          We didn't investigate a thousand hires over ten

21  years.  We have evidence of a scheme.  We took a sample

22  group of hires.  We investigated those.  And to the extent

23  that they proved the existence of this scheme, those were

24  charged.

25          Many of these files, as the defendants know and as

1  the government knows, are incomplete.  They don't have all

2  the documents in there, so they're not susceptible to a

3  complete investigation.  We took those files that were as

4  complete as possible with all the scoring sheets, and we

5  investigated a group of cases that ultimately resulted in

6  the charges in this indictment.

7        It really boggles my mind for them to stand up and

8  say that we don't understand the theory of prosecution here,

9  we don't understand what the government is alleging, when I

10 think it's clear to them they do understand.

11       How do we prove that the most qualified candidate

12 was not hired?  This is going to be an evidentiary or

13 factual issue decision by the jury.  They're going to see

14 that, you know, the people who were hired a judge thought

15 was fifteenth out of twenty people who were interviewed.

16 That the chief probation officer thought he was eighth or

17 ninth out of the twenty people, and the other -- usually

18 it's a regional administrator ranked that person as fifth or

19 sixth.  And ultimately there were many other people ranked

20 much higher who didn't get hired.  And they didn't get

21 hired, because at the final round interview the two --

22       THE COURT:  Where was the final round interview?

23       MR. WYSHAK:  Where?

24       THE COURT:  Not where physically, but who did

25 that?

1           MR. WYSHAK:  That was done by two of the deputy

2   commissioners -- generally Fran Wall and Pat Walsh -- who

3   will testify that we were given the names, and those people

4   became number one --

5           THE COURT:  So just so I understand the process,

6   at the round you're describing where the judge, the local

7   chief probation officer and the regional administrator, they

8   would interview candidates, and then they would pass up a

9   group to another round.

10          MR. WYSHAK:  Generally eight people made it to the

11  final round.

12          THE COURT:  To the final round.  And then the

13  final round was an interview with people --

14          Those two people you mentioned, are they

15  designated by the commissioner, or are they by statute, or

16  by procedure, or what?

17          MR. WYSHAK:  No, they're designated by the

18  commissioner to conduct the final round interview.

19          THE COURT:  I see.  And then who would make --

20          The commissioner would make the choice based on

21  what they recommend --

22          MR. WYSHAK:  Technically they would always rank

23  the sponsored candidate as number one, and then the

24  commissioner based upon that ranking would appoint that

25  individual and send the certification to Judge Mulligan.

1            THE COURT:  I see.

2            MR. WYSHAK:  So, you know, the defendants have

3 exactly what we have, and they have --

4            THE COURT:  Well, not exactly.

5            MR. WYSHAK:  Pretty much.  I mean, we used those

6 records to make our case that we produced to them.

7            THE COURT:  Yeah, so they have the 180 boxes.

8            MR. WYSHAK:  Yes.  Yes.  And they understand, I

9 think --

10            I can't explain any better.  If they want to come

11 back to the office and walk through the hot docs again --

12            THE COURT:  I don't think they're complaining

13 about -- or I haven't heard them complaining about that

14 explanation.  I think that that's a good thing to do --

15            MR. WYSHAK:  So to claim that --

16            THE COURT:  -- as a general matter.

17            MR. WYSHAK:  And what particularly troubles me is

18 what they're doing is they're trying to cabin the evidence

19 that they seek as exculpatory.

20            This is a mail fraud indictment.  This is a scheme

21 to defraud in which there was a rigged hiring system, and a

22 false certification was made to the CJAM in support of the

23 scheme to defraud.

24            They keep talking about *quid pro quo*.  This is not

25 a bribery case.

1        THE COURT:  Do you think it's just a mail fraud

2  case?

3        MR. WYSHAK:  That's what's charged.  It's a RICO

4  mail fraud.

5        THE COURT:  I have to say that's not what I read

6  in the indictment.

7        MR. WYSHAK:  Well --

8        THE COURT:  It's a RICO racketeering conspiracy

9  with predicate acts of mail fraud and substantive mail fraud

10  counts, but I don't think this indictment's exactly the same

11  as an indictment that just alleged mail fraud.

12        MR. WYSHAK:  Well, it provides a motive to commit

13  the crime, and the motive is an intent to influence

14  legislators.

15        But just because we articulate a motive, as you

16  know, there's no obligation upon the government to prove a

17  motive.  It's not an element of the crime.  And the fact

18  that Mr. O'Brien --

19        THE COURT:  But the elements of RICO are a crime

20  that's alleged by the grand jury in the indictment.

21        MR. WYSHAK:  That does not change the --

22        The elements of a RICO have nothing to do with

23  bribery or *quid pro quo*.

24        THE COURT:  No.

25        MR. WYSHAK:  No.

1          THE COURT:  Not necessarily.

2          MR. WYSHAK:  And in this case the elements of RICO

3 are that there was an enterprise, and that the defendants

4 were members and associates of the enterprise, and that they

5 engaged in a pattern of racketeering which in this case is a

6 series of mail frauds.

