## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 12-40026-FDS |
|  | ) |  |
| v. | ) | Violations: |
|  | ) | 18 U.S.C. §§ 1962(c); 1962(d); |
| JOHN J. O'BRIEN, | ) | 1341; 371; 666; and 2. |
| ELIZABETH V. TAVARES, and | ) |  |
| WILLIAM H. BURKE, III, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

### SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY in and for the District of Massachusetts charges

that:

### COUNT ONE
(Racketeering Conspiracy)

At all times relevant to this Indictment,

### THE ENTERPRISE

1.     The Administrative Office of the Trial Courts (hereinafter referred to as "AOTC")

is the administrative arm of the trial courts of the Commonwealth of Massachusetts. The Chief

Justice for Administration and Management (hereinafter referred to as "CJAM") oversees the

Commonwealth's trial court system. The Office of the Commissioner of Probation (hereinafter

referred to as "OCP") is a department within AOTC, and the CJAM has oversight responsibility

over OCP.

2.     OCP is comprised of the Office of the Commissioner, the Massachusetts

Probation Service (hereinafter referred to as the "Probation Department") and the Office of

Community Corrections (hereinafter referred to as "OCC"). The Office of the Commissioner is responsible for administrative functions and oversight of the Probation Department and OCC, such as hiring, promotion and discipline of employees; budget matters; training, drafting and tracking legislation related to the Probation Department; and overseeing the electronic monitoring of probationers and parolees, among other responsibilities. OCP, therefore, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a legal entity which engaged in, and the activities of which affected, interstate and foreign commerce. OCP affected interstate and foreign commerce by, among other things, the use of goods and services in interstate commerce. OCP also operated an "Interstate Compact" Department which accepted probationers from outside the Commonwealth and transferred local probationers to sister states, thereby affecting interstate commerce.

3.      The Probation Department has approximately 1,800 employees in approximately 100 offices located in each of the Superior, District, Juvenile, Probate and Family and Boston Municipal Courts. Within the various offices, probation officers supervise criminal defendants placed on probation as a condition of a sentence imposed by a court. Within each probation office in a particular court, a Chief Probation Officer supervises the functions and employees of that office. Depending upon the number of probation officers assigned to a given office, a particular office could also have a First Assistant Chief Probation Officer as well as Assistant Chief Probation Officers assigned to the court. The probation officers' work includes supervising probationers, reporting findings and making recommendations to the court, enforcing court orders, and electronic monitoring of certain probationers. In the probate and family courts, probation officers serve more as investigators and mediators on contested probate and family

2

court issues, such as child custody and divorce disputes.

4.    OCC has 21 Community Corrections Centers throughout Massachusetts and employs approximately 100 people. Community Corrections Centers are community-based supervision sites where offenders must check-in regularly. Individuals assigned to the Community Corrections Centers must also perform community service projects. Community Corrections Centers are manned by probation officers with the title "Probation Officer In Charge."

### THE MASSACHUSETTS TRIAL COURT'S HIRING SYSTEM

5.    AOTC had a merit-based hiring system for all of its employees, including those within the Probation Department, governed by Massachusetts General Laws, Chapter 211B, § 8 and the *Personnel Policies and Procedures Manual* of AOTC promulgated thereunder (hereinafter "the Manual"). For example, Section 4.000 of the Manual stated that "*the objective of the hiring process is to select the most qualified individuals who can carry out their responsibilities in a competent and professional manner*" in order to ensure the successful operation of the Trial Court. Similarly, Section 4.304 of the Manual, which addressed nepotism and favoritism in hiring, stated that "[i]*t is the policy of the Trial Court that all appointments be made solely on the basis of merit. The practice and appearance of nepotism or favoritism* in the hiring process are to be avoided." (Emphasis added.)

a.    The Manual also stressed the importance of conducting interviews based upon objective standards and criteria. For example, Sections 4.302(A) and (C) of the Manual stated that:

    (A)    All applicants meeting the minimum qualifications

3

for the position must be interviewed.

\* \* \*

(C)    Interviews must be objectively tailored to measure
the applicant's knowledge, skills and abilities for
the position under consideration. To achieve this,
the appointing authority must develop a standard set
of questions designed to measure the knowledge,
skills and abilities of applicants based on the job
description for the specific position.

b.    Subsection (E) of 4.302 specifically applied to hiring within the Probation

Department. It adopted broad guidelines for hiring and interviewing and provided further

specifics with respect to the composition of the interview panel and the number of candidates

who may be recommended by the interview panel to the Commissioner for appointment. It

stated that:

> In the case of a Probation Officer, Probation Officer In
> Charge, Assistant Chief Probation Officer, or First
> Assistant Chief Probation Officer vacancy, an interview
> committee consisting of the Commissioner of Probation
> (Chair) or his/her designee, the Chief Probation Officer of
> the Division, and a representative of the Chief Justice of the
> Department shall interview applicants consistent with the
> guidelines set forth in this section. Each candidate selected
> for an interview shall be evaluated and determined to be
> recommended or not recommended. A list not to exceed 8
> names of recommended candidates for each open position
> shall be forwarded to the First Justice.

By letter of November 22, 2004, the CJAM modified the last sentence of Section

4.302(E) to read, "A list not to exceed 8 names of recommended candidates for each open

position shall be forwarded to the Commissioner of Probation for appointment subject to the

approval of the Chief Justice of Administration and Management."

4

6.      The requirement to establish and promulgate standards for the appointment, performance,

promotion, continuing education and removal of all personnel within the trial court was codified

in Massachusetts General Laws, Chapter 211B, § 8 which stated, in pertinent part,
        Any appointment that is governed by standards promulgated under the provisions
        of this section shall forthwith be certified in writing for compliance with such
        standards to the chief justice for administration and management. The chief
        justice for administration and management shall have the power to reject any such
        appointment within fourteen days after receipt of the certification of compliance
        by the appointing authority but such power to reject any such appointment shall be
        limited to non-compliance with the standards for appointment.

7.      In 2001, the Massachusetts legislature amended Massachusetts General Laws, Chapter

276, § 83 to vest hiring authority for employees of the enterprise (that is, OCP) in the

Commissioner of Probation. This authority had previously been held by the CJAM and First

Justices of the trial courts. After the 2001 amendment, the CJAM retained authority to reject any

appointment not in compliance with the standards set forth in the Manual.

## THE DEFENDANTS

8.      The defendant **JOHN J. O'BRIEN** served as the Commissioner of OCP from

approximately 1998 to May 24, 2010. **O'BRIEN** previously served as the Chief Probation

Officer in Suffolk County Superior Court. **O'BRIEN** had worked in the Probation Department

since approximately 1980 as a probation officer and in other managerial positions.

9.      The defendant **ELIZABETH V. TAVARES** served as the First Deputy Commissioner of

OCP from approximately 2008 to approximately 2010. Prior to that, **TAVARES** served as the

Second Deputy Commissioner from 2001 through 2008. **TAVARES** had worked in the

Probation Department since approximately 1980 and had also served as associate legal counsel

and Deputy Commissioner of Programs.

5

10. The defendant **WILLIAM H. BURKE, III,** served as Deputy Commissioner of OCP from approximately 1999 to approximately 2009 when he retired. Prior to that, **BURKE** had served as Regional Administrator for western Massachusetts since approximately 1992. **BURKE** had worked in the Probation Department in other capacities since approximately 1972.

## THE RACKETEERING CONSPIRACY

11. From in or before 2000 and continuing through April 2010, both dates being approximate and inclusive, within the District of Massachusetts and elsewhere, the defendants

### JOHN J. O'BRIEN,
### ELIZABETH V. TAVARES, and
### WILLIAM H. BURKE, III

and others known and unknown to the Grand Jury, being persons employed by and associated with the Office of the Commissioner of Probation (OCP), an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did unlawfully and knowingly conspire, confederate and agree to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity as set forth in paragraph 12 below.

12. The pattern of racketeering activity, as that term is defined by Title 18, United States Code, Sections 1961(1) and 1961(5), through which the defendants and their coconspirators agreed to conduct and participate directly and indirectly in the conduct of the affairs of the enterprise, consisted of multiple acts of mail fraud indictable under Title 18, United States Code, Section 1341 and multiple acts involving bribery in violation of Massachusetts General Laws, Chapter 268A, Sections 2(a)(1) and 3(a).

13. It was part of the conspiracy that each defendant agreed that a conspirator would commit

6

at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## OBJECTS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

14. To maintain their positions within the enterprise, to increase the budget and resources of the enterprise, to gain tighter control over the conduct of the enterprise, and to aggrandize power to themselves, the defendants and their co-conspirators sought to curry favor with members of the Massachusetts legislature and others who were in a position to impact the enterprise through legislation, budget authorizations, and in other ways, by instituting a rigged hiring system that catered to requests from state legislators and others to employ and promote candidates for employment with the enterprise.

15. Accordingly, the defendants and their co-conspirators sought to carry out a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, by obtaining employment and promotions for individuals who were not the most qualified, but who the defendants understood to be most politically connected.

16. Through hiring and promoting individuals who were sponsored by members of the Massachusetts legislature, while also maintaining the facade of a merit-based hiring system, the defendants and their co-conspirators sought to influence legislators to increase the conspirators' ability to obtain favorable votes on their budget requests and other interests.

## MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

It was a part of the conspiracy that:

17. The enterprise obtained from members of the Massachusetts legislature, legislators' staff members, and other influential individuals, the names of candidates for employment with the enterprise whom the legislators and others sought to sponsor. The enterprise then organized this

7

information and maintained records known as "sponsor lists" to ensure that the sponsored candidates obtained employment.

