IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

JOHN J. O'BRIEN, ET AL.

No. 12-CR-40026-FDS

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

*Patronage in and of itself is not illegal.*
— United States Attorney Carmen Ortiz[1]

*An employment decision motivated by cronyism . . . is lawful, though perhaps unsavory.  [B]ackscratching, log-rolling, horse-trading, institutional politics, envy, nepotism [and] spite are not illegal motivations for employment decisions.*[2]

*The idea that it is a federal crime for any official in state or local government to take account of political considerations when deciding how to spend public money is preposterous.*[3]

The Second Superseding Indictment ("the indictment") charges former Massachusetts

Probation ("Probation") Commissioner O'Brien and two of his deputies, Ms. Tavares and Mr.

Burke, with multiple racketeering, mail fraud, and bribery offenses that threaten decades in

federal prison.  Specifically, the prosecution alleges that, in order to curry favor with the

---

[1] Statements at a press conference on March 23, 2012, as quoted in *The Boston Globe*.  Andrea Estes, et al., "US Attorney Carmen Ortiz:  Indictment of 3 former state probation officials 'is just one step' in corruption probe of Massachusetts government," *Boston Globe*, available at http://www.boston.com/2012/03/23/probationx/IbQVlSuWH2MyM1IvOOd20O/story.html.

[2] *Zavatsky v. O'Brien*, --- F. Supp. 2d ---, 2013 WL 5202039 (D. Mass. 2013) (Gorton, J.) (internal citations and quotation marks omitted) (dismissing civil lawsuit arising from Probation Department hiring allegations).

[3] *United States v. Thompson*, 484 F.3d 877, 883 (7th Cir. 2007) (vacating bribery conviction where state contract was awarded to local supplier rather than bid winner for political reasons).

legislature, defendants ran "a rigged hiring system that catered to requests from state legislators and others to employ and promote candidates for employment" in the Probation Department. Second Superseding Indictment, Dkt # 139 (hereinafter "2d Sup. Ind.") at 7.

Notably, the indictment does not allege, and the prosecution has never claimed, that the defendants — career public servants who dedicated their lives to running a critical state public safety agency — put a penny in their pockets or, indeed, did anything illegal for personal gain. The indictment does not allege, and prosecutors have expressly disavowed any suggestion that, the defendants hired unqualified employees or failed to act in the best interests of Probation and its mission. Yet prosecutors nevertheless insist that the defendants committed federal crimes because, in considering and sometimes acting on recommendations from legislators, they violated a purported obligation to hire the still-unidentified candidates that prosecutors contend in hindsight to have been the "*most* qualified" and did so with the intent to influence the legislature.

Recognizing that an amorphous "honest services" prosecution could not survive in the wake of the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), the government has been forced to craft an indictment that attempts to shoehorn the defendants' alleged actions and intentions into the elements of federal criminal statutes — racketeering, mail fraud, and bribery — that they cannot meet and do not fit. These statutes, aimed at significant criminal enterprises and substantial economic fraud, were never intended to reach political horse-trading, a practice that has long-existed and is still tolerated, even openly embraced, at the highest levels of the state and federal governments. Try as it might, this indictment and its legal deficiencies perfectly illustrate why the federal government cannot (and should not be allowed to) stretch criminal statutes beyond recognition to prosecute state practices it might deem

unsavory or that happen to attract media attention.  Even if the government's creative application of these federal statutes has surface appeal, the prosecution ultimately must fail "as applied" under the rule of lenity and "void for vagueness" doctrines because no reasonable person could be expected to understand or anticipate that these federal criminal laws prohibit the conduct alleged here.  *See Skilling*, 130 S. Ct. at 2927  (warning against construing a "'statute in a manner that leaves its outer boundaries ambiguous and involves the federal government in setting standards of disclosure and good government for local and state officials'" (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987))).

The Court should repudiate the prosecution's deployment of federal criminal statutes to second-guess state officials and micromanage state politics.  This is *not* a case about political corruption.  Rather, this is a prosecution that would criminalize both patronage as well as the ordinary and necessary give-and-take of politics itself.  The case already has damaged the lives and careers of Mr. O'Brien, Ms. Tavares, and Mr. Burke unjustly and irrevocably. The lengthy federal grand jury fishing expedition in search of a crime cast a chill over the State House, distracting and draining resources from legislators and their staffs for over two years.  The resulting indictment is fatally flawed as a matter of law and should be dismissed now, before the proceedings wreak further unwarranted damage on institutions of state government and the honorable men and women who have served and continue to serve in them.

### Historical and Factual Background

Mr. O'Brien was Commissioner of Probation from 1998 until May 2010.  Ms. Tavares and Mr. Burke served as deputy commissioners during that time.  The charges concern Probation's hiring practices during Mr. O'Brien's tenure.  During this period, the legislature amended the relationship between the Commissioner and Probation on one side and the judges

3

and the Trial Court on the other.  The government and media have framed this as a political

corruption case, but it is really about politics and a fight over control and management of

Probation during a time marked by a shifting and uncertain power dynamic.

## I.   PROBATION AND THE COURTS — STATUTORY AND ORGANIZATIONAL HISTORY.

In 1978, the Massachusetts legislature centralized the state's trial courts.  *See* The

Massachusetts Court System Introduction, *available at*

http://www.mass.gov/courts/admin/intro.html.  Prior to 1978, with the exception of the land

court, trial courts in Massachusetts were run and funded by counties and localities.  *See id.*  The

1978 reorganization, codified in chapter 211B of the Massachusetts General Laws, formed "a

trial court of the commonwealth which shall consist of the following departments:  the superior

court department, the housing court department, the land court department, the probate and

family court department, the Boston municipal court, the juvenile court department and district

court department."  M.G.L. c. 211B, § 1.  This restructuring made court personnel state

employees.  It also created the position of Chief Justice for Administration and Management

(CJAM) to oversee these newly-formed Trial Court departments.[4]   The SJC appoints a Trial

Court Justice to be CJAM.  *See* M.G.L. c. 211B, § 6.  At the time of the events giving rise to the

indictment, the CJAM operated a central office called the Administrative Office of the Trial

Court (AOTC).

---

[4] In 2011, the legislature amended many of the statutes discussed in this memorandum as part of
an administrative restructuring of the courts and probation.  One of these changes created a
new position, Court Administrator, to assist the CJAM in managing the Massachusetts Trial
Courts.  M.G.L.  c. 211B, § 6B.  The 2011 changes post-date the conduct charged in this case.
Because the conduct charged ended in 2010, this memorandum describes the organization of
the courts and probation at that time, and does not focus on any post-2010 changes to the
courts or Probation.

Chapter 211B does not empower, provide for, or even discuss Probation.[5]  Probation is not a statutorily-identified "department" of the Trial Court.   The statutes relating to Probation are found primarily in chapter 276.  Section 98 of that chapter defines the role of the Commissioner:  "There shall be a commissioner of probation appointed by the chief justice for administration and management who shall have executive control and supervision of the probation service…."  M.G.L. c. 276, § 98 (version effective 1993-2000).  This position was created in 1956; prior to that, Probation was overseen by a board.  *See id.* (historical notes). While Mr. O'Brien was Commissioner, he managed the three facets of Probation:  the Office of the Commissioner of Probation (OCP), the Massachusetts Probation Service, and the Office of Community Corrections (OCC).  *See* M.G.L. c. 211F, § 2 (establishing OCC in 1996).

The authority to select and hire probation officers has shifted throughout the years. Beginning in the 1880s, justices in the local courts had the power to appoint probation officers as they deemed necessary.  *See* M.G.L.  c. 276, § 83 (historical notes).  The statute that replaced the Board of Probation with the Commissioner in 1956 made the Commissioner "responsible for: making recommendations to the first justice and the chief justice for administration and management on the appointment of chief probation officers, assistant chief probation officers and probation officers."  M.G.L. c. 276, § 98.  However, judges in local courts continued to make Probation hiring decisions.  Probation received job applications and determined whether the applicants met the minimum job qualifications.  A panel including a Probation regional supervisor, the chief probation officer in the court with the vacancy, and a judge or other Trial Court representative from the court with the vacancy interviewed all qualified candidates.  These

---

[5] At the time of the events giving rise to the allegations, the sole mention of Probation in Chapter 211B enabled the Commissioner of Probation (Commissioner) to help the CJAM appoint a committee to craft policies for the Trial Court departments.  *See* M.G.L. c. 211B, § 8 (version effective 1992-2010).

panelists ranked the interviewed candidates, and the names of the top candidates were sent to the presiding justice of the court with the vacancy.  The presiding justice conducted interviews and sent the name of his chosen candidate to the Commissioner and the CJAM.

This decentralization of Probation hiring and de facto control spread across local courts created certain practical problems.  In effect, the Commissioner had little power or ability to manage the Probation service or establish uniform policies and procedures for Probation supervision of offenders across the Commonwealth.

In 2001, the legislature removed the CJAM and judges from involvement in Probation hiring and empowered the Commissioner, amending the statute regarding Probation hiring to provide that:  "Subject to appropriation, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial courts as he deems necessary."  M.G.L. c. 276, § 83 (version effective 2001-2011).  The legislature reinforced this shift of authority in the budgets from fiscal year 2002 through fiscal year 2011.  In these budgets, the line item for the Office of the Commissioner of Probation stated that "notwithstanding the provisions of any general or special law, rule or regulation to the contrary, said commissioner, subject to appropriation, shall have exclusive authority to appoint, dismiss, assign and discipline probation officers, associate probation officers, probation-officers-in-charge, assistant chief probation officers and chief probation officers."  *E.g.*, 2001 Mass. Legis. Serv. Ch. 177 (HB 4800), item 0339-1001.

Related to these changes in legislation, Probation hiring procedures also changed in 2001.  Probation's personnel department conducted an initial screening to eliminate unqualified applicants from the pool of candidates.  All qualified candidates were interviewed.  Between 2001 and 2005, a local panel consisting of the chief probation officer and first justice assigned to

6

the court with the vacancy and a Probation employee designated by the Commissioner interviewed all qualified candidates.  After 2005, a screening panel of two Probation employees interviewed all qualified candidates, and the local panel interviewed the candidates the screening panel ranked most highly.  The candidates who received the highest scores from the local panel were interviewed by a final panel consisting of two Probation deputy commissioners.  The final panel's rankings were sent to the Commissioner, who appointed candidates in rank order.

## II.    DEVELOPMENTS LEADING TO THE INSTANT CHARGES.

Mr. O'Brien began working for Probation in 1980 as a probation officer in the Suffolk Superior Court.  He was appointed Commissioner by the then-CJAM John Irwin on January 1, 1998, and remained in that position until May 24, 2010.  Mr. O'Brien chose Ms. Tavares, who also began working for Probation in 1980, as his Second, and later First, Deputy Commissioner during this time.  Mr. O'Brien made Mr. Burke, who had worked for Probation since 1972, a Deputy Commissioner.

Two judges served as CJAM during the relevant time period: Barbara Dortch-Okara and then Robert Mulligan.  Judge Mulligan began his judicial career in the Boston Municipal Court in 1980, and he was CJAM from 2003 until 2013.

On May 24, 2010, the day after publication of a *Boston Globe* story — *An Agency Where Patronage is Job One*, Boston Globe, May 23, 2010 — CJAM Mulligan and the Chief Justice of the SJC called for an inquiry into Probation hiring.  That same day, the SJC appointed Paul Ware, a former prosecutor and partner at Goodwin Proctor LLP, to conduct an investigation into hiring at Probation.  Mr. Ware ultimately issued a paper known as the Ware Report.  Paul Ware, *Report of the Independent Counsel* (Nov. 9, 2010), available at

http://www.mass.gov/courts/sjc/docs/report-of-independent-counsel-110910.pdf  [hereinafter

*Ware Rpt*.].  The Ware Report concluded that Probation's hiring and promotion process systemically favored politically-connected candidates.  *Id.* at 3-11.  Mr. Ware suggested that federal criminal charges could be filed against Mr. O'Brien, Mr. Burke, Ms. Tavares, and other Deputy Commissioners.  *Id.* at 25-28.  In support, he noted his understanding that "[t]he *Practices and Procedures Manual*[6] of the Trial Court requires the Probation Department to select the most qualified candidates based solely on merit," and also cited a single federal case, *United v. Sorich*, 523 F.3d 702 (7th Cir. 2008).

The Ware Report also alleged improprieties unrelated to hiring.  It asserted that Mr. O'Brien solicited political contributions from Probation employees for State Treasurer Timothy Cahill's campaign to help Mr. O'Brien's wife get a job at the State Lottery.  *Id.* at 29-33.

