IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  DISTRICT  OF  MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN J. O'BRIEN, ET AL. | No. 12-CR-40026-FDS |

**REPLY  TO  GOVERNMENT'S  RESPONSE  TO  DEFENDANTS'
MOTION  TO  DISMISS  THE  INDICTMENT**

*With the law books filled with a great assortment of crimes, a prosecutor stands a
fair chance of finding at least a technical violation of some act on the part of
almost anyone. In such a case, it is not a question of discovering the commission
of a crime and then looking for the man who has committed it, it is a question of
picking the man and then searching the law books, or putting investigators to
work, to pin some offense on him. It is in this realm — in which the prosecutor
picks some person whom he dislikes or desires to embarrass, or selects some
group of unpopular persons and then looks for an offense, that the greatest
danger of abuse of prosecuting power lies. It is here that law enforcement
becomes personal, and the real crime becomes that of being unpopular with the
predominant or governing group, being attached to the wrong political views, or
being personally obnoxious to or in the way of the prosecutor himself.*
*. . . .*
*In spite of the temptation to divert our power to local conditions where they have
become offensive to our sense of decency, the only long-term policy that will save
federal justice from being discredited by entanglements with local politics is that
it confine itself to strict and impartial enforcement of federal law, letting the chips
fall in the community where they may.*

— Robert H. Jackson, 24 J. AM. JUD. SOC'Y 18 (1940)

The sheer technical complexity of the government's Response ("Resp.") to the

defendants' Motion to Dismiss reflects the challenge prosecutors face in trying to force alleged

conduct that does not involve financial corruption for personal gain to fit RICO, mail fraud, and

bribery offenses.  The derisive tone the government strikes, including repetition (at least 8 times

in the Response) of the "Let's Pretend" locution lifted from its own earlier sentencing

memorandum in *United States v. Bulger*,[1] only highlights the excessiveness of such charges here.

Even taking the jaundiced caricature of Probation hiring conjured by the government's

allegations at face value, these defendants are not mobsters, murderers, or thieves.  Jack O'Brien

is not Whitey Bulger.  The gravamen of the indictment is that, while employed as state officials,

the defendants favored candidates sponsored by legislators in certain hiring decisions in order to

maintain the goodwill of the legislature.  That is politics.  The supposed inconsistency of such

hiring with an aspirational internal policy of employing the "most qualified" candidates does not

create a federal mail fraud.  The supposed *quid pro quo* with the legislature is too inchoate to

make out a bribery offense and would be protected by the statutory safe harbor even if it were

more specific.  All counts of the indictment therefore should be dismissed.

## I.     RULE 12 PERMITS PRETRIAL RESOLUTION OF DEFENDANTS' MOTION.

Fed. R. Crim. P. 12(b)(3)(B) authorizes pretrial motions to dismiss "alleging a defect in

the indictment," including claims that the indictment "fails . . . to state an offense."  The

government asserts that the defendants' motion goes to the sufficiency of the evidence, and

cannot be decided before trial.  (Resp. at 2-5.)  On the contrary, the defendants demonstrate in

their motion that the allegations of the indictment fail, *as a matter of law*, to establish the crimes

charged.  The defendants' arguments rest on state and federal statutes as well as the factual

allegations charged in the indictment, not on evidence that might emerge during a trial.  The

Court need not consider evidence whether the defendants committed the alleged acts in order to

decide the defendants' motion.[2]  Indeed, ironically, it is the government that suggests evidence of

---

[1]   *See* Crim. No. 99-CR-10371-DJC, dkt # 1365 "Government's Sentencing Memorandum" at 4
      ("When he was finally captured after sixteen years as a fugitive, Bulger chose to go to trial
      and play an elaborate game of 'Let's Pretend.'").

[2]   Although Rule 12 does not enable pretrial consideration of the ultimate trial issues, Rule

the defendants' actions and practices could somehow trump the plain meaning of the statutory framework in which they exercised their authority.

