IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN J. O'BRIEN, ET AL. | No. 12-CR-40026-FDS<br><br>REDACTED FOR PUBLIC DOCKET |

**MOTION TO COMPEL PRODUCTION OF EXCULPATORY INFORMATION AND FOR ORDER TO SHOW CAUSE WHY THE GOVERNMENT SHOULD NOT BE SANCTIONED FOR *BRADY* VIOLATIONS**

*There is an epidemic of* Brady *violations abroad in the land. Only judges can put a stop to it.*[1]

*The* Brady *problem is in many ways structural. Prosecutors have the task of deciding when a piece of evidence would be helpful to the defense. But since it is their job to believe in the defendant's guilt, they have little incentive to turn over, say, a single piece of exculpatory evidence when they are sitting on what they see as a mountain of evidence proving guilt. The lack of professional consequences for failing to disclose exculpatory evidence only makes the breach of duty more likely. As Judge Kozinski wrote, "Some prosecutors don't care about* Brady *because courts don't <u>make</u> them care."*[2]

Late on December 20, 2013, the government produced over 7,000 pages of putative *Jencks* material, comprising statements by over 100 anticipated government trial witnesses. While defense counsel have only started to scratch the surface of these documents, it immediately became apparent that they are replete with plainly exculpatory information that should have been produced within 28 days of arraignment or reasonably promptly after the information became known to the government, pursuant to the Due Process Clause of the

---

[1] *United States v. Olsen*, 737 F.3d 625 (9th Cir. Dec. 10, 2013) (Kozinski, J. dissenting from denial of rehearing).

[2] Editorial Board, *Rampant Prosecutorial Misconduct*, N.Y. TIMES, Jan. 4, 2014, available at http://www.nytimes.com/2014/01/05/opinion/sunday/rampant-prosecutorial-misconduct.html?_r=1&hp=&adxnnl=1&rref=opinion&adxnnlx=1389041264-No7lavDhdKcsihuMjzOwmw (referencing *Olsen*).

1

Constitution, *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, the Local Rules of the United States District Court for the District of Massachusetts, and prior orders of this Court. The sheer volume of previously undisclosed exculpatory information contained in statements of witnesses whom the government intends to call at trial — presumably, those it believes to be most helpful to the prosecution — naturally raises the question of whether even more extensive exculpatory information likely remains suppressed in statements of others interviewed or subpoenaed to the grand jury whom the government does not intend to call at trial.

In addition, as noted in Mr. O'Brien's separate Motion to Compel Compliance with Discovery Orders [dkt # 208], the government earlier identified the names of certain witnesses who "may have information which you deem helpful to the defense" in lieu of disclosing the actual substance of exculpatory information, itself, as ordered by the Court and as required under *Brady* and the Local Rules.

The Supreme Court has consistently warned prosecutors against "tacking too close to the wind" in discovery matters. *Kyles v Whitley*, 514 U.S. 419, 439 (1995). This district has a uniquely "dismal history of intentional and inadvertent violations of the government's duties to disclose . . . ." *United States v. Jones*, 609 F. Supp. 2d 113, 119 & n.2 (D. Mass. 2009) (collecting cases). The government's brazen violation of its obligations here is nothing short of astonishing, particularly in a so-called "public corruption" case that follows in the wake of the searing *Brady* debacle surrounding the prosecution of the late Senator Ted Stevens. *See generally United States v. Stevens,* Crim. No. 08-231 (EGS) (D.D.C.) (various pleadings and docketed transcripts).

In light of these developments, the defendants respectfully move:

1) that this Court compel the government to disclose all material exculpatory information in

its possession, custody, or control, including witness statements (whether or not the government intends to call the witness), as detailed below; and

2) that this Court order the government to show cause why sanctions, including possible dismissal of the indictment, should not be imposed for its past and ongoing failures to make timely disclosures of material exculpatory information.

**Background**

A twelve-count indictment, returned on March 22, 2012, charged the defendants with violating the RICO and mail fraud statutes. At the time of the charged conduct, O'Brien was the Commissioner of the Massachusetts Probation Service, and Tavares and Burke were Deputy Commissioners. Broadly speaking, the original indictment and superseding indictments that followed charge the defendants with creating a "rigged" hiring system that gave preference to candidates "sponsored" by legislators while falsely purporting to hire the "most qualified" candidates. The government alleges that the defendants ensured that the "sponsored" candidates would be hired by giving the names of those candidates to the "members of the interview panels." 2d Sup. Ind. at 8-9. A thirty-count superseding indictment that added charges (*e.g.*, bribery), but not defendants, was returned on April 24, 2013.[3] The new counts allege, in relevant part, that the defendants sought recommendations from legislators to fill positions in a new electronic monitoring program (ELMO), and hired recommended candidates without interviews, all with the intent to influence the legislature.

