UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 12-40026-FDS |
| | ) | |
| JOHN J. O'BRIEN, | ) | |
| ELIZABETH V. TAVARES, and | ) | |
| WILLIAM H. BURKE, III, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO
COMPEL PRODUCTION OF EXCULPATORY INFORMATION, TO COMPEL
COMPLIANCE WITH DISCOVERY ORDERS, AND TO CONTINUE TRIAL**

I.    **Introduction**

The defendants have filed two motions regarding discovery in the case at bar.  See

Docket Numbers 208 and 209 (hereinafter "Dckt # __").  In the first (Dckt #208), the defendants

allege that the government has not complied with an Order issued on March 13, 2013, by

Magistrate Judge Sorokin.  In the second (Dckt #209), the defendants complain of late disclosure

by the government, request sanctions, and demand disclosure of exculpatory evidence.  Finally,

the defendants request that the trial of this matter be continued.  See Dckt # 210.  For the reasons

set forth below, these motions should be denied.

The government has produced significant discovery in this case.  Prior to December 20,

2013, the government produced approximately 61,626 pages of discovery to the defendants.  On

May 17, 2012, the government also produced a "hot document" disk to the defendants which

identified for the defendants the significant documents regarding each of the probation officer

hires and promotions identified in the Indictment.  Furthermore, the government has made every

file maintained by the Administrative Office of the Trial Court regarding the employment and promotion of probation officers over the past decade available to the defendants.[1]  Finally, on December 20, 2013, the government produced approximately 7,000 additional pages to the defendants which included, *inter alia*, *Jencks* and *Giglio* materials.  In their motion to compel exculpatory information (Dckt #209), the defendants now complain that information contained in seven of those documents contained exculpatory information that should have been disclosed earlier.[2]

### II.    Argument

#### A.    The Legal Standard

Local Rule 116.2(a)(1) defines exculpatory evidence as "information that is material and favorable to the accused and includes, but is not necessarily limited to, information that tends to … cast doubt on defendant's guilt as to any essential element in any count of the indictment or information."

In the case at bar, the defendants are charged with racketeering based upon predicate acts of mail fraud, state bribery and state illegal gratuity offenses.  The defendants are also charged with mail fraud, federal program bribery and conspiracy to commit federal program bribery.  In their motion, the defendants have not conducted any analysis that might demonstrate that any of the information contained in those seven documents mentioned above tends to "cast doubt on

---

[1]    These files were obtained by the government from the Massachusetts Attorney General's Office per Order of the Massachusetts Supreme Judicial Court and made available to the defendants in approximately July 2012.  The defendants commenced their review in approximately August 2012, concluding their review in approximately December 2012 when they hired a contractor to copy a large volume of documents.  In addition, the government provided personnel who spent hundreds of hours making these materials available to the defendants.

[2]    There are eight documents attached to defendants' motion.  The eighth document was produced in July 2013.

defendant's guilt as to any essential element in any count of the indictment or information." Rather, the defendants identify facts contained in those documents that they deem helpful to their defense.

Helpful facts alone do not constitute materially exculpatory information within the meaning of Local Rule 116.2 or *Brady v. Maryland*, 373 U.S. 83 (1963).  Indeed, the defendants do not have a constitutional right to disclosure of every helpful fact or every fact that might be employed by a resourceful defense attorney.  The Supreme Court has expressly rejected such a notion. *United States v. Agurs*, 427 U.S. 97, 108-10 (1976).  Rather, the Constitution requires only that the Government disclose <u>material</u> exculpatory evidence.  Evidence is "material" within the meaning of *Brady* if "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 289 (1999) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *accord United States v. Brodie*, 524 F.3d 259, 268 (D.C. Cir. 2008). A "'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

The Supreme Court defined the materiality standard for disclosure of exculpatory and impeachment evidence in *Agurs*, 427 U.S. at 108-10 and *United States v. Bagley*, 473 U.S. 667, 682 (1985), respectively.  In *Agurs*, the Court noted that the standard used to determine whether the prosecutor has a duty to disclose information is the same standard that is used by a court to determine whether non-disclosure deprived the defendant of his right to due process.

> For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose.

3

*Id.* at 108.

