UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES of AMERICA | ) ) ) | |
| v. | ) ) ) | Criminal No. 12-40026-FDS |
| JOHN J. O'BRIEN, ELIZABETH V. TAVARES, and WILLIAM H. BURKE, III, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER ON MOTIONS TO SEVER

**SAYLOR, J.**

This is a criminal prosecution arising out of an allegedly corrupt hiring scheme at the Massachusetts Office of the Commissioner of Probation between 2000 and 2010. Defendants John J. O'Brien, Elizabeth V. Tavares, and William H. Burke III, all former Probation officials, are charged with conspiracy to commit racketeering, racketeering, mail fraud, conspiracy to commit bribery, and bribery. Essentially, the government contends that defendants engaged in a scheme to defraud involving the process of hiring probation officers, in which individuals who were "sponsored" by state legislators would be hired in return for favorable legislation and appropriations.

All three defendants have filed motions to sever. For the following reasons, the motions will be denied.

**I.     Background**

    **A.     The Defendants**

The Office of the Commissioner of Probation ("OCP") is a department within the

Administrative Office of the Trial Courts ("AOTC"), the administrative arm of the Massachusetts trial courts. The Chief Justice for Administration and Management ("CJAM") oversees the OCP as well as the trial courts. The OCP, in turn, oversees the Massachusetts Probation Service ("Probation Department") and the Office of Community Corrections ("OCC"). The Probation Department and OCC employ about 1,800 individuals statewide.

John J. O'Brien, Elizabeth V. Tavares, and William H. Burke III joined the Probation Department in 1980, 1980, and 1972, respectively. In 1998, O'Brien became Commissioner of OCP, serving in that role until May 24, 2010. From 2001 to 2008, Tavares served as the Second Deputy Commissioner, and from 2008 to 2010, she served as First Deputy Commissioner. Burke served as Deputy Commissioner from 1999 to 2009, when he retired.

### B. The Indictment

On March 22, 2012, O'Brien, Tavares, and Burke were indicted by a grand jury on various criminal offenses. The second superseding indictment charges (1) one count of conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d); (2) one count of racketeering, in violation of 18 U.S.C. § 1962(c) (O'Brien and Tavares only); (3) ten counts of mail fraud, in violation of 18 U.S.C. § 1341; (4) one count of conspiracy to commit bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 371; and (5) seventeen counts of bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(2).

According to the indictment, defendants awarded employment and promotions to individuals in the Probation Department through a corrupt process in which the best-qualified candidates were routinely rejected. Specifically, the indictment charges that defendants hired only applicants who had been "sponsored" by members of the Massachusetts legislature,

legislators' staff members, and other influential individuals.

Publicly, defendants posted employment and promotion opportunities online and on a telephone hotline. After receiving applications by mail, they conducted three rounds of interviews, which included sending application packages to interviewers and creating and maintaining standardized scoring sheets and forms. Rejection letters and postcards, often signed by Burke or Tavares, were sent at the end of the process to unsuccessful candidates. O'Brien then certified in writing to the CJAM that the successful candidates had been hired in compliance with the standards set forth in the Personnel Policies and Procedures Manual of AOTC. Those standards, among other things, require that hiring and promotions be conducted based on merit.

The public process, however, was a sham. Privately, O'Brien would pre-select applicants from a "sponsor" list and provide those names to Tavares, Burke, and other interviewers. Defendants then acted to ensure that the "sponsored" candidate would pass through each interview round and be awarded the highest final score, leading to his or her employment.

The indictment alleges that in return for hiring and promoting the favored candidates, O'Brien, Tavares, and Burke sought to influence legislators to act favorably on probation-related appropriations and other legislation.

### C. The Ware Investigation

On May 23, 2010, the *Boston Globe* ran an article criticizing the hiring practices at Probation for being politically motivated. The following day, the SJC issued an order appointing Paul F. Ware, Jr., of the law firm Goodwin Procter LLP, as independent counsel to conduct an administrative inquiry into the alleged improprieties. As independent counsel, Ware had the power to subpoena witnesses and administer oaths.

Tavares appeared at depositions taken pursuant to subpoena on July 13 and October 22, 2010. She was represented by counsel on both occasions. She testified outside the presence of counsel during the first proceeding. She asserted her Fifth Amendment rights at the second. Burke testified at a deposition pursuant to subpoena on July 22, 2010; he was not represented by counsel.

Both Tavares and Burke were advised of their rights prior to the depositions, which included advice concerning the witness's Fifth Amendment right to remain silent.