7          The motive to commit the crime is not an element

8 of the crime, does not have to be proven beyond a reasonable

9 doubt; and furthermore, you know, whether or not Jack

10 O'Brien was able to successfully influence legislators is

11 not something the government has to prove.  All we have to

12 prove is the reason he did it is because he thought he was

13 influencing legislators.

14          So to try to bootstrap --

15          THE COURT:  But if --

16          MR. WYSHAK:  -- into a <u>Brady</u> argument --

17          THE COURT:  If legislators were saying to O'Brien

18 in one means or another be it orally or by e-mail or

19 what-have-you that we don't care, would that not be

20 exculpatory of that motive, even though it's true you don't

21 have to prove motive?

22          MR. WYSHAK:  I think that, at best, is probably

23 21-day material.  That's a statement that's inconsistent

24 with the --

25          THE COURT:  That's 21-day if you're not calling

1 the witness.  It's only if it's a witness a 21-day material.

2          MR. WYSHAK:  Well, no, I think that 21-day

3 material does require us to produce inconsistent statements

4 as made by witnesses even if we're not calling that witness.

5          THE COURT:  I see.  You'd see it more as Gigleo

6 than --

7          MR. WYSHAK:  Yeah.

8          THE COURT:  -- than Brady.

9          MR. WYSHAK:  That here's a witness -- we're

10 putting on these ten witnesses, they're saying this is the

11 motive for the crime, and then we have another witness who

12 said that's not the motive or --

13          THE COURT:  Another person who you're not calling

14 --

15          MR. WYSHAK:  Right.

16          THE COURT:  -- who says something different.

17          MR. WYSHAK:  Right.  Right.  I would say that's

18 21-day material.

19          It's not core Brady material.  It doesn't

20 exculpate him from making a false certification to the CJAM

21 --

22          THE COURT:  Doesn't it go to his intent?

23          MR. WYSHAK:  Does it go to -- the intent?

24          THE COURT:  His intent.

25          MR. WYSHAK:  No, it doesn't go to intent.  It goes

1  to motive.

2       His intent is to make a false certification to the

3  CJAM to hide the fact that he has rigged the hiring system

4  within his own office, so he intentionally gives the CJAM a

5  false document basically to conceal the fact that he's

6  hiring somebody who is not, in fact, the most qualified

7  candidate.

8       We prove that circumstantially as we've laid out

9  to the defendants by showing the scoring sheets by three

10 people in the second round interview where these individuals

11 are ranked low on the list.  That's how we prove that.

12      They know that.  They understand that.  They have

13 those very same documents.

14      So the Brady argument --

15      I mean, I'm a little insulted by the Brady

16 argument.  They want to call it Brady.  It is not Brady.

17 It's not Brady in this case.  If anything, it's 21-day

18 material; which, of course, we will provide at the

19 appropriate time.

20      THE COURT:  If it's 21 day material.

21      MR. WYSHAK:  If it's 21 day material, yes.

22      THE COURT:  Okay.  Thank you.

23      MR. FICK:  The only other thing I would just

24 mention, Your Honor.  There's an inclination so it's a wait

25 to see what the government gives us when they're done with

1  the grand jury; which, I mean, I've explained why I don't

2  think that's appropriate, but I think the government should

3  at least tell us very clearly what --

4          THE COURT:  I don't think I'm going to do that --

5          MR. FICK:  Okay.

6          THE COURT:  -- unless all of you told me --

7  suggested that I do that as I think about it.  Because if I

8  did it, I'd only do it with respect to the narrower set of

9  -- not --

10          It's not all the requests, but it sounds like from

11 what I understood Mr. Fisher to be saying, in a sense there

12 are certain requests that they referred to either

13 investigations, and those were the things that he thought

14 might be resolved by whatever transpires in the near future.

15 And so if I --

16          I think it not likely that I'm going to go down

17 that road; but if I do, then I'll give you all an

18 opportunity in some way to comment on it --

19          MR. FICK:  Thank you, Your Honor.

20          THE COURT:  -- either in response to an order or

21 otherwise.

22          I have one question I just want to ask counsel at

23 sidebar not exactly pertaining to the motion.

24     (Discussion at sidebar off the record.)

25          THE COURT:  All right.  Thank you very much.

1  We're adjourned.  Have a good day.

2        (Court adjourned at 5:02:37 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATION

2        I, Judy Bond Gonsalves, a court approved transcriber,

3    certify that the foregoing is a correct transcript from the

4    official electronic sound recording of the proceedings in

5    the above-entitled matter.

6

7

8    _____   March 28, 2013
     Judy Bond Gonsalves
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                     *Judy Bond Gonsalves*
            **Certified Federal Court Transcriber**
                     **508.984.7003**