18.     In order to conceal the true nature of the enterprise's hiring decisions, the defendants created a sham hiring system which included, among other things:

     a.     The "posting" of employment and promotion opportunities over the Internet on the enterprise's web site as well as over a telephone "hot line." These postings invited prospective candidates to submit applications and resumes to the enterprise. Applications for employment were frequently submitted to the enterprise by mail.

     b.     A series of panel interviews for prospective candidates which included: (1) an initial interview for all candidates who met the minimum qualifications; (2) a second round interview for candidates who passed the initial round; and (3) a final round interview generally for the top eight candidates.

     c.     Scoring sheets and forms containing the candidates' answers to a set of standardized questions were created and maintained.

     d.     Rejection letters and postcards were routinely mailed to unsuccessful candidates after each round of interviews.

     e.     The defendant **O'BRIEN** made written certifications to the CJAM that the successful candidate had been hired in compliance with the standards set forth in the Manual.

19.     This sham system was used by the defendants and other members of the conspiracy to conceal the fact that the hiring decisions were pre-determined and not based upon merit, but based upon the nature and extent of the sponsorship. In fact, the defendant **O'BRIEN** routinely selected the name or names of a "preferred" candidate for each position from the sponsor lists

8

and provided those names to the defendants **TAVARES** and **BURKE** and other members of the interview panels. By pre-selecting the preferred candidate, the defendants sought to ensure that the preferred candidate reached the final round and was also awarded the highest score at the final round interview. The defendants and their co-conspirators falsified the scoring sheets and skewed other methodology to achieve this result. This sham system created the aura of a legitimate merit-based hiring process.

20.     When the defendant **O'BRIEN** falsely certified to the CJAM that the candidate for employment had been hired pursuant to the procedures mandated by the Manual, he often included or caused to be included other documents containing false statements and misrepresentations that were created during the rigged hiring process.

21.     Unsuccessful candidates were routinely notified by mail that they had not received the desired employment with the enterprise. These letters were regularly signed by the defendant **TAVARES** and, at times, by the defendant **O'BRIEN.** It was the usual practice of the enterprise to mail interview packages containing the applications of prospective candidates to the members of the interview panels. On other occasions, these interview packages were obtained by panel members at the enterprise's office.

22.     In 2006, the Massachusetts legislature enacted legislation which provided for electronic monitoring of sex offenders and offenders involved in domestic violence. The legislation provided that the Probation Department was responsible for the supervision of these offenders and required the implementation of electronic monitoring (hereinafter "ELMO"). The legislature appropriated funds for the Probation Department to purchase equipment and hire personnel to implement the program.

9

23.     In approximately November 2007, the Probation Department opened an ELMO facility in

Clinton, Massachusetts to respond to the legislature's mandate to monitor sex offenders and

other dangerous individuals. During 2007 and 2008, approximately forty individuals were hired

to staff this facility.

24.     The defendant **O'BRIEN** obtained permission from the CJAM to staff the Clinton ELMO

facility with temporary employees. This strategy enabled **O'BRIEN** to circumvent some of the

requirements of the Manual including the requirement that permanent positions be posted and

made available to the general public.

25.     During 2007 and 2008, the defendant **O'BRIEN** staffed approximately twenty ELMO

positions by soliciting members of the legislature for the names of candidates to fill those

positions. These individuals were subsequently hired without any vetting process and without

any interview.

26.     During 2007 and 2008, the defendant **O'BRIEN** gave the then Chairman of the House

Ways and Means Committee the opportunity to fill several of the ELMO positions described

above in paragraph 25 with individuals chosen by the Chairman. The Chairman and a member of

his staff subsequently contacted approximately ten members of the House of Representatives

who provided the names of candidates for ELMO positions within the Probation Department.

These individuals were subsequently hired without any vetting process and without any

interview. Many of these individuals are still employed, approximately five years later, as

temporary employees at the Clinton ELMO facility.

27.     The defendant **O'BRIEN** engaged in the conduct described above in paragraphs 25 and

26 in order to influence and attempt to influence members of the legislature to act favorably on

10

legislation and budget requests regarding the Probation Department as well as to assist the Chairman in an upcoming contest for the post of Speaker of the House of Representatives.

28.     The defendant **O'BRIEN** routinely met with members of the legislature to discuss proposed and pending legislation that affected the Probation Department, including matters related to the Probation Department's budget.

29.     The defendant **O'BRIEN** attended annual meetings with the Chairman of the Ways and Means Committee to discuss the annual budget requests by the Probation Department. Further, in approximately September 2007 the defendant **O'BRIEN** met with the then Chairman of the Ways and Means Committee to discuss legislation proposed by **O'BRIEN** that would significantly impact the CJAM's supervisory authority over **O'BRIEN.**


        All in violation of Title 18, United States Code, Section 1962(d).

11

<u>COUNT TWO</u>
(Racketeering)

1.     Paragraphs One through Ten and Fourteen through Twenty-nine of Count One of this

Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From in or before 2000 and continuing through April 2010, in the District of

Massachusetts and elsewhere, the defendants herein,

**JOHN J. O'BRIEN,** and
**ELIZABETH V. TAVARES,**

and others, including the defendant **WILLIAM H. BURKE, III**, who is not named in this

Count, known and unknown to the Grand Jury, being persons employed by and associated with

the enterprise, did unlawfully and knowingly conduct and participate, directly and indirectly, in

the conduct of the affairs of the Office of the Commissioner of Probation (OCP), which was

engaged in and the activities of which affected interstate and foreign commerce, through the

pattern of racketeering activity particularly described below in paragraphs 3 through 52.

THE SCHEME TO DEFRAUD

3.     Between 2000 and 2010, the defendants **JOHN J. O'BRIEN, ELIZABETH V.**

**TAVARES,** and **WILLIAM H. BURKE, III,** devised and intended to devise a scheme and

artifice to defraud and to obtain money and property by means of false and fraudulent pretenses

and representations, in that the defendants and their co-conspirators did award employment and

promotions to individuals who were solicited from and sponsored by members of the

Massachusetts legislature and others when those sponsored individuals were not the most

qualified candidates who had applied for the employment or promotion. In so doing, the

defendants obtained money and property, to wit, jobs and salaries for individuals who were not

12

the most qualified candidates, but who had the sponsorship of a member of the state legislature or some other individual of significance to members of the enterprise.

*The employment of P.L.*

4.     P.L. was the son of a member of the state judiciary and was sponsored for employment by the President of the Senate as a probation officer at the Plymouth County Probate and Family Court. P.L. was not the most qualified candidate, but was hired in or about June 2008. Rejection letters were mailed to unsuccessful candidates on or about May 29, 2008.

*The employment of M.M.*

5.     M.M. was an acquaintance of the District Attorney for the Cape & Islands and was sponsored for employment by the President of the Senate as a probation officer at the Plymouth District Court. M.M. was not the most qualified candidate, but was hired in or about May 2008. Rejection letters were mailed to unsuccessful candidates on or about March 12, 2008.

*The employment of P.M.*

6.     P.M. was sponsored for employment by the President of the Senate as a probation officer at the Plymouth District Court. P.M. was not the most qualified candidate, but was hired in or about May 2008. Rejection letters were mailed to unsuccessful candidates on or about March 12, 2008.

*The employment of K.M.*

7.     K.M. was sponsored for employment by a member of the Senate as a probation officer at the Bristol County Probate and Family Court. K.M. was not the most qualified candidate, but was hired in or about April 2008. Rejection letters were mailed to unsuccessful candidates on or about April 10, 2008.

13

*The employment of L.M.*

8. L.M. was sponsored for employment by a member of the House of Representatives and a member of the state judiciary as a probation officer at the Worcester County Probate and Family Court. L.M. was not the most qualified candidate, but was hired in or about March 2008. Rejection letters were mailed to unsuccessful candidates on or about March 13, 2008.

*The employment of M.W.*

9. M.W. was sponsored for employment by a member of the House of Representatives and the then Speaker of the House as a probation officer at the Middlesex County Juvenile Court. M.W. was not the most qualified candidate, but was hired in or about November 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

*The employment of K.O.*

10. K.O. was sponsored for employment by a member of the House of Representatives and the then Speaker of the House as a probation officer at the Middlesex County Juvenile Court. K.O. was not the most qualified candidate, but was hired in or about November 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

*The employment of M.S.*

11. M.S. was the daughter of a member of the state judiciary and was sponsored for employment by a member of the House of Representatives and the then Speaker of the House as a probation officer at the Middlesex County Juvenile Court. M.S. was not the most qualified candidate, but was hired in or about November 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

14

*The employment of E.N.*

12.     E.N. was sponsored for employment by a member of the Senate as a probation officer at the Taunton District Court. E.N. was not the most qualified candidate, but was hired in or about March 2007. Rejection letters were mailed to unsuccessful candidates on or about March 20, 2007.

*The employment of A.M.*

13.     A.M. was sponsored for employment by a member of the Senate and the President of the Senate as a probation officer at the Middlesex County Juvenile Court. A.M. was not the most qualified candidate, but was hired in or about September 2007. Rejection letters were mailed to unsuccessful candidates on or about September 19, 2007.

14.     A.M. was sponsored again for employment by a member of the Senate and the President of the Senate as a probation officer at the Peabody District Court. A.M. was not the most qualified candidate, but was hired in or about September 2008. Rejection letters were mailed to unsuccessful candidates on or about October 9, 2008.

*The employment of J.C.*

15.     J.C. was sponsored for employment by a member of the Senate as a probation officer at the Suffolk County Probate and Family Court. J.C. was not the most qualified candidate, but was hired in or about November 2006. Rejection letters were mailed to unsuccessful candidates on or about November 10, 2006.