Indictments, both state and federal, followed the publication of the Ware Report.  Mr. O'Brien and one of Treasurer Cahill's staff members were charged in Suffolk Superior Court with bribery, illegal gratuities, and campaign contribution violations in connection with the allegations related to Mr. O'Brien's wife's job at the Lottery.  Mr. O'Brien was acquitted by a jury on April 16, 2013.  State charges against the Cahill staffer were later dismissed.

On March 22, 2012, Mr. O'Brien, Ms. Tavares, and Mr. Burke were charged in federal court based upon allegations related to the hiring system at Probation.  The twelve-count indictment ("the original indictment") included charges of racketeering conspiracy, racketeering, and ten counts of mail fraud.  It alleged that Probation hiring was conducted pursuant to a fraudulent scheme, and that the Trial Court Personnel Policies and Procedures Manual (the Trial Court Manual) required Probation to hire only "the *most* qualified" individuals in an applicant

---

[6] The "Practices and Procedures Manual" referenced by the Ware Report is the Trial Court Personnel Policies and Procedures Manual, which this memorandum calls the Trial Court Manual. A copy of the Manual, which was provided by the government during the course of discovery, in effect at relevant times, is attached as Exhibit A.

pool.  According to the original indictment, when there was an open position, Probation posted

the job and held a series of interviews as required by the Trial Court Manual.  However, the

original indictment alleged, this process was a "sham": Probation did not use this process to

select "the most qualified" candidate; instead Mr. O'Brien, through his deputies, told

interviewers which candidate should be selected for the job.  According to the original

indictment, Mr. O'Brien directed the selection of candidates who had been "sponsored" for

employment by legislators.  The government alleged that once this "sponsored" individual was

selected, Mr. O'Brien "falsely certified" to the CJAM that the hiring process had been conducted

in accordance with the Trial Court Manual.

After the original indictment was issued, the federal prosecutors continued an extensive

and lengthy grand jury investigation into Probation, state legislators, and the relationships among

them.  Many state legislators, legislative staffers, and Probation employees were subpoenaed to

the grand jury.  On April 24, 2013, the grand jury returned a thirty-count superseding indictment.

The superseding indictment included the charges alleged in the original indictment, and added

charges related to hiring for the electronic monitoring program (ELMO) that the legislature

ordered Probation to initiate in 2006.

The superseding indictment alleged that when the ELMO program began, Mr. O'Brien

received permission from the CJAM to fill the necessary new positions with temporary

employees.  Instead of posting and interviewing for these jobs, Mr. O'Brien allegedly contacted

legislators and asked them for names to fill these positions.  The government asserted that Mr.

O'Brien hired these individuals recommended by legislators without interviewing them.  The

superseding indictment charged that Probation hired in this way to curry favor with the

legislators and to obtain favorable legislation and budgets for Probation.  The superseding

indictment did not add defendants, and no legislators or other individuals have been charged in connection with the alleged hiring practices.

A Probation officer, one who was passed over for a promotion in favor of an individual the original indictment alleged to have been "sponsored" by a legislator, claimed that he had been discriminated against by Mr. O'Brien, Ms. Tavares, and CJAM Mulligan. *See Zavatsky v. O'Brien*, --- F.Supp.2d ---, 2013 WL 5202039 (D. Mass.).  Judge Gorton dismissed this claim, finding that "an employment decision motivated by cronyism, rather than discrimination, is 'lawful, though perhaps unsavory.'"  *Id.* at *4 (quoting *Barry v. Moran*, 661 F.3d 696, 708 (1st Cir. 2011)).

### III.    THE SECOND SUPERSEDING INDICTMENT.

A Second Superseding Indictment ("the indictment"), returned on August 21, 2013, did not add charges or defendants; it simply changed dates and added information regarding certain charged acts.  It charges Mr. O'Brien, Ms. Tavares, and Mr. Burke with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d), one count of racketeering in violation of 18 U.S.C. § 1962(c),[7] ten counts of mail fraud in violation of 18 U.S.C. § 1341, and seventeen counts of bribery involving a program receiving federal funds in violation of 18 U.S.C. § 666(a)(2).[8]

According to the indictment, Probation "is a department within AOTC, and the CJAM has oversight responsibility over" it.  2d Sup. Ind. at 1.  Yet the indictment also states that the Commissioner's office was "responsible for administrative functions and oversight of the

---

[7] Mr. Burke is not charged in the racketeering count.

[8] Six of these bribery charges relate to the hiring of specific probation officers.  These six charges include all three defendants and are based on conduct alleged in the original indictment.  The remaining eleven bribery counts relate to ELMO hiring, and charge only Mr. O'Brien.

Probation Department and OCC, such as hiring, promotion and discipline of employees." *Id.* at 2. The indictment rests on the assertion that "AOTC had a merit-based hiring system for all of its employees, including those within the Probation Department, governed by Massachusetts General Laws c. 211B, § 8 and the *Personnel Policies and Procedures Manual* of AOTC promulgated thereunder." *Id.* at 3. It alleges that this manual required objective hiring standards and practices and forbade nepotism and favoritism. *Id.* at 3-5. While noting that this manual includes guidelines related to Probation interviewing and hiring, the indictment recognizes that in 2001 the legislature vested the authority to hire Probation employees, previously held by the CJAM and First Justices, in the Commissioner. *Id.* at 5. Despite this legislative change, the indictment alleges that the Commissioner had to certify to the CJAM that each appointment complied with the Manual, and "the CJAM retained authority to reject any appointment not in compliance with the standards set forth in the Manual." *Id.*

The indictment describes the object of the defendants' alleged conduct as follows:

> To maintain their positions within the enterprise [defined as Probation], to increase the budget and resources of the enterprise, to gain tighter control over the conduct of the enterprise, and to aggrandize power to themselves, the defendants and their co-conspirators sought to curry favor with members of the Massachusetts legislature and others who were in a position to impact the enterprise through legislation, budget authorizations, and in other ways, by instituting a rigged hiring system that catered to requests from state legislators and others to employ and promote candidates for employment with the enterprise.

*Id.* at 7. The indictment further alleges that "[t]hrough hiring and promoting individuals who were sponsored by members of the Massachusetts legislature, while also maintaining the facade of a merit-based hiring system, the defendants and their co-conspirators sought to influence legislators to increase the conspirators' ability to obtain favorable votes on their budget requests and other interests." *Id.* The indictment alleges two separate, but related schemes through which OCP sought favors and votes from legislators in return for employing "sponsored" individuals.

The indictment calls the first alleged scheme, related to permanent Probation jobs, the "scheme to defraud." It asserts that Probation "obtained" the names of individuals that the legislators wished to "sponsor" for employment with Probation and organized these names in "sponsor lists." *Id.* at 7-8. It alleges that Mr. O'Brien, Ms. Tavares, and Mr. Burke "created a sham hiring system" "to conceal the true nature of [Probation's] hiring decisions." *Id.* at 8. As part of this alleged sham, OCP posted jobs, conducted interviews, maintained scoring sheets, sent rejection letters to unsuccessful candidates, and certified to the CJAM that the hiring complied with the Trial Court Manual. *Id.* at 8. The indictment alleges that this system "created the aura of a legitimate merit-based hiring process," and obscured the fact that Mr. O'Brien preselected a "preferred," politically-sponsored candidate. *Id.* at 8-9. According to the indictment, Mr. O'Brien gave the preferred candidate's name to the interviewers who would ensure that this candidate was hired. *Id.* at 8-9. At the end of the hiring process, Mr. O'Brien allegedly falsely certified to the CJAM that the hiring was conducted in accordance with the Trial Court Manual. *Id.*

The indictment calls the second alleged scheme, related to the hiring necessitated by the legislature's 2006 mandate that OCP create an electronic monitoring program for sex offenders (ELMO), the "ELMO hiring scheme." *Id.* at 9-10. In response to this legislation, Probation opened an ELMO office in Clinton, Massachusetts. *Id.* CJAM Mulligan gave Mr. O'Brien permission to fill the newly created ELMO positions with temporary, or "acting," employees. *Id.* at 10. The indictment alleges that Mr. O'Brien employed this "strategy" to "circumvent some of the requirements of the Manual." *Id.* According to the indictment, Mr. O'Brien staffed these new positions "by soliciting members of the legislature for the names of candidates to fill those positions," and hired these individuals "without any vetting process and without any interview."

*Id.*

The indictment alleges that Mr. O'Brien "gave the then Chairman of the House Ways and Means Committee the opportunity to fill several" of these positions and that the Chairman asked ten other members of the House of Representatives for names of individuals to fill these jobs. *Id.* It asserts that Mr. O'Brien reached out to the Chairman "to influence and attempt to influence members of the legislature to act favorably on legislation and budget requests regarding the Probation Department as well as to assist the Chairman in an upcoming contest for the post of Speaker of the House of Representatives." *Id.* at 10-11. The indictment notes that Mr. O'Brien "routinely met" with legislators regarding "proposed and pending legislation that affected the Probation Department," that he met with the Chairman of the Ways and Means Committee annually to discuss Probation's budget requests, and that he met with the Chairman in 2007 "to discuss legislation proposed by Mr. O'Brien that would significantly impact the CJAM's supervisory authority over Mr. O'Brien." *Id.*

The 30 charges in the indictment can be grouped in six categories.

### 1.    *Count 1 — Racketeering Conspiracy.*

Count 1 charges a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), encompassing all of the conduct described above. *Id.* at 1-11.

### 2.    *Count 2[9] — Racketeering.*

Count 2 alleges racketeering in violation of 18 U.S.C. § 1962(c), and specifies a number of racketeering acts. Racketeering acts 1-22, 23(a)-44(a), and 23(b)-44(b) relate to the "scheme to defraud," and racketeering acts 45(a)-62(a) and 45(b)-62(b) relate to the "ELMO hiring scheme."

---

[9] Mr. Burke is not charged in this count.

The first half of Count 2 details the "scheme to defraud."  It identifies, by initials, 21 individuals hired and/or promoted by Probation while Mr. O'Brien was Commissioner.  *Id.* at 13-18.  The indictment alleges that these individuals were "sponsored" for employment and were hired even though they were not the most qualified candidates.  *Id.*  The indictment states the position held by each of their sponsors, but does not identify the sponsors by name or initial.

Racketeering acts 1-22 allege that the defendants committed mail fraud when they "(1) cause[d] [specific] individuals . . . to be hired and promoted when they were not the most qualified candidate; (2) provide[d] materially false documents to the CJAM to make it appear that those individuals were the most qualified candidates and were hired pursuant to a merit-based system; and (3) use[d] the United States Postal Service as well as private and commercial interstate carriers to deliver rejection letters to other unsuccessful candidates and to receive and deliver other documents related to employment with [Probation]."  *Id.* at 18-19.

Racketeering acts 23(a)-44(a) allege that the hiring of these individuals violated the Massachusetts state law prohibition on corrupt gifts (M.G.L. c.268A § 2(a)(1)) by giving "jobs and promotions within the Probation Department to individuals sponsored by members of the legislature to favorably influence and attempt to favorably influence the decisions of those legislators regarding legislative matters affecting the Probation Department including, but not limited to, the annual General Appropriations Act."  *Id.* at 20-21.  Acts 23(b)-44(b) allege that the defendants violated the Massachusetts gratuities statute (M.G.L. c.268A § 3(a)) by giving "jobs and promotions within the Probation Department to individuals sponsored by members of the legislature who made decisions regarding legislative matters affecting the Probation Department."  *Id.* at 22.

The second half of Count 2 deals with racketeering acts related to the "ELMO hiring

scheme." It identifies, by initials, 18 individuals who were allegedly "sponsored" by politicians and who received jobs as temporary ELMO employees without being interviewed. *Id.* at 23-27. The indictment states the position of the politicians involved, but it does not identify them by name or initials.

Racketeering acts 45(a)-62(a) allege that the defendants violated the Massachusetts state law prohibition on corrupt gifts (M.G.L. c.268A § 2(a)(1)) by hiring these individuals because they gave "jobs and promotions within the Probation Department to individuals sponsored by members of the legislature to favorably influence and attempt to favorably influence the decisions of those legislators regarding legislative matters affecting the Probation Department." *Id.* at 28. Similarly, racketeering acts 45(b)-62(b) allege that the defendants violated the Massachusetts gratuities statute (M.G.L. c.268A § 3(a)) by giving "jobs and promotions within the Probation Department to individuals sponsored by members of the legislature who made decisions regarding legislative matters affecting the Probation Department." *Id.* at 29.