The cases cited by the government support the proposition that questions of law can be decided pretrial if they can be resolved without making factual determinations that would be jury questions at a trial.[3]  In *United States v. Covington*, 395 U.S. 57, 60 (1969), the Supreme Court explained that a court can consider an issue pretrial if "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense."  In *United States v. Del Monte*, 470 F.Supp. 248, 249 (D. Mass. 1979), the court refused to consider a pretrial motion to dismiss because its resolution turned on "the defense's prediction" of what the evidence at trial would show.  The issues raised by the defendants here are ripe for pretrial resolution.  The evidence that may emerge at trial is irrelevant; the defendants' arguments focus on the allegations in the indictment and the underlying statutory scheme.

The government focuses on Eleventh Circuit law that:  "The sufficiency of a criminal indictment is determined from its face."  *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992).  It also includes a quotation the defendants cited in support of the pretrial resolution of their motion:  "Under Fed. R. Crim. P. 12(b) an indictment may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial."  *United States v. Torkington*, 812

---

12(b)(4) permits a court to make factual findings in connection with a pretrial motion where necessary "to resolve issues of fact peculiar to the motion."  *United States v. Covington*, 395 U.S. 57, 60 (1969).

[3]   Two of the cases the government cites, *Costello v. United States*, 350 U.S. 359 (1956) and *United States v. Valencia-Lucena*, 925 F.2d 506 (1st Cir. 1991), involve challenges to the grand jury process, not motions to dismiss under Rule 12.

F.2d 1347, 1354 (11th Cir. 1987).  However, the government incorrectly concludes that the indictment is valid simply because it parrots the elements of the statutes.  As *Torkington* notes, in deciding a motion to dismiss, a court must consider "the factual allegations in the indictment" in the light most favorable to the government.  *Id.*  The indictment here is not a bare bones recitation of statutory language; it includes factual allegations.  The issues raised by the defendants are "infirmit[ies] of law" in light of the government's allegations that this Court can resolve.  *Id.*  Pretrial consideration of the "ultimate issue" — whether or not defendants are guilty of committing charged acts — may be prohibited, but the defendants do not ask this Court to make such a determination.

## II.   THE CENTRAL PREMISES OF THE INDICTMENT ARE LEGALLY ERRONEOUS BECAUSE THE COMMISSIONER HAD EXCLUSIVE HIRING AUTHORITY.

Immediately after asserting that the defendants' motion must be denied because it requires this Court to consider the evidence that will be advanced at trial, the government accuses the defendants of "ignor[ing] the facts and evidence."  (Resp. at 5.)  However, the defendants make legal arguments that do not depend on the "facts and evidence."  Rather than confronting these arguments through legal analysis, the government elides them with the claim that the evidence at trial will trump the law.  Throughout its response, the government asserts that it does not matter whether the Commissioner had exclusive hiring authority, because the *evidence at trial* will show that the defendants submitted documentation to the CJAM and that the CJAM had to approve all hiring decisions at Probation.  This response fails to confront the statutory issues raised by the defendants.  The government also ignores the lenity and vagueness doctrines.  Even if the allegations of the indictment were sufficient make a case the defendants arguably acted in a manner inconsistent with their lawful authority under the state statutory framework, the very difficulty and uncertainty of reaching such a conclusion would only confirm

that federal prosecution arising from the alleged activity is overreach that violates due process.

The defendants' arguments do not rely on the evidence that may be introduced at trial; they are grounded in the state statutory scheme. The fact that Probation was not a "department" of the Massachusetts Trial Court, that the Commissioner had exclusive hiring authority such that the CJAM's approval was not legally necessary, and that Probation was not bound by the Trial Court Manual are all propositions of law established by state statutes. *See* M.G.L. c. 211B, §§ 1, 8; c. 276, § 83; *see also* Defendant's Memorandum in Support of Motion to Dismiss, dkt. #169 [hereinafter Def. Mem.], at 18-24. The government repeatedly asserts that Probation and the CJAM behaved as though the CJAM had the authority to approve Probation hires, and that history shows that Probation was part of the Trial Court, but practice and tradition cannot supersede statutes.[4]