For more than a year, beginning with a discovery letter dated November 21, 2012, the defendants repeatedly asked the government to comply with its duty to disclose evidence favorable to the defense. Rather than making the required disclosures, the government has

---

[3] A second superseding indictment was returned on August 21, 2013. It altered and augmented information contained in the superseding indictment, but did not add charges or defendants.

ignored, fought, and misconstrued the requests (as well as misrepresenting the nature of its own allegations) at every turn.[4]

On January 24, 2012, the defendants filed a motion to compel seeking, *inter alia*, specified types of exculpatory evidence. [Dkt #84.] The government responded that the defendants' requests were irrelevant, not exculpatory, and beyond the scope of *Brady*. [Dkt #87.] After the Magistrate Judge allowed the defendants' motion to compel in part, [dkt. #97], the government moved the magistrate judge to "clarify" the order, [dkt #103], and then asked this Court to review that order [Dkt #112.] Throughout these filings, the government insisted that the defendants had not shown that the information they requested was material or exculpatory, never acknowledging that its own failure to make required disclosures made it impossible for the defendants to make such a showing. As discussed in a separate motion, [Dkt #208], even when this Court entered an order affirming much of the magistrate judge's order, the government failed to make the required disclosures.

---

[4] For example, the defendants requested information suggesting that there was no *quid pro quo* between Probation and the Legislature in their first Motion to Compel. In initially refusing to produce such evidence, the government repeatedly stated that it had not alleged a *quid pro quo* between Probation and the legislature. *See, e.g.,* Dkt #87 at 8; dkt #112 at 4. However, in its recent responses to the defendants' substantive motions, the government makes it clear that it alleged a *quid pro quo* all along. In its response to the defendants' Motion to Dismiss, the government stated that the indictment "alleges a quid pro quo no less than a dozen times." Dkt #195 at 37. In its response to the defendants' Motions to Sever, the government argues that Burke and Tavares's statements cannot be powerfully incriminating because neither fully recognizes "the depth and breadth of the fraud, or the reason for it (the *quid pro quo*)." Dkt. # at 16. In the earlier submissions, the government explicitly stated that "[t]he government has not alleged . . . a *quid pro quo* between the Probation Department and the Legislature." Dkt. #87 at 8. Although this representation was made before the superseding indictment was returned, the language that the government now cites for the proposition that it *has* alleged a quid pro quo was part of the *original* indictment.

4

**Argument**

I. **THE GOVERNMENT HAS SUPPRESSED EXCULPATORY EVIDENCE.**

Before the original indictment was returned, and in the thirteen months between its return and the return of the superseding indictment, the government convened a grand jury to examine hiring at Probation and to investigate a possible connection between Probation and the legislature. Many witnesses, including Probation employees, judges, and legislators, testified in the grand jury. Witnesses brought documents and were shown evidence during their testimony. The investigation also included interviews that were memorialized in FBI 302s and other reports.

Prior to making its *Jencks* disclosure on December 20, 2013, the government had produced just a single FBI 302 and fourteen grand jury transcripts (seven of which it now says were produced at the time "by mistake"). In starting to process the voluminous December 20 *Jencks* disclosure, it became immediately apparent that the government has been suppressing information squarely contrary to the allegations underlying the indictment that should have been disclosed under *Brady* and the Local Rules many months ago. Review of just a few hundred pages of the 7,000 page disclosure already has revealed multiple witness statements that are plainly exculpatory. For example:

- One of the hiring decisions specified by the indictment is the promotion of E.T. 2d Sup. Ind. at 17. The government alleges that E.T. was hired pursuant to the "sham hiring system" in which the defendants gave the names of "sponsored" candidates to members of the interview panel before the interview. The *Jencks* production included the transcript of J▆▆ C▆▆▆▆▆'s grand jury testimony. J▆▆ C▆▆▆▆▆, a Chief Probation Officer, was a member of one of the interview panels involved in E.T.'s promotion. C▆▆▆▆▆ testified that he was "never told that [E.T.] was a preferred candidate." Ex. A (USAO00062259).