A showing that the defendant has been denied a fair trial, the Court continued, requires more than a showing that the evidence "might" have affected the jury's verdict:

> The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose **any** information that might affect the jury's verdict.  That statement of a constitutional standard of materiality approaches the "sporting theory of justice" which the Court expressly rejected in *Brady*.  For a jury's appraisal of a case "might" be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt.  If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice.

> Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much.  While expressing the opinion that representatives of the State may not "suppress substantial material evidence," former Chief Justice Traynor of the California Supreme Court has pointed out that "they are under no duty to report *sua sponte* to the defendant all that they learn about the case and about their witnesses."  And this Court recently noted that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.  The mere **possibility** that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.

*Id.* at 108-110 (citations omitted, emphasis added).

Nor does the prosecutor violate *Brady* by failing to disclose materially favorable information when circumstances of which the defendant is aware suggest that the evidence is available to the defense from other sources in the exercise of reasonable diligence. *See, e.g.*, *United States v. Pelullo*, 399 F.3d 197, 202 (3d Cir. 2005) (noting "the well-established principle that the government is not obliged under *Brady* to furnish a defendant with information which he already had or, with any reasonable diligence, he can obtain himself") (internal quotation marks omitted); *United States v. Hicks*, 848 F.2d 1, 4 (1st Cir. 1988) (no *Brady* violation where the defense knew of and had access to the potential witness, and therefore was "on notice of the

essential facts required to enable him to take advantage of [the] exculpatory testimony") (quoting *United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir. 1973)).

Courts have uniformly held that the government satisfies its *Brady* obligations by furnishing materially favorable information in time for the defendant to use it at trial. *See, e.g., Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably."); *Bielanski v. County of Kane*, 550 F.3d 632, 645 (7th Cir. 2008); *United States v. Smith*, 534 F.3d 1211, 1223 (10th Cir. 2008); *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005); *United States v. Coppa*, 267 F.3d 132, 142-44 (2d Cir. 2001); *United States v. Williams*, 132 F.3d 1055, 1060 (5th Cir. 1998); *United States v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993); *United States v. Higgs*, 713 F.2d 39, 43-44 (3d Cir. 1983); *United States v. Kubiak*, 704 F.2d 1545, 1550 (11th Cir. 1983); *United States v. Andrews*, 532 F.3d 900, 907-08 (D.C. Cir. 2008)  (rejecting *Brady* challenge because defendant received information in time to make effective use of it at trial); *United States v. Wilson*, 160 F.3d 732, 741-42 (D.C. Cir. 1998); *United States v. Tarantino*, 846 F.2d 1384, 1417 (D.C. Cir. 1988) (holding that "nothing approaching a *Brady* violation occurred," despite defendant's claim that production was too late, because earlier disclosure would not have appreciably enhanced the effectiveness of the defendant's use of the information at trial); *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988) (no *Brady* violation when a defendant receives exculpatory evidence "in time to make effective use of it"); *see also United States v. Mangual-Garcia*, 505 F.3d 1, 5-6 (1st Cir. 2007).

The defendants rely on *United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005), for their contention that the materiality standard does not apply in determining the government's pre-trial

*Brady* obligations.  In *Safavian*, the district court concluded that "the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed – with the benefit of hindsight – as affecting the outcome of trial," *id.* at 16, and ordered the government, before trial, immediately to disclose favorable material. That view of *Brady*, we submit, does not reflect the scope of the government's disclosure obligations, nor has that view been adopted by other courts. *See, e.g.*, *Coppa*, 267 F.3d at 142-44, 146 (vacating district court order requiring production of all favorable information immediately upon demand by defendant).  Nor is that view consistent with this Court's Local Rules or First Circuit precedent.

However, mindful of the difficulty in predicting the materiality of information pre-trial, the Court should be aware that it is the policy of the United States Attorney's Office ("USAO") that Assistant United States Attorneys strive to produce favorable evidence to the accused without conducting a materiality analysis.  Nevertheless, the failure to produce non-material favorable information does not constitute a violation of the government's *Brady* obligations.

**B.** **Analysis of the Alleged Brady Violations**

**1.** **Docket #210**

Throughout the pre-trial litigation in this case,  the defendants  have tried to redefine the allegations in the Indictment to support various arguments for discovery requests and other relief from the Court.  The instant motions continue this theme.  However, the proposed premises for many of the defendants' allegations are simply wrong, and do not, therefore, support their claims.