## II. Standard of Review

"As a rule, persons who are indicted together should be tried together." *United States v. O'Bryant'*, 998 F.2d 21, 25 (1st Cir. 1993). However, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "[W]hen defendants properly have been joined . . . , a district court should grant severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "Thus, when multiple defendants are named in a single indictment, a defendant who seeks a separate trial can ordinarily succeed in obtaining one only by making a strong showing of evident prejudice." *O'Bryant*, 998 F.2d at 25.

## III. Analysis

All defendants contend that admission of the statements of Tavares and Burke in the course of the Ware investigation would violate their rights under the Confrontation Clause of the Sixth Amendment under *Crawford v. Washington*, 541 U.S. 36 (2005), and *Bruton v. United*

*States*, 391 U.S. 123 (1968).[1]

### A. *Crawford* Confrontation Rights

"The Confrontation Clause of the Sixth Amendment . . . guarantees the right of a criminal defendant 'to be confronted with the witnesses against him.'" *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (quoting U.S. Const. amend. VI). Under *Crawford*, the Confrontation Clause prohibits the admission of testimonial hearsay unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. 541 U.S. at 59. However, "[w]hen the out-of-court statement at issue was made by the defendant, it is typically classified as an admission and not hearsay, and ordinarily may be admitted against him." *United States v. Rodriguez-Duran*, 507 F.3d 749, 768 (1st Cir. 2007); *see also* Fed. R. Evid. 801(d)(2)(A).

In its opposition memorandum, the government has represented that it is only seeking to admit the statements of a particular defendant against the speaker of those statements. (Gov. Opp. at 14 n.15). Such statements are admissible as statements of a party-opponent and do not raise constitutional issues under *Crawford*. *See* Fed. R. Evid. 801(d)(2)(A); *Rodriguez-Duran*, 507 F.3d at 768. Accordingly, the defendants' trials will not be severed on the basis of possible prejudice to their Sixth Amendment rights under *Crawford*.[2] The Court will, however, give such limiting instructions as may be necessary or appropriate in the course of the trial.

### B. *Bruton* Confrontation Rights

Defendants also request severance under *Bruton*. "The right of confrontation includes the right to cross-examine witnesses. . . . Therefore, where two defendants are tried jointly, the

---

[1] O'Brien contends that in a joint trial, the admission of statements of Tavares and Burke would be unfairly prejudicial to him. Tavares contends that the admission of Burke's statements would unfairly prejudice her, and Burke contends that the admission of Tavares's statements would unfairly prejudice him.

[2] The Court does not decide whether the statements are independently admissible against any other defendants.

5

pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." *Richardson*, 481 U.S. at 206 (citation omitted). "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Id.*

Under *Bruton*, however, the Supreme Court recognized a "narrow exception" to that principle. *Id.* at 207. It held that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Id.* The *Bruton* rule is not limited to confessions; it "proscribes the introduction of statements that are 'powerfully incriminating' vis-a-vis a jointly tried co-defendant." *United States v. Vega-Molina*, 407 F.3d 511, 520 (1st Cir. 2005); *see Rodriguez-Duran*, 507 F.3d at 769 (where non-testifying defendant's extrajudicial statement is "powerfully incriminating" against other defendants, the risk that the jury cannot follow instructions is so great the statement cannot be admitted); *United States v. Lopez-Lopez*, 282 F.3d 1, 13 (1st Cir. 2002) (the fact that a statement "was of an 'incriminatory nature' is insufficient to clear the hurdle requiring a powerfully incriminating statement").

In *Richardson*, the Supreme Court limited the scope of *Bruton*, and held that "the Confrontation Clause is not violated by the admission of a nontestifying defendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211. And *Bruton* does not require the exclusion of statements that are not incriminating on their face, but only when linked with evidence introduced later at trial. *Richardson*, 481 U.S. at 208; *United States v. Celestin*, 612 F.3d 14, 19-20 (1st Cir. 2010) (no *Bruton* preclusion where co-defendant's

statement demonstrated existence of a conspiracy but did not contain any evidence as to defendant's participation in the conspiracy). As the First Circuit has explained:

> Statements that facially incriminate a co-defendant are per se inadmissible under the rule of *Bruton v. United States*. By contrast, statements that incriminate a co-defendant only when linked with evidence introduced later at trial can be admitted if references to the co-defendant are redacted and the jury is instructed not to consider the statement against any defendant other than the declarant. We presume in the latter situation that the jury will follow instructions and consider the statement only for the proper purpose (assessing the declarant's guilt) and not the improper purpose (assessing the co-defendant's guilt).