*The employment of B.M.*

16.     B.M. was the son of an employee of a member of the House of Representatives, and was sponsored for employment as a probation officer at the Suffolk County Superior Court by that

15

member who was the then Chairman of the House Ways and Means Committee. B.M. was not the most qualified candidate, but was hired in or about December 2005. Rejection letters were mailed to unsuccessful candidates in or about December 2005.

*The employment of D.M.*

17.     D.M. was the son of a former member of the Senate and was sponsored for employment by a member of the Senate as a probation officer at the Bristol County Probate and Family Court. D.M. was not the most qualified candidate, but was hired in or about April 2005. D.M.'s appointment letter was mailed to the Chief Probation Officer in or about October 24, 2005.

*The employment of C.H.*

18.     C.H. was sponsored for employment by the defendant **BURKE** as a probation officer at the Hampshire County Superior Court. C.H. was not the most qualified candidate, but was hired in or about January 2006. Rejection letters were mailed to unsuccessful candidates in or about January 2006.

*The promotion of A.P.*

19.     A.P. was sponsored for a promotion to an Assistant Chief Probation Officer at the Milford District Court by a member of the House of Representatives and the defendant **BURKE.** A.P. was not the most qualified candidate, but was promoted in or about March 2005. Rejection letters were mailed to unsuccessful candidates on or about March 16, 2005.

*The promotion of F.G.*

20.     F.G. was sponsored for a promotion to an Assistant Chief Probation Officer at the Franklin County Superior Court by a member of the House of Representatives and the defendant **BURKE.** F.G. was not the most qualified candidate, but was promoted in or about February

16

2006. Applications from prospective candidates were mailed to the enterprise in or about December 2005.

*The promotions of J.D.*

21.     J.D. was sponsored for a promotion to a First Assistant Chief Probation Officer at the Bristol County Superior Court by a member of the Senate. J.D. was not the most qualified candidate, but was promoted in or about April 2005. Rejection letters were mailed to unsuccessful candidates in or about April 4, 2005.

22.     J.D. was sponsored for a promotion to a Chief Probation Officer at the Bristol County Superior Court by a member of the Senate. J.D. was not the most qualified candidate, but was promoted in or about April 2006. Rejection letters were mailed to unsuccessful candidates in or about March 28, 2006.

*The promotion of B.D.*

23.     B.D. was sponsored for a promotion to an Assistant Chief Probation Officer at the Worcester District Court by the then Speaker of the House of Representatives. B.D. was not the most qualified candidate, but was promoted in or about January 2005. Rejection letters were mailed to unsuccessful candidates on or about February 17, 2005.

*The promotion of E.T.*

24.     E.T. was sponsored for a promotion to an Assistant Chief Probation Officer at the Barnstable District Court by a member of the Senate. E.T. was not the most qualified candidate, but was promoted in or about March 2005. Rejection letters were mailed to unsuccessful candidates in or about February 25, 2005.

*The employment of K.P.*

17

25.     K.P. was the wife of a member of the House of Representatives and was sponsored for
employment by the then Speaker of the House of Representatives for a position as Program
Manager for the Electronic Monitoring Program in Springfield. K.P. was not the most qualified
candidate, but was hired in or about February 2001. Applications from prospective candidates
were mailed to the enterprise in or about November 2000.

*The employment of M.B.*

26.     M.B. was the daughter of the defendant **BURKE** and was sponsored by the defendant
**BURKE** for the position of Assistant Program Manager for the Electronic Monitoring Program
in Springfield. M.B. was not the most qualified candidate, but was hired in or about April 2001.

### RACKETEERING ACTS NUMBERS ONE THROUGH TWENTY-TWO

27.     On or about the dates set forth below, in the District of Massachusetts, the defendants,
**JOHN J. O'BRIEN** and **ELIZABETH V. TAVARES,** aided and abetted by others known and
unknown to the Grand Jury, including the defendant **WILLIAM H. BURKE, III**, who is not
named in this Count, having devised and intending to devise a scheme and artifice to defraud,
and for obtaining money and property by means of materially false and fraudulent pretenses,
representations and promises, did cause to be placed in post offices and authorized depositories
for mail matter any matter and thing whatever to be sent and delivered by the Postal Service and
any private and commercial interstate carrier, and did cause to take and receive therefrom, for the
purpose of executing and attempting to execute said scheme and artifice to defraud, in that the
defendants and their co-conspirators did: (1) cause those individuals set forth below to be hired
and promoted when they were not the most qualified candidate; (2) provide materially false
documents to the CJAM to make it appear that those individuals were the most qualified

18

candidates and were hired pursuant to a merit-based system; and (3) use the United States Postal

Service as well as private and commercial interstate carriers to deliver rejection letters to other

unsuccessful candidates and to receive and deliver other documents related to employment with

the enterprise in violation of Title 18, United States Code, Sections 1341 and 2.

| Racketeering Act | Sponsored Candidate | Date of Mailing in Furtherance of Scheme | Documents Mailed in Furtherance of Scheme |
|---|---|---|---|
| One | P.L. | May 29, 2008 | Rejection letters |
| Two | M.M. | March 12, 2008 | Rejection letters |
| Three | P.M | March 12, 2008 | Rejection letters |
| Four | K.M. | April 10, 2008 | Rejection letters |
| Five | L.M. | March 13, 2008 | Rejection letters |
| Six | M.W. | September 19, 2007 | Rejection letters |
| Seven | K.O. | September 19, 2007 | Rejection letters |
| Eight | M.S. | September 19, 2007 | Rejection letters |
| Nine | E.N. | March 20, 2007 | Rejection letters |
| Ten | A.M. | September 19, 2007 | Rejection letters |
| Eleven | A.M. | October 9, 2008 | Rejection letters |
| Twelve | J.C. | November 10, 2006 | Rejection letters |
| Thirteen | B.M. | December 2005 | Rejection letters |
| Fourteen | D.M. | October 24, 2005 | Appointment letter |
| Fifteen | C.H. | January 2006 | Rejection letters |
| Sixteen | A.P. | March 16, 2005 | Rejection letters |
| Seventeen | F.G. | December 2005 | Applications for employment |

| Eighteen | J.D. | April 4, 2005 | Rejection letters |
| Nineteen | J.D. | March 28, 2006 | Rejection letters |
| Twenty | B.D. | February 17, 2005 | Rejection letters |
| Twenty-one | E.T. | February 25, 2005 | Rejection letters |
| Twenty-two | K.P. | November 2000 | Applications for employment |

## RACKETEERING ACTS NUMBERS TWENTY-THREE THROUGH FORTY-FOUR

28.     The defendants **JOHN J. O'BRIEN** and **ELIZABETH V. TAVARES** committed the

following acts involving violations of the Massachusetts bribery statutes. The commission of

either corresponding racketeering act denoted subdivision (a) in paragraph 29 or denoted

subdivision (b) in paragraph 30 of Racketeering Acts Twenty-three through Forty-four

constitutes the commission of that racketeering act.

29.     On or about the dates set forth below, in the District of Massachusetts, the defendants,

**JOHN J. O'BRIEN** and **ELIZABETH V. TAVARES,** aided and abetted by others known and

unknown to the Grand Jury, including the defendant **WILLIAM H. BURKE, III**, who is not

named in this Count, did directly and indirectly corruptly give, offer and promise anything of

value to any state employee, and offer and promise such employee to give anything of value to

any other person, with intent to influence an official act and any act within the official

responsibility of such an employee, in that the defendants and their co-conspirators did give jobs

and promotions within the Probation Department to individuals sponsored by members of the

legislature to favorably influence and attempt to favorably influence the decisions of those

legislators regarding legislative matters affecting the Probation Department including, but not

limited to, the annual General Appropriations Act, in violation of Massachusetts General Laws,

20

Chapter 268A, Section 2(a)(1).

| Racketeering Act | Sponsored Candidate | Approximate Date of Appointment |
|---|---|---|
| Twenty-three (a) | P.L. | May 20, 2008 |
| Twenty-four (a) | M.M. | March 11, 2008 |
| Twenty-five (a) | P.M. | March 11, 2008 |
| Twenty-six (a) | K.M. | April 8, 2008 |
| Twenty-seven (a) | L.M. | March 14, 2008 |
| Twenty-eight (a) | M.W. | August 30, 2007 |
| Twenty-nine (a) | K.O. | August 30, 2007 |
| Thirty (a) | M.S. | August 30, 2007 |
| Thirty-one (a) | E.N. | March 19, 2007 |
| Thirty-two (a) | A.M. | August 30, 2007 |
| Thirty-three (a) | A.M. | October 8, 2008 |
| Thirty-four (a) | J.C. | July 6, 2006 |
| Thirty-five (a) | B.M. | December 7, 2005 |
| Thirty-six (a) | D.M. | October 24, 2005 |
| Thirty-seven (a) | C.H. | January 20, 2006 |
| Thirty-eight (a) | A.P. | March 22, 2005 |
| Thirty-nine (a) | F.G. | February 3, 2006 |
| Forty (a) | J.D. | April 1, 2005 |
| Forty-one (a) | J.D. | March 29, 2006 |
| Forty-two (a) | B.D. | February 3, 2005 |

| Forty-three (a) | E.T. | February 25, 2005 |
| Forty-four (a) | K.P. | November 22, 2000 |