### 3.    *Counts 3-12 — Substantive Mail Fraud Counts.*

Counts 3-12 allege discrete counts of mail fraud, in violation of 18 U.S.C. § 1341, related to the alleged "scheme to defraud." Each of these counts specifies, by initials, a "sponsored candidate." *Id.* at 32. The indictment alleges that the defendants "(1) cause[d] [the "sponsored candidates"] to be hired and promoted when they were not the most qualified candidates; (2) provide[d] materially false documents to the CJAM to make it appear that those individuals were the most qualified candidates and were hired pursuant to a merit-based system; and (3) use[d] the United States Postal Service as well as private and commercial interstate carriers to deliver rejection letters to other unsuccessful candidates and to receive and deliver other documents related to employment." *Id.* at 31-32. For each count, the government specifies the date of the

rejection letters that are the alleged mailings in furtherance of the scheme.  *Id.*

### 4.    *Count 13 — Conspiracy to Commit Bribery.*

Count 13 alleges that the defendants conspired to commit bribery in connection with a program receiving federal funds in violation of 18 U.S.C. § 666(a)(2).  The defendants allegedly conspired "to give jobs and salaries to candidates for employment sponsored by a member of the Massachusetts legislature in order to influence those members of the legislature and others who were in a position to affect the defendants through legislation, budget authorizations, and in other ways."  *Id.* at 33.

The manner and means of this alleged conspiracy is each of the hiring decisions alleged as racketeering acts in count 2.  *Id.* at 34-49.  This manner and means section provides a chronology related to each of the hiring decisions.  It identifies, by initials, 21 individuals who were hired and/or promoted by Probation as part of the "scheme to defraud."  *Id.* at 34-43.  For each individual, count 13 specifies a variety of dates related to when the individual was recommended and interviewed, and often includes the rank that an interview panel awarded each individual.  *Id.*  The manner and means section also includes chronologies related to the alleged "ELMO hiring scheme."  *Id.* at 43-49.  This section identifies, by initials, 18 individuals who were allegedly hired to work for ELMO without interview because they had political sponsorship.  *Id.*  These chronologies indicate when each individual was sponsored, the date on which the individual applied, the date of hire, and a statement that the individual was not interviewed.  *Id.*

Count 13 specifies 43 overt acts allegedly committed in furtherance of the charged conspiracy.  *Id.* at 49-52.  Each act is defined as when Mr. O'Brien appointed, for the CJAM's approval, the identified sponsored individuals. *Id.*

16

5.     *Counts 14-19 — Substantive Bribery Counts.*

Counts 14-19 allege discrete instances of bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(2).  *Id.* at 54-55.  These counts relate to the "scheme to defraud," and assert that the defendants "gave jobs and salaries to candidates for employment . . . as sponsored by a member of the Massachusetts legislature in order to influence those members of the legislature who were in a position to affect the defendants through legislation, budget authorizations, and in other ways."  *Id.* at 54.  Each count identifies a "sponsored candidate" and his or her approximate start date or appointment date.

6.     *Counts 20-30[10] — Substantive Bribery Counts RE: the ELMO Program.*

Counts 20-30 charge bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(2).  These counts relate to the "ELMO hiring scheme," and assert that Mr. O'Brien gave "jobs and salaries to candidates for employment . . . sponsored by a member of the Massachusetts legislature in order to influence those members of the legislature who were in a position to impact the defendants through legislation, budget authorizations, and in other ways."  *Id.* at 56.  Each count specifies a "sponsored candidate" and his or her approximate date of appointment.  *Id.* at 56-57.

## Argument

Fed. R. Crim. P. 12(b)(3)(B) authorizes pretrial motions to dismiss "alleging a defect in the indictment," including claims that the indictment  "fails . . . to state an offense."  The role of the Court is to determine whether the indictment sufficiently alleges the charged crimes.  *See United States v. Sampson*, 371 U.S. 75, 76 (1962); *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987) ("Under Fed. R. Crim. P. 12(b) an indictment may be dismissed where

---

[10] Mr. Burke and Ms. Tavares are not charged in these counts.

there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however,

on a determination of facts that should have been developed at trial.").

For the reasons detailed below, the indictment here should be dismissed in its entirety.

**I.      THE CENTRAL PREMISES OF THE INDICTMENT ARE ERRONEOUS BECAUSE THE COMMISSIONER HAD EXCLUSIVE HIRING AUTHORITY.**

The indictment alleges that the defendants "created a sham hiring system" and tried to

"circumvent" hiring requirements.  *E.g.*, 2d Sup. Ind. at 8, 10.  These assertions are premised on

the government's twin assumptions that the Commissioner was bound by the Trial Court Manual

to hire only the "*most* qualified" candidate and that the CJAM had the authority to substantively

review the Commissioner's hiring decisions.  These assumptions do not survive scrutiny.  The

relevant statutes and regulations reveal that the Commissioner had the exclusive authority to hire

and promote Probation employees.

**A.  The Commissioner had Exclusive Hiring Authority Notwithstanding any Other Provision of Law.**

On November 21, 2001, the Massachusetts legislature approved Probation's Fiscal Year

2002 budget.  In the line item detailing the appropriations for the Office of the Commissioner of

Probation, the legislature included the following language:

> For the office of the commissioner of probation; provided, that *notwithstanding* the provisions of any general or special law, rule or regulation to the contrary, said commissioner, subject to appropriation, shall have *exclusive authority* to appoint, dismiss, assign and discipline probation officers, associate probation officers, probation officers-in-charge, assistant chief probation officers and chief probation officers . . . .

2001 Mass. Legis. Serv. Ch. 117 (H.B. 4800), line 0339-1001 (emphasis added).  Each state

budget passed between this date and 2011 included this language.

These provisions are unequivocal; they give the Commissioner the sole and exclusive

authority to make Probation hiring decisions.[11]   The Commissioner's power is limited only by

the budget appropriation that the legislature allots Probation.   The "notwithstanding" language in

these provisions, enacted annually between 2001 and 2011, is critical.   This language signifies

that these provisions override all statutes, regulations, or other authorities suggesting that the

Commissioner has less than "exclusive" hiring authority or that the Commissioner is bound by

limits other than Probation's budget.   *See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)

("The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature

says in a statute what it means and means in a statute what it says there.'   Thus, our inquiry

begins with the statutory text, and ends there as well if the text is unambiguous." (quoting

*Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992))).

The SJC has examined "notwithstanding" clauses in Massachusetts statutes and

concluded: "'The use of such a "notwithstanding" clause clearly signals the drafter's intention

that the provisions of the "notwithstanding section override conflicting provisions of any other

section.'   A 'clearer statement is difficult to imagine.'"   *Attorney General v. Commissioner of

Ins.*, 450 Mass. 311, 319 (2008) (quoting *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18

(1993)) and *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991)); *see

also Bresnahan v. City of Gloucester*, 82 Mass. App. Ct. 1108, *2 (Mass. App. Ct. 2012) ("The

use of 'notwithstanding' in the introductory sentences of Chapter 449 and other special acts

'clearly signals the drafter's intention that the provisions of the "notwithstanding" section

---

[11] The legislature's intention to give the Commissioner exclusive hiring authority at Probation is
further indicated by a legislative amendment made in 2001.   As noted in the indictment, "In
2001, the Massachusetts legislature amended Massachusetts General Laws, Chapter 276, §83
to vest hiring authority for [Probation] in the Commissioner . . . ."   2d Sup. Ind. at 5.   Between
2001 and 2011, that section read:   "Subject to appropriation, the commissioner of probation
may appoint, dismiss and assign such probation officers to the several sessions of the trial
court as he deems necessary."   M.G.L. c. 276, § 83 (version effective 2001 to 2011).

override conflicting provisions.'" (quoting *Attorney General v. Commissioner of Ins.*, 450 Mass.

at 319-20))); *Field v. Napolitano*, 663 F.3d 505, 511 (1st Cir. 2011) (applying the same rule

regarding "notwithstanding" clauses and quoting *Cisneros*). "'[T]he "notwithstanding" clause

takes on meaning only when we assume that the new Act has made some change in the law to

which the "notwithstanding" statement is noting a specific exception.'" *Attorney General v.*

*Commissioner of Ins.*, 450 Mass. at 320-21 (quoting *Shomberg v. United States*, 348 U.S. 540,

546 (1955)); *Bresnahan*, 82 Mass. App. Ct. 1008 at *2.

The "notwithstanding" clauses in Probation budgets unambiguously signify that this

language trumps all conflicting authorities.  Regardless of what any other law, policy, regulation,

or manual may have said, the legislature gave the Commissioner exclusive authority to conduct

hiring at Probation and to appoint employees.  The indictment may assert that the Commissioner

was bound to follow the Trial Court Manual and to submit appointments to the CJAM's review

by the Trial Court Manual and M.G.L. c. 211B, § 8; however, this statute and manual are

precisely the type of conflicting authorities that the "notwithstanding" clause overrides.  Pursuant

to the probation budgets enacted between 2001 and 2011, the Commissioner was not required to

adhere to any Trial Court Manual rules or standards in connection with hiring, and the CJAM did

not have any authority to review or approve the Commissioner's hiring process or choices.

### B.  The CJAM Did Not Have Authority to Set Policy for Probation.

Not only did the legislature give the Commissioner exclusive hiring authority

notwithstanding any other provisions to the contrary, the legislature did not give the CJAM the

power to set policy regarding Probation hiring.  Chapter 211B, § 8 does not enable the CJAM to

set policy for Probation, and Probation is not required to adhere to any policies promulgated

under its auspices.  Chapter 211B, § 1 defines the "trial court of the commonwealth which shall

consist of the following departments: the superior court department, the housing court department, the land court department, the probate and family court department, the Boston municipal court, the juvenile court department and district court department." M.G.L. c. 211B, § 1. Although probation officers work in these courts, the Massachusetts Probation Service is not a department of the "trial courts" as defined by statute. At the time of the charged conduct, c. 211B, § 8 permitted the CJAM and the Commissioner to appoint a committee to advise the CJAM on establishing "standards for the appointment, performance, promotion, continuing education and removal of all personnel *within the trial court*." M.G.L. c. 211B, § 8 (version effective 2001 through 2011) (emphasis added). However, the relevant and applicable statutes make clear that Probation is not part of the Trial Court, and probation officers are not "personnel within the trial court" whose employment is governed by c. 211B, § 8 and the Trial Court Manual.

Even before the Commissioner was given exclusive hiring authority in 2001, Probation hiring was governed by c. 276, § 83, not by the sections of 211B relating to the Trial Court.[12] *See* M.G.L. c. 276, § 83 (historical notes) (vesting power to appoint probation officers in trial court justices and later in CJAM before giving it to Commissioner). Probation was part of the judicial branch, but it was not part of the statutorily created "trial court" administered by the CJAM and subject to the Trial Court Manual. The role and authority of the CJAM is defined by statute. The CJAM appoints the Commissioner and the CJAM sets policy for the seven Trial Court departments, but the CJAM does not set policy for Probation. The legislature provided

---

[12] Nearly all of the conduct described in the indictment occurred after 2001; a single mail-fraud based racketeering act occurred before 2001. The government cannot support the charges with this single, pre-2001 allegation. Even before the Commissioner was given exclusive hiring authority, the Trial Court Manual did not apply to Probation, and the CJAM had no power to force Probation to comply with it. Similarly, as discussed later in this memorandum, a single act is not a pattern of activity sufficient to support a racketeering charge.

separately for Probation policies, and gave the Commissioner the authority to set rules and regulations for Probation.  *See* M.G.L. c. 276, § 99.  The legislature gave the CJAM the power to review and approve, but not to write, these policies.  Any purported inclusion of hiring standards for Probation in the Trial Court Manual would exceed the authority of the CJAM.  The CJAM cannot limit the Commissioner's absolute statutory authority to conduct Probation hiring by writing Probation into the Trial Court Manual, a document which is statutorily inapplicable to Probation.