The government attempts to draw a distinction between "appointing," which it concedes to be within the Commissioner's power, and "hiring," which it argues was not. Resp. at 7. The Massachusetts statutory framework does not support such a distinction. For example, the section setting forth the powers of the CJAM gives the CJAM the power to "appoint" personnel within the office of the CJAM. M.G.L. c. 211B, § 9 (xviii). Presumably these "appointment" decisions are also "hiring" decisions. Nothing in § 9 gives the CJAM the power to "hire" anyone. The Trial Court Manual also equates "hiring" and "appointment." The government argues that O'Brien cannot "hire," then in the same breath asserts that his appointment decisions are governed by section 4.000 of the Manual, which is entitled "Hiring Policies and Procedures." The fact that the federal system includes instances in which the President's nominations are

---

[4] Illustrated another way, if one mistakenly believes the speed limit in a 55 MPH zone to be 40 MPH and drives for years in conformance with that erroneous belief, such practice would not allow issuance of a violation for driving 50 MPH. The law is the law.

subject to Congress's review says nothing about how the Massachusetts legislature allocated the power to select Probation employees. Nor are "appointing" and merely "nominating" synonymous; unlike "appointing," the verb "nominate" necessarily connotes that the selection is provisional, a mere recommendation that is subject to review.

The government's discussion of *First Justice of Bristol Division of the Juvenile Court Dept. v. Clerk Magistrate of the Bristol Division of the Juvenile Court Dept.*, 780 N.E.2d 908 (Mass. 2003), muddles the relevant legislative actions. Resp. at 7-9. In 2001, the legislature passed the 2002 state budget. This budget included two separate sections that impacted the relationship between Probation and the CJAM. *First*, in§ 52 of the 2002 budget, a so-called "outside section,"[5] the legislature amended M.G.L. c.276 § 83 as follows:

> Chapter 276 of the General Laws is hereby amended by striking out section 83, as so appearing, and inserting in place thereof the following section:—
> << MA ST 276 § 83 >>
> Section 83. Subject to appropriation, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial court as he deems necessary. In any court having 2 or more probation officers, said commissioner may designate 1 probation officer to serve as chief probation officer and may designate other probation officers to serve as assistant chief probation officers, as he deems necessary for the effective administration of justice; provided, however, that said commissioner may suspend or discipline any such probation officer. The compensation of probation officers in the trial court shall be paid by the commonwealth according to schedules established in section 99B or in a provision of an applicable collective bargaining agreement.

2001 Mass. Legis. Serv. Ch. 177 (H.B. 4800), § 52, at 789. This bill codified this amendment to c. 276 § 83, and the quoted language was in effect until the legislature took action to change it again in 2011. It did not have to be included in the budget each year; its inclusion in the 2002 budget enacted it. *Second*, in § 2 of the 2002 budget, the section that sets out each appropriation as a line item, the legislature allocated money to Probation with the provision that:

---

[5]   "Outside sections" are "provisions that do not appropriate funds" that are nonetheless attached to appropriations bills. *Sutton Corp. v. Metropolitan District Commission*, 667 N.E.2d 838, 847 (Mass. 1996).

> *notwithstanding* the provisions of any general or special law, rule or regulation to the contrary, [the commissioner of probation], subject to appropriation, shall have exclusive authority to appoint, dismiss, assign and discipline probation officers, associate probation officers, probation officers-in-charge, assistant chief probation officers and chief probation officers . . . .

*Id.* § 2, line item 0339-1001, at 29.  This language is not an "outside section" that amends the general law; it is a condition of the appropriation.  It was included in each budget enacted between 2001 and 2011, and was in effect during that time. [6]

In *First Justice*, the SJC considered the first change — the amendment to c. 276, §83 by way of an "outside section" — but not the second — the appropriation granting Probation funds on the condition that the Commissioner had the exclusive authority to appoint Probation employees.  The SJC clearly delineated the scope of its review; it included "[t]he challenged statutes, *set forth in full* as an Appendix," to the *First Justice* opinion.  780 N.E.2d at 912, 923-26 (emphasis added).  This appendix includes the "outside section" language amending c. 276, §83, but not the "notwithstanding" language appended to the line item.  The "notwithstanding" provision was not raised, and the SJC did not consider or mention its existence in *First Justice*.  The government's assertion that *First Justice* considered the impact of the "notwithstanding" clause is simply false.  The "notwithstanding" clause stands apart from the statutory amendment, and it gave the Commissioner exclusive hiring authority regardless of what any other statute, policy, or case law may provide or practice may have been.