- The government has repeatedly asserted that one indication that Probation hiring was a "sham" is the fact that interviewers wrote their scores in pencil. C▆▆▆▆▆, however, testified that this was not a practice developed by the defendants; it began under Cochran, the previous Commissioner of Probation. Ex. A.

- Another hiring decision specified by the indictment is the promotion of J.D. to Chief

5

Probation Officer. 2d Sup. Ind. At 17. The government alleges that J.D. was not the most qualified candidate and that J.D. was hired pursuant to the "sham hiring system" in which the defendants gave the names of "sponsored" candidates to members of the interview panel before the interview. The *Jencks* production included notes of an interview with Judge P▇ D▇▇▇ Justice of ▇▇▇▇▇▇, who participated in the interview that resulted in J.D.'s promotion. Judge D▇▇ stated that although he later thought that J.D.'s hiring was a mistake, at the time of the interview, he thought that J.D. was the top candidate. Judge D▇▇ also stated that he was never given the names of preferred candidates before Probation interviews, and he was never told that J.D. was pre-selected for the job. Ex. B (USAO00062717-18).

- The government's case is premised on its assertion that Probation hiring "catered" to legislators and that the defendants favored "sponsored" candidates to obtain a more favorable Probation budget. The government's theory is that legislators gave Probation favorable budget treatment because they knew they could count on getting constituents jobs with Probation. The government included Representative S▇▇ W▇▇'s grand jury testimony in its *Jencks* production. Rep. W▇ testified that helping job applicants is a regular part of constituent services. People called his office "frequently" asking for job references. "[T]hat's constituent services. That what we do on a regular basis." Ex. C (USAO00068693-94). Rep. W▇ further stated that he did not know whether particular individuals he, or even the Speaker of the House, recommended, would be hired. He stated that recommendations did not always help individuals get jobs. Ex. D (USAO00068701-2).

- Four of the hiring decisions specified in the indictment arose from the same interview process: M.W., K.O., M.S., and A.M., were all hired as probation officers in the same court at the same time. The *Jencks* production includes the FBI 302 from an interview of R▇▇ A▇▇▇, a Chief Probation Officer, who participated in one of the interviews that led to the hiring of these four individuals. A▇▇ stated that he was *never* given the names of preferred, or "sponsored," candidates prior to an interview. Ex. E (USAO00061627).

- The government asserts that the charged "sham" hiring system resulted in the employment of less qualified Probation employees. In connection with each hiring decision specified in the indictment, the government asserts that the individual hired was not the most qualified candidate for that job. The *Jencks* production included the FBI 302 interview with retired Judge T▇▇ B▇▇▇, former ▇▇▇ Justice of ▇▇▇ District Court. Judge B▇▇ stated that when he participated in Probation interviews, he was never given the names of favored candidates, and that he did not remember any instance when a less qualified candidate got a job over a more qualified candidate. Ex. F (USAO00061801).

- The interview notes also reveal that Judge B▇▇ said he had never heard about candidates being "sponsored" for Probation jobs. In contrast, he stated that it was "obvious" that candidates needed "sponsors," particularly the Speaker of the House and the Senate President, to get jobs as *court security officers* (a position for which hiring is

entirely controlled by judges and the CJAM, the putative "victim" supposedly "defrauded" by the defendants' alleged "misrepresentations" concerning merit-hiring here). Ex. F.

- One of the hiring decisions specified by the indictment is hiring of L.M. 2d Sup. Ind. at 14. The government alleges that L.M. was hired pursuant to the "sham hiring system" in which the defendants gave the names of "sponsored" candidates to members of the interview panel before the interview. The *Jencks* production included the FBI 302 interview of M▮▮▮▮ U▮▮▮▮. U▮▮▮▮, a Chief Probation Officer, was a member of one of the interview panels involved in L.M.'s hiring. U▮▮▮▮ testified that she was not aware of any candidates being "preferred" and her only knowledge of names being passed consisted of "rumors" after the Ware Report issued. Ex. G (USAO00068131-2).