The government will not reiterate the oral argument before the Court on January 9, 2013, but will briefly address the defendants' claims *seriatim*.

- **FBI Report of Chief Probation Officer John Chapman (dated November 27, 2013; produced December 20, 2013)** [3]

  The FBI report of Chief Probation Officer John Chapman indicates, *inter alia*, that Chapman was "never told that E.T. was a preferred candidate."[4]  The government has never alleged that every member of the Probation Department knew of or participated in the alleged conspiracy.  Indeed, whether or not a Chief Probation Officer who sat on an interview panel did not receive the name of a preferred candidate does not tend to negate the defendants' guilt with respect to the alleged hiring fraud.  With respect to CPO Chapman, the government produced a list of unindicted co-conspirators to the defendants via letter dated April 20, 2012.  Chapman was not listed.

- **FBI Report of Judge Paul Dawley (dated October 28, 2013; produced December 20, 2013)**

  The FBI report of Judge Paul Dawley indicates, *inter alia*, that he thought J.D. was the "top candidate."  Judge Dawley also stated that he was never given the names of preferred candidates.  Regarding the first statement, the defendants have had Judge Dawley's scoring sheets for J.D. since the commencement of this prosecution.  Those sheets clearly show that Judge Dawley gave J.D. the highest score.  See Documents Bates Numbered USAO 00033571-33572 (produced May 20, 2012).  Any claim by the defendants that they were surprised by this information is disingenuous.  Regarding the second statement, the government has never alleged that members of the state judiciary were participants in the charged conspiracy and Judge Dawley's name does not appear on the government's list of unindicted coconspirators.  Indeed, whether or not a judge who sat on an interview panel did not receive the name of a preferred candidate does not tend to negate the defendants' guilt with respect to the alleged hiring fraud.

- **Grand Jury Testimony of Representative Steven Walsh (dated May 23, 2012; produced December 20, 2013)**

  The grand jury testimony of Representative Steven Walsh indicates that Walsh stated that "helping job applicants is a regular part of constituent services" and that sometimes people he recommended to the Commissioner [O'Brien] received consideration and sometimes they did not.  As the government stated in Court, the defendants have had access to all the hiring files of the Probation Department over the past ten years.  They have spent months reviewing those files.  The

---

[3]     It is unclear when the USAO actually received the report, however, it generally takes several weeks for these reports to be cleared through the FBI and produced to the USAO.

[4]     It is important to note that Chapman stated that E.T. was not his "top choice" and that Chapman had been given a name of a candidate that "the Commissioner's Office was interested in" during an unrelated prior interview.

defendants know that not every single candidate who was sponsored for a job received that particular job.  As the government explained in court, each job opening generated dozens, if not hundreds of applications.  Many of those applicants may have been "sponsored," but if there were only one or two openings, there would be only one or two individuals hired despite the number of "sponsored" applicants.  The Indictment alleges that there was a scheme to hire sponsored applicants, not that every sponsored applicant was hired.

- **FBI Report of Chief Probation Officer Richard Antonelli (dated December 16, 2013; produced December 20, 2013)**

The FBI report of Chief Probation Officer Richard Antonelli indicates, *inter alia*, that Antonelli was "never furnished the name(s) of preferred candidate(s)."  As set forth above, the government has never alleged that every member of the Probation Department knew of or participated in the alleged conspiracy.  Whether or not a Chief Probation Officer who sat on an interview panel did not receive the name of a preferred candidate does not tend to negate the defendants' guilt with respect to the alleged hiring fraud.

- **FBI Report of Judge Thomas Brownell (dated March 16, 2012; produced December 20, 2013)**

The FBI report of Judge Thomas Brownell indicates, *inter alia*, that Judge Brownell stated that he was never given the names of preferred candidates and could not recall any instances when "the least qualified candidate got a position over a more qualified candidate."[5]  As stated above, the government has never alleged that members of the state judiciary were participants in the charged conspiracy and Judge Brownell's name does not appear on the government's list of unindicted coconspirators.  Indeed, whether or not a judge who sat on an interview panel did not receive the name of a preferred candidate does not tend to negate the defendants' guilt with respect to the alleged hiring fraud.  Like Judge Dawley, Judge Brownell participated in very few probation officer interviews.