*United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010) (internal quotations and citations omitted).

The first inquiry, then, is whether the statements Tavares and Burke made under oath in their depositions "facially incriminate" one of the defendants and are so "powerfully incriminating" such that a jury would not be able to follow an instruction designed to cure any prejudice. If the statements incriminate a co-defendant only when linked with other evidence, the statements can be admitted if references to the co-defendant are redacted and the jury is given a limiting instruction.

### 1. Statements Against O'Brien

O'Brien contends that statements given in the Ware investigation by Burke and Tavares fall within the scope of *Bruton*, and therefore severance is required.

#### a. Tavares' Testimony

Tavares testified at a deposition on July 13, 2010. O'Brien contends that the following excerpts are illustrative of testimony that clearly incriminates him and cannot be redacted:

> Q. Was it your understanding when the Commissioner gave you a name for the Chief Probation Officer jobs the day of the interview that you should, you know, try and score that person more highly than you otherwise would have if he hadn't given you that person's name?

A. In my mind, it was to take a good look at this person.

Q. You're giving a good look to all the people, though, right?

A. Yeah, but I think at that point with the recommendation, you know, our applications call for recommendations on the back side. So, I mean, I guess we are looking at everybody, but I think if the Commissioner is telling us that he received a recommendation and the recommendation is based on a person's personal knowledge of this person working in a court, then we're taking a good look at that person. I mean, sometimes I go into these interviews thinking that I know the folks because I've spent 30 years in the system, and folks have reputations. And I'm thinking that one person is going to do very well, and you have somebody come in and do exceptionally well, and that person ends up getting the job. So, you know, I think it really depends upon how the person does at that point when they're responding to the questions that we're asking.

Q. Was it your understanding that when the Commissioner was giving you a name on the day of the interview that he wanted you to try and score that person most highly?

A. To some degree, I guess.

Q. Is that a yes?

A. Well, to some degree.

Q. Were there occasions in which the Commissioner gave you the name on that morning, but of the people you were interviewing you just thought that person wasn't the best so you didn't score them the highest?

A. I don't think that has happened, no.

Q. So is it fair to say that on every occasion where the Commissioner gave you a name that morning, that's the person who was ultimately was hired?

A. But that's assuming that we were given a name every time we had a Chief Probation Officer position.

Q. Let me ask you the question that way then. On every occasion where the Commissioner gave you a name on the morning of the interview for a CPO candidate, was that the person who was ultimately hired?

A. No, not necessarily.

8

(Tavares Tr., Jul. 13, 2010, at 114-16).

> Q. Did you ever have a conversation with Commissioner O'Brien in which he discussed the politics of passing names down to the local panels of the folks who should be advanced?
>
> A. The politics of it?
>
> Q. Right. What I mean is did he ever say, you know, I'm getting names from the legislature of people they want to see get hired, and it's important for us as a department to stay in good terms with legislators by helping them out in this way?
>
> A. I don't recall having a conversation of that sort. I mean, he just provided me with people that were recommended and instructed me to call the local RAs involved in the interview process and see if we could move these folks along.
>
> Q. Was it your understanding that by doing this that the department was gaining favor with the State House?
>
> A. No, because the recommendations came not only from the State House, they were from judges, and some people were successful and some people were not.
>
> Q. Let's talk about the people, names that are coming from the State House. Was it your understanding that by passing along names of people who were recommended by folks in the State House that the department was staying on better terms with the State House than it would be if those folks weren't getting hired in the end?
>
> A. That wasn't my understanding. He received these recommendations. I assumed that they were based on a personal knowledge of the person, whoever gave them those recommendations, and they were passed along, and they would have been required to be responsive to the questions. And if they made it, they made it; if they didn't, they didn't.
>
> Q. Was the Commissioner's expectation that if he passed a name down to the local panel that person had better appear on the list of names which comes up?
>
> A. I don't know that it was an expectation. I'd ask you to ask him that question. I don't know.

(Tavares Tr., Jul. 13, 2010, at 62-64).

9

As a whole, those statements are not facially incriminating at all, much less powerfully incriminating. At most, Tavares's states that O'Brien received and passed on recommendations for jobs in Probation from various public officials. Indeed, if taken at face value, the statements are largely exculpatory.[3] In any event, for the statements themselves to be inculpatory, they must at a minimum be linked with other evidence. Tavares's statements therefore do not require exclusion under *Bruton*, as "[s]tatements that are incriminating only when linked to other evidence in the case do not trigger application of *Bruton*'s preclusionary rule." *Vega-Molina*, 407 F.3d at 520.