30.     On or about the dates set forth below, in the District of Massachusetts, the defendants **JOHN J. O'BRIEN** and **ELIZABETH V. TAVARES,** aided and abetted by others known and unknown to the Grand Jury, including the defendant **WILLIAM H. BURKE, III**, who is not named in this Count, did, otherwise as provided by law for the proper discharge of official duty, directly and indirectly give, offer and promise anything of substantial value to any present and former state employee for and because of any official act performed and to be performed by such state employee, in that the defendants and their co-conspirators did give jobs and promotions within the Probation Department to individuals sponsored by members of the legislature who made decisions regarding legislative matters affecting the Probation Department in violation of Massachusetts General Laws, Chapter 268A, Section 3(a).

| Racketeering Act | Sponsored Candidate | Approximate Date of Appointment |
| --- | --- | --- |
| Twenty-three (b) | P.L. | May 20, 2008 |
| Twenty-four (b) | M.M. | March 11, 2008 |
| Twenty-five (b) | P.M. | March 11, 2008 |
| Twenty-six (b) | K.M. | April 8, 2008 |
| Twenty-seven (b) | L.M. | March 14, 2008 |
| Twenty-eight (b) | M.W. | August 30, 2007 |
| Twenty-nine (b) | K.O. | August 30, 2007 |
| Thirty (b) | M.S. | August 30, 2007 |
| Thirty-one (b) | E.N. | March 19, 2007 |

22

| | | |
|---|---|---|
| Thirty-two (b) | A.M. | August 30, 2007 |
| Thirty-three (b) | A.M. | October 8, 2008 |
| Thirty-four (b) | J.C. | July 6, 2006 |
| Thirty-five (b) | B.M. | December 7, 2005 |
| Thirty-six (b) | D.M. | October 24, 2005 |
| Thirty-seven (b) | C.H. | January 20, 2006 |
| Thirty-eight (b) | A.P. | March 22, 2005 |
| Thirty-nine (b) | F.G. | February 3, 2006 |
| Forty (b) | J.D. | April 1, 2005 |
| Forty-one (b) | J.D. | March 29, 2006 |
| Forty-two (b) | B.D. | February 3, 2005 |
| Forty-three (b) | E.T. | February 25, 2005 |
| Forty-four (b) | K.P. | November 22, 2000 |

## THE ELMO HIRING SCHEME

31.     In or about and between 2007 and 2008, the defendant **JOHN J. O'BRIEN** did give

members of the Massachusetts legislature the opportunity to place political supporters, friends,

and constituents in positions within the Probation Department, particularly the ELMO facility in

Clinton, Massachusetts, to favorably influence and attempt to favorably influence the decisions

of those legislators regarding legislative and budget matters affecting the Probation Department.

32.     *The employment of D.F.*

D.F. was sponsored for employment as an assistant ELMO coordinator in October 2007

by a member of the House of Representatives who received information about the employment

opportunity through the then Chairman of the House Ways and Means Committee. D.F. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

33. *The employment of M.S.*

M.S. was sponsored for employment as an assistant ELMO coordinator in August 2007 by a member of the House of Representatives who received information about the employment opportunity through the then Chairman of the House Ways and Means Committee. M.S. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

34. *The employment of S.W.*

S.W. was sponsored for employment as an assistant ELMO coordinator in October 2007 by a member of the House of Representatives who received information about the employment opportunity through the then Chairman of the House Ways and Means Committee. S.W. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

35. *The employment of M.C.*

M.C. was sponsored for employment as an assistant ELMO coordinator in June 2008 by a member of the House of Representatives who received information about the employment opportunity through the then Chairman of the House Ways and Means Committee. M.C. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

24

36.    *The employment of R.P.*

R.P. was sponsored for employment as an assistant ELMO coordinator in June 2008 by a
member of the House of Representatives who received information about the employment
opportunity through the then Chairman of the House Ways and Means Committee. R.P. was
hired without an interview as a temporary employee. He is no longer employed by the Probation
Department.

37.    *The employment of K.W.*

K.W. was sponsored for employment as an assistant ELMO coordinator in June 2008 by a
member of the House of Representatives who received information about the employment
opportunity through the then Chairman of the House Ways and Means Committee. K.W. was
hired without an interview as a temporary employee. He is no longer employed by the Probation
Department.

38.    *The employment of G.F.*

G.F. was sponsored for employment as an assistant ELMO coordinator in June 2008 by a
member of the House of Representatives who received information about the employment
opportunity through the then Chairman of the House Ways and Means Committee. G.F. was
hired without an interview as a temporary employee and currently remains employed by the
Probation Department.

39.    *The promotion of P.D.*

P.D. was sponsored for a promotion to an acting ELMO coordinator in June 2007 by a
member of the House of Representatives. P.D. was promoted without an interview and currently
remains employed by the Probation Department.

40.    *The employment of J.L.*

J.L. was sponsored for employment as an assistant ELMO coordinator in June 2008 by the then Chairman of the House Ways and Means Committee.  J.L. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

41.    *The employment of R.W.*

R.W. was sponsored for employment as an assistant ELMO coordinator in June 2008 by a member of the House of Representatives who received information about the employment opportunity through the then Chairman of the House Ways and Means Committee.  R.W. was hired without an interview as a temporary employee and  is no longer employed by the Probation Department.

42.    *The employment of F.P-M.*

F.P-M. was sponsored for employment as an assistant ELMO coordinator in July 2008 by the then Chairman of the House Ways and Means Committee.  F.P-M. was hired without an interview as a temporary employee and  is no longer employed by the Probation Department.

43.    *The employment of C.G.*

C.G. was sponsored for employment as an assistant ELMO coordinator in June 2008 by the President of the Massachusetts Senate.  C.G. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

44.    *The employment of D.C.*

D.C. was sponsored for employment as an assistant ELMO coordinator in August 2007 by the President of the Massachusetts Senate.  D.C. was hired without an interview as a

temporary employee and currently remains employed by the Probation Department.

45. *The employment of B.M.*

B.M. was sponsored for employment as an assistant ELMO coordinator in June 2008 by the Lieutenant Governor. B.M. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

46. *The employment of G.C.*

G.C. was sponsored for employment as an assistant ELMO coordinator in July 2008 by a member of the House of Representatives who received information about the employment opportunity through the then Speaker of the House of Representatives. G.C. was hired without an interview as a temporary employee and is no longer employed by the Probation Department.

47. *The employment of M.G.*

M.G. was sponsored for employment as an assistant ELMO coordinator in October 2007 by a member of the House of Representatives who received information about the employment opportunity through the then Speaker of the House of Representatives. M.G. was hired without an interview as a temporary employee and is no longer employed by the Probation Department.

48. *The employment of R.D.*

R.D. was sponsored for employment as an assistant ELMO coordinator in May 2008 by a member of the Massachusetts Senate. R.D. was hired without an interview as a temporary employee and currently remains employed by the Probation Department.

49. *The employment of K.B.*

K.B. was sponsored for employment as an assistant ELMO coordinator in June 2008 by a member of the House of Representatives. K.B. was hired without an interview as a temporary

27

employee and is no longer employed by the Probation Department.

RACKETEERING ACTS NUMBERS FORTY-FIVE THROUGH SIXTY-TWO

50.     The defendant **JOHN J. O'BRIEN** committed the following acts involving violations of the Massachusetts bribery statutes. The commission of either corresponding racketeering act denoted subdivision (a) in paragraph 51 or denoted subdivision (b) in paragraph 52 of Racketeering Acts Forty-five through Sixty-two constitutes the commission of that racketeering act.

51.     On or about the dates set forth below, in the District of Massachusetts, the defendant, **JOHN J. O'BRIEN,** aided and abetted by others known and unknown to the Grand Jury, did directly and indirectly corruptly give, offer and promise anything of value to any state employee, and offer and promise such employee to give anything of value to any person, with intent to influence an official act and any act within the official responsibility of such an employee, in that the defendant and his co-conspirators did give jobs and promotions within the Probation Department to individuals sponsored by members of the legislature to favorably influence and attempt to favorably influence the decisions of those legislators regarding legislative matters affecting the Probation Department in violation of  Massachusetts General Laws, Chapter 268A, Section 2(a)(1).

| Racketeering Act | Sponsored Candidate | Approximate Date of Appointment |
| --- | --- | --- |
| Forty-five (a) | D.F. | August 31, 2007 |
| Forty-six (a) | M.S. | July 31, 2007 |
| Forty-seven (a) | S.W. | September 11, 2007 |
| Forty-eight (a) | M.C. | May 6, 2008 |

| Forty-nine (a) | R.P. | May 6, 2008 |
| Fifty (a) | K.W. | May 6, 2008 |
| Fifty-one (a) | G.F. | May 6, 2008 |
| Fifty-two (a) | P.D. | June 11, 2007 |
| Fifty-three (a) | J.L. | May 30, 2008 |
| Fifty-four (a) | C.G. | May 6, 2008 |
| Fifty-five (a) | D.C. | July 31, 2007 |
| Fifty-six (a) | B.M. | May 20, 2008 |
| Fifty-seven (a) | G.C. | July 1, 2008 |
| Fifty-eight (a) | M.G. | September 11, 2007 |
| Fifty-nine (a) | R.W. | May 20, 2008 |
| Sixty (a) | F.P-M. | June 11, 2008 |
| Sixty-one (a) | R.D. | May 20, 2008 |
| Sixty-two (a) | K.B. | October 9, 2007 |

52.     On or about the dates set forth below, in the District of Massachusetts, the defendant,

**JOHN J. O'BRIEN,** aided and abetted by others known and unknown to the Grand Jury, did,

otherwise as provided by law for the proper discharge of official duty, directly and indirectly

give, offer and promise anything of substantial value to any present and former state employee

for and because of any official act performed and to be performed by such state employees, in

that the defendant and his co-conspirators did give jobs and promotions within the Probation