The two cases in which the SJC, which appoints the CJAM to administer the trial courts on its behalf, considered issues related to Probation hiring are not to the contrary.  Prior to 2001, when the legislature amended M.G.L. c. 276, § 83 to give the Commissioner the power to appoint, suspend, discipline, dismiss, and assign probation officers,  section 83 vested these powers in the CJAM and the First Justice of each court.  In *First Justice of Bristol Div. of Juvenile Court Dept. v. Clerk-Magistrate of Bristol Div. of Juvenile Court Dept.*, 438 Mass. 387, 388 (2003), the First Justice of the Bristol Juvenile Court contended that the 2001 amendment (and similar ones related to the appointment and supervision of clerks) were unconstitutional because they "infringe[d] on inherent powers of the judiciary."  Notably, the First Justice did not claim judicial authority to *hire* probation officers:  "Our task is made easier by the fact that the plaintiffs' claim appears to be limited to the effect of the modifications on a judge's ability to manage supervise, and control clerks, assistant clerks, and probation officers.  Significantly, the plaintiffs do not assert that the scope of inherent judicial power includes the exclusive power to select or appoint assistant clerks and probation officers."  *Id.* at 403.   Rather, the limited scope of the case concerned the role of judges in the ongoing supervision of probation officers in their courts, not the selection of those officers.  While the SJC decision upholding the constitutionality

of the 2001 amendments included dicta regarding indirect influence of the CJAM over Probation hiring (by appointing and supervising the Commissioner),[13] it did not hold that the Commissioner's power to hire was limited or that the CJAM had direct authority to review Probation hiring.

Critically, the SJC did not consider the effect of the "notwithstanding" clause contained in Probation's budgets; its analysis was limited to section 83 and other statutes.  Nothing in *First Justice* can overcome the fact, discussed above, that the legislature had given the Commissioner exclusive hiring power notwithstanding the content of any other authorities.  Thus, M.G.L. c. 211B, § 9 cannot be read to give the CJAM the authority to regulate or review Probation hiring, because the necessary impact of the "notwithstanding" clause is to negate any conflicting statutes.  The CJAM cannot "retain" hiring authority over Probation (which he never had) given the "notwithstanding" language of the budgets enacted between 2001 and 2011.

In *Anzalone v. Administrative Office of the Trial Court*, 457 Mass. 647, 653-55 (2010), the SJC held that an aspiring probation officer whose appointment by the Commissioner was rejected by the CJAM lacked legal basis to demand that he be hired.  The SJC held that "[s]ubject to the superintendence power of this court, the CJAM has 'general superintendence of the administration of the trial court.'"  *Id.* at 649.  Citing *First Justice*, the SJC noted that despite the 2001 amendment to M.G.L. c. 276, § 83, the CJAM "had 'broad' and 'substantial' authority

---

[13] "It is important to note here that the CJAM retains substantial authority with regard to the appointment of probation officers. In the first place, the Legislature did not amend G.L. c. 276, §§ 98 and 99.  The CJAM, therefore, retains the power to appoint the commissioner and substantial authority to supervise and direct the performance of all his duties, including the selection of probation officers.  The CJAM also retains the broad authority stated in G.L. c. 211B, § 9, including superintendence of the administration of the Trial Court and personnel management.  As discussed with respect to the appointment of clerks, it remains entirely within the CJAM's power to establish a set of conditions that the commissioner would be required to follow in the appointment of probation officers, including strict compliance with all aspects of the personnel manual."  *First Justice*, 438 Mass. at 407.

under G.L. c. 211B, §§ 8 and 9, to supervise the selection of probation officers and set appointment standards for probation officers.'"  *Id.* at 782, n.12.  This case was argued just weeks before the SJC appointed Ware, and the decision was issued three months later, while Ware was conducting his investigation.

As in *First Justice*, the SJC in *Anzalone* did not consider the "notwithstanding" language contained in each of Probation's budgets between 2001 and 2011.  The SJC's conclusion that the CJAM had statutory authority to review Probation hiring cannot overcome the legislature's unequivocal grant of exclusive hiring authority to the Commissioner.  Even assuming, *arguendo*, that M.G.L. c. 211B, §§ 8 and 9 provided the CJAM with the authority to regulate Probation hiring, the "notwithstanding" provision trumps these conflicting statutes.  In any event, *Anzalone* was not in effect during the time that the defendants worked for Probation.  Whatever force this decision has with respect to Probation hiring conducted after August 2010, it has no bearing on the hiring decisions at issue in this case.  The defendants were not working under this decision during their tenure, and could not have known how the SJC would interpret these statutory provisions later, when a power struggle between the Judiciary and the Legislature over the independence of Probation was under way and the media took up the mantle.

## II.  THE ALLEGATIONS IN THE INDICTMENT FAIL TO SUSTAIN COUNTS BASED UPON MAIL FRAUD.

The indictment details 22 alleged instances of mail fraud in violation of 18 U.S.C. § 1341.  Each of these instances is part of the alleged "scheme to defraud," and relates to the hiring or promotion of a Probation employee.  The employees are identified by initials, and the allegations follow the same pattern:  the individual was "sponsored" for a job at Probation, was not the most qualified candidate, was hired or promoted, and then something (usually rejection letters) was sent in the mails.  The racketeering conspiracy charged in count 1 alleges that the

pattern of racketeering activity included, *inter alia*, these 22 hiring decisions.  These 22 instances

are also charged as racketeering acts 1-22 in count 2.  Counts 3-12 charge ten of these hiring

decisions as substantive counts of mail fraud in violation of 18 U.S.C. § 1341.

"The elements of mail fraud are: (1) devising or attempting to devise a scheme or artifice

to defraud; (2) knowing and willful participation in the scheme with the specific intent to

defraud; and (3) the use of the United States mails in furtherance of that scheme."  *United States*

*v. Stergios*, 659 F.3d 127, 132-33 (1st Cir. 2011).  The government must prove that the defendants

had the "specific intent" to defraud, "which excludes false statements honestly believed to be

true and promises or predictions made in good faith."  *United States v. Mueffelman*, 470 F.3d 33,

36 (1st Cir. 2006).  The alleged fraud must include a "misrepresentation or concealment of

*material* fact."  *Neder v. United States*, 527 U.S. 1, 22-25 (1999).  Section 1341 penalizes mail

fraud aimed at depriving someone of money or property; it does not criminalize the deprivation

of intangible rights.  *See Skilling v. United States*, --- U.S. ---, 130 S.Ct. 2896, 2927 (2010).

### A.   Mailed Rejection Letters Were Not "In Furtherance" of the Charged Scheme.

To establish that the defendants used the mails in furtherance of the charged scheme, the

government must prove that "the mails . . . further or assist in carrying out the scheme."  *United*

*States v. LaPlante*, 714 F.3d 641, 644 (1st Cir. 2013).  "[T]he use of the mails need not be an

essential element of the scheme but need only be 'incident to an essential part of the scheme' or

'a step in the plot.'"  *Stergios*, 659 F.3d at 133 (quoting *Schmuck v. United States*, 489 U.S. 705,

710-11 (1989)).  However, "'[t]he federal mail fraud statute does not purport to reach all frauds,

but only those limited instances in which the use of the mails is a part of the execution of the

fraud, leaving all other cases to be dealt with by appropriate state law.'"  *Schmuck*, 489 U.S. at

710 (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)).  In connection with all of the

substantive mail fraud charges, the government alleges that the mailing element is satisfied because Probation sent rejection letters to unsuccessful applicants.[14]  The connection between rejection letters and the alleged scheme is too attenuated; the mail fraud charges cannot proceed based on the assertion that rejection letters were sent.

The Supreme Court explored the necessary connection between the alleged scheme and the use of the mails in *Schmuck*, 489 U.S. 705.  In *Schmuck*, the defendant was accused of buying used cars, rolling their odometers back, and selling the cars to retail car dealers.  *Id.* at 707.  When these unwitting dealers resold the cars to purchasers who relied on the falsified odometer readings, the dealers sent a title-application form to the state department of transportation.  *Id.*  Without the title, the dealer could not complete the sale to the retail customer.  *Id.*  The Court held that these forms satisfied the mailing element because if they had not been sent, Schumuck's scheme, which rested on his ability to sell cars to dealers who could resell them, would have collapsed:

> Under these circumstances, we believe that a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title.  Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him.  These resales and Schmuck's relationships with the retail dealers naturally depended on the successful passage of title among the various parties.  Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

---

[14] The indictment alleges that the mailings in furtherance of all of the substantive mail fraud charges were rejection letters sent to unsuccessful applicants.  However, in connection with three alleged racketeering acts specified in count two, the indictment alleges a different mailing in furtherance.  Racketeering act fourteen is based on the mailing of an "appointment letter," and acts seventeen and twenty-two are based on the mailing of "applications for employment."  2d Sup. Ind. at 19-20.  None of the substantive mail fraud charges can survive the defendants' argument that rejection letters do not meet the "mailing in furtherance" element.  The RICO charges cannot rest upon these outlier racketeering acts, as they do not represent a pattern of criminal activity.

*Id.* at 714.

*Schmuck* distinguished three cases in which the Supreme Court held that mailings were not in furtherance.  *Id.* at 712-14.  In *Kann*, the defendants set up a dummy corporation to funnel the proceeds of a legitimate corporation to themselves.  323 U.S. at 90.  As part of the scheme, the defendants cashed checks at local banks.  *Schmuck*, 489 U.S. at 713.  The government alleged that the mailing element was satisfied because the local banks mailed the checks to the drawee banks for payment.  *Id.*  The Court held that these mailings were not in furtherance because when the local banks mailed the checks, "[t]he scheme in each case had reached fruition.  The persons intended to receive the money had received it irrevocably.  It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank."  *Kann*, 323 U.S. at 94.  In *Parr v. United States*, 363 U.S. 370 (1960), the defendants were charged with "the unauthorized use of a credit card issued to the school district which employed them."  *Schmuck*, 489 U.S. at 713.  The alleged mailing occurred when the credit card company sent a bill to the school district and when the school district mailed the credit card company payment.  *Id.*  The *Parr* Court, relying on *Kann*, held that these mailings were not in furtherance because the defendants' scheme was done and the defendants did not care how the credit card company collected payment.  *Parr*, 363 U.S. at 393.  The defendant in *Maze v. United States*, 414 U.S. 395, 396-97 (1974), was accused of using a stolen credit card to pay for motel rooms.  The alleged mailing in furtherance occurred when the hotels sent invoices to the credit card company and the company sent a bill to the card holder.  *Id.*  The Court held that these mailings were not in furtherance of the scheme because the defendant's "scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss."  *Id*. at 402.

The *Schmuck* Court explained that the mailings in *Kann*, *Parr*, and *Maze* were not in furtherance of the charged schemes because they were "little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Schmuck*, 489 U.S. at 714. The Court held that *Schmuck* was different because "[t]he mailing of the title-registration forms was an essential step in the successful passage of the title to the retail purchasers" and "a failure of this passage of title would have jeopardized Schmuck's relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended." *Id.*

The allegations in this case fit the *Kann-Parr-Maze* mold. The rejection letters alleged to be in furtherance of the alleged scheme could not be sent until the alleged scheme already had reached fruition. That is, rejection letters could not be sent until the successful candidate already had been hired. The very Trial Court Manual upon which the government relies states that rejection letters "should be sent *after* the receipt of the letter from the [CJAM] approving the appointment of the successful candidate." Exhibit A § 4.301(E) (emphasis added). As in *Kann*, *Parr*, and *Maze*, this mailing occurred after the alleged fraud (hiring a candidate recommended by the legislature) was completed, and was a ministerial or administrative communication directed to individuals who had not been hired. Unlike in *Schmuck*, these mailings had no role in preserving any relationship necessary to the alleged fraud. The mailings did not go to the CJAM, and were entirely unnecessary—had they not been sent, unsuccessful candidates would have known they did not receive the job when they were not contacted and hired.

Rejection letters were an unnecessary administrative function that occurred only after the alleged fraud was completed. These letters were not in furtherance of the alleged scheme, and the mail fraud charges that rest on them must be dismissed.

### B. The Commissioner's Exclusive Hiring Authority Requires Dismissal of Mail Fraud Charges.

The mail fraud statute requires the government to prove that the defendants devised a scheme to defraud that included a "misrepresentation or concealment of *material* fact." *Neder*, 527 U.S. at 22-25. "[A] false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder*, 527 U.S. at 16 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). The indictment is vague about whom the defendants purportedly defrauded, but it is clear about the alleged material misrepresentation. The government alleges that Probation was bound, by M.G.L. c. 211B, § 8 and the Trial Court Manual, to conduct merit-based hiring in accordance with rules set by the CJAM. The statute requires that "[a]ny appointment that is governed by standards promulgated under the provisions of this section shall forthwith be certified in writing for compliance with such standards to the chief justice for administration and management." *Id.* The government asserts that Mr. O'Brien falsely certified to the CJAM that the "sponsored individuals" were hired under a merit-based system as defined by the Trial Court Manual, and that this certification was a material misrepresentation.