---

[6]  Not only did the appropriations enacted between 2001 and 2011 give the Commissioner the exclusive authority to select Probation employees, they excised language that had previously given the CJAM the authority to review Probation employment decisions.  That the legislature specifically took this authority from the CJAM and gave it to the Commissioner, in the line item as well as in the outside section, shows that the legislature fully shifted the authority to the Commissioner and provided no role for the CJAM in Probation hiring.

### III.   THE ALLEGATIONS IN THE INDICTMENT FAIL TO SUSTAIN COUNTS BASED UPON MAIL FRAUD.

#### A.   The Government Has Not Sufficiently Alleged Mailings Made In Furtherance of the Charged Scheme.

The government recognizes that it must prove that the alleged mailings were made in furtherance of the charged scheme.  Resp. at 12-13.  "'[T]he scheme's completion or the prevention of its detection must have depended in some way on the mailings.'"  *United States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2008) (quoting *United States v. Pacheco-Ortiz*, 889 F.2d 301, 305 (1st Cir. 1989)).  The government argues that a mailing is "in furtherance" if it helped to prevent the detection of the scheme by lending it "a false air of legitimacy."  Resp. at 13.

The government cites two Seventh Circuit cases in support of its contention that a mailing can be in furtherance if it gave the alleged scheme a false air of legitimacy.  *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008); *United States v. Fernandez*, 282 F.3d 500 (7th Cir. 2002).  In *Fernandez*, upon which *Sorich* relied, the Seventh Circuit held that letters to companies that did not receive a bid furthered a bid-rigging scheme.  *Fernandez*, 282 F.3d at 508.  The court specifically identified how the rejection letters contributed to the continuation of the scheme; namely they "falsely portrayed *to anyone who examined* [the relevant] records that the bids submitted were legitimate."  *Id.*

First Circuit law supports the notion that such after-the-fact mailings are not "in furtherance" unless they play an identifiable role in continuing the scheme or preventing its discovery is borne out.  In *United States v. Pimental*, 380 F.3d 575, 586 (1st Cir. 2004), the First Circuit noted that mailings that "help maintain a harmonious relationship between the perpetrator and the victim" — in that case, mailings that the defendant was required to send to the victim insurer in order to maintain insurance coverage — could be considered "in furtherance."

In contrast, the rejection letters at issue here did nothing to further the alleged scheme. The government asserts that the rejection letters lent a false air of legitimacy to the hiring process, but it fails to allege or even explain how.  The rejection letters were sent to job applicants, not to the CJAM.  The letters did nothing to maintain a harmonious relationship between applicants and Probation; in some instances, the receipt of a rejection letter triggered a hiring grievance.  The relationship between applicants and Probation would have been the same had the letters not been sent.  Nor did these letters maintain a harmonious relationship between the CJAM and Probation.  The CJAM did not receive the letters and would not have known whether the applicants received them.  The government has not alleged or explained how these letters helped continue the alleged scheme or suggested what would have happened if they had not been sent.  Unlike the cases cited by the government, and for the reasons explained in the defendants' memorandum, the mailings in this case did not further the alleged scheme or prevent its detection.

### B.    The Government Has Not Sufficiently Alleged a Material Misrepresentation.

The government acknowledges that it must prove that the alleged scheme involved a material misrepresentation.  (Resp. at 16.)  In arguing that the alleged misrepresentations, the certifications, were material, the government states that *evidence at trial* will show that the practice of the Commissioner was to make a certification to the CJAM.  (Resp. at 16-17.)  This assertion fails to confront the defendants' legal argument that, whatever the practice was, whatever the evidence might be, the CJAM did not have the authority to review Probation hiring, and the Commissioner had exclusive authority to select Probation employees *as a matter of law*.