- In connection with the ELMO hires, the government asserts that Probation filled these jobs by hiring, without interview, individuals recommended by legislators. One of the individuals hired by the ELMO program is identified in the indictment as M.C. The government specifically alleged that "M.C. was never interviewed." 2d Sup. Ind. at 44. However, in M.C.'s grand jury testimony, M.C. stated that he was interviewed prior to being hired. Ex. H (USAO00060994-5).[5]

It bears repeating that the above examples represent only a small sample of plainly exculpatory information that counsel have identified in a preliminary review of just a few hundred pages of the 7,000-plus-page *Jencks* disclosure received on December 20. Each of these statements is obviously exculpatory and material. Undersigned counsel will continue to identify other examples as review continues. But whatever the volume, there can be no excuse for the government's failure to disclose such evidence in a timely manner. The government's belated disclosure of exculpatory information does not create a "no harm, no foul" situation. With trial scheduled for February 24, the defense is left with insufficient time not only to digest the information but to pursue avenues of further investigation that it suggests. The obvious additional question that remains is what other exculpatory information may remain suppressed,

---

[5] The government disclosed M.C.'s grand jury testimony "inadvertently" on July 1, 2013; it meant to produce this testimony only later, with the rest of its *Jencks* disclosure. The fact that the government intended to suppress this evidence that directly contradicts the charges contained in the indictment highlights the extent to which the government has ignored or misconstrued its obligations under *Brady* and the Local Rules.

*e.g.,* information provided by witnesses whom the government does not intend to call at trial and thus were not included in the *Jencks* production.[6]

## II. SUPPRESSION OF EXCULPATORY EVIDENCE VIOLATES THE GOVERNMENT'S CONSTITUTIONAL OBLIGATIONS.

The government has a constitutional "duty to disclose evidence in its possession that is favorable to the accused and material to guilt or punishment." *United States v. Prochilo*, 629 F.3d 264, 266 (1st Cir. 2011) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)). Information is "favorable" under *Brady* if it "relates to guilt or punishment and . . . tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." *United States v. Safavian*, 233 F.R.D. 12, 16 (D.C. Cir. 2005).

The Local Rules set a schedule for disclosure of exculpatory information. *See* Local Rule 116.2. In relevant part, those rules require production within 28 days of arraignment of information "that would tend directly to negate the defendant's guilt concerning any count in the indictment." Local Rule 116.2(B)(1)(a). "The duties established by these Local Rules are continuing. Each party is under a duty, when it learns that a prior disclosure was inaccurate or incomplete to supplement promptly any disclosure required. . . ." Local Rule 116.7. In its automatic discovery letter accompanying the superseding indictment, the government also acknowledged its obligation to review the evidence in its possession and to disclose information that is helpful to the defense "forthwith."[7]

---

[6] As noted in the Defendant's Motion to Compel Compliance with Discovery Orders [dkt # 208], statements of 15 individuals identified in the government's October 15 letter as having information helpful to the defense were not included in the government's *Jencks* production.

[7] The fact that exculpatory information may be contained in witness statements does not vitiate these timing requirements. Simply put, the *Jencks* Act is not a shield that can trump the requirement to produce *Brady* evidence. *See, e.g., United States v. Snell*, 899 F. Supp. 17, 21 (D. Mass. 1995) ("[I]n seeking to harmonize the Jencks Act and *Brady*, it makes no sense to indulge

The government cannot try to hide behind a self-serving determination that the exculpatory evidence suppressed here somehow is not "material." Notably, appellate cases examining whether a new trial is warranted based on *Brady* violations employ a retrospective "materiality" metric — whether information could have affected the outcome of a completed trial — that is inapposite in the pre-trial discovery context. The standard governing "materiality" prior to trial is necessarily different:

> The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of "materiality" discussed in . . . appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase. The only question before (and even during) trial is whether the evidence at issue may be "favorable to the accused"; if so, it must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.
> . . . .
> Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure.

*Safavian*, 233 F.R.D. at 16. Even "evidence itself inadmissible could be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it." *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003).

Nor can the government credibly argue that merely disclosing the identity of witnesses

---

in a crabbed interpretation of a constitutional right, like *Brady*, and an expansive interpretation of a statutory one, like Jencks."); *United States v. Poindexter*, 727 F. Supp. 1470, 1485 (D. D.C. 1989) ("The *Brady* obligations are not modified merely because they happen to arise in the context of witness statements."); *see also* Local Rule 115.2(b)(5) ("If an item of exculpatory information can reasonably be deemed to fall into more than one of the foregoing categories, it shall be deemed for purposes of determining when it must be produced to fall into the category which requires the earliest production.").

with exculpatory information suffices to fulfill *Brady* obligations.  *See Tennison v. San Francisco*, 570 F.3d 1078, 1091 (9th Cir. 2009) (holding that even if defendant knew that a certain defense witness had helpful information about the crime charged, "this knowledge is not the same as [the witness's] extensive statements to the police").  As the Seventh Circuit persuasively explained:

> We regard as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes.  To begin with, it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses.  Sometimes, a defense witness may be uncooperative or reluctant.  Or, the defense witness may have forgotten or inadvertently omitted some important piece of evidence previously related to the prosecution or law enforcement.  Or, as may have been the case here, the defense witness learned of certain evidence in the time between when she spoke with defense counsel and the prosecution.

*Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001).

Indeed, any suggestion that disclosure of witness identify suffices would excuse nearly all *Brady* violations, including some of the most notorious government failures to make *Brady* disclosures. In this District, for example, the government's suppression of exculpatory information in *Ferrara v. United States* would have been excused because the defense could have learned (indeed, ultimately did learn) independently that a known witness told the government that Ferrara had not ordered a murder.  *See Ferrara v. United States*, 384 F. Supp. 2d 384, 387 (D. Mass. 2005).  If that were the law, *Brady* would be left toothless and eviscerated.[8]

Finally, even assuming that awareness of a witness or independent availability of information to the defense might defeat a *post hoc* constitutional *Brady* challenge to a criminal

---

[8] *United States v. Hicks*, 848 F.2d 1, 3-4 (1st Cir. 1988) is not to the contrary.  *Hicks* predates adoption of the Local Rules, which require the government to disclose exculpatory *information* itself, not merely the names of witnesses who may have provided it.  It also predates instances of egregious injustice such as *Ferrara*.  Finally, *Hicks* is a post-conviction case, where, as noted above, the materiality standard is different and required burden of proof to overturn a conviction is higher.

conviction under a kind of "no harm, no foul" analysis, such principles do not extinguish the government's disclosure obligations *ab initio*. In this District, the Local Rules expressly require the production of exculpatory *information* without qualification: that is, without suggestion that an obligation to produce the information itself, in its native form, can be satisfied merely by identifying prospective witnesses who may be able to provide the information.

Judge Kozinski explained the importance of enforcing *Brady* obligations in *Olsen*:

> A robust and rigorously enforced *Brady* rule is imperative because all the incentives prosecutors confront encourage them not to discover or disclose exculpatory evidence. Due to the nature of a *Brady* violation, it's highly unlikely wrongdoing will ever come to light in the first place. This creates a serious moral hazard for those prosecutors who are more interested in winning a conviction than serving justice. In the rare event that the suppressed evidence does surface, the consequences usually leave the prosecution no worse than had it complied with *Brady* from the outset. Professional discipline is rare, and violations seldom give rise to liability for money damages. Criminal liability for causing an innocent man to lose decades of his life behind bars is practically unheard of.

737 F.3d at 630 (internal citation omitted). Appropriate sanctions for discovery violations can include dismissal. *See United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (dismissal upheld as an appropriate remedy when government violated its discovery obligations under court's supervisory powers "to implement a remedy for the violation of a recognized statutory or constitutional right"). The Court should "send prosecutors a clear message" that *Brady* violations will not be tolerated because "[w]hen a public official behaves with such casual disregard for his constitutional obligations and the rights of the accused, it erodes the public's trust in our justice system, and chips away at the foundational premises of the rule of law. When such transgressions are acknowledged yet forgiven by the courts, we endorse and invite their repetition." *Olsen,* 737 F.3d at 632-33.

## **Conclusion**

For the foregoing reasons, the Court should order the government to produce all

11

exculpatory information, including information contained in witness statements (whether or not the government intends to call the witness) and issue an order to show cause why the government should not be sanctioned for violating its obligations under *Brady* and the Local Rules.

        Respectfully submitted,

        JOHN J. O'OBRIEN
        by his attorneys

        /s/ William Fick
        Stylianus Sinnis, Esq.
        William W. Fick, Esq.
        Christine DeMaso, Esq.
        FEDERAL PUBLIC DEFENDER OFFICE
        51 Sleeper Street, 5th Floor
        Boston, MA 02210
        617-223-8061
        STELLIO_SINNIS@FD.ORG
        WILLIAM_FICK@FD.ORG
        CHRISTINE_DEMASO@FD.ORG

        ELIZABETH V. TAVARES
        by her attorney,

        /s/ R. Bradford Bailey
        R. Bradford Bailey, Esq.


        WILLIAM H. BURKE, III
        by his attorney,

        /s/ John Amabile
        John Amabile, Esq.

## Certificate of Service

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 8, 2014.

        /s/ William Fick