- **FBI Report of Chief Probation Officer Marjorie Ursoleo (dated November 14, 2013; produced December 20, 2013)**

The FBI report of Chief Probation Officer Marjorie Ursoleo indicates, *inter alia*, that Ursoleo was not furnished the names of preferred candidates in the two instances in which she participated in the hiring process for probation officers.  Despite the claim in defendants' brief that "her only knowledge of names being passed on consisted of rumors after the Ware report was issued," the FBI report clearly stated that she was aware of rumors of preferred candidates prior to the Ware report and that she specifically discussed with Judge Hart regarding one of those hires "that she was relieved to tell Judge Hart she was not aware of any of

---

[5]     The defendants paraphrase the report and insert the word "less" for "least."

the candidates being preferred candidates of the Commissioner (Jack O'Brien)." As set forth above, the government has never alleged that every member of the Probation Department knew of or participated in the alleged conspiracy.  Indeed, whether or not a Chief Probation Officer who sat on an interview panel did not receive the name of a preferred candidate does not tend to negate the defendants' guilt with respect to the alleged hiring fraud.

- **Grand Jury Testimony of M.C. (dated September 12, 2012; produced July 1, 2013)**

   As an initial matter, the charges regarding M.C. were not alleged until the issuance of the Superseding Indictment on April 24, 2013.  Thus, the information requested by the defendants was not discoverable until after that date.  Regardless, it is not exculpatory under *Brady*.  The defendants allege that the grand jury testimony of M.C. indicates that M.C. was interviewed prior to his employment in Probation's ELMO program despite the fact that the Indictment recites that M.C. was never interviewed.  In fact, M.C.'s testimony reveals that he merely spoke with a Probation Department employee while filling out a job application, which M.C. described as "like kind of both conversation, interview type thing."  The defendants fail to explain how whether an interview occurred or did not occur "tends to … cast doubt on defendant's guilt as to any essential element in any count of the indictment or information."

For the reasons set forth above as well as the government's argument before the Court on January 9, 2014, the above matters do not constitute materially exculpatory evidence within the meaning of the *Brady* or the District Court's Local Rules and disclosure was made in time for defendants' effective use at trial.

2. <u>**Docket #208**</u>

The defendants complain that the government has not complied with certain provisions of Magistrate Judge Sorokin's Order issued March 13, 2013.  The government appealed these particular provisions to the District Court, which granted in part and denied in part the government's appeal.  That Order was issued on June 18, 2013 and required the government to produce, among other things, information that candidates recommended by a member of the

legislature did not receive the specific job for which they were recommended.  See Dckt # 128.[6]

Pursuant to that Order, the government conducted an extensive review of testimony and

statements in its possession, and then, by letter dated October 16, 2013, provided the defendants

with a list of 36 individuals who had provided that information.  The government later

supplemented that list by letter to the defendants dated November 4, 2013.

---

[6]      In addition, as set forth in the defendants' motion, the government was required to
produce three additional categories of documents.  See Dckt # 208 at 3.  As described below, the
government is unaware of any information, not previously disclosed, that is responsive to those
requests.

Defendants' Request (b): Information that the hiring or promotion process conformed to
the policies in the Trial Court manual in one of the instances detailed in the indictment or when
filling any vacancy during the period of the conspiracy for which at least one "sponsored"
candidate applied.

Response: The government takes this request to mean information regarding any hire
from 2000 to 2010 for which the most qualified candidate (non-sponsored) was hired despite the
existence of at least one sponsored candidate.  As described previously before Magistrate Judge
Sorokin, the government has not completed - and is not required to complete - an analysis of
each and every hire during the time period of the conspiracy.  The government, however, has
provided the defendants access to all of the hiring files during that time period as well as the
sponsor lists in the government's possession, custody and control – materials which the
defendants could use to perform this analysis.  Otherwise, the government is unaware of any
information requested by Defendants' Request (b).

Defendants' Request (d): Information that the Trial Court Manual permitted the
consideration of legislative or other recommendations during the hiring process.

Response: The government has provided the defendants with a copy of the Trial Court
Manual in existence during the alleged conspiracy.  The government is unaware of any other
information responsive to this request.

Defendants' Request (e): Information that the defendants were aware that a legislator
who "sponsored" a candidate for employment with Probation did not expect that this candidate
would necessarily be hired, would not punish Probation if the candidate was not hired, and
would not reward Probation if the candidate was hired.