That raises the question whether the various references to defendant O'Brien should be redacted. That issue is complicated somewhat by the fact that Tavares sometimes gave exculpatory responses, and that some questions asked the witness to speculate (for example, as to O'Brien's "expectation"). Rather than resolve the issue now, the Court will defer the issue until the government specifically identifies the statements, if any, that it intends to introduce at trial.

### b. Burke's Testimony

Burke testified at a deposition on July 22, 2010. O'Brien contends that the following testimony clearly incriminates him:

> Q. Did you have conversation with Mr. O'Brien in which he personally recommended to you candidates?
>
> A. No.
>
> Q. On no occasion?
>
> A. On no occasion did Jack O'Brien ask me to put anybody on a list or ask me for – if I thought somebody was good, I would tell Liz or Frannie and say,

---

[3] The government contends that the testimony of Tavares (and Burke) is replete with false exculpatory statements intended to conceal the scheme and its scope and duration. To the extent that contention is true, it is the antithesis of a "powerfully incriminating" statement.

           this guy is outstanding; this lady is outstanding. But he has never, never.

Q. When you were given names which you understood to have come from the Commissioner that came through principally Liz Tavares?

A. Frannie or Eddie Ryan.

Q. Ed Ryan?

A. Fran Wall.

Q. And Liz Tavares?

A. Liz Tavares, right.

Q. Those were the individuals who passed along names from the Commissioner to you or to Regional Administrators or to interview panels, right?

A. Correct.

Q. Did you ever have any conversation with Commissioner O'Brien with respect to his meetings with legislative leaders for funding?

A. No.

Q. You understood, didn't you, that while it wasn't written down, the legislature was funding Probation generously because Probation was responding to legislative requests for hiring, among other things, isn't that right?

A. I'd say yeah.

Q. So you understood that one of the reasons Probation under the auspices of Jack O'Brien could get the funding it needed was that Jack O'Brien was being responsive to the hiring requests of legislative leaders?

A. And judges.

Q. But certainly legislative leaders, correct?

A. Yeah, correct.

Q. And who are the legislative leaders that had the most clout in terms of getting jobs within Probation?

A. Don't have a clue. I'm sure it's the Speaker or, you know, I don't know. As I said, I'm a hundred miles from here.

Q. Well, you're not a hundred miles from Representative Petrolati, correct?

A. Correct.

Q. And you knew that he, with respect to Western Massachusetts and specifically Hampden County, had a lot of clout as regards hiring and Probation, isn't that true?

A. He had some clout, yeah.

Q. You participated on some occasions in facilitating names coming from Representative Petrolati to the Commissioner's office, correct?

A. As I said, a couple to three.

Q. But you were aware that he was communicating directly with the Commissioner's office, as you said earlier, names that weren't channeled through you, correct?

A. I was not aware of it, but I'm sure it happened.

Q. Fair enough. You assume it happened?

A. Yeah.

Q. And your understanding, given what you know about the process and the system, was that Representative Petrolati was giving names to Fran Wall or Eddie Ryan or Liz Tavares, isn't that correct?

A. I'd say yes.

Q. You said earlier that you're confident that if Commissioner O'Brien were still actively running Probation at this time that there wouldn't have been layoffs?

A. I honestly believe that, yeah.

Q. And what you meant by that, if I understood you, was that he had the ability to go to the legislature and get the money that was needed, is that right?

A. Correct, yeah.

Q. Do you know that he did that while you were Deputy Commissioner?

A. I know he did it up until the last year because Judge Mulligan forbid [*sic*] him to go over there.

Q. And prior to that last year when Judge Mulligan intervened, what was the process, as you understood it, by which Commissioner O'Brien got funding for Probation?

A. He grew up with a lot of them. I mean, he grew up with Tommy Finneran. Finneran introduced him to a lot of people. I mean, it's politics. It's who you know.

Q. And so your understanding is that Commissioner O'Brien would meet with legislative leaders and would present the financial needs of Probation or desires of Probation?

A. Mm hmm.

Q. The legislature would respond, and they would respond in part because Commissioner O'Brien in turn would meet the legislature's job needs, is that correct?