Department to individuals sponsored by members of the legislature who made decisions

regarding legislative matters affecting the Probation Department in violation of  Massachusetts

29

General Laws, Chapter 268A, Section 3(a).

| Racketeering Act | Sponsored Candidate | Approximate Date of Appointment |
| --- | --- | --- |
| Forty-five (b) | D.F. | August 31, 2007 |
| Forty-six (b) | M.S. | July 31, 2007 |
| Forty-seven (b) | S.W. | September 11, 2007 |
| Forty-eight (b) | M.C. | May 6, 2008 |
| Forty-nine (b) | R.P. | May 6, 2008 |
| Fifty (b) | K.W. | May 6, 2008 |
| Fifty-one (b) | G.F. | May 6, 2008 |
| Fifty-two (b) | P.D. | June 11, 2007 |
| Fifty-three (b) | J.L. | May 30, 2008 |
| Fifty-four (b) | C.G. | May 6, 2008 |
| Fifty-five (b) | D.C. | July 31, 2007 |
| Fifty-six  (b) | B.M. | May 20, 2008 |
| Fifty-seven (b) | G.C. | July 1, 2008 |
| Fifty-eight (b) | M.G. | September 11, 2007 |
| Fifty-nine (b) | R.W. | May 11, 2008 |
| Sixty (b) | F.P-M. | June 11, 2008 |
| Sixty-one (b) | R.D. | May 20, 2008 |
| Sixty-two (b) | K.B. | October 9, 2007 |

All in violation of Title 18, United States Code, Section 1962(c).

## COUNTS THREE THROUGH TWELVE
(Mail Fraud)

1.      Paragraphs One through Ten and Fourteen through Twenty-one of Count One and Three

through Twenty-six of Count Two of this Indictment are realleged and incorporated by reference

as though fully set forth herein.

2.      On or about the dates set forth below, in the District of Massachusetts, the defendants,

### JOHN J. O'BRIEN ,
### ELIZABETH V. TAVARES, and
### WILLIAM H. BURKE, III,

aided and abetted by others known and unknown to the Grand Jury, having devised and intending

to devise a scheme and artifice to defraud, and for obtaining money and property by means of

materially false and fraudulent pretenses, representations and promises, did cause to be placed in

post offices and authorized depositories for mail matter any matter and thing whatever to be sent

and delivered by the Postal Service and any private and commercial interstate carrier, and did

cause to take and receive therefrom, for the purpose of executing and attempting to execute said

scheme and artifice to defraud, in that the defendants and their co-conspirators did: (1) cause

those individuals set forth below to be hired and promoted when they were not the most qualified

candidates; (2) provide materially false documents to the CJAM to make it appear that those

individuals were the most qualified candidates and were hired pursuant to a merit-based system;

and (3) use the United States Postal Service as well as private and commercial interstate carriers

to deliver rejection letters to other unsuccessful candidates and to receive and deliver other

documents related to employment with the enterprise.

31

| Count | Sponsored Candidate | Date of Mailing in Furtherance of Scheme | Documents Mailed in Furtherance of Scheme |
|-------|---------------------|------------------------------------------|-------------------------------------------|
| Three | P.L. | May 29, 2008 | Rejection letters |
| Four | M.M. | March 12, 2008 | Rejection letters |
| Five | P.M. | March 12, 2008 | Rejection letters |
| Six | K.M. | April 10, 2008 | Rejection letters |
| Seven | L.M. | March 13, 2008 | Rejection letters |
| Eight | M.W. | September 19, 2007 | Rejection letters |
| Nine | K.O. | September 19, 2007 | Rejection letters |
| Ten | M.S. | September 19, 2007 | Rejection letters |
| Eleven | A.M. | September 19, 2007 | Rejection letters |
| Twelve | A.M. | October 9, 2008 | Rejection letters |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THIRTEEN

(Conspiracy to commit bribery concerning programs receiving federal funds)

1.      Paragraphs One through Ten and Fourteen through Twenty-nine of Count One and paragraphs Three through Twenty-six and Thirty-one through Forty-nine of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or before 2000 and continuing through April 2010, both dates being approximate and inclusive, in the District of Massachusetts, the defendants,

### JOHN J. O'BRIEN ,
### ELIZABETH V. TAVARES, and
### WILLIAM H. BURKE, III,

and others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate and agree together and with each other to corruptly give, offer and agree to give a thing of value to any person, with intent to influence and reward an agent of a state government, in connection with any business, transaction, and series of transactions of such government involving a thing of value of $5,000 or more, where said state government in any one year period received benefits in excess of $10,000 under a Federal grant program, in that the defendants and others known and unknown to the Grand Jury did conspire, confederate and agree to give jobs and salaries to candidates for employment sponsored by a member of the Massachusetts legislature in order to influence those members of the legislature and others who were in a position to affect the defendants through legislation, budget authorizations, and in other ways, in violation of Title 18, United States Code, Section 666(a)(2).

33

## MANNER AND MEANS OF THE CONSPIRACY

It was a part of the conspiracy that:

3 . *The P.L. hire*

a. On or about February 28, 2008, the Office of the Senate President opened a case file regarding employment of P.L.

b. On or about February 29, 2008, P.L.'s father forwarded P.L.'s resume to the Office of the Senate President.

c. On or about March 11, 2008, P.L.'s father sent an e-mail to the Office of the Senate President stating in part, "I know that Jack O'Brien takes very seriously calls from your office where there is a strong interest on the part of the Senate President."

d. On or about March 24, 2008, an aide to the Senate President placed a call to an OCP employee regarding the application of P.L.

e. On or about March 31, 2008, an aide to the Senate President drafted a memorandum to the Senate President that included an update on the status of P.L.'s application for employment.

f. On or about April 18, 2008, two OCP employees and the First Justice of the Plymouth County Probate and Family Court interviewed P.L., who received an overall ranking of nine out of ten candidates who advanced to the final round of interviews.

g. On or about May 2, 2008, an OCP employee placed a telephone call to an aide to the Senate President to report that P.L. had been hired.

h. On or about May 29, 2008, an aide to the Senate President drafted a memorandum to the Senate President that informed the Senate President that the CJAM had approved P.L.'s appointment as a probation officer.

i. On or about June 5, 2008, P.L. sent an e-mail to the Senate President thanking the Senate President for her assistance.

4. *The M.M. hire*

a. On or about April 17, 2007, the Office of the Senate President opened a case file regarding employment of M.M.

34

b.    On or about February 23, 2007, the District Attorney for the Cape and Islands sent a letter to the Senate President recommending M.M. for a probation officer job.

c.    On or about March 8, 2007, an aide to the Senate President spoke with an OCP employee regarding the application of M.M.

d.    On or about June 13, 2007, an aide to the Senate President forwarded M.M.'s updated resume to an OCP employee.

e.    On or about December 18, 2007, M.M. sent an e-mail to the Office of the Senate President stating that M.M. applied for a probation officer position.

f.    On or about February 7, 2008, two OCP employees and the First Justice of the Plymouth County District Court interviewed M.M., who received an overall ranking of 8 out of 16 candidates who advanced to the final round of interviews.

g.    On or about February 29, 2008, the defendant **O'BRIEN** placed a telephone call to an aide to the Senate President to report that M.M. would be offered a probation officer position in Plymouth County District Court.

h.    On or about March 3, 2008, an aide to the Senate President drafted a memorandum to the Senate President that informed the Senate President that M.M. would be offered a probation officer position in Plymouth County District Court.

5.    *The P.M. hire*

a.    On or about October 24, 2007, the Office of the Senate President opened a case file regarding employment of P.M.

b.    On or about December 14, 2007, an aide to the Senate President forwarded P.M.'s resume to an employee of OCP.

c.    On or about January 15, 2008, P.M. sent an e-mail to an aide of the Senate President stating, among other things, "Thank you again."

d.    On or about February 7, 2008, two OCP employees and the First Justice of the Plymouth County District Court interviewed P.M., who received an overall ranking of 9 out of 16 candidates who advanced to the final round of interviews.

e.    On or about February 29, 2008, the defendant **O'BRIEN** placed a telephone call to an aide to the Senate President to report that P.M. would be offered a job as a probation officer in Plymouth District Court.

f.    On or about March 3, 2008, an aide to the Senate President drafted a memorandum to the Senate President noting that P.M. was hired for a job in Plymouth District Court, and specifically stated "She's very excited and grateful to you; her interview was just ok but knows it was because of your intervention that she was selected."

6.    *The K.M. hire*

a.    In or about late 2007 or early 2008, an aide to a state senator ("State Senator 1") contacted the then Director of OCC and recommended K.M., who was involved in a romantic relationship with the senator, for a probation officer position.

b.    On or about February 7, 2008, two OCP employees and the First Justice of the Bristol County Probate and Family Court interviewed K.M., who received an overall ranking of 8 out of 9 candidates who advanced to the final round of interviews.

7.    *The L.M. hire*

a.    In early 2008, a member of the House of Representatives ("State Representative 1") contacted an aide of the then Chairman of the House Ways and Means Committee, to seek assistance with obtaining employment for L.M. at Probation.

b.    On or about February 12, 2008, two OCP employees and an Associate Justice of Worcester Probate and Family Court interviewed L.M., who received an overall ranking of 7 out of 8 candidates who advanced to the final round of interviews.

c.    On or about March 14, 2008, the sponsoring state representative sent a letter to defendant **O'BRIEN** thanking the defendant **O'BRIEN** for appointing L.M. as a probation officer.