When the charges are viewed in light of Massachusetts law, it is clear that liability for mail fraud cannot be premised on a certification made by the Commissioner to the CJAM asserting that the Commissioner had complied with the Trial Court Manual. Such a theory rests on the erroneous assumption that the Commissioner was required to follow the Trial Court Manual and that the CJAM had hiring authority over Probation. As discussed above, the CJAM had no such authority, and the Commissioner was not so bound. The Commissioner had absolute hiring authority, and was not bound by the provisions of M.G.L. chapter 211B or the Trial Court Manual. The certification could not have influenced the CJAM, because the CJAM had no

authority to make decisions related to Probation hiring.  This certification was unnecessary and immaterial as the decision-making process rested solely with the Commissioner.  Because the CJAM did not have a role in the Probation hiring process, statements to the CJAM regarding that process were not "capable of influencing" the CJAM and cannot be the material misrepresentation required for mail fraud.

### C.  The Certifications to the CJAM Were True and Accurate, Not Fraudulent.

The indictment alleges that the defendants made a material misrepresentation when they certified to the CJAM that the hiring had been conducted in a certain way.  As discussed above, this certification cannot be a material misrepresentation because the CJAM had no authority over Probation hiring.  Additionally, this certification cannot be a material misrepresentation because it was not a misrepresentation at all.

Apart from the question of whether the CJAM had any authority to review the Commissioner's hiring choices, the certification was factually true.  A true statement cannot be the material misrepresentation underlying a mail fraud charge or support a finding that the defendants had the specific intent to defraud.  *See United States v. Rowe*, 144 F.3d 15, 21 (1st Cir. 1998) ("[A]n answer to a question is not fraudulent if there is an objectively reasonable interpretation of the question under which the answer is not even false."); *Boufford v. United States*, 239 F.2d 841, 844 (1st Cir. 1956) ("[I]f the defendant did not make a 'false statement,' as charged in the indictment, he could not be convicted of 'knowingly' making a false statement."). The certification alleged to be a material misrepresentation was not false and cannot support mail fraud charges.

The certification read as follows:

In accordance with the established personnel standards, enclosed are:

___     The <u>Applicant Interview and Hiring Record</u> (F4).
___     The <u>Applicant Flow Record</u> (F17).
___     A copy of all applications of the candidates who were interviewed.
___     A copy of the notice of vacancy (job posting).
___     The Jobs Hotline Confirmation letter (F3) (if on the Hotline).
___     The <u>Employment Eligibility Verification Form 19</u> (F 16) & supporting
           documentation (new hires only).
___     The <u>SSA-1945 Statement Concerning Employment in a Job not Covered</u>
           <u>by Social Security</u> (F 30) (new hires only).
___     The <u>Consent to Criminal Record Check</u> (F 23) (new hires only).
___     The <u>Application for Allied Service Credit</u> (F 26) (Probation Officer
           positions only).

I certify that I have complied with the Trial Court's personnel standards and that sufficient funding exists in the current fiscal year budget to support this position.

_____
Appointing Authority

The indictment characterizes the Commissioner's signature as the "appointing authority" on this form as a false statement that "the candidate for employment had been hired pursuant to the procedures mandated by the [Trial Court] Manual." 2d Sup. Ind. at 9.

However, the certification does not aver that the Commissioner complied with or even considered the Trial Court Manual, much less the hortatory language in the Manual about "merit" hiring. Instead, it simply avers that the Commissioner complied with the Trial Court "*personnel standards*." This reference to "personnel standards," a commonplace human resources term of art, does not encompass the entire Trial Court Manual. "Personnel standards" are mentioned once in the Trial Court Manual, in the section entitled "Approval Process":

> Upon selecting a final candidate to fill a position on a permanent basis, the appointing authority [*i.e.*, the Commissioner] must certify compliance with the *personnel standards* of this section, must certify that sufficient funding is available in the current fiscal year budget to support the position, and must submit the following material to the Human Resources Department:
> T. the <u>Appointment Documentation</u> form (Appendix C, Form F5);
> U. the <u>Applicant Interview and Hiring Record</u> (Appendix C, Form F4);
> V. the <u>Applicant Flow Record</u> (Appendix C, Form F17);
> W. a copy of the application of the final candidate and the applications of all who were interviewed and, if required, the resume of the final candidate;

31

X.   a copy of the notice of vacancy;
Y.   the <u>Jobs Hot Line Confirmation Letter</u> (Appendix C, Form F3);
Z.   the <u>Employment Eligibility Verification Form I-9</u> (Appendix C, Form F16) and supporting documentation (new hires only);
AA.   the <u>Consent to Criminal Record Check</u> (Appendix C, Form F23).

Exhibit A § 4.400(A) (emphasis added).  Arguably this portion of the "Approval Process" section does not even apply to Probation.  Subsection B of the "Approval Process" is a similar provision specifically directed at Probation hiring, and it does not require any certification or mention "personnel standards."  *Id.* at § 4.400(B).  In *First Justice*, the SJC defined "personnel standards" as "deal[ing] expressly with job posting, newspaper advertising, review of applications, interviewing applicants, reference checks, verification of eligibility to work in the United States, and criminal record checks."  438 Mass. at 394.

The "personnel standards" of the Trial Court are administrative requirements of the hiring process; they relate to human resources record keeping and to ensuring that the chosen candidate is eligible to work in the United States and does not have a criminal record.  The Trial Court Manual is broader in scope than "personnel standards."  The certification does not mention the Trial Court Manual or M.G.L. c. 211B, § 8.  The Commissioner's signature on this line indicated that he had posted the job, reviewed applications, interviewed applicants, conducted the proper records checks, and assembled the correct paperwork, *not* that he hired pursuant to the Trial Court Manual or had selected the "most qualified" candidate.

Defining "personnel standards," as the minimum, administrative qualifications required for a certain job, is consistent with its use as a term of art in employment law.  *See, e.g., Acevedo-Diaz v. Aponte*, 1 F.3d 62, 68, n.5 (1st Cir. 1993) (discussing "personnel standards" as "the established minimum qualifications" for a given job (citing *Hiraldo-Cancel v. Aponte*, 925 F.2d 10, 14 (1st Cir. 1991))); *see also First Justice*, 438 Mass. at 404, n.10 (noting that the

CJAM could revise the "personnel standards" by creating "stricter minimum qualifications for Trial Court positions"). It is also consistent with the statutory role of the CJAM vis-à-vis Probation. The CJAM may have had administrative responsibilities in connection with Probation, but did not have any authority to set Probation's hiring policy or to review its hiring decisions.

There is no allegation that the defendants violated the administrative personnel standards mentioned in the certification. The certifications were true, and they cannot serve as the material misrepresentation necessary to support the mail fraud charges.

### D.   The Indictment Fails to Allege Deprivation of Tangible Property.

To prove that the defendants committed mail fraud in violation of 18 U.S.C. § 1341, the government must establish that the defendants participated in a scheme to defraud someone of tangible property. *McNally v. United States*, 483 U.S. 350, 360 (1987) (§ 1341 is "limited in scope to the protection of property rights"). A separate statute prohibits fraud aimed at depriving someone of the intangible right of honest services. *See* 18 U.S.C. § 1346; *Skilling*, 130 S. Ct. at 2927. This honest-services fraud statute criminalizes only bribes or kickbacks. *Id.* at 2931.

The indictment fails to sufficiently allege that the defendants engaged in a scheme to defraud anyone of tangible property. The indictment alleges that "the defendants obtained money and property, to wit, jobs and salaries for individuals who were not the most qualified candidates." 2d Sup. Ind. at 12-13. The indictment does not specify whom they deprived. These allegations fail to establish mail fraud in violation of § 1341 because: 1) "jobs and salaries" were not obtained as a result of the alleged scheme; and 2) any such deprivation does not involve a tangible right to money or property.

1.      *The alleged scheme did not "obtain" jobs and salaries.*

Before advertising for an open job, Mr. O'Brien submitted documentation detailing probation officer workloads and the necessity of hiring a new probation officer to the CJAM.  If the CJAM approved a request to appropriate funding for a job slot, AOTC human resources would add the job posting to the job hotline, and candidates could apply.  The indictment does not allege that there was any fraud involved in this process.  The hiring process did not begin until the decision that a given job and its attendant salary would be allocated to Probation had been made.  The hiring process existed to determine who would work and be paid that salary, but when the hiring process began, the financial appropriation and decision to pay that salary to someone had already been made.  At the time funding for the slot was approved, Probation did not know who would apply, and could not have known who would ultimately be hired or what credentials that individual would have.

The process by which Probation "obtained" the job and the process by which it assigned that job to a particular candidate are separate.  The mail fraud statute contemplates a scheme related to how property is obtained, not how it is allocated it if has been obtained legitimately.  *See McNally*, 483 U.S. at 360-61 (noting that defendants had not been charged with depriving state of its money where they had been accused of misconduct in distributing state funds that would have been spent anyway).  The government has not alleged a scheme to defraud that involved obtaining property, and the mail fraud charges therefore must be dismissed.

2.      *The purported scheme does not allege deprivation of tangible property.*

The mail fraud charges cannot stand because the government has not sufficiently alleged that anyone was deprived of tangible property.  The indictment fails to identify whom the defendants allegedly deprived of jobs and salaries.  Three possible theories are: 1) the defendants

deprived the CJAM of jobs and salaries; 2) the defendants deprived unsuccessful applicants of jobs and salaries; and 3) the defendants deprived the citizens of Massachusetts of the "most qualified" probation officers.  None of these apparent possibilities would support the mail fraud charges.

The theory that the defendants deprived the CJAM of jobs and salaries cannot support the mail fraud charges.  The CJAM did not possess the jobs or salaries.  As explained above, there is no fraud alleged in connection with the process by which the CJAM determined that Probation could hire for a given position.  The CJAM had no authority to review Probation hiring decisions, and the defendants did not deprive him of any such opportunity.  Moreover, even if the CJAM were deprived of the ability to fully review Probation hiring decisions, that opportunity is not a tangible property right.

The theory that the defendants deprived unsuccessful applicants of jobs and salaries cannot support the mail fraud charges.  The unsuccessful applicants had no tangible property right to a job at Probation.  Probation received hundreds of applications for each job, and no candidate had a right to a job.  At most, the unsuccessful applicants were deprived of a hiring process in which recommendations played no role.  Job applicants do not have a right to an "honestly" conducted hiring process.  *See United States v. Doherty*, 867 F.2d 47, 55 (1st Cir. 1989) (holding that mail fraud indictment cannot be based on deprivation of policeman's "right to have 'promotional examinations, and law enforcement appointments and promotions, conducted honestly'" or applicant's "right to have promotions and examinations 'conducted honestly'").  Participation in a "fair" hiring process is not a property right that can support mail fraud charges.

Finally, the theory that the defendants deprived Massachusetts citizens of the "most

qualified" probation officers cannot support the mail fraud charges.  As explained above, the

legislature gave the Commissioner exclusive hiring authority; there were no restrictions placed

on this authority that would give the citizens of the Commonwealth any expectation or right that

probation officers would be hired in any particular way or that the hired applicants would be the

"most qualified officers."  At the time of the alleged conduct, the statute giving the

Commissioner hiring authority read:

> Subject to appropriate, the commissioner of probation may appoint, dismiss and assign
> such probation officers to the several sessions of the trial court as he deems necessary.

M.G.L. c. 276, § 83 (version effective 2001 through 2011).  Nothing in this language requires the

Commissioner to hire the "most qualified" candidates, or creates the expectation that such

candidates would be hired.

This legal landscape is quite different from the authorities present in cases in which

courts have concluded that alleged fraud in a hiring process did constitute a deprivation of

property.  In *Doherty*, the defendants were policemen accused of stealing copies of the civil

service exam and selling "them to policemen so they could cheat and obtain promotions."  867

F.2d at 51.  The First Circuit held that the indictment "validly charges a conspiracy to defraud the

government of money" where it stated "that it was a 'further objective of the conspiracy for the

conspirators to illegally assist relatives, friends and associates in obtaining appointment to or

promotion within police departments in . . . Massachusetts so that those relatives, friends and

associates would receive the benefits of such appointment or promotion; which benefits included

in the salary or increased salary by reason of appointment to or promotion within the police

department and whatever pension benefits would accrue by reason of the appointment to or

promotion within the police department.'"  *Id.* at 55-56.