The government refers to the Trial Court Manual in its argument that the alleged certification was false.  The government argues that section 4.400(A), which asks an appointing

authority to "certify compliance with the *personnel standards of this section*," requires that authority to comply with all of section 4.000, because the word "section" refers to 4.000, rather than to *sub*section 4.400.  (Resp. at 18.)  This linguistic argument is not supported by the Trial Court Manual viewed in as a whole, which refers to 4.400, and other such divisions, as "sections" and not "subsections."  *See, e.g.*, Trial Court Manual § 4.500(A)(2) (referring to "section 4.400").  Even the government, when it refers to portions of section 4.000 outside the context of this linguistic argument, calls them "sections."  *See* Resp. at 5 n.4 (quoting "Section 4.[304]), 6 (referring to "section 4.302(E)).  Section 4.400 may be, organizationally, a subsection of section 4.000, but the Trial Court Manual nonetheless calls it "section 4.400," and does not use the word "subsection."

The government also argues that the title of section 4.000 suggests that it contains "personnel standards."  (Resp. at 18.)  The title of section 4.000 is "Hiring Policies and Procedures;" it contains no reference to "personnel standards."  As the defendants argued, "personnel standards" refers only to the requirements of section 4.400.  That this section also requires the submission of supporting documentation does not render a certification requirement redundant.

The government argues that a document mentioned in section 4.400 and submitted to the CJAM contained a false statement because it states that the selected applicants were the "Best Candidates."  (Resp. at 20-21.)  The government argues that this statement was incorporated into the certification because the certification stated compliance with section 4.400, which required the submission of this document.  This broad statement that someone was the "best candidate" cannot be considered false.  The government accuses the defendants of failing to hire the "most qualified" candidates.  The statement that someone was the "best" candidate does not suggest

that he or she was the "most qualified" candidate or that his or her hiring was not influenced by recommendations; it is a subjective statement that the person the Commissioner is appointing is the one the Commissioner has decided would be the best.  Further, this statement is not incorporated into the certification.  The certification states simply that the Commissioner complied with the "personnel standards."  These standards do not require merit hiring or the selection of the "most qualified" candidate.  That one of the administrative forms required by section 4.400 asks for subjective value judgments about the candidates does not import a "most qualified" standard into that section or the certification.

Finally, the government argues that "one of the minimum qualifications for the job . . . was that a candidate be hired solely on the basis of merit."  (Resp. at 21, n.17.)  This makes no sense; a purported requirement to hire the "*most* qualified" candidate cannot be a "*minimum* qualification*" for employment.  Moreover, in its opposition to the Magistrate Judge's discovery order, the government stated that "[a]s a threshold matter, the individuals named in the indictment, and other individuals hired by probation officials during the course of the conspiracy, *all appear to have possessed the minimum qualifications* required for the positions for which they applied."  Dkt. #112 at 3 (emphasis added).  This Court relied on that representation in its order reversing a portion of the Magistrate Judge's discovery order.  Dkt. #128 at 2-3.  Thus, by the government's own admissions, each of the employees hired during the course of the alleged conspiracy possessed the minimum qualifications for the position, which necessarily includes the qualification that they were hired on merit.

### C.     The Government Has Not Sufficiently Alleged a Deprivation of Property.

The government asserts that it has properly alleged the deprivation of property because it has alleged a scheme to provide "merit-based state jobs and promotions to individuals who are

not the most meritorious candidates." (Resp. at 23.) This assertion fails to confront the defendants' statutory argument that there was no requirement that Probation hire the "most qualified" candidates because the Commissioner had exclusive and unconstrained hiring authority.[7] The government also asserts that it has not alleged a scheme to obtain jobs and salaries but rather a scheme to obtain jobs and salaries for "sponsored" candidates who were not the most qualified. The government does not challenge the defendants' assertion that there was no fraud in the process of obtaining the funding for jobs. Instead, the government argues that there was fraud in the process of hiring to fill those jobs.