Response: The government is unaware of any information regarding the defendants'
knowledge of the legislators' expectations regarding sponsored candidates.

Generally, the information at issue consisted only of the fact that a particular individual had previously applied for a job which he or she did not obtain.  This information was most often provided to the government as an aside, with little, if any, detail.  Although many of these individuals sought assistance from a legislator, they had limited knowledge about what that legislator may or may not have done to help them.  The focus of the government's investigation was on jobs people obtained and how they obtained those jobs.  Thus, individuals who were interviewed were those who were eventually hired or promoted even though they had failed to obtain a job or promotion on previous attempts.  Similarly, legislators who testified before the grand jury or who were interviewed may have mentioned that they were not always successful in obtaining employment for individuals who had sought assistance from them.

The defendants seek the grand jury testimony and/or interview reports of these individuals even though the information they have requested constitutes a negligible portion of those documents.[7]  Since the defendants had already essentially identified the information that they were seeking, the government simply provided the identities of those individuals who had provided that information.

Providing the identity of witnesses who possess specific exculpatory information satisfies the government's *Brady* obligations.  *See United States v. Hicks,* 848 F.2d 1, 3-4 ( 1st Cir. 1988) (government has no obligation to produce grand jury testimony of non-testifying witness where the defense has access to interview or subpoena the witness to obtain exculpatory information). *See also Lugo v. Munoz*, 682 F.2d 7, 9-10 (1st Cir. 1982) (government has no *Brady* burden when facts are readily available to a diligent defender).  The First Circuit explained in *Hicks* that it was following a long line of cases in the Second Circuit that held that where the defense was

---

[7] On December 20, 2013, the government produced grand jury transcripts for 21 of these witnesses.

aware of the grand jury witness and had access to interview the witness and have the witness testify at trial, the government need not disclose the details of the witness' grand jury testimony. *Hicks*, 848 F.2d at 4.

More recently in *United States v. Bond*, 552 F.3d 1092 (9th Cir. 2009), the Ninth Circuit denied defendant's *Brady* claim based upon the government's failure to call a witness at defendant's trial who possessed exculpatory information and who had been identified on the government's witness list.  The Ninth Circuit, citing its decision in *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006), remarked,

> [t]he animating purpose of Brady is to preserve the fairness of criminal trials…. The Brady rule is not meant to displace the adversary system…. *Id.* Bond merely could have subpoenaed Johnson [the witness] on his own had he thought that the witness had anything exculpatory to say.

*See also United States v. Lockhart*, 956 F.2d 1418, 1425-26 (7th Cir. 1992) (no *Brady* violation where government decided not to call one of its witnesses who had recanted but failed to provide precise details of such recantation because the defendant had the opportunity to subpoena the witness).

The defendants have not represented to the Court that they exercised due diligence in attempting to interview and subpoena the witnesses in question.  For the most part, these witnesses are probation officers and state elected officials who are readily available to the defense.  Without a showing that the defendants have exercised due diligence and a representation to the Court that a particular witness is unavailable, the Court should not order the production of the underlying source materials.  *See Hicks*, 848 F.2d at 4.

### III.   Conclusion

For the reasons set forth above, the defendants' motions should be denied.  These

motions are simply an apparent attempt to delay the trial of this matter.  The government has

committed no *Brady* violations.  Furthermore, the government produced the bulk of its *Jencks*

and *Giglio* materials more than sixty days before trial.  Included in those materials were

statements by witnesses the government does not intend to call at trial, but which contained

material that the defense might deem helpful.  The government produced these documents, most

of which were only recently acquired, to the defense although the information was not materially

exculpatory.  The government has complied with its discovery obligations and has tried to

interpret those obligations liberally in doing so.

<div style="margin-left: 40%">

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

</div>

By:    /s/ Fred M. Wyshak, Jr.
       Fred M. Wyshak, Jr.
       Karin M. Bell
       Robert A. Fisher
       Assistant U.S. Attorneys

Date:   January 13, 2014


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<div style="margin-left: 40%">

/s/ Fred M. Wyshak, Jr.
Fred M. Wyshak, Jr.
Assistant United States Attorney

</div>

Date:   January 13, 2014