A. Ask the Commissioner. I mean, I didn't hire one person.

Q. I understand that, but you've been around a long time.

A. Yes, I have.

Q. You've been Deputy Commissioner a long time.

A. Yeah.

Q. You know politics; you know the real world; you know Massachusetts.

A. Yeah.

Q. The way in which it worked was one hand, you know, washed the other?

A. Washes the other. Yeah, I know. I know what you're talking about.

Q. And the way it worked particularly with Probation was Mr. O'Brien would get his funding, and the legislature would get some jobs, isn't that right?

>    A.   Yeah, I would say so, yeah.
>
>    Q.   That's what you know as a human being and as a guy experienced in both politics and Probation, isn't that so?
>
>    A.   That's correct. But most of those people were probably the most qualified people, too.
>
>    Q.   Well, they may or may not have been, and maybe that's evident on paper from their credentials and their experience.
>
>    A.   Right.
>
>    Q.   But the fact is, whether qualified or not, they were being preferred because names were being given by the Commissioner's office, isn't that so?
>
>    A.   Yes.

(Burke Tr., Jul. 22, 2010, at 78-83).

Burke's testimony is not facially incriminating, and again is far from powerfully incriminating. Unlike Tavares, he acknowledged that it was his understanding that O'Brien was able to get preferential treatment from the state legislature in return for hiring candidates recommended by legislators. However, without evidence that the hiring process was rigged to hire only recommended candidates, Burke's statements are not facially incriminatory. They may be of an incriminatory nature, but that is not enough to require exclusion under *Bruton*. *See Lopez-Lopez*, 282 F.3d at 13. Again, the Court will defer the issue of redaction until the government specifically identifies what statements, if any, it seeks to introduce.

In short, this "is not a case involving the 'powerfully incriminating' effect of one accomplice pointing the finger directly at another, without subjecting himself to cross-examination." *United States v. DiGregorio*, 605 F.2d 1184, 1190 (1st Cir. 1979); *see also United States v. Barnett*, 989 F.2d 546, 558 (1st Cir. 1993) (finding no *Bruton* violation where co-defendant did not confess his own guilt, much less admit to knowledge of the defendant's guilt).

In their testimony, neither Tavares nor Burke testified that O'Brien, or they themselves, did anything wrong. Their statements are not "so powerfully inculpating of [O'Brien] that there would be substantial doubt as to whether the jury could abide by a limiting instruction." *Vega-Molina*, 407 F.3d at 519. Accordingly, O'Brien's motion to sever will be denied.

### 2. Statements Against Tavares

Tavares contends that the statements made by Burke during the Ware investigation powerfully incriminate her. She quotes the excerpt reproduced above as a representative portion. In Burke's testimony, he outlines how recommendations were passed from O'Brien to him through intermediaries such as Tavares. Although he testified that Tavares received names from a representative, he did not directly mention her when discussing possible influence over state-government decisions. He also did not testify that Probation hired individuals with recommendations from legislators in preference to those who were more highly qualified.

Again, *Bruton* requires exclusion of a statement that is "powerfully incriminating" and "inculpatory on its face." *Vega-Molina*, 407 F.3d at 520. By itself, Tavares's role in passing down recommendations is not enough to inculpate her, because it does not show that the hiring process was a sham, much less that Tavares knew it was fraudulent or participated to gain favor from the state legislature. Again, the Court will defer action as to any possible redaction. Tavares's motion to sever, however, will be denied.

### 3. Statements Against Burke

Finally, Burke contends that the admission in a joint trial of statements made by Tavares to the Ware investigators would violate *Bruton*. He identifies 78 questions and answers from her testimony on July 13, 2010, that he contends are incriminating. (Burke Aff. ¶¶ 1-78). Most of the excerpts concern actions taken by O'Brien, the recommendations given to O'Brien for jobs, or the

removal of individuals from interview panels. (*Id.*). Burke is not mentioned by name in any of the 78 questions or answers. (*Id.*). Indeed, the entire transcript does not mention Burke. (*See generally* Tavares Tr., Jul. 13, 2010). Although Tavares did testify that she passed recommendations from O'Brien to the hiring panels, substantial additional evidence would have to be introduced to establish that Burke was on some of those hiring panels.

Again, *Bruton* requires exclusion of a statement that is "powerfully incriminating" and "inculpatory on its face." *Vega-Molina*, 407 F.3d at 520. Tavares's statements do not directly mention Burke at all. Accordingly, Burke's motion to sever will be denied, and redaction issues (if any) will be dealt with at a later point.

## VI. Conclusion

For the foregoing reasons, defendants' motions to sever are DENIED. The Court will address the issue of possible redactions, and such limiting instructions as may be appropriate or necessary under the circumstances, at a later stage in the proceedings.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  January 17, 2014