8.    *The M.W. hire*

a.    In or about November 2006, M.W. applied for a probation officer position at the Middlesex Juvenile Court.

b.    In or about November 2006, M.W.'s father contacted a member of the House of Representatives ("State Representative 2") to seek assistance with obtaining employment for M.W. at Probation.

c.    In or about early 2007, State Representative 2 contacted an aide of the then-Speaker of the House of Representatives to seek assistance with obtaining employment for M.W. at Probation.

d.   On or about February 20, 2007, two OCP employees and an Associate Justice of Middlesex County Juvenile Court interviewed M.W., who was ranked 11out of 14 candidates who advanced to the final round of interviews.

9.   *The K.O. hire*

a.   In or about November 2006, K.O. applied for a probation officer position in the Middlesex Juvenile Court.

b.   In or about November 2006, K.O. contacted State Representative 2 to seek assistance in obtaining the probation officer position.

c.   In or about early 2007, State Representative 2 contacted an aide of the then Speaker of the House of Representatives to seek assistance with obtaining employment for K.O. at Probation.

d.   On or about February 20, 2007, two OCP employees and an Associate Justice of Middlesex County Juvenile Court interviewed K.O., who was ranked 9 out of 14 candidates who advanced to the final round of interviews.

10.  *The M.S. hire*

a.   In or about November 2006, M.S., whose father was a state court judge, applied for a probation officer position in the Middlesex Juvenile Court.

b.   In or about November 2006, M.S. contacted the wife of a member of the House of Representatives ("State Representative 3"), to seek assistance in obtaining the probation officer position.

c.   On or about February 20, 2007, two OCP employees and an Associate Justice of Middlesex County Juvenile Court interviewed M.S., who was ranked 12 out of 14 candidates who advanced to the final round of interviews.

11.  *The E.N. hire*

a.   In or about November 2006, E.N. applied for a job as a probation officer position in Taunton District Court.

b.   On or about December 28, 2006, a state senator ("State Senator 2")sent a letter to defendant **O'BRIEN** recommending E.N. for the job.

c.   On or about February 9, 2007, two OCP employees and a Justice of the Taunton District Court interviewed E.N., who was ranked second by the OCP employees, and ninth by the Justice out of 16 candidates who advanced to the final round of

interviews.

12.    *The A.M. hires*

a.    In or about November 2006, A.M. contacted a state senator ("State Senator 3") for
      a recommendation for a probation officer position in Middlesex Juvenile Court.

b.    On or about February 20, 2007, two OCP employees and the First Justice of
      Middlesex Juvenile Court interviewed A.M., who was ranked 10 out of 14
      candidates who advanced to the final round of interviews.

c.    On or about August 6, 2008, the Office of the Senate President opened a case file
      regarding employment of A.M. for a probation officer position at Peabody District
      Court.

d.    On or about July 16, 2008, two OCP employees and the First Justice of Peabody
      District Court interviewed A.M., who was ranked of 6 out of 13 candidates who
      advanced to the final round of interviews.

e.    On or about October 8, 2008, an aide to the Senate President spoke to an
      employee of OCP who indicated that A.M. would "go to Peabody District Court."

f.    On or about October 8, 2008, an aide to the Senate President "conveyed" this
      information to the office of State Senator 3, so that State Senator 3's office could
      tell A.M. that he had been hired by Probation.

13.    *The J.C. hire*

a.    On or about October 6, 2005, a state Senator ("State Senator 4"), sent a letter to
      defendant **O'BRIEN** noting his "strong support" for J.C. for a probation officer
      position.

b.    On or about May 15, 2006, J.C. applied for a probation officer position in Suffolk
      Probate and Family Court.

c.    At some time during the application process, J.C. contacted the office of State
      Senator 4 seeking support for his application for the probation officer position at
      Suffolk Probate and Family Court.

d.    On or about June 6, 2006, two OCP employees and a Justice of the Suffolk
      Probate and Family Court interviewed J.C., who was ranked 7 out of 7 candidates
      who advanced to the final round of interviews.

e.    In or about October 2006, the CJAM requested a meeting with an OCP employee

38

regarding J.C.'s appointment because the CJAM questioned the integrity of the
interview process.

f.      At the October 2006 meeting with the CJAM, the OCP employee misrepresented
        the hiring process, indicating that J.C. was hired because he was the most
        qualified candidate.

g.      On or about November 10, 2006, the CJAM approved defendant **O'BRIEN**'s
        request to appoint J.C. as a probation officer in Suffolk Probate and Family Court.

14.     *The B.M. hire and promotions*

a.      In or about July 2004, the then-Director of OCC hired B.M., the son of a former
        aide to the then-Chairman of the House Ways and Means Committee, as an
        assistant court services coordinator.

b.      On or about September 28, 2005, B.M. applied for a probation officer position in
        Suffolk Superior Court.

c.      On or about December 7, 2005, the then-Chairman of the House Ways and Means
        Committee wrote a letter to defendant **O'BRIEN** recommending B.M. for the
        probation officer position.

d.      In or about December 2007, defendant **O'BRIEN** contacted B.M. via telephone
        and offered him the position of Acting Probation Officer-in-Charge in Suffolk
        County without application or interview.

e.      In or about the Spring of 2009, defendant **O'BRIEN** contacted B.M. via telephone
        and offered him a promotion to Acting Chief Probation Officer at OCP.

15.     *The D.M. hire*

a.      In or about the Fall of 2004, defendant **O'BRIEN** contacted D.M. by telephone
        and offered him a temporary position as a probation officer in Bristol Probate and
        Family Court without receiving an application or conducting an interview.

b.      On or about January 25, 2005, D.M. applied to become a permanent probation
        officer in Bristol Probate and Family Court.

c.      At or about the time of his application, D.M. contacted the office of State Senator
        1 to seek assistance in obtaining the probation officer position.

d.      On or about February 7, 2005, State Senator 1 sent a letter to defendant **O'BRIEN**
        recommending D.M. for a permanent probation officer position, describing D.M.

> as "a highly qualified individual with excellent organizational and managerial skills."

   e.   In or about April 2005, two OCP employees and the First Justice of the Bristol Probate and Family Court interviewed D.M. who was ranked 7 out of 11 candidates who advanced to the final round of interviews.

16.   *The C.H. hire*

   a.   In or about the Fall of 2005, C.H. applied for a position as a probation officer in Hampshire Superior Court.

   b.   On or about December 19, 2005, two OCP employees and a Justice of the Hampshire Superior Court interviewed C.H. who was ranked 8 out of at least 11 candidates who advanced to the final round of interviews.

   c.   On or about January 3, 2006, immediately following C.H.'s final round interview, C.H. spoke with defendant **BURKE** who told C.H. that C.H. would be hired as a probation officer in Hampshire Superior Court and that another applicant would not be hired.

17.   *The A.P. promotion*

   a.   On or about January 13, 2005, A.P., the grand-niece of a former member of the House of Representatives applied for a promotion to the position of Assistant Chief Probation Officer in Milford District Court.

   b.   On or about February 14, 2005, two OCP employees and a Justice of the Milford District Court interviewed A.P., who was ranked 6 out of 10 individuals who advanced to the final round of interviews.

18.   *The F.G. promotion*

   a.   On or about December 2, 2005, F.G. applied for the position of Assistant Chief Probation Officer in Franklin Superior Court.

   b.   On or about January 12, 2006, two OCP employees and a Justice of the Franklin Superior Court interviewed F.G., who was ranked 5 out of 6 candidates who advanced to the final round of interviews.

19.   *The J.D. promotions*

   a.   In or about January 2005, J.D. applied for a promotion to First Assistant Chief Probation Officer of Bristol Superior Court and solicited State Senator 2 for

assistance.

b.   In or about and between January and March 2005, State Senator 2 told J.D. that he had spoken with the defendant **O'BRIEN,** who stated that J.D. would receive the promotion or the position would be "frozen."

c.   On or about March 9, 2005, two OCP employees and an Associate Justice of the Bristol Superior Court interviewed J.D., who ranked second, fifth and fifth respectively out of seven candidates who advanced to the final round of interviews.

d.   In or about late 2005, J.D. received a telephone call from State Senator 2 advising J.D. that J.D. would be appointed to Acting Chief Probation Officer by the defendant **O'BRIEN** in Taunton District Court.

e.   On or about January 24, 2006, J.D. applied for the position of Chief Probation Officer in Taunton District Court and called State Senator 2 who stated that he would call the defendant **O'BRIEN.**

f.   In or about March 2006, one day after J.D.'s interview for the Chief Probation Officer position, J.D. called State Senator 2 who stated that he had spoken with defendant **O'BRIEN** and **O'BRIEN** stated that J.D. "would be fine."

g.   Approximately one week later, defendant **O'BRIEN** called J.D. and offered J.D. the position of Chief Probation Officer in Taunton District Court.

20.   *The B.D. promotion*

a.   On or about January 18, 2005, B.D. submitted an application for Assistant Chief Probation Officer in Worcester District Court and requested assistance from the then- Speaker of the House of Representatives.

b.   In late January 2005 and prior to the interview mentioned below in subparagraph c., B.D. was informed by an aide to the then Speaker of the House of Representatives that B.D. would receive the promotion and B.D. could "sleep through the interview."

c.   On or about January 31, 2005, the defendant **BURKE,** a First Justice of the Worcester District Court, and one other OCP employee interviewed B.D., who was ranked second out of fourteen candidates.

d.   On or about February 2 and 17, 2005, letters signed by the defendant **O'BRIEN** were sent to unsuccessful candidates.