Underlying this theory is the fact that the hiring and promotion of police officers was

controlled by the civil service provisions of M.G.L. c. 31.  One of these statutes requires that police officers can only be hired and promoted "after competitive examination."  M.G.L. c. 31, § 59.  This chapter also requires the compilation of a list of individuals eligible for civil service provisions based on the results of this examination, and dictates how individuals can be hired from those lists.  *See* M.G.L. c. 31, §§ 6, 27.  Because of these statutes, when the legislature allocates money to a civil service agency, it has an expectation as to how hiring at that agency will proceed.  In *Doherty*, the legislature had required that police officers be hired in a certain way, and the defendants personally profited from selling a stolen exam in order to subvert the legislature's dictates.

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), is similar to *Doherty*.  In *Sorich*, the defendants worked for the mayor of Chicago and were accused of "dol[ing] out thousands of city civil service jobs based on political patronage and nepotism."  523 F.3d at 705.  The government asserted that "the defendants concealed what they were doing by falsely assuring city lawyers that their hires were legitimate, and then shredding evidence and hiding their involvement once a criminal investigation began."  *Id.*  The Court rejected the contention that the jobs at issue were not property because "the city paid for, and was cheated out of, qualified civil servants."  *Id.* at 713.  The court was able to assert that the city paid for qualified civil servants because "[t]his all went on despite the existence of multiple laws and personnel regulations forbidding the use of political considerations in hiring for civil service jobs, and mandating the awarding of those jobs on merit."  *Id.* at 706.  Those statutes enabled the legislature to expect that civil servants would be hired in a particular manner and without regard to politics.

At the time of the alleged conduct here, there was no statute or other regulation that gave the Massachusetts legislature or populace any reason to expect that probation officers would be

hired in a certain manner or that those officers would be the "most qualified" under any metric. The statute in effect at the time gave the Commissioner the absolute authority to hire as he deemed fit.  See M.G.L. c. 276, § 83 (version effective 2001 through 2011).  In 2011, and perhaps as a result of these allegations, the legislature amended this statute to impose stringent restrictions on Probation hiring, including requiring Probation to administer a written examination to applicants, to confer with the court administrator and CJAM regarding hiring, and to not consider recommendations until after the exam and interview process.  *See* M.G.L. c.276 § 83.  That the legislature has passed such requirements in 2011 further indicates that earlier, in their absence, the Commonwealth had no tangible right to probation officers hired in any particular way.

Nor do any of the statutes or manuals discussed in the indictment give Massachusetts a tangible right to a certain type of probation officers.  As detailed above, neither chapter 211B nor the Trial Court Manual apply to Probation.  That chapter and the policies promulgated under it concern the seven trial court departments: "the superior court department, the housing court department, the land court department, the probate and family court department, the Boston municipal court, the juvenile court department and district court department."  M.G.L. c.211B, § 1.  The Trial Court Manual applies only to employees of those departments, and cannot create an expectation that Probation officers would be hired under its auspices.  Because the legislature gave the Commissioner exclusive hiring authority without conditions, neither it, nor the citizens of Massachusetts, have any tangible right to expect that probation officers would be hired in any particular way.  Unlike in *Doherty* and *Sorich*, the defendants could not have deprived the state of any tangible property right in salaries being paid to the "most qualified" employees.

Because the government has not alleged the deprivation of a tangible property right, the

38

mail fraud charges must be dismissed.

### III. THE ALLEGATIONS OF THE INDICTMENT FAIL TO SUSTAIN COUNTS BASED ON BRIBERY OR GRATUITY.

Count 13 alleges that the defendants conspired to commit bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(2).  The manner and means and overt acts alleged in connection with this conspiracy include the 22 Probation hires and the 18 ELMO hires.  Counts 14-19 charge substantive violations of 18 U.S.C. § 666(a)(2) based on six of the alleged Probation hires.  Counts 20-30 charge Mr. O'Brien alone with substantive violations of 18 U.S.C. § 666(a)(2) in connection with eleven of the alleged ELMO hires.

The elements of bribery in violation of 18 U.S.C. § 666(a)(2) are: (1) corruptly giving, offering, or agreeing to give something of value (2) with intent to influence or reward an agent of a state government (3) in connection with a transaction or series of transactions of that government involving something worth $5,000 or more (4) where that government receives in a year, more than $10,000 in federal assistance.  18 U.S.C. § 666(a)(2).  The third element is called the transactional element, and the $5,000 valuation "refers to the value of the 'business' or 'transaction' sought to be influenced," not to the bribe itself.  *United States v. Fernandez*, 722 F.3d 1, 12-13 (1st Cir. 2013) ("'In other words, the *subject matter* of the bribe must be valued at $5,000 or more; the bribe itself need only be "anything of value."'" (quoting *United States v. Robinson*, 663 F.3d 265, 271 (7th Cir. 2011))).  "[T]he value of the bribe may be relevant in determining the value of the bribe's objective."  *Id.* at 13.

Bribery allegations also underlie the racketeering charges.  Count 2 details 40 instances in which the defendants allegedly violated the state bribery and gratuity statutes — M.G.L. c. 268A, § 2(a)(1) and M.G.L. c.268A, § 3(a).  Twenty-two are part of the "scheme to defraud," and are the same hiring decisions alleged to be mail fraud.  The other 18 instances relate to the alleged

"ELMO hiring scheme."  These 40 hires (Probation and ELMO) are charged as racketeering acts in support of the count 2.  Racketeering acts 23(a) through 44(a) and 23(b) through 44(b) allege that the defendants violated M.G.L. c. 268A, § 2(a)(1) and M.G.L. c. 268A, § 3(a), respectively, in connection with the Probation hires.  Racketeering acts 45(a) through 62(a) and 45(b) through 62(b) allege that the defendants violated M.G.L. c. 268A, § 2(a)(1) and M.G.L. c. 268A, § 3(a), respectively, in connection with the ELMO hires.  Count 1 alleges that the racketeering conspiracy included all of this conduct as well as the alleged mail fraud discussed above.

"Chapter 268A is a comprehensive measure designed to prevent the improper use of influence on public officials."  *Scaccia v. State Ethics Commission*, 431 Mass. 351, 355-56 (2000).  Chapter 268A § 2(a)(1) prohibits bribery, and c.268A § 3(a) prohibits gratuities.  To satisfy the bribery statute, the government must prove that the defendant corruptly gave, offered, or promised anything of value to a public official with the intent to influence an official act.  M.G.L. c.268A § 2(a)(1).  The gratuity statute requires the government to prove that "something of 'substantial value' [was] given, offered, or promised to a public official 'for or because of any official act performed or to be performed' by such public official."  *Scaccia*, 431 Mass. at 354.  The government must prove "a link between a gratuity and an official act."  *Id.* at 355 (citing *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 414 (1999)).  "A gratuity violation is, essentially, a lesser included offense of bribery."  *Id.* at 356.  The SJC has explained the conceptual difference between bribery and gratuities:

> Bribery also typically involves a quid-pro-quo, in which the giver corruptly intends to influence an official act through a "gift," and that "gift" motivates an official to perform an official act. In effect, what is contemplated is an exchange, involving a two-way nexus. A gratuity in violation of the statute, in contrast, can either be provided to an official as a reward for past action, to influence an official regarding a present action, or to induce an official to undertake a future action.  Only a one-way nexus need be established for a gratuity violation.

*Id.* (internal citation omitted); *see also Sun-Diamond*, 526 U.S. at 404 (explaining same distinction between federal bribery and gratuity statutes).

### A.  Substantive Bribery Charges Under 18 U.S.C. § 666 Must Be Dismissed.

The defendants are charged with bribery in violation of 18 U.S.C. § 666(a)(2), which imposes criminal penalties on a person who "corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward" an agent of a state government, or any agency thereof, "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more."  The organization, government, or agency must receive, in a one-year period, benefits in excess of $10,000 under a federal program.  *Id.* at § 666(b).

### 1.    The alleged conduct falls in the "safe harbor" provision of § 666.

The charges based on § 666 must be dismissed under § 666(c), which creates a safe harbor for bona fide salaries for employees:  "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  18 U.S.C. § 666(c).  Section 666(c) protects against the prosecution of "acceptable business practices."  H.R. Rep. No. 99-797, at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153; *see Mills,* 140 F.3d at 632, 634 (pointing to this "restriction on the reach of 18 U.S.C. § 666" as evidence that not all instances of bribery "merit the attention of the federal courts").

In accordance with congressional intent to limit § 666 to the most egregious offenses, courts have applied the safe harbor provision broadly to cases in which the job itself was genuine and the employee performed it adequately.  If those conditions are met, the safe harbor provision applies regardless of *how* the employee obtained the position.  *See Mills*, 140 F.3d at 633.  In *Mills*, a local sheriff was charged with violating § 666(a)(1)(B) by accepting monetary payments

in exchange for hiring certain employees.  *See* 140 F.3d at 632.  The sheriff passed over more

meritorious candidates to hire deputies who paid him bribes; those deputies then performed the

jobs adequately.  The district court dismissed the § 666 counts before trial based on the safe

harbor exemption for bona fide compensation.  *Id.*  The Sixth Circuit affirmed, holding that the

value of the yearly salary of a deputy sheriff's job, if bona fide, should not be considered in

establishing the $5,000 transactional valuation.  *Id.* at 633.  Accordingly, conduct charged by the

government did not constitute a violation of 18 U.S.C. § 666 because the requisite minimum

transaction valuation had not been satisfied.  *Id.* at 631.

The *Mills* court rejected the government's argument that the salaries could not have been

bona fide "because of the illegal nature of the employment procurement process," *i.e.*, via bribes

to the sheriff.  *Id.* at 633.  The court explained that this argument was unavailing as long as the

employee fulfilled legitimate duties:

> Unfortunately for the government, the indictment does not allege that the jobs in question
> were unnecessary or that the individuals who obtained those employment positions did
> not responsibly fulfill the duties associated with their employment.  In the absence of
> such allegations, the government has no support for its claims that the salaries paid to the
> deputy sheriffs were not properly earned "in the usual course of business."

*Id.*  The Court made clear that § 666 is not concerned with illegal procurement.  If jobs are the

thing of value and the compensation is bona fide, then § 666 is not implicated.  *See id.*

Other courts have approached the safe harbor provision similarly.  In *United States v.*

*Mann*, 1999 U.S. App. LEXIS 160 (6th Cir. 1999), the government charged a school principal

with violating § 666 by accepting his salary even though he was not qualified for the job.  The

district court dismissed the charge pursuant to the exception for bona fide compensation.  The

Sixth Circuit affirmed, rejecting the government's argument that the defendant was unqualified

and thus "stole" the salary for the principal position.  It held that the wages were bona fide

42

because the position of principal was "clearly a real and necessary one," the defendant performed

the duties of the job, and he was paid in the ordinary course of business despite his lack of

qualifications.  *Id.*[15]

In contrast, courts have rejected § 666(c) defenses in cases involving no-show, fraudulent,

or otherwise illegitimate positions.  In *United States v. Bryant*, 556 F. Supp. 2d 378, 428 (D.N.J.

2008), a state senator was alleged to have received payments, via a retainer with his law firm, in

exchange for advocating for legislation favorable to the bribe payer.  The *Bryant* court

distinguished *Mills*:  "The allegations at issue in *Mills* were consistent with the possibility that,

once the bribers were hired, the salary at issue was paid only for legitimate work, leaving the

procurement process as the only reason to claim their salary was not bona fide."  *Id.*  The court

explained:

> The reason why Bryant's salary is not "bona fide" and "in the usual course of business" is
> not because of the alleged illegal nature of the procurement process.  The allegations at
> issue in *Mills* were consistent with the possibility that, once the bribers were hired, the
> salary at issue was paid only for legitimate work, leaving the procurement process as the
> only reason to claim their salary was not "bona fide."  If the Indictment alleged that
> Gallagher, like the *Mills* defendants, was paid a bribe in exchange for giving Bryant an
> otherwise totally legitimate job at SOM, a different result might follow.  But the bribery
> arrangement, as alleged in the Indictment, is very different.  The Indictment alleges that
> whatever legitimate work Bryant may have done at SOM, his "primary role" was to use
> his legislative office to advocate on behalf of SOM.  Thus, because Bryant accepted his
> SOM salary "intending to be influenced" as a state legislator, his salary was not merely
> corruptly procured, but also constituted payment for on-going corrupt activity.

*Id.* (internal citation omitted).