Especially given the Commissioner's authority to select Probation employees, this theory is one of honest-services fraud, not mail fraud. *See McNally v. United States*, 483 U.S. 350, 356 (1987) ("The mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizenry to good government."). The government cannot identify a property right that these charges protect. It states that "the CJAM was deprived of his right to control who got jobs and promotions within the Probation Department," "the most qualified, unsuccessful candidates were deprived of their right to a job; and, the citizens of this Commonwealth were deprived of their right to the most qualified probation officers." (Resp. at 25, n.20.) None of these asserted rights are property rights that can be vindicated by a mail fraud prosecution. The only money or property at issue in this case is the "job," the defendants

---

[7]   Comparing the statutes in effect from 2001 to 2011 with the statutes ineffect prior to 2001 and after 2011 highlights the fact that at the time of the allegations, the Commissioner had exclusive hiring authority. Between 2001 and 2011, the relevant statute simply said that "[s]ubject to appropriation, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial court as he deems necessary." M.G.L. c.276 §83 (version effective 2001 to 2011). Prior to 2001, the statute expressly limited the Commissioner's power to hire on the "approval of the chief justice for administration and management." Similarly, after 2011, the legislature amended the statute to include a number of requirements, including, *inter alia*, exam-based hiring, review by the CJAM, and behaviorally-based interviews.

"obtained" those jobs for Probation independently of the alleged fraud.  Even assuming, *arguendo*, that those jobs were obtained in the expectation that they would be given to a "sponsored" candidate, the distribution of jobs by a state employee who had exclusive hiring authority does not involve money or property as required by the mail fraud statute.

To permit the "deprivation of property" theory of prosecution that the government advances here would turn every mine-run employment discrimination case into a potential mail fraud.  The only necessary ingredients would be a representation of equal opportunity employment, a discriminatory hire, and a mailing to rejected applicants.  Those are floodgates that the mail fraud statute was never designed to open.  The mail fraud counts here should be dismissed.

IV.     **THE ALLEGATIONS OF THE INDICTMENT FAIL TO SUSTAIN THE COUNTS BASED ON BRIBERY OR GRATUITY.**

A.      **The Government Has Not Sufficiently Alleged a Violation of § 666 because the Bona Fide Wages Exception Encompasses the Charges.**

Section 666 contains a safe harbor provision that limits the bribery statute's application: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  18 U.S.C. § 666(c).[8]  The government argues that the bona fide wages exception does not apply here, and attempts to distinguish *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998).  The defendants in *Mills* gave money to the sheriff in return for jobs as deputies.  The Sixth Circuit upheld the district court's decision to dismiss the case prior to trial.  The government asserts that this case is

---

[8]     The government argues that legislative history indicates that this exception was meant to "maintain robust prosecutions of public official bribery yet not to constrain 'acceptable commercial and business practices.'"  (Resp. at 26-27.)  The text of this exception is clear; its application is not limited to cases involving "acceptable commercial and business practices." Further, it is unclear what the limited exception proposed by the government would accomplish, as all § 666 prosecutions necessarily involve "public official bribery."

distinguishable because it involved a single individual who paid the bribe and received the wages in question. The government does not explain the significance of this distinction without a difference. If anything, the conduct in *Mills* was more egregious than that charged here; the government has not alleged that money changed hands or that the defendants profited from the alleged conduct.

Section 666 contains three valuation requirements: the agency involved must receive $10,000 or more in federal funds; the transaction at issue must involve $5,000 or more, and the bribe must be a thing of value. *See* 18 U.S.C. § 666. *Mills* considered whether the bona fide wages exception applied to all of the valuation elements. Critically, *Mills* held that "[B]ona fide salaries, wages, fees, and other compensation either *received by* or *promised by* §666 defendants fall within the scope of the [bona fide wages exception.]" *Mills*, 140 F.3d at 633 (emphasis added); *see also United States v. Cornier-Ortiz*, 361 F.3d 29, 33 (1st Cir. 2004) (quoting this sentence from *Mills* while explaining bona fide wages exception). The government incorrectly asserts that *Mills* held that the bribe must exceed the $5,000 threshold. Rather, *Mills* held that the bona fide wages exception prevented the government from using the deputies' salaries to fulfill the transactional element of $5,000, so the Court looked to the amount of the bribe to see if it could use it as a substitute to satisfy this element. *See Mills*, 140 F.3d at 633; *see also United States v. Fernandez*, 722 F.3d 1, 13 (1st Cir. 2013) ("We note, however, that the value of the bribe may be relevant in determining the value of the bribe's objective."). The bribe in *Mills* did not exceed $5,000 and the salaries could not be considered, so the court was left with nothing to fulfill the transactional element.