41

21.    *The E.T. promotion*

   a.    On or about January 13, 2005, E.T. submitted an application for Assistant Chief
          Probation Officer in Barnstable District Court and listed a state representative
          ("State Representative 4"), a friend and supporter, as a reference.

   b.    E.T. contacted a state senator ("State Senator 5"), a close friend of E.T.'s
          godfather, and asked for the support of State Senator 3 regarding the Assistant
          Chief Probation Officer position.

   c.    On or about February 2, 2005, E.T. was scheduled to interview with two OCP
          employees and the First Justice of the Barnstable District Court, but arrived late
          for his interview, after the interviews for the position had concluded.

   d.    Shortly after the events described above in paragraph c, E.T. received a phone call
          from defendant **TAVARES** about E.T.'s failure to attend his scheduled interview.

   e.    On or about February 9, 2005, OCP scheduled a new set of interviews for the
          Assistant Chief Probation Officer position and all candidates for the job, including
          E.T., were re-interviewed by two different OCP employees and a different First
          Justice.

   f.    After this second set of interviews, E.T. was ranked in the top 8 candidates.

22.    *The M.B. hire*

   a.    In or about the Fall of 2000, defendant **BURKE** told M.B. to apply for a position
          as Court Services Coordinator in the ELMO program.

   b.    On or about December 7, 2000, M.B. interviewed for the position with at least one
          OCP employee.

23.    *The K.P. hire*

   a.    In or about November 2000, K.P., the wife of member of the House of
          Representatives ("State Representative 5"), applied for a position as Program
          Manager in the recently created ELMO program.

   b.    At or near the time K.P. submitted her application, State Representative 5
          informed the then- Speaker of the House about K.P.'s application.

   c.    In or about November 2000, K.P. interviewed for the position with at least one
          OCP employee.

### *The ELMO hires*

24.   *The D.F. hire*

    a.    In or about Spring or Summer 2007, the then-Chairman of the House Ways and Means Committee spoke with a state representative ("State Representative 6") about a job opening in Probation's ELMO facility in Clinton.

    b.    In or about Spring or Summer 2007, State Representative 6 contacted D.F. and asked D.F. if D.F. was interested in a job at Probation's ELMO facility in Clinton.

    c.    On or about August 16, 2007, D.F. went to Clinton and filled out his application.

    d.    D.F. was never interviewed.

25.   *The S.W. hire*

    a.    In or about September 2007, then-Chairman of the House Ways and Means Committee spoke with a state representative ("State Representative 7") about a job opening in Probation's ELMO facility in Clinton.

    b.    In or about September 2007, State Representative 7 contacted S.W. and asked S.W. if S.W. was interested in a job at Probation.

    c.    On or about September 5, 2007, S.W. went to Clinton and filled out an application.

    d.    S.W. was never interviewed.

26.   *The M.S. hire*

    a.    In or about Spring or Summer 2007, L.M., an aide to then-Chairman of the House Ways and Means Committee, R.D., spoke with a state representative ("State Representative 8") about a job opening in Probation's ELMO facility in Clinton.

    b.    In or about Spring or Summer 2007, State Representative 8 contacted M.S. and asked M.S. if M.S. was interested in a job at Probation's ELMO facility in Clinton.

    c.    On or about June 29, 2007, M.S. went to Clinton and filled out his application.

    d.    M.S. was never interviewed.

Case 4:12-cr-40026-FDS Document 113 Filed 04/24/13 Page 44 of 56

27.     *The M.C. hire*

    a.    In or about Spring 2008, then-Chairman of the House Ways and Means Committee spoke with a state representative ("State Representative 9") about a job opening in Probation's ELMO facility in Clinton.

    b.    In or about Spring 2008, State Representative 9 contacted M.C. and asked M.C. if M.C. was interested in a job at Probation's ELMO facility in Clinton.

    c.    In or about late April 2008, M.C. went to Clinton and filled out his application.

28.     *The G.F. hire*

    a.    In or about Spring 2008, L.M., an aide to the then-Chairman of the House Ways and Means Committee, R.D., spoke with a state representative ("State Representative 10") about a job opening in Probation's ELMO facility in Clinton.

    b.    In or about Spring 2008, State Representative 10 contacted G.F. and asked if G.F. was interested in a job at Probation's ELMO facility in Clinton.

    c.    On or about April 22, 2008, G.F. filled out his application for the ELMO job.

    d.    G.F. was never interviewed.

29.     *The K.W. hire*

    a.    In or about Spring 2008, an aide to the then-Chairman of the House Ways and Means Committee spoke with a state representative ("State Representative 11") about a job opening in Probation's ELMO facility in Clinton.

    b.    In or about Spring 2008, State Representative 11 contacted K.W. and asked K.W. if K.W. was interested in a job at Probation's ELMO facility in Clinton.

    c.    On or about April 23, 2008, K.W. filled out his application for the ELMO job.

    d.    K.W was never interviewed.

30.     *The R.P. hire*

    a.    In or about Spring 2008, an aide to the then-Chairman of the House Ways and Means Committee spoke with a state representative ("State Representative 12") about a job opening in Probation's ELMO facility in Clinton.

     b.     In or about Spring 2008, State Representative 12 contacted R.P. and asked if R.P. was interested in a job at Probation's ELMO facility in Clinton.

     c.     On or about April 17, 2008, R.P. filled out his application for the ELMO job.

     d.     R.P. was never interviewed.

31.    *The P.D. promotion*

     a.     In or about Spring 2007, P.D.'s father spoke with a state representative ("State Representative 13") about a promotion for P.D. to become a supervisor at Probation's ELMO facility in Clinton.

     b.     In or about Spring 2007, State Representative 13 spoke with defendant **O'BRIEN** about a promotion for P.D. to become a supervisor at Probation's ELMO facility in Clinton.

32.    *The J.L. hire*

     a.     In or about Spring 2008, an aide to the then-Chairman of the House Ways and Means Committee, R.D., spoke with a longtime political supporter of R.D. about a job for J.L.

     b.     In or about Spring 2008, the aide spoke with J.L and asked if J.L. was interested in a job at Probation's ELMO facility in Clinton.

     c.     On or about May 22, 2008, J.L. filled out his application for the ELMO job.

     d.     J.L. was never interviewed.

33.    *The C.G. hire*

     a.     In or about Spring 2008, one of C.G.'s parents spoke with an aide to the Senate President about employment for C.G. with the state.

     b.     In or about Spring 2008, an aide to the Senate President sent C.G.'s resume to an employee at Probation.

     c.     In or about Spring 2008, an employee at Probation called C.G. and offered C.G. a job at Probation's ELMO facility in Clinton.

     d.     C.G. was never interviewed.

34.   *The D.C. hire*

    a.    In or about Spring 2007, D.C.'s father contacted the Senate President's Office seeking employment for D.C.

    b.    In or about Spring 2007, an aide to the Senate President contacted D.C. and asked D.C. if he was interested in employment at Probation.

    c.    In or about Spring 2007, an employee at Probation called D.C. and offered D.C. a job at Probation's ELMO facility in Clinton.

    d.    D.C. was never interviewed.

35.   *The B.M. hire*

    a.    In or about Spring 2008, B.M.'s mother contacted a relative of the Lieutenant Governor seeking employment for B.M.

    b.    In or about Spring 2008, an aide to the Lieutenant Governor contacted an employee at Probation seeking assistance in obtaining employment for B.M. at Probation.

    c.    In or about Spring 2008, an employee at Probation spoke with B.M. and instructed B.M. to fill out a job application at Probation's ELMO facility in Clinton.

36.   *The G.C. hire*

    a.    In or about Spring 2007, a state representative ("State Representative 14") was informed by the then-Speaker of the House, or an aide to the Speaker that jobs were available at Probation.

    b.    In or about Spring 2008, State Representative 14 told G.C. that jobs were available at Probation's ELMO facility in Clinton

    c.    On or about June 25, 2008, G.C. completed a job application and delivered it to Probation's ELMO facility in Clinton.

    d.    On or about June 26, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing G.C. as an Acting Assistant ELMO coordinator.

37. *The M.G. hire*

    a.    In or about Summer 2007, State Representative 14 was informed by the then-Speaker of the House, or an aide to the Speaker that jobs were available at Probation.

    b.    In or about Summer 2007, State Representative 14 communicated through an intermediary to M.G.'s father that jobs were available at Probation's ELMO facility in Clinton.

    c.    On or about September 5, 2007, M.G. completed a job application and delivered it to Probation's ELMO facility in Clinton.

38. *The R.W. hire*

    a.    In or about Spring 2008, an aide to the then-Chairman of the House Ways and Means Committee spoke with a state representative ("State Representative 15") about a job opening in Probation's ELMO program.

    b.    In or about Spring 2008, State Representative 15 spoke with R.W. and told R.W. to call the Chairman's aide regarding a job in Probation's ELMO program.

    c.    On or about May 13, 2008, R.W. completed a job application for a job in Probation's ELMO program.

39. *The F.P-M. hire*

    a.    In or about Spring 2008, F.P-M. was informed by an aide to the then-Chairman of the House Ways and Means Committee that jobs were available at Probation.

    b.    On or about June 3, 2008, F.P-M. completed a job application for a position at Probation's ELMO facility in Clinton.

    c.    On or about June 4, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing F.P-M. as an Acting Assistant ELMO coordinator.

40. *The R.D. hire*

    a.    In or about Spring 2008, R.D. spoke with State Senator 2 about a job at Probation's ELMO facility in Clinton.

    b.    On or about May 5, 2008, R.D. completed a job application and delivered it to Probation's ELMO facility in Clinton.

c.    R.D. was never interviewed.