Similarly, in *United States v. Grubb*, 11 F.3d 426, 430 (4th Cir. 1993), the defendant

---

[15] Although *Mills* and *Mann* involved § 666(a)(1)(B), the same analysis applies to alleged
violations of § 666(a)(2).  *See, e.g., United States v. Bryant,* 556 F. Supp.2d 378, 427 (D.N.J.
2008) (in case charging § 666(a)(1)(B) and (a)(2), distinguishing *Mills* because the job at
issue was not legitimate); *United States v. Spano*, 401 F.3d 837, 840 n.2 (7th Cir. 2005)
("[W]e see no reason for any differentiation in analysis among the (a)(1) and (a)(2) charges,
which are basically two sides of the same coin.").

arranged for Adams to hire Tomblin if Tomblin paid Adams $10,000.  The Court held that §

666(c) did not apply because Tomblin's wages were not bona fide and in the usual course of

business.  *Id.* at 434.  Unlike in *Mills*, Tomblin received a salary despite "perform[ing] little

work."  *Id.* at 431; *see also United States v. Williams*, 507 F.3d 905, 908-09 (5th Cir. 2007)

(salary was not bona fide where it involved payments for work defendant had not performed); *id.*

at 908 ("[A] salary is not bona fide or earned in the ordinary course of business under § 666(c) if

the employee is not entitled to the money."); *United States v. Stout*, No. 93-2289, 1994 U.S. Dist.

LEXIS 3182, *13 (E.D. Pa. Mar. 21, 1994) (compensation was paid to no-show employees so the

exception did not apply); *United States v. Shelton*, 816 F. Supp. 1132, 1134 & 1137 (W.D. Tex.

1993) (salary was not bona fide because it was paid for a job that was created just to benefit

defendant's relative who could not have been hired because of nepotism rules); *United States v.

Vitillo*, No. 03-555, 2005 U.S. Dist. LEXIS 22394, *17-18 (E.D. Pa. Oct. 5, 2005) (wage

payments were not bona fide where defendants submitted false invoices for payment); *United

States v. Robinson*, No. 11-361, 2012 U.S. Dist. LEXIS 147793, *13 (E.D. Mo. Oct. 15, 2012)

("[O]ne who submits weekly time sheets falsely certifying time worked to obtain a salary

payment, when in fact no work is performed, is not receiving a bona fide salary, wages or fee and

is not being paid in the usual course of business within the meaning of § 666(c)."); *United States

v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (purported "commission split" was an illegal

kickback, not a bona fide fee under § 666(c)); *United States v. Baldridge*, 559 F.3d 1126, 1139

(10th Cir. 2009) (wages were not bona fide because the first defendant did work for which he

could not legally be paid and the second defendant did no work at all); *United States v. Paul*, No.

06-30506, U.S. App. LEXIS 19953, *2 (9th Cir. Aug. 17, 2007) (defendant misappropriated

funds in an unauthorized manner and thus did not receive bona fide wages).

The First Circuit has cited *Mills* with approval.  In *United States v. Dwyer*, No. 05-2051, 2007 U.S. App. LEXIS 20259, *42 (1st Cir. Aug. 24, 2007), the defendant had filled out time sheets for employees.  The court found that there was ample evidence that the work had not been done and that the compensation was not bona fide.  *Id.*  The First Circuit cited *Mills* for the proposition that the bona fide wages exception applied where "there was no allegation that employees did not responsibly fulfill the duties associated with their employment."  *Id.* at *44. In *United States v. Cornier-Ortiz*, 361 F.3d 29, 36 (1st Cir. 2004), the court held that compensation was not bona fide where an individual was hired and paid, but the work was performed by the individual's brother, who was legally precluded from doing the work by conflict of interest rules.  *Id.; see also id.* at 35 (citing *Mills* for the proposition that the "exception would not apply if the government proved that salaries were paid for jobs that were unnecessary or unjustified").

Case law makes clear that § 666 is not concerned with how a job was procured as long as the compensation paid was for necessary labor that was actually performed by the employee. The § 666(c) safe harbor provision applies to the allegations in this case.  The employees referenced in the charges filled real positions and performed the work adequately.  The indictment does not allege that the positions described were fictitious or illegitimate or that the employees failed to perform the required work, or were paid outside of the ordinary course of business.  Rather, it alleges that the individuals hired were not the "most qualified" applicants and were chosen because they had been recommended by a legislator.  Regardless of how the hiring process worked, the jobs described in the indictment were legitimate, the salaries were bona fide, and the § 666(c) exemption applies.  These allegations stand outside both the letter and the intent of section 666.  Because the government has failed to allege conduct outside the reach of § 666(c)'s

safe harbor, the case must be dismissed as a matter of law.  *See Mann*, No. 97-6179, 1999 U.S.

App. LEXIS 160 (indictment dismissed where § 666(c) covered alleged conduct); *Mills,* 140

F.3d at 631-32 (indictment properly dismissed pretrial where § 666(c) precluded prosecution for

the alleged conduct).

2.      *The transactional element of § 666 is not satisfied.*

The government's § 666 charges also fail because the indictment does not sufficiently

allege the transactional element of the statute.  For a bribe to fall within § 666, it must be made

"in connection with any business, transaction, or series of transactions of [the covered]

organization, government, or agency involving anything of value of $5,000 or more."  18 U.S.C.

§ 666(a)(2). This requirement has been referred to as the "transactional element."  *United States*

*v. Robinson,* 663 F.3d 265, 270 (7th Cir. 2011).  The $5000 element "refers to the value of the

'business, transaction, or series of transactions,' not the value of the bribe."  *Fernandez*, 722 F.3d

at 12.

The safe harbor provision dictates that bona fide wages cannot fulfill the $5,000

transactional element.  *Mills,* 140 F.3d at 633.  The *Mills* court explained:

> Because the bona fide salary exception of subsection (c) must be read to apply to all of §
> 666 . . . the value of the yearly salary of a deputy sheriff's job, *if bona fide,* should not be
> considered in establishing the $5,000 transactional valuation. In such a case, the values of
> the allegedly illegal transactions are not the salaries to be paid to deputy sheriffs for
> actual performance of necessary governmental duties.  Rather, the only guide to
> determining the true values of the transactions is the money required to secure the
> positions in the first place.  The indictment returned against the defendants clearly and
> specifically assigns values ranging from $3,500 to $3,930 to those jobs. Because those
> amounts are below the $5,000 statutory floor, the district court correctly dismissed those
> counts premised upon alleged violations of 18 U.S.C. § 666.

*Id.* at 633.  The safe harbor provision exempts the salaries paid to the probation employees from

the transactional element calculus.  The salaries were bona fide, and the government must look

elsewhere to satisfy the $5,000 threshold.  Only "money required to secure the positions in the

46

first place" can supply this element. *Id.* The indictment does not allege that <u>any</u> money changed hands.

The Probation budget cannot satisfy the transactional element. In *Fernandez*, the First Circuit held that a legislative transaction can satisfy this element where "*the direct and foreseeable effect* of that legislation would be to give the individual offering the bribe *a particular desired result* — assuming, of course, that the transaction involved something of value of $5,000 or more." 722 F.3d at 15 (emphasis added). The government presented evidence that the foreseeable effect of the passage of the specific legislation at issue in *Fernandez* would be a change in the armored car service industry resulting in financial benefits to the bribe givers exceeding $5,000. *Id.*

The indictment does not allege that the hiring of the specified probation officers was tied to any particular legislative action. The indictment alleges that by hiring these individuals, the defendants sought to influence "those members of the legislature *who were in a position to affect* the defendants through legislation, budget authorization, and in other ways." 2d Sup. Ind. at 54 (emphasis added). This vague allegation is too attenuated to satisfy the transactional element. Unlike *Fernandez,* there is no allegation that hiring particular individuals was tied to a specific legislative action that would have the "direct and foreseeable effect" of giving the defendants a "particular desired result." The indictment fails to sufficiently allege the transactional element, and the charges based on § 666 must be dismissed.

> *3.    Section 666 is not intended to criminalize state politics.*

Congress passed § 666 "to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for

dollars." *Sabri v. United States*, 541 U.S. 600, 605 (2004).  The Senate Report describes the statute as a means of "vindicat[ing] *significant* acts of theft, fraud, and bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program."  S. REP. NO. 98-225, at 369 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510 (emphasis added).

Courts, too, have noted that the statute was intended to reach only "substantial acts of bribery," *i.e.,* those "involving real money and therefore posing a real threat to the integrity of federal funds."  *United States v. McCormack*, 31 F. Supp. 2d 176, 183 (D. Mass. 1998) (internal citations and quotation marks omitted).  "[I]n its drafting of the statute, Congress made clear that, despite its abhorrence for acts of bribery, not every such misdeed should be subjected to federal oversight and punishment."  *United States v. Mills*, 140 F.3d 630, 632 (6th Cir. 1998).  Rather, "Congress evidenced its intent that only the most serious instances of governmental corruption should be policed by the federal judiciary."  *Id.*  The United States Attorneys' Manual cautions that "[t]he advisability of a Federal prosecution under 18 U.S.C. § 666(a)(1)(A) should be carefully weighed against the likelihood that State prosecution will be sufficient to protect Federal interests."  *See* Criminal Resource Manual at § 1001; *see also id.* § 1002 ("The section is designed to facilitate the prosecution of persons who steal money or otherwise divert property or services from state and local governments . . . .").

Courts are extremely reluctant to sanction the federal criminal prosecutions of state or local officials for engaging in politics.  In *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), which involved a state contract that was awarded for political reasons rather than to the official bid winner, the court stated that "[a] preference for in-state suppliers who can vote, over competitors who can't, may be smart politics.  Again no federal statute regulates such behavior,

let alone declares it to be a felony." *Id.* at 880.  The court noted that Supreme Court decisions

"do not say that the Constitution forbids all politically-motivated contracting practices . . . An

error — even a deliberate one, in which an employee winks at the rules in order to help out

someone he believes deserving but barely over the eligibility threshold — is a civil rather than

criminal transgression . . . ."  *Id.* at 881.

> That's politics: people get and keep office by getting the people what they want, even if it
> is not what they 'need' by some higher calculus . . . [S]upporting local vendors, a form of
> 'pork,' may or may not be good government but is not a 'misuse of office' in the criminal
> sense. The idea that it is a federal crime for any official in state or local government to
> take account of political considerations when deciding how to spend public money is
> preposterous.

*Id.* at 883.  Section 666 must be interpreted against this backdrop of caution and restraint.

### 4.      *Section 666 Charges Do Not Allege a Quid Pro Quo*

The First Circuit has held that § 666 does not criminalize gratuities.  *See United States v.*

*Fernandez*, 722 F.3d 1 (2013).  The charges here under § 666 must be dismissed because the

government has not adequately alleged a *quid pro quo*.  The Supreme Court explained the

distinction between bribes and gratuities:

> The distinguishing feature of each crime is its intent element.  Bribery requires intent "to
> influence" an official act or "to be influenced" in an official act, while illegal gratuity
> requires only that the gratuity be given or accepted "for or because of" an official act.  In
> other words, for bribery there must be a *quid pro quo* — a specific intent to give or
> receive something of value *in exchange* for an official act.  An illegal gratuity, on the
> other hand, may constitute merely a reward for some future act that the public official
> will take (and may already have determined to take), or for a past act that he has already
> taken.

*Sun-Diamond*, 526 U.S. at 404-05; s*ee also United States v. Mariano,* 983 F.2d 1150, 1159 (1st

Cir. 1993) (noting in a § 666 case that "[t]he essential difference between a bribe and an illegal

gratuity is the intention of the bribe-giver to effect a *quid pro quo*"); *United States v. Griffin,* 154

F.3d 762, 764 (8th Cir. 1998) ("The core difference between a bribe and a gratuity is not the time

the illegal payment is made, but the *quid pro quo,* or the agreement to exchange [a thing of value] for official action.").

In *Fernandez*, the defendants were Bravo, the president of a private firm that provided security services, and Martínez, the chair of the Public Safety Committee of the Puerto Rico Senate.  Bravo supported legislation related to the security industry in Puerto Rico, which would have benefitted his firm financially.  Bravo arranged for first-class tickets to Las Vegas for himself, Martínez, and another senator, and paid for Martínez's hotel room one night, an expensive meal, and $1,000 fight tickets.  Two days later, Martínez voted for the legislation Bravo supported.  *Id.* at 6-7.