The government cites *United States v. Robinson*, 663 F.3d 265, 266 (7th Cir. 2011) as a repudiation of *Mills*. *Robinson*, in turn, cites *United States v. Marmolejo*, 889 F.3d 1185, 1190

n.5 (5th Cir. 1996), as disagreeing with *Mills*.  However, *Marmolejo* did not consider the breadth

of the bona fide wages exception; the case involved a monetary bribe on one hand and a

transactional element valued at more than $5000 (conjugal visits for a prisoner) on the other, so

the court did not have to consider salaries.  *See* 889 F.3d at 1190 n.5.  Similarly, the cases cited

by *Marmolejo* held that on the facts presented, the wages at issue were not bona fide; they did

not explore the scope of the bona fide wages provision.  *See United States v. Valentine*, 63 F.3d

459, 465 (6th Cir. 1995); *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993).

     The government endorses the holding from *Robinson* that "[t]he natural reading of the

[bona fide wages] exception is that § 666 does not target bona fide salary, wages, and

compensation; that is, compensation paid in the ordinary course shall not be construed as a

bribe."  663 F.3d at 272.  Even accepting, *arguendo*, this narrow meaning of the bona fide wages

exception, the § 666 charges against the defendants must be dismissed.  The government offers

two possible "things of value" as the alleged bribe.  First, it states that the "thing of value"

"provided by the defendants to the legislators was the ability and/or privilege afforded to the

legislator to place his or her recommended candidate in a job, or secure a promotion."  (Resp. at

31.)  The Supreme Court specifically reserved the issue of the applicability of § 666 to intangible

benefits.  *See Salinas v. United States*, 522 U.S. 52 (1997).  This supposed ability is not a "thing

of value" that can constitute a bribe.  Under the government's theory of prosecution, O'Brien did

not have the authority to place candidates in a job, so he could not have bestowed this ability on

others.  Further, the argument that this ability is a thing of value turns on the assumption that the

job includes a salary.  Even the narrow formulation of the bona fide wages exception advanced in

*Robinson* prohibits the consideration of bona fide salaries when determining whether a bribe is a

thing of value.

In its argument that the bribe alleged was a thing of value, the government does not describe the bribe as "the ability to place a candidate in a job;" it defines the bribe as a job. (Resp. at 34-37.)  The indictment charges the defendants with giving "jobs and salaries" to sponsored candidates.  Ind. at 54, 56.  If the alleged bribe is a job, the government's formulation of the bona fide wages exception prohibits the consideration of the bona fide wages associated with the job in the determination of whether the bribe was a thing of value.  The value of a job is its salary.  *See United States v. Maricle*, 2011 WL 86242 (E.D. Ky.) (considering state statute and noting that offering a public servant a job was a bribe involving a "pecuniary benefit" because "[p]resumably, [the public servant] was interested in the job because of the economic gain he would realize as a result"); Resp. at 37 (quoting *Maricle*).  If the bribe was a job, the "legitimate wages" paid to Probation employees "should not be ensnared in the bribe probe," Resp. at 30, and the government cannot prove that the bribe was a "thing of value."

**B.      The Government Has Not Sufficiently Alleged the Transactional Element of §666.**

The government argues that the $5,000 transactional element is satisfied because "the subject matter of the bribe is the budget of the probation department and related legislation," and Probation had a "multi-million dollar budget."  (Resp. at 33.)  However, to satisfy this element, the government must show that "*the direct and foreseeable effect* of that legislation would be to give the individual offering the bribe *a particular desired result* — assuming, of course, that the transaction involved something of value of $5,000 or more."  *Fernandez* 722 F.3d at 15 (emphasis added).  The indictment does not allege that the hiring of the specified probation officers was tied to any particular legislative action.  The vague allegation that the defendants generally hoped for favorable budget action is too attenuated to satisfy the transactional element. Unlike *Fernandez,* there is no allegation that hiring particular individuals was tied to a specific

16

legislative action that would have the "direct and foreseeable effect" of giving the defendants a "particular desired result."