41.    *The K.B. hire*

    a.    In or about Summer 2007, K.B.'s husband spoke with the then Speaker Pro Tempore about a job in Probation's ELMO program.

    b.    On or about August 22, 2007, K.B. completed a job application for a position in Probation's ELMO program.

    c.    K.B. was never interviewed.

## OVERT ACTS

42.    In furtherance of the conspiracy and to accomplish the objects thereof, the defendants and their co-conspirators committed and caused to be committed, in the District of Massachusetts and elsewhere, numerous overt acts including those set forth below in subparagraphs (a) through (qq).

    (a)    On or about May 20, 2008, the defendant **O'BRIEN** sent a letter to the CJAM appointing P.L. as a probation officer.

    (b)    On or about March 11, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing M.M. as a probation officer.

    (c)    On or about April 14, 2008, the defendant **O'BRIEN** sent a letter to the CJAM appointing P.M. as a probation officer.

    (d)    On or about April 8, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing K.M. as a probation officer.

    (e)    On or about March 14, 2008, the defendant **O'BRIEN** sent a letter to the CJAM appointing L.M. as a probation officer in Worcester Probate and Family Court.

    (f)    On or about August 30, 2007, the defendant **O'BRIEN** sent a letter to the CJAM appointing M.W. as a probation officer in Middlesex County Juvenile Court.

    (g)    On or about August 30, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing K.O. as a probation officer in Middlesex County Juvenile Court.

(h)     On or about August 30, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing M.S. as a probation officer in Middlesex County Juvenile Court.

(i)     On or about March 19, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing E.N. as a probation officer in Taunton District Court.

(j)     On or about August 30, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing A.M. as a probation officer in Middlesex Juvenile Court.

(k)     On October 8, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing A.M. as a probation officer in Peabody District Court.

(l)     On or about July 6, 2006, defendant **O'BRIEN** sent a letter to the CJAM appointing J.C. as probation officer in Suffolk Probate and Family Court.

(m)     On or about December 7, 2005, defendant **O'BRIEN** sent a letter to the CJAM appointing B.M. as a probation officer in Suffolk Superior Court.

(n)     On or about December 28, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing B.M. to Acting Probation Officer-in-Charge in Suffolk County .

(o)     On or about May 8, 2009, defendant **O'BRIEN** sent a letter to the CJAM appointing B.M. to Acting Chief Probation Officer at OCP.

(p)     In or about October 2004, defendant **O'BRIEN** sent a letter to the CJAM appointing D.M. as a temporary probation officer in Bristol Probate and Family Court.

(q)     On or about October 24, 2005, defendant **O'BRIEN** sent a letter to the CJAM appointing D.M. as a permanent probation officer in the Bristol Probate and Family Court.

(r)     On or about January 20, 2006, defendant **O'BRIEN** sent the CJAM a letter appointing C.H. as a probation officer in Hampshire Superior Court.

(s)     On or about March 16, 2005, defendant **O'BRIEN** sent the CJAM a letter appointing A.P. as Assistant Chief Probation Officer in Milford District Court.

(t)     On or about February 3, 2006, defendant **O'BRIEN** sent a letter to the CJAM appointing F.G. as Assistant Chief Probation Officer in Franklin District Court.

(u)     In or about March 2005, defendant **O'BRIEN** sent a letter to the CJAM

appointing J.D. as First Assistant Chief Probation Officer of Bristol Superior Court.

(v)     On or about December 12, 2005, defendant **O'BRIEN** sent a letter to the CJAM appointing J.D. as Acting Chief Probation Officer in Taunton District Court.

(w)     On or about March 29, 2006, defendant **O'BRIEN** sent a letter to the CJAM appointing J.D. as permanent Chief Probation Officer in Taunton District Court.

(x)     On February 3, 2005, defendant **O'BRIEN** sent a letter to the CJAM appointing B.D. as an Assistant Chief Probation Officer in Worcester District Court.

(y)     On February 25, 2005, defendant **O'BRIEN** sent a letter to the CJAM appointing E.T. to the position of Assistant Chief Probation Officer.

(z)     On or about December 28, 2000, defendant **O'BRIEN** sent a letter to the CJAM appointing M.B. to the position of Court Services Coordinator.

(aa)    On or about November 22, 2000, defendant **O'BRIEN** sent a letter to the CJAM appointing K.P. to the position of Program Manager in the ELMO program.

(bb)    On or about August 17, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing D.F. as an Acting Assistant ELMO coordinator.

(cc)    On or about September 5, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing S.W. as an Acting Assistant ELMO coordinator.

(dd)    On or about July 3, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing M.S. as an Acting Assistant ELMO coordinator.

(ee)    On or about May 1, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing M.C. as an Acting Assistant ELMO coordinator.

(ff)    On or about April 25, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing G.F. as an Acting Assistant ELMO coordinator.

(gg)    On or about April 25, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing K.W. as an Acting Assistant ELMO coordinator.

(hh)    On or about May 1, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing R.P. as an Acting Assistant ELMO coordinator.

(ii)    In or about June 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing

P.D. as an Acting ELMO coordinator.

(jj)     On or about May 22, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing J.L. as an Acting Assistant ELMO coordinator.

(kk)     On or about April 25, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing C.G. as an Acting Assistant ELMO coordinator.

(ll)     On or about July 3, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing D.C. as an Acting Assistant ELMO coordinator.

(mm)     On or about September 5, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing M.G. as an Acting Assistant ELMO coordinator.

(nn)     On or about May 14, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing R.W. as an Acting Assistant ELMO coordinator.

(oo)     On or about May 14, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing B.M. as an Acting Assistant ELMO coordinator.

(pp)     On or about May 8, 2008, defendant **O'BRIEN** sent a letter to the CJAM appointing R.D. as an Acting Assistant ELMO coordinator.

(qq)     On or about September 18, 2007, defendant **O'BRIEN** sent a letter to the CJAM appointing K.B. as an Acting Assistant ELMO coordinator.

All in violation of Title 18, United States Code, Section 371.

## COUNTS FOURTEEN THROUGH NINETEEN
(Bribery concerning programs receiving federal funds)

1.     Paragraphs One through Ten and Fourteen through Twenty-nine of Count One and

paragraphs Three through Twenty-six and Thirty-one through Forty-nine of Count Two of this

Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     On or about the dates set forth below, in the District of Massachusetts, the defendants,

### JOHN J. O'BRIEN ,
### ELIZABETH V. TAVARES, and
### WILLIAM H. BURKE, III,

aided and abetted by others known and unknown to the Grand Jury, did corruptly give, offer and

agree to give a thing of value to any person, with intent to influence and reward an agent of a

state government, in connection with any business, transaction, and series of transactions of such

government involving a thing of value of $5,000 or more, where said state government in any

one year period received benefits in excess of $10,000 under a Federal grant program, in that the

defendants and others, known and unknown to the Grand Jury, did give jobs and salaries to

candidates for employment as set forth below sponsored by a member of the Massachusetts

legislature in order to influence those members of the legislature who were in a position to affect

the defendants through legislation, budget authorizations, and in other ways.

| Count | Sponsored Candidate | Approximate Date of Appointment or Start Date |
|-------|---------------------|-----------------------------------------------|
| Fourteen | P.L. | May 20, 2008 |
| Fifteen | K.M. | April 28, 2008 |
| Sixteen | A.M. | October 8, 2008 |
| Seventeen | L.M. | May 12, 2008 |

52

| Eighteen | M.M. | May 12, 2008 |
|----------|------|--------------|
| Nineteen | P.M. | May 12, 2008 |

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

COUNTS TWENTY THROUGH THIRTY
(Bribery concerning programs receiving federal funds)

1.      Paragraphs One through Ten and Fourteen through Twenty-nine of Count One and

paragraphs Three through Twenty-six and Thirty-one through Forty-nine of Count Two of this

Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      On or about the dates set forth below, in the District of Massachusetts, the defendant,

**JOHN J. O'BRIEN,**

aided and abetted by others known and unknown to the Grand Jury, did corruptly give, offer and

agree to give a thing of value to any person, with intent to influence and reward an agent of a

state government, in connection with any business, transaction, and series of transactions of such

government involving a thing of value of $5,000 or more, where said state government in any

one year period received benefits in excess of $10,000 under a Federal grant program, in that the

defendants and others, known and unknown to the Grand Jury, did give jobs and salaries to

candidates for employment as set forth below sponsored by a member of the Massachusetts

legislature in order to influence those members of the legislature who were in a position to

impact the defendants through legislation, budget authorizations, and in other ways.

| Count | Sponsored Candidate | Approximate Date of Appointment |
|-------|--------------------|---------------------------------|
| Twenty | M.C. | May 6, 2008 |
| Twenty-one | R.P. | May 6, 2008 |
| Twenty-two | K.W. | May 6, 2008 |
| Twenty-three | G.F. | May 6, 2008 |
| Twenty-four | J.L. | May 30, 2008 |

| Twenty-five | C.G. | May 6, 2008 |
| Twenty-six | B.M. | May 20, 2008 |
| Twenty-seven | G.C. | July 1, 2008 |
| Twenty-eight | R.W. | May 20, 2008 |
| Twenty-nine | F.P-M. | June 11, 2008 |
| Thirty | R.D. | May 20, 2008 |

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

**A TRUE BILL**

_Ephraim Josephs_
FOREPERSON OF THE GRAND JURY

Karin M. Bell
Fred Wyshak
Robert Fisher

ASSISTANT U.S. ATTORNEYS

DISTRICT OF MASSACHUSETTS; April 24, 2013.

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

3: 06 p.

56