There was record evidence to support a gratuity or a bribe, and the trial court's instructions allowed the jury to find liability on either theory.  *Id.* at 16-20.  The First Circuit analyzed the text and history of § 666 and concluded that it, like § 201, criminalizes only bribes and not gratuities, such that a § 666 prosecution must be based on a *quid pro quo* exchange.  It suggested that Congress limited liability under § 666 to bribery to avoid federal over criminalization:  "Congress may have been wary of venturing too far into the thickets of state and local corruption, which often implicate the political processes of the state."  *Id.* at 25 (citation omitted); *see also Sun-Diamond*, 526 U.S. at 409 (in context of § 201, holding that "a narrow, rather than a sweeping prohibition is more compatible with the fact that [anti-bribery laws are] merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials").  The First Circuit chose a narrow approach in determining the reach of § 666:

> "[Because] this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions ... a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter."

*Fernandez,* 722 F.3d at 25 (*quoting Sun-Diamond,* 526 U.S. at 408, 412).

In connection with the § 666 charges, the government must prove that the defendants had the specific intent to give something of value in exchange for an official act.  The indictment alleges that the defendants gave jobs and salaries to applicants "sponsored" by legislators "to influence those members of the legislature who were in a position to affect the defendants through legislation, budget authorization, and in other ways."  2d Sup. Ind. at 33.  Significantly, the government does not allege that the hiring and payment of the specified probation officers represented an exchange for an official act, such as a particular vote on a particular bill.  Recognizing acts that the legislators took in the past or may take in the future does not amount to a *quid pro quo*.  *See Sun-Diamond,* 526 U.S. at 404-05.  The distinction is illustrated in *Fernandez*: evidence that Martinez voted in favor of bills enriching Bravo within a week of returning from the Las Vegas trip supported a *quid pro quo* theory, while evidence that Martinez took favorable action before the trip (*i.e.* submitting the bills to the Senate) supported only a gratuity theory.   *See* 722 F.3d at 20.

Even if the defendants acted in the hope that their hiring practices might curry favor with the legislators who allegedly "sponsored" particular job candidates, this does not satisfy the statute.  *See Sun-Diamond*, 526 U.S. at 406 (holding that evidence that gifts were given "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future" does not satisfy federal gratuity statute).  The indictment does not allege the *quid pro quo* bribe required by § 666.

### B.  Massachusetts Bribery and Gratuity Offenses Are Not Racketeering Predicates Because There is No Link Alleged Between a Promised "Thing of Value" and an Official Act.

The racketeering charge in Count 2 is founded on 62 alleged racketeering acts. With the

exception of the 22 acts based on mail fraud, these acts allege that the defendants violated the

Massachusetts state laws prohibiting bribery (M.G.L. c. 268A, § 2(a)(1)) and gratuities (M.G.L.

c.268A, § 3(a)).  To prove a violation of either statute, the government must show that there was

a link between the alleged bribe or gratuity and a specific official act.  The indictment does not

allege sufficiently that there was any such link, and these acts therefore cannot support a

racketeering conviction.

The SJC's interpretation of these statutes follows the Supreme Court's approach to the

similar federal statutes.  *See Scaccia*, 431 Mass. at 354-55.  Both courts have held that bribery

and gratuity convictions must be supported by a link between the thing given and a specific

official act.  A bribery conviction requires proof that there was a *quid pro quo*; that thing of value

was given in exchange for the performance of a specific official act.  *See id.* at 356; *Sun-

Diamond*, 526 U.S. at 404-05 ("[F]or bribery there must be a *quid pro quo*—a specific intent to

give or receive something of value *in exchange* for an official act.").  In *Sun-Diamond*, the

Supreme Court reversed the trial court's determination that the gratuity statute, "unlike the

bribery statute, did not require any connection between respondent's intent and a specific official

act." *Sun-Diamond*, 526 U.S. at 406.  *Sun-Diamond* held that a gratuities conviction requires

proof that the alleged gift was connected to a specific official act and not given just because of

the public official's position or "to build a reservoir of goodwill that might ultimately affect one

or more of a multitude of unspecified acts, now and in the future."  *Id.*  The SJC followed suit,

holding that to establish a gratuities violation, "there must be proof of a linkage to a particular

official act, not merely the fact that the official was in a position to take some undefined or

generalized action, such as holding a hearing on proposed legislation that, if passed, could

benefit the giver of the gratuity."  *Scaccia*, 431 Mass. at 356.

The indictment alleges that the defendants gave jobs to applicants sponsored by legislators in the hopes that the legislators would act in Probation's favor.  However, the indictment identifies no specific legislative act that these legislators took or that the defendants hoped they would take.  In Count 1, the indictment alleges that the defendants hired sponsored candidates "to influence [their] ability to obtain favorable votes on their budget requests and other interests.  2d Sup. Ind. at 7.  In connection with the alleged ELMO hiring scheme, the government asserts that Mr. O'Brien asked the Chairman of the House Ways and Means Committee and other legislators for recommendations to fill ELMO positions "in order to influence and attempt to influence members of the legislature to act favorably on legislation and budget requests regarding the Probation Department as well as to assist the Chairman in an upcoming contest for the post of Speaker of the House of Representatives." *Id.* at 11.  These allegations carry through count 2, where the indictment states that the defendants gave "jobs and promotions within the Probation Department to individuals sponsored by members of the legislature to favorably influence and attempt to favorably influence the decisions of those legislators regarding legislative matters affecting the Probation Department including, but not limited to" the state budget.  *Id.* at 21; *see also id.* at 22, 28, 29.

These general statements that Probation hired "sponsored" candidates to curry favor with the legislators do not suffice to allege a *quid pro quo* or the required linkage between the thing of value and the hoped-for official act. The indictment does not allege any link between the charged hiring decisions and a specific official act sufficient to uphold the Massachusetts bribery or gratuity charges.  The Massachusetts legislature routinely had matters in front of it related to Probation, and these allegations suggest, at most, that the defendants took the alleged actions "by reason of the recipient's mere tenure in office" or "to build a reservoir of goodwill that might

53

ultimately affect one or more of a multitude of unspecified acts, now and in the future."   *Sun-Diamond*, 526 U.S. at 408.  As *Sun-Diamond* and *Scaccia* held, the statutes require proof that the defendants sought to influence or reward a specific legislative act by giving a particular thing of value.  The indictment fails to link the jobs to a specific legislative act, and the alleged state law bribery and gratuity offenses cannot support the racketeering charges.

## IV.   THE RACKETEERING COUNTS MUST BE DISMISSED.

Count 1 charges the defendants with participating in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d), and count 2 charges Mr. O'Brien and Ms. Tavares with a substantive RICO violation contrary to 18 U.S.C. § 1962(c).  "Five elements must coalesce to make out a substantive RICO violation. The government must show: '(1) an enterprise existed; (2) the enterprise participated in or its activities affected interstate commerce; (3) the defendant was employed by or was associated with the enterprise; (4) the defendant conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity.'" *United States v. Nascimento*, 491 F.3d 25, 31 (1st Cir. 2007) (quoting *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002)).  To satisfy the statute of limitations for a substantive RICO violation, the government must prove at least one racketeering act that occurred within five years of the indictment.  *See United States v. Torres Lopez*, 851 F.2d 520, 525 (1st Cir. 1988).  The elements of a RICO conspiracy are distinct, but include overlapping concepts.  "For a defendant to be found guilty of *conspiring* to violate RICO, the government must prove '(1) the existence of an enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or

more predicate offenses.'"  *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997) (quoting

*Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1561 (1st Cir. 1994)).

Both RICO counts require the government to prove that the defendants engaged in a

"pattern of racketeering activity."  To establish such a pattern, the government must prove "'at

least two acts of racketeering activity' over a period of ten years."  *Brandao*, 539 F.3d at 54

(quoting 18 U.S.C. § 1961(5)).  The indictment alleges 62 racketeering acts—22 relate to the

alleged mail fraud charges, 22 relate to alleged violations of the Massachusetts bribery and

gratuity laws in connection with the "scheme to defraud," and 18 involve alleged violations of

the state bribery and gratuity laws in connection with the "ELMO hiring scheme."

As explained above, the government has not adequately pled any racketeering acts.  In

connection with the mail fraud charges, the government has not sufficiently pled a material

misrepresentation, a mailing in furtherance, or a scheme that deprived someone of property

rights. [16]  As to the state law bribery and gratuity charges, the government has not sufficiently

pled that the alleged bribe or gratuity was linked to a specific legislative action.  The government

has not sufficiently pled any racketeering acts, it cannot prove a pattern of racketeering activity,

and the RICO counts therefore must be dismissed.

---

[16] Even if this Court were to find that the single racketeering act charging mail fraud in
connection with a pre-2001 hiring decision survived the defendants' arguments regarding the
Commissioner's exclusive hiring authority, this single act would not establish a pattern of
racketeering acts as required by RICO.  Similarly, if this Court were to find that the three
racketeering acts that allege mail fraud based on mailings other than rejection letters survived
the defendants' argument that rejection letters were not in furtherance, these three, isolated
allegations would not establish a pattern of racketeering acts.  Moreover, none of these three
acts occurred within five years of the indictment.  Thus, none of the acts discussed in this
footnote satisfies the statute of limitations of a substantive RICO violation.  *See Torres Lopez*,
851 F.2d at 525.

**V.    THE RULE OF LENITY AND VOID FOR VAGUENESS DOCTRINES REQUIRE DISMISSAL OF THE INDICTMENT.**

In the sections above, the defendants have established multiple reasons that the indictment must fail as a matter of law, that is, reasons why the specific factual allegations of the indictment do not meet or fit the legal elements of the charged crimes.  However, even if the Court nevertheless were to conclude that some of these legal questions are "close calls" that could permit shoehorning the allegations into the statutory elements — *e.g.,* that the state statutory scheme could be read to subject the Commissioner's "exclusive" hiring authority to the CJAM; that "personnel standards" could be interpreted to include a "merit" hiring requirement; that rejections letters could constitute mailings "in furtherance" of a scheme; that a deprivation of tangible property is alleged; that the bribery allegations could fall outside the statutory "safe harbor," etc.— the indictment still should be dismissed under the "rule of lenity" and/or "void for vagueness" doctrines.

The rule of lenity provides that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Skilling*, 130 S. Ct. at 2932.  "This interpretive guide is particularly appropriate" in construing fraud statutes because "mail and wire fraud are predicate offenses under the Racketeer Influenced and Corrupt Organizations Act." *Id.* (internal brackets and quotation marks omitted).

The "void for vagueness" doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.  *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  This doctrine "addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Skilling*, 130 S. Ct. at, 2933 (2010).  The First Circuit has warned of the potential vagueness problems inherent in the mail fraud statute, in

particular:

> The broad language of the mail and wire fraud statutes are both their blessing and their curse.  They can address new forms of serious crime that fail to fall within more specific legislation.  On the other hand, they might be used to prosecute kinds of behavior that, albeit offensive to the morals or aesthetics of federal prosecutors, cannot reasonably be expected by the instigators to form the basis of a federal felony.

*United States v. Czubinski*, 106 F.3d 1069, 1079 (1st Cir. 1997).

Any application of the alleged conduct to the criminal charges alleged should be rejected under the rule of lenity and vagueness doctrines.   In particular, given the repeated statements by the Massachusetts legislature that the Commissioner had exclusive hiring authority, the defendants could not have known that they were required to conduct hiring in any particular way, and certainly could not have anticipated that they could be subject to federal criminal prosecution for their failure to do so.  Under the rule of lenity, any "close calls" in resolving legal questions in this motion should be resolved in the defendants' favor.  Under the vagueness doctrine, the Court should find the charged statutes invalid as applied to the conduct alleged here.  *See Skilling*, 130 S. Ct. at 2927  (warning against construing a "'statute in a manner that leaves its outer boundaries ambiguous and involves the federal government in setting standards of disclosure and good government for local and state officials'" (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987))).

## Conclusion

For the foregoing reasons, the defendants ask this Court to dismiss all of the charges

against them pursuant to Federal Rule of Criminal Procedure 12.

Respectfully submitted,

JOHN J. O'OBRIEN
by his attorneys

 /s/ William W. Fick
Stylianus Sinnis, Esq.
William W. Fick, Esq.
Christine DeMaso, Esq.
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
STELLIO_SINNIS@FD.ORG
WILLIAM_FICK@FD.ORG


ELIZABETH V. TAVARES
by her attorney,

/s/ R. Bradford Bailey
R. Bradford Bailey, Esq.


WILLIAM  H. BURKE, III
by his attorney,

/s/  John Amabile
John Amabile, Esq.


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on October 30,
2013.

/s/ William W. Fick