> ### C.    The Government Has Not Sufficiently Alleged the Charges and Predicate Acts Based on § 666 and the State Law Bribery and Gratuities Statutes Because it Has Not Alleged a *Quid Pro Quo* or a Link Between a Promised Thing of Value and an Official Act.

The defendants argued that the charges and predicate acts based on § 666 and on the state bribery and gratuities statutes must be dismissed because the government has not sufficiently alleged a *quid pro quo* or a link between a promised thing of value and an official act.  The government begins its discussion of this argument by stating that the indictment "alleges a quid pro quo no less than a dozen times."  (Resp. at 37.)  In previous submissions, the government explicitly stated that "[t]he government has not alleged . . . a quid pro quo between the Probation Department and the Legislature."  Dkt. #87 at 8.  Although this statement was made before the superseding indictment was returned, the language that the government now cites for the proposition that it *has* alleged a quid pro quo was part of the original indictment.

The government devotes substantial space to arguing that Massachusetts state bribery and gratuity offenses can, in the abstract, be RICO predicates.  (Resp. at 38-40.)  The defendants do not contest that these offenses can, theoretically, be RICO predicates.  Instead, the defendants argue that in this case, the government has not sufficiently alleged the Massachusetts bribery and gratuities offenses.  Thus, the predicate acts that allege state bribery and gratuities offenses must be dismissed because the government has not pled them sufficiently.

The defendants argued that the § 666 charges and the state law bribery and gratuities predicates all require the government to allege a link between the bribe or gratuity offered and the legislative act to be encouraged or rewarded.  For § 666 and state law bribery, the government must allege a specific *quid pro quo*.  *See Fernandez*, 722 F.3d 1; *Scaccia v. State*

*Ethics Commission*, 727 N.E.2d 824, 828-29 (Mass. 2000).  State law gratuity requires "a link

between a gratuity and an official act."  *Scaccia*, 727 N.E.2d at 828-29; *United States v. Sun-*

*Diamond Growers of Cal.*, 526 U.S. 398, 406 (1999) ("The insistence upon an 'official act,'

carefully defined, seems pregnant with the requirement that some particular official act be

identified and proved.").  The government responded that the *quid pro quo* does not have to be

fully executed to support the charges and that it need not allege a *quid pro quo* in connection

with the state law gratuities predicates.  These arguments do not address the defendants' central

contention: each of these offenses requires the government to allege that the defendants provided

the alleged bribe or gratuity *because of a particular legislative act.*

      The only link that the government has alleged between the alleged bribe or gratuity and

an official act is the general assertion that the defendants performed the charged conduct in the

hopes that the legislature would treat Probation favorably.  The indictment identifies no specific

act that the legislators took or that the defendants hoped they would take  This supposed *quid pro*

*quo*, or linkage, is nothing more than an allegation that the defendants tried to generally curry

favor with legislators  The Supreme Court has rejected the idea that  such actions can support a

gratuities charge.  *See Sun-Diamond,* 526 U.S. at 404-06 (holding that evidence that gifts were

given "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of

unspecified acts, now and in the future" does not satisfy federal gratuity statute).  There is no

allegation that the defendants took any particular action in response to, or in the hopes of

influencing, any particular legislative decision.  Without such a linkage, the charges based on §

666 and state law bribery and gratuities statue fail, regardless of whether the *quid pro quo* or

linkage was brought to fruition.

## Conclusion

For the foregoing reasons, as well as those set forth in the defendants' opening

memorandum, the Court should dismiss all counts of the indictment.

Respectfully submitted,

JOHN J. O'OBRIEN
by his attorneys

 /s/ William W. Fick
Stylianus Sinnis, Esq.
William W. Fick, Esq.
Christine DeMaso, Esq.
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
STELLIO_SINNIS@FD.ORG
WILLIAM_FICK@FD.ORG


ELIZABETH V. TAVARES
by her attorney,

/s/ R. Bradford Bailey
R. Bradford Bailey, Esq.


WILLIAM  H. BURKE, III
by his attorney,

/s/  John Amabile
John Amabile, Esq.


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-registered participants on December 9,
2013.

/s/ William W. Fick