**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

_____
                                 )

**UNITED STATES of AMERICA**      )
                                 )

     **v.**                          )        **Criminal No.**
                                 )        **12-40026-FDS**

**JOHN J. O'BRIEN,**           )
**ELIZABETH V. TAVARES, and**    )
**WILLIAM H. BURKE, III,**       )
                                 )

     **Defendants.**            )
_____)

**MEMORANDUM AND ORDER ON MOTION TO
DISMISS THE INDICTMENT**

**SAYLOR, J.**

This is a criminal prosecution arising out of an allegedly corrupt hiring scheme at the

Massachusetts Office of the Commissioner of Probation between 2000 and 2010.  Defendants

John J. O'Brien, Elizabeth V. Tavares, and William H. Burke III, all former Probation officials,

are charged with conspiracy to commit racketeering, racketeering, mail fraud, conspiracy to

commit bribery, and bribery.  Essentially, the government contends that defendants engaged in a

scheme to defraud involving the process of hiring probation officers, in which individuals who

were "sponsored" by state legislators would be hired in return for favorable appropriations and

other legislation.

Defendants have moved to dismiss the indictment on multiple grounds.  First, defendants

contend that the indictment is based on a flawed premise, because the Commissioner had

"exclusive" hiring authority under state law and was not required to hire on the basis of merit.

Second, they contend that the indictment fails to allege mail fraud, because the alleged mailings

were not "in furtherance of" the scheme, there was no misrepresentation of a material fact,

defendants made no false statements, and the scheme alleged did not defraud anyone of money or property.  Third, they contend that the federal bribery counts fall within the "*bona fide* salary" exemption, do not properly allege the "transactional" requirement, and do not allege the required *quid pro quo*.  Fourth, they contend that the racketeering acts based on state bribery and gratuity violations must be dismissed because the indictment does not allege the required link between the thing of value and an official act.  Finally, they contend that the indictment should be dismissed under the vagueness doctrine and the rule of lenity.

For the reasons set forth below, the motion to dismiss will be denied.

## I.  <u>Background</u>

Unless otherwise noted, the facts are presented as set forth in the indictment.[1]

The Office of the Commissioner of Probation ("OCP") is a department within the Administrative Office of the Trial Courts ("AOTC"), the administrative arm of the Massachusetts trial courts.  The Chief Justice for Administration and Management ("CJAM") oversees the OCP as well as the trial courts.  The OCP, in turn, oversees the Massachusetts Probation Service ("Probation") and the Office of Community Corrections ("OCC").  Together, Probation and OCC employ about 1,800 individuals statewide.

John J. O'Brien, Elizabeth V. Tavares, and William H. Burke, III joined the Probation Department in 1980, 1980, and 1972, respectively.  In 1998, O'Brien became Commissioner of OCP; he served in that role until May 24, 2010.  From 2001 to 2008, Tavares served as the Second Deputy Commissioner, and from 2008 to 2010, she served as First Deputy Commissioner.  Burke served as Deputy Commissioner from 1999 to 2009.

---

[1] The Court presumes the allegations of the indictment are true for the purposes of assessing whether it is sufficient to withstand a motion to dismiss.  *United States v. Dunbar,* 367 F. Supp. 2d 59, 60 (D. Mass. 2005) (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952)).

According to the government, from 2000 to 2010, defendants awarded employment and promotions to individuals whom members of the Massachusetts legislature, legislators' staff members, and other influential individuals had "sponsored," but who were not the most-qualified candidates.

Publicly, defendants posted employment and promotion opportunities online and on a telephone hotline.  After receiving applications by mail, they conducted three rounds of interviews, which included sending application packages to interviewers and creating and maintaining standardized scoring sheets and forms.  Rejection letters and postcards, often signed by Burke or Tavares, were sent at the end of the process to unsuccessful candidates.  O'Brien then certified in writing to the CJAM that the successful candidates had been hired in compliance with the standards set forth in the Personnel Policies and Procedures Manual of the AOTC (the "Personnel Manual").

The public process, however, was a sham.  Privately, O'Brien would pre-select applicants from a "sponsor" list and provide those names to Tavares, Burke, and other interviewers. Defendants then acted to ensure that the selected candidate would pass through each interview round and be awarded the highest final score, leading to his or her employment.  On multiple occasions, O'Brien spoke with legislators who suggested that he promote current employees, which he then did.

In 2006, the Massachusetts legislature enacted legislation providing for electronic monitoring of sex offenders and offenders involved in domestic violence.  The legislation charged Probation with oversight of these individuals and implementation of the electronic monitoring system ("ELMO").  The legislature also appropriated funds to purchase equipment and hire personnel.  Probation opened an ELMO facility in Clinton, Massachusetts, in November

2007, and the CJAM granted O'Brien permission to hire temporary employees to work there. During 2007 and 2008, O'Brien chose twenty individuals, solicited from members of the legislature, who were then hired without interviews or other vetting.  In particular, O'Brien offered the then-Chairman of the House Ways and Means Committee the opportunity to suggest individuals, and he in turn solicited names from ten members of the House of Representatives. Many of these "temporary" employees still work at the Clinton facility.  At the same time, O'Brien routinely met with legislators to discuss proposed and pending legislation—including discussing a bill with the Chairman that would have significantly affected the CJAM's supervisory authority over his office—and attended annual meetings with the Chairman to discuss Probation's annual budget requests.

In summary, the indictment alleges that in return for hiring and promoting the favored candidates, O'Brien, Tavares, and Burke sought to influence legislators to act favorably on Probation-related appropriations and other legislation.

## II.    Standard of Review

A district court has the power to dismiss an indictment prior to trial.  *See* Fed. R. Crim. P. 12.  Dismissal, however, is reserved for "extremely limited circumstances."  *United States v. George*, 839 F. Supp. 2d 430, 435 (D. Mass. 2012) (citing *Whitehouse v. United States District Court*, 53 F.3d 1349, 1360 (1st Cir. 1995)).  "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits."  *Costello v. United States*, 350 U.S. 359, 363 (1956).  If the indictment "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense," then it is sufficient.  *Hamling v.*

*United States*, 418 U.S. 87, 117 (1974) (citing *Hagner v. United States*, 285 U.S. 427 (1932) and

*United States v. Debrow*, 346 U.S. 374 (1953)).

The indictment may use the language of the statute in the general description of an

offense, as long as "those words of themselves fully, directly, and expressly, without any

uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] to be

punished." *Hamling*, 418 U.S. at 117 (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)).

If the language of the statute is quoted, it "must be accompanied with such a statement of the

facts and circumstances as will inform the accused of the specific [offense], coming under the

general description, with which he is charged." *Id.* (quoting *United States v. Hess*, 124 U.S. 483,

487 (1888)).

"There is no summary judgment procedure in criminal cases." *United States v. Critzer*,

951 F.2d 306, 307 (11th Cir. 1992). Likewise, the trial court cannot make a pre-trial

determination as to the sufficiency of the evidence. *Id.* Only issues that can be determined

without a trial on the merits may be raised in a pretrial motion. *See* Fed. R. Crim. P. 12(b)

(providing that "any defense, objection, or request that the court can determine without the trial

of the general issue" may be raised before trial by motion); *United States v. Ayarza-Garcia*, 819

F.2d 1043, 1048 (11th Cir. 1987) ("[A] pretrial motion to dismiss the indictment cannot be based

on a sufficiency of the evidence argument because such an argument raises factual questions

embraced in the general issue.").

**III.**   **Analysis**

   **A.**   **Whether the Commissioner Had Exclusive Hiring Authority**

Defendants first contend, in substance, that they could not have committed the crimes

charged in the indictment, because the Commissioner of Probation had the "exclusive authority

to appoint" probation officers under Massachusetts law.[2]  According to defendants, approval of the CJAM was not required to hire probation officers, and the mandate of the Personnel Manual to hire the "most qualified" candidate did not apply.  Accordingly, defendants argue, the central premise of the indictment is flawed, requiring dismissal.

Defendants' argument hinges principally on a series of enactments by the Massachusetts legislature as part of the annual budget process.  Those enactments must, however, be interpreted in light of the overall statutory scheme and case law interpreting those statutes.  *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) (holding that the opinions of a state's highest court as to state laws are to be accepted by federal courts).

### 1.     The Statutory Framework

Mass. Gen. Laws ch. 276, § 98 establishes the office of the Commissioner of Probation.[3] That statute sets forth the Commissioner's duties, which include the following:

> Subject to the approval and direction of the [CJAM], the commissioner shall perform such duties and responsibilities as otherwise provided by law or as designated from time to time by the [CJAM], and shall be responsible for: making recommendations to the first justice and the [CJAM] on the appointment of chief probation officers, assistant chief probation officers and probation officers . . . .

Mass. Gen. Laws ch. 276, § 98.

From 2001 to 2011, ch. 276, § 83 provided:  "Subject to appropriation, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of

---

[2] To the extent that the question raised by defendants is a question of law, this Court may properly consider it in a motion to dismiss.  *United States v. McCormack*, 31 F. Supp. 2d 176, 180 (D. Mass. 1998).

[3] The Massachusetts legislature has since amended Chapter 276, including § 83.  Unless otherwise noted, all citations will be to the prior versions of the statute.

the trial court as he deems necessary."[4]

Chapter 211B establishes the Trial Court of the Commonwealth.  Section 8 creates an "advisory committee on personnel standards" with various members, including the Commissioner of Probation.[3]  That committee is charged with "advis[ing] the [CJAM] who shall establish and promulgate standards for the appointment, performance, promotion, continuing education and removal of all personnel within the trial court."  Mass. Gen. Laws ch. 211B, § 8. All appointments "governed by [those] standards" must be certified as compliant to the CJAM, and the CJAM has the power to reject any appointment for "non-compliance with the standards for appointment."  *Id.*

Pursuant to that statute, the CJAM has promulgated standards for appointment and promotion of personnel, which are set out in the Personnel Manual.  Section 4.000 of the Manual states that "the objective of the hiring process is to select the most qualified individuals." Section 4.304 provides that "[i]t is the policy of the Trial Court that all appointments be made solely on the basis of merit.  The practice and appearance of nepotism or favoritism in the hiring process are to be avoided."

Each year from 2001 to 2011, the Massachusetts legislature included the following provision in the budget line item detailing the appropriations for OCP:

> For the office of the commissioner of probation; provided *notwithstanding* the
> provisions of any general or special law, rule or regulation to the contrary, said

---

[4] Prior to 2001, the CJAM held the power to "appoint, dismiss and assign" probation officers.  Mass. Gen. Laws ch. 276, § 83 (2000).

[3] Defendants contend that the Commissioner is governed by Chapter 276, which grants him appointment power, not Chapter 211B, and that his inclusion on the advisory committee does not render Probation subject to the Personnel Manual or CJAM control, because Probation is not a "department" of the Trial Court.  *See* Mass. Gen. Laws ch. 211B, § 1.  As discussed in this section, the statutes and relevant case law clearly indicate that OCP is part of the trial court system.  *See First Justice of Bristol Div. of Juvenile Court Dep't v. Clerk-Magistrate of Bristol Div. of Juvenile Court Dep't,* 438 Mass. 387, 399-401 (2003).

> commissioner, subject to appropriation, shall have *exclusive* authority to appoint, dismiss, assign and discipline probation officers, associate probation officers, probation officers-in-charge, assistant chief probation officers and chief probation officers . . . .

2001 Mass. Legis. Serv. Ch. 117 (H.B. 4800), line 0339-1001 (emphasis added).  Those enactments were never codified in the Massachusetts General Laws.

Defendants contend that these latter enactments are "unequivocal," and that they give the Commissioner "the sole and exclusive authority to make Probation hiring decisions."  Def. Mem. at 18-19.  In particular, defendants point to the use of the word "notwithstanding," which they contend "signifies that these provisions override all statutes, regulations, or other authorities suggesting that the Commissioner has less than 'exclusive' hiring authority or that the Commissioner is bound by limits other than Probation's budget."  *Id.* at 19.[4]  Thus, the argument goes, it does not matter what representations defendants made to the CJAM, or whether the hires were based on merit as required by the Personnel Manual, because the Commissioner could have hired whomever he chose.

### 2.    Judicial Interpretation of the Statutes

Defendants' argument would have considerably greater force if not for a pair of Supreme Judicial Court cases interpreting ch. 276, § 83 and the Massachusetts statutory framework governing the hiring of probation officers.  *See First Justice of the Bristol Division of the Juvenile Court Department v. Clerk-Magistrate of the Bristol Division of the Juvenile Court Department*, 438 Mass. 387 (2003); *Anzalone v. Administrative Office of the Trial Court*, 457

---

[4] As a general proposition, "[t]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section.  A clearer statement is difficult to imagine."  *Attorney Gen. v. Comm'r of Ins.*, 450 Mass. 311, 319-20 (2008) (quoting *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) and *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991)) (internal quotations omitted).

Mass. 647 (2010).  Taken together, those cases stand for the proposition that the Massachusetts legislature has not stripped, and cannot strip, the judiciary of the authority to approve or reject the hiring of probation officers.

      **a.**      **The *First Justice* Opinion**

In *First Justice*, two state judges filed a lawsuit contending that the court reorganization statutes enacted in 2001 violated the Massachusetts constitution.  The statutes at issue included a variety of provisions directed to the appointment and supervision of clerks and probation officers.  *Id.* at 389.  Among other things, the challenged statute included the 2001 amendment to Chapter 276, § 83, which contained the following language:

> Subject to appropriation, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial court as he deems necessary.

*Id.* at 411.  The plaintiffs contended, among other things, that the statutes unconstitutionally "eliminate[d] the authority of the CJAM to appoint, dismiss, and assign probation officers in the trial court" and shifted those powers to the Commissioner of Probation.  *First Justice*, 438 Mass. at 390, 395.

The Supreme Judicial Court upheld the statutes, but under a narrow construction. The SJC first noted that article 30 of the Massachusetts Declaration of Rights prohibited the legislature from interfering with "the judiciary's core functions" or enacting legislation "that attempts to restrict or diminish those judicial powers that are necessary to the court's ability to perform its core judicial functions."  *Id.* at 396.  Citing to articles 29 and 11 of the Declaration of Rights, the court noted that "from these lofty principles . . . flows the concept of inherent judicial powers."  *Id.* at 397.  It then stated:

> The scope of inherent judicial authority reaches beyond traditional adjudicatory

> powers and encompasses (but is not limited to) the court's power to commit the fiscal resources of the Commonwealth and other governmental agencies necessary to ensure the proper operation of the courts, the power to make rules governing the internal organization of the courts and to control the practice of law, and the power to control and supervise personnel within the judicial system.

*Id.* (citations omitted).

After addressing the roles of clerks and assistant clerks under the constitutional structure, the court turned to probation officers. It observed that "[t]he work of probation officers, like that of clerks and assistant clerks, is intimately connected to the existence and function of the judiciary." *Id.* at 399. After delineating the principal duties of probation officers, and noting their "critical role" in the courts, *id.* at 400, the court concluded:

> What can be distilled from the above are the following principles. First, . . . probation officers perform duties essential to the processing of cases and, in the larger picture, the successful functioning of the Trial Court and the proper administration of justice. Second, judges' authority to control and supervise judicial personnel includes inherent authority, independent of statute, *to ensure that . . . probation officers serving in their courts are qualified* and possess the skills and competence to enable them to perform their duties in a professional manner and in conformity with governing statutes, rules, orders, and standards of accountability. Third, any attempt by the Legislature to restrict or nullify this inherent authority would likely be void under art. 30.

*Id.* at 401 (emphasis added).

The SJC did not, however, invalidate the statutes as unconstitutional. Instead, it accepted the narrowing construction offered by the defendants, that the statutes did not render clerks and probation officers "immune" from judicial authority and oversight. *Id.* at 402.[5] As to probation

---

[5] The plaintiffs in the action were judges, who under preexisting law had the authority to hire clerks and probation officers. The judges were not, however, asserting that the legislature could not give the Probation Commissioner any appointment authority whatsoever. As the SJC observed:

> Our task is made easier by the fact that the plaintiffs' claim appears to be limited to the effect of the modifications on a judge's ability to manage, supervise, and control clerks, assistant clerks, and probation officers. Significantly, the plaintiffs do not assert that the scope of inherent judicial power includes the *exclusive* power to select or appoint assistant clerks and probation officers.

officers, the court held:

> We construe the statute to speak solely to channels of administrative authority within the department of probation, and not to the ability of judges to direct and supervise probation officers assigned to their court rooms or promptly to address any misbehavior on the part of such officers.

*Id.* at 406.

> It then stated the following:

> It is important to note here that the CJAM retains substantial authority with regard to the appointment of probation officers. . . . The CJAM . . . retains the power to appoint the commissioner and substantial authority to supervise and direct the performance of all his duties, *including the selection of probation officers.* The CJAM also retains the broad authority stated in G.L. c. 211B, § 9, including superintendence of the administration of the Trial Court and personnel management. As discussed with respect to the appointment of clerks, *it remains entirely within the CJAM's power to establish a set of conditions that the commissioner would be required to follow in the appointment of probation officers, including strict compliance with all aspects of the personnel manual.*

*Id.* at 407 (emphasis added).

> The SJC's analysis ended with an "observation":

> Any disputes involving the authority of the CJAM, Chief Justices, or First Justices over clerks, assistant clerks, or probation officers that may arise in the future will be adjudicated under the narrow interpretation of the challenged statutes set forth in this opinion. In the meantime, the CJAM (in collaboration with First Justices and departmental Chief Justices) is to monitor *and ensure that appointments falling under the statutes are made on their merits in conformity with governing requirements and standards*, and that performance remains subject to the supervision of judges.

*Id.* at 407-08 (emphasis added).

### b.      The *Anzalone* Opinion

In *Anzalone v. Admin. Office of Trial Court*, 457 Mass. 647 (2010), an applicant for a

position as probation officer filed suit against the AOTC and the CJAM, asserting that he had

---

*Id.* at 403 (emphasis added).

been appointed as a probation officer by the Commissioner and then wrongly denied that

appointment by the CJAM.  The Commissioner had appointed the plaintiff as a probation officer

and certified that the appointment accorded with the Trial Court's standards for such

appointments.  The CJAM rejected the appointment because the plaintiff had not listed all of his

relatives currently employed by Probation, in violation of the Personnel Manual's anti-nepotism

guidelines.  *Id.* at 655-57.

The SJC held that the CJAM had no duty to appoint the plaintiff, despite the

Commissioner's certification, and that the Personnel Manual applied to the hiring decision.  *Id.*

at 655-56.[6]  Specifically, the court held:

> The CJAM had no "legal duty" to appoint Anzalone as a probation officer simply
> because the commissioner certified that the appointment met the Trial Court's
> standards for appointment.
>
>  . . .
>
> There is no merit in Anzalone's argument that, on his "appointment" by the
> commissioner, he was no longer a job "applicant" governed by the standards of
> appointment applicable to "aspiring employees," but an "appointee" governed
> only by the Trial Court's personnel standards. . . . Until, and unless, the CJAM
> gave his final written approval that Anzalone was appointed a probation officer,
> Anzalone remained a Trial Court job applicant, subject, as *all* Trial Court job
> applicants must be, to *all* the hiring policies of the Trial Court.

*Id.* (emphasis in original) (footnote omitted).

### 3.    <u>Analysis</u>

It is true that neither *First Justice* nor *Anzalone* addressed the actual legislative

---

[6] Defendants contend that even if the SJC correctly interpreted the law in *Anzalone*, the rule of lenity
counsels that they should not be held criminally responsible for acts prior to the SJC's 2010 decision.  The rule of
lenity, however, is a guide to the interpretation of ambiguous statutes.  *Muscarello v. United States*, 524 U.S. 125,
138 (1998); *United States v. Councilman*, 413 F.3d 67, 83 (1st Cir. 2005) (en banc).  Defendants are actually making
a factual argument, not a legal argument; in substance, they contend that they could not have had the necessary *mens
rea* because they relied on the existence of the statutory language without the benefit of the *Anzalone* interpretation.
That question cannot be resolved on a motion to dismiss.

enactments at issue here—that is, the legislative enactments each year from 2001 to 2011

purporting to grant "exclusive" authority to the Commissioner to appoint probation officers.

There is, accordingly, no case holding directly that those provisions must be narrowly construed

or are unconstitutional.  Nonetheless, the principles enunciated by the SJC leave no room for

doubt:  under Massachusetts law, the CJAM retains ultimate authority over hiring in the

Probation Department, no matter how the legislature attempts to eliminate or curb that authority.

As a matter of Massachusetts law, therefore, the Commissioner of Probation did *not*, during the

relevant time, have "exclusive" authority to hire Probation officers.

 Consistent with *First Justice*, it is possible to read the annual budget enactments

narrowly.  Indeed, the government contends that a distinction can be drawn between the

authority to "appoint" (that is, the enactments granted the Commissioner exclusive power to

"appoint" probation officers) and the authority to "hire" (which ultimately remains with the

CJAM).  But it is not necessary to decide that issue.  Whether the Massachusetts courts would

construe the disputed enactments narrowly, or declare them unconstitutional, the result is the

same:  the CJAM has inherent authority to approve or disapprove the hiring of probation

officers.

 The government also notes that "[t]he practice of the Probation Department since the

decision in *First Justice* has been consistent with the SJC's holding, a clear indication that the

defendants understood that the CJAM had the authority to approve or disapprove any permanent

appointment."  Govt. Mem. at 9.  It argues that "if their claims were true, the defendants engaged

in a systemic and pervasive rigged hiring scheme and concealed it from the CJAM for no

reason."  *Id.* at 6.  That may well be true, but that is a question of evidence, not state law.  For

present purposes, it is enough to conclude that the enactments on which defendants rely do not,

as a matter of law, give exclusive hiring authority to the Commissioner.[7]

In summary, defendants' arguments that they did not commit, or could not have committed, the crimes charged in the indictment because the Commissioner was not required to seek approval of the CJAM before hiring probation officers must be rejected. To the extent defendants' motion to dismiss is premised on that assumption, it will be denied.

### B.  **Mail Fraud**

The indictment charges ten counts of mail fraud, all of which are also charged as racketeering acts. It also charges an additional twelve acts of mail fraud as racketeering acts, but not as substantive mail fraud violations.

Mail fraud, under 18 U.S.C. § 1341, is "(1) the devising or attempting to devise a scheme or artifice to defraud; (2) the knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme." *United States v. Pimental*, 380 F.3d 575, 584 (1st Cir. 2004). Violations of these sections can serve as predicate acts for a racketeering charge. *See* 18 U.S.C. § 1962*; Nystedt v. Nigro*, 700 F.3d 25, 29 (1st Cir. 2012).

Defendants contend that the indictment does not allege facts sufficient to establish all of the elements of mail fraud. Specifically, defendants contend that the indictment does not allege (1) any mailings "in furtherance of" the scheme to defraud, (2) any material representations, (3) any false statements, or (4) any deprivation of tangible property.

---

[7] That conclusion does not necessarily render those enactments irrelevant as a factual matter. For example, if defendant contends that he relied on the existence of the annual budget enactments, and therefore did not have the necessary *mens rea*, the fact of the enactments may be relevant even if their legal significance is limited. Again, such issues cannot be resolved on a motion to dismiss.

1.      **Mailings "in Furtherance of" the Scheme**

In order to prove the crime of mail fraud, the government must prove that the defendant
(1) caused the use of the mails (2) for the purpose, or in furtherance of, executing the scheme to
defraud. *United States v. Hebshie*, 549 F.3d 30, 36 (1st Cir. 2008). The "in furtherance"
requirement "is to be broadly read and applied." *Id.* The mailings need not be an essential part
of the scheme, but may be merely "incident to an essential part of the scheme." *Id.* However,
"the scheme's completion or the prevention of its detection must have depended in some way on
the mailings." *Id.* Mailings that are intended to "'lull the victims into a false sense of security,
postpone their ultimate complaint to the authorities, and therefore make the apprehension of the
defendant[] less likely' . . . are sufficient under the statute." *Pimental*, 380 F.3d at 587-88
(quoting *United States v. Lane*, 474 U.S. 438, 451–52 (1986)).

The indictment alleges a fraudulent hiring scheme that occurred "between 2000 and
2010." 2d Sup. Ind. at 12-13, ¶ 3. It alleges that in the course of the scheme, and in furtherance
of it, rejection letters were mailed to unsuccessful candidates. Defendants contend that those
letters cannot be in furtherance of the scheme, because they constitute merely "ministerial or
administrative" communications mailed after the scheme had achieved its alleged goal—that is,
the hiring of the politically-connected candidates. Def. Mem. at 28. In particular, defendants
cite to the Personnel Manual, which states that rejection letters "should be sent after the receipt
of the letter from the [CJAM] approving the appointment of the successful candidate."
Personnel Manual § 4.301(E). Defendants argue that the mailings were thus unnecessary to
bring the scheme to fruition.

It is true, as a general proposition, that a mailing made after a scheme has reached
fruition is not a mailing "in furtherance of" a fraud and cannot support a mail fraud prosecution.

*See, e.g.*, *Maze v. United States*, 414 U.S. 395, 402 (1974); *Parr v. United States*, 363 U.S. 370, 393 (1960); *Kann v. United States*, 323 U.S. 88, 94-95 (1944).  But it is also true that courts have held that rejection letters sent to unsuccessful applicants as part of a fraudulent hiring scheme, or unsuccessful bidders as part of a fraudulent bid-rigging scheme, were "in furtherance of" those schemes.  *See, e.g.*, *United States v. Sorich*, 523 F.3d 702, 714 (7th Cir. 2008) (rejection letter sent to unsuccessful candidates as part of fraudulent hiring scheme to perpetuate patronage hiring in city government was "in furtherance of" the scheme because the letter was sent at a time when "the overall hiring scheme continued, and . . . [the letter] lent a false air of propriety and regularity to the city's hiring process"); *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002) (rejection letter sent to unsuccessful bidder as part of fraudulent bid-rigging scheme was "in furtherance of" the scheme "by falsely portraying to anyone who examined . . . [the] records that the bids submitted were legitimate, thereby concealing the true nature of the scheme").

Here, the indictment alleges an ongoing scheme that occurred over a period of at least ten years, with multiple instances of fraudulent hiring.  As the government notes:

> The sham hiring system was essential to the longevity and continuity of the alleged hiring scheme.  The rejection letters—all of which were mailed within the time frame of the alleged hiring scheme—assisted the defendants in creating that sham hiring system.

Govt. Mem. at 15.  Thus, the rejection letters, like those in *Sorich*, allegedly "lent a false air of propriety and regularity . . . to the hiring process."  Presumably, where the scheme extended over a lengthy period of time, it was particularly important to maintain the facade of a merit-based system.  Accordingly, the rejection letters may support an indictment alleging mail fraud under § 1341, and the indictment will not be dismissed for failure to allege a mailing "in furtherance of"

the scheme.

## 2.    Misrepresentation of a Material Fact

Defendants next contend that the indictment fails to charge a scheme to defraud that included a "misrepresentation or concealment of material fact." *Neder v. United States*, 527 U.S. 1, 22-25 (1999).  The indictment charges that the misrepresentations consisted of the false certifications by O'Brien to the CJAM that the individuals in question were hired on the basis of merit, as required by the Personnel Manual.  Again, defendants contend that because the Commissioner had "exclusive authority" by statute to hire probation officers, he was not required to follow the Personnel Manual or make the certifications to the CJAM; therefore, they contend, the certifications, even if false, were not material.

For the reasons stated above, the underlying premise of that argument is incorrect:  the Commissioner did not have exclusive authority to hire probation officers, and the approval of the CJAM was indeed required.  The indictment therefore charges material misrepresentations within the meaning of the mail fraud statute.

## 3.    Truth of the Certifications

Defendants also contend that the certifications to the CJAM were not false, but factually true, and therefore cannot form the basis of a mail fraud charge.[8]  Defendants' argument is somewhat convoluted, but may be summarized as follows.

The indictment charges that the certifications made by the Commissioner to the CJAM were false, in that the certifications falsely stated that the candidate for employment "had been hired pursuant to the procedures mandated by the [Personnel] Manual."  2d Sup. Ind. at 8, ¶

---

[8] Both defendants and the government appear to assume that the Trial Court Manual is a state regulation that this Court should interpret as a matter of law.

18(e).  Defendants contend, however, that:

> [T]he certification does not aver that the Commissioner complied with or even considered the [Personnel] Manual, much less the hortatory language in the Manual about 'merit' hiring.  Instead, it simply avers that the Commissioner complied with the Trial Court '*personnel standards*.'  This reference to 'personnel standards,' a commonplace human resources term of art, does not encompass the entire [Personnel] Manual.

Def. Mem. at 31.  Defendants contend that the "'personnel standards' of the Trial Court are administrative requirements of the hiring process; they relate to human resources record keeping and to ensuring that the chosen candidate is eligible to work in the United States and does not have a criminal record," and that therefore the Commissioner did not certify that he had followed the Personnel Manual in all respects or that he hired candidates based on merit.  Def. Mem. at 32.

> The relevant portion of the Personnel Manual states as follows:

> Upon selecting a final candidate to fill a position on a permanent basis, the appointing authority must certify compliance with the personnel standards of this section, must certify that sufficient funding is available in the current fiscal year budget to support the position, and must submit the following material to the Human Resources Department:  1. the Appointment Documentation form . . . 2. the Applicant Interview and Hiring Record . . . 3. the Applicant Flow Record . . . 4. a copy of the application of the final candidate and the applications of all who were interviewed . . . 5. a copy of the notice of vacancy; 6. the Jobs Hot Line Confirmation Letter . . . 7. the Employment Eligibility verification Form 1-9 . . . 8. the Consent to Criminal Record Check.

Personnel Manual, §4.400(A).

Both parties agree that the reference to "personnel standards" in §4.400(A) "does not encompass [every standard in] the entire [Personnel] Manual."  Def. Mem. at 31; *see* Govt. Mem. at 18.  Rather, it applies to "the personnel standards of this section" of the Manual.  And it is clear that the term "section" as used in subsection 4.400 refers to the (larger) section of which it is a (smaller) subsection—that is, it refers to section 4.000 of the Manual.  Section 4.000 sets

forth "personnel standards" for the Trial Court.  It provides that "the objective of the hiring

process is to select the most qualified individuals."  The section goes on to state:  "It is the policy

of the Trial Court that all appointments be made solely on the basis of merit.  The practice and

appearance of nepotism or favoritism in the hiring process are to be avoided."  *See id.* § 4.304.

Furthermore, the language of § 4.400(A) makes clear that the certification requirements

are separate, and in addition to, the requirement to assemble and submit the correct hiring

documentation.  That subsection states that, upon selecting a final candidate for the Probation

Department, the Commissioner must *both* certify compliance with the personnel standards of

Section 4.000 of the Personnel Manual *and* submit various hiring-related documents to the

CJAM for approval.  The fact that the Manual requires both certification and submission of

hiring-related documents indicates that the requirements are different.  Otherwise, the language

would be redundant.  *See United States v. Holmquist*, 36 F.3d 154, 160 (1st Cir. 1994) ("[N]o

construction [of a statute] should be adopted which would render statutory words or phrases

meaningless, redundant or superfluous.").

Accordingly, a certification that the appointment was made in compliance "with the

personnel standards of this section" is a certification that the appointment was made "solely on

the basis of merit."  Whether the phrase "personnel standards" has some other meaning, in other

contexts, is irrelevant.  The indictment therefore charges a false or fraudulent statement within

the requirements of the mail fraud statute, and will not be dismissed on that basis.

### 4. <u>Money or Property</u>

Next, defendants contend that the indictment fails to allege a mail fraud violation because

it does not allege a scheme to defraud anyone of "tangible property."  Def. Mem. at 33.  The

indictment alleges that "the defendants obtained money and property, to wit, jobs and salaries for

individuals who were not the most qualified candidates."   2d Sup. Ind. at 12-13, ¶ 3.  According to defendants, (1) "'jobs and salaries' were not obtained as a result of the alleged scheme," and (2) "any such deprivation does not involve a tangible right to money or property."  Def. Mem. at 33.

Defendants' first argument is based on the premise that Probation had already "obtained" funding for the jobs in question at the time of the alleged fraud, and that the alleged fraud simply involved the "allocation" of those previously-obtained jobs to particular individuals.  Def. Mem. at 34.  That argument mischaracterizes the indictment.  It does not charge that defendants obtained "jobs and salaries," but rather "jobs and salaries for individuals who were not the most qualified candidates."  It is well-settled that a scheme to obtain jobs or promotions to persons who are not qualified, or not the most qualified, can constitute a scheme to obtain money or property under the mail fraud statute.  *See United States v. Doherty*, 867 F.2d 47, 55-56 (1st Cir. 1989) (defendants illegally assisted others to obtain appointments to or promotions within police departments under a merit-based civil service system); *United States v. Sorich*, 523 F.3d 702, 712-13 (7th Cir. 2008) (defendants set up a "false hiring bureaucracy" by providing city jobs to politically sponsored candidates who were not necessarily the most qualified; "the city paid for, and was cheated out of, qualified civil servants"); *see also United States v. Leahy*, 464 F.3d 773, 786-89 (7th Cir. 2006) (defendants misrepresented their status as owners of minority-owned businesses); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990) (defendant fraudulently obtained bus driver's permit and position as a bus driver).

Defendants' second argument is that the indictment does not sufficiently allege that "anyone was deprived of tangible property."  Def. Mem. at 34.  As an initial matter, defendants incorrectly assert that the mail fraud statute requires that the object of the scheme be "tangible"

property.  That is not the law.  While the mail fraud statute requires proof of a scheme to obtain

money or property, the term "property" can include either tangible or intangible property.  *See,*

*e.g.*, *Carpenter v. United States*, 484 U.S. 19, 25 (1987) (mail fraud statute covers intangible

property, such as confidential business information).  Furthermore, it is well-established that jobs

and salaries for persons who otherwise would not have been hired or promoted can constitute

"money or property" within the meaning of the mail fraud statute.  *See, e.g.*, *Sorich*, 523 F.3d at

713 (jobs and salaries in political patronage scheme); *Granberry*, 908 F.2d at 280 (job as bus

driver); *Doherty*,  867 F.2d at 56 (promotions based on scheme to steal examinations).

In summary, the indictment will not be dismissed for failure to charge violations of the

mail-fraud statute.

### C.    **Bribery**

Counts 14 through 19 charge that defendants committed bribery concerning programs

receiving federal funds in violation of 18 U.S.C. § 666(a)(2) in connection with the alleged

hiring scheme.  Count 13 charges conspiracy to commit those acts of bribery in violation of 18

U.S.C. § 371.  Counts 20 through 30 charge O'Brien alone with violations of § 666(a)(2) in

connection with 11 of the alleged ELMO appointments.

Section 666, in relevant part, provides as follows:

(a)  Whoever, if the circumstance described in subsection (b) of this section
exists –
            . . .

(2)  corruptly gives, offers, or agrees to give anything of value to any
person, with intent to influence or reward an agent of an organization or of
a State . . . government, or any agency thereof, in connection with any
business, transaction, or series of transactions of such organization,
government, or agency involving anything of value of $5,000 or more;

shall be [guilty of an offense].

(b)  The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

> 1.     **"Bribe" Element**

Defendants first contend that the federal bribery allegations should be dismissed on the ground that the alleged bribes were the payment of *bona fide* salaries to probation officers who performed work in return for their pay.

One of the elements that the government must prove under § 666 is that a bribe was paid—more specifically, that "anything of value" was given to a person "with intent to influence or reward" that person.  *See generally United States v. Fernandez*, 722 F.3d 1, 22-27 (1st Cir. 2013).  The phrase "anything of value" is construed broadly, and includes intangible rights and benefits.  *See United States v. Robinson*, 663 F.3d 265, 274 (7th Cir. 2011); *United States v. Townsend*, 630 F.3d 1003, 1011 (11th Cir. 2011).

Defendants rely on an exception to the bribery statute, set forth in § 666(c).  That section provides that "[t]his section does not apply to *bona fide* salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business."  18 U.S.C. § 666(c).  Congress enacted that provision in order to avoid the section's "possible application to acceptable commercial and business practices."  *United States v. Cornier-Ortiz*, 361 F.3d 29, 33 (1st Cir. 2004) (quoting H.R. Rep. No. 99-797, at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153).  Generally, whether wages are "*bona fide*" and paid "in the usual course of business" are questions of fact for the jury.  *United States v. Dwyer*, 238 F. Appx. 631, 647-48 (1st Cir. 2007) (unpublished); *see Cornier-Ortiz*, 361 F.3d at 36.

 Defendants contend that the alleged bribes here fall within the exception set forth in

§ 666(c), because the probation officers were paid salaries and performed work in the ordinary course.  That argument is based largely on the decision of the Sixth Circuit in *United States v. Mills*, 140 F.3d 630 (6th Cir. 1998).  In *Mills*, two members of a county sheriff's department sought money from various individuals in return for a promise that they would hire the individuals as deputy sheriffs.  The defendants provided jobs as deputies to individuals who paid the bribes, and those individuals performed work as deputy sheriffs, for which they were paid salaries.  The government argued, among other things, that the salaries paid to the deputies "could not have been bona fide because of the illegal nature of the employment procurement process," and that therefore the exception in § 666(c) did not apply.  *Id.* at 633. The Sixth Circuit held, however, that in the absence of allegations that the jobs were unnecessary or that the individuals hired did not "responsibly fulfill" their duties, the exception applied.  *Id.* at 633-34. Although the court's reasoning in that respect is not entirely clear, it appears that it concluded that (1) *bona fide* salaries cannot be used to prove the requirement under the statute that the defendant paid a bribe (that is, a "thing of value") and (2) the statute does not apply where the object of the bribery scheme is an employment position that pays a *bona fide* salary.  *Id*. at 634.

There is no dispute that the exception set forth in § 666(c) applies generally to the "bribe" element of the statute.  *See, e.g.*, *Robinson*, 663 F.3d at 272.  The difficulty, if any, lies in its application.  Clearly, the exception does not apply where a defendant receives payment despite performing no work, such as a scheme to create no-show jobs.  *See, e.g.*, *Dwyer*, 238 Fed. Appx. at 647-48.  Just as clearly, the exception applies to wages and salaries paid in the ordinary course, such as where a part-time state legislator is paid a salary by a private employer to perform normal job duties.  *See Robinson*, 663 F.3d at 272 ("[c]ompensation paid in the ordinary course shall not be construed as a bribe.").  The *Mills* decision, however, sweeps

broadly, and seems to suggest that legitimate salary payments can never be an object of a bribery scheme.  Among other things, such a reading would mean that § 666 would not apply where a bribe was paid to obtain an otherwise-legitimate job (as the *Mills* court indeed held).  And it likewise would not apply where a bribe was paid to obtain any benefit that included the payment of legitimate salaries—such as a contract under which individuals would be paid salaries and wage to perform legitimate work.  Under that reading, for example, a $10,000 bribe paid to obtain a $10 million consulting contract would not fall within the statute if the contract involved the payment of legitimate salaries for legitimate work.  Nothing in the language of the statute appears to require such a counterintuitive result.

Although the First Circuit has not addressed that precise issue, it has addressed an analogous issue in a case involving a charge of misapplication of funds under 18 U.S.C. § 666(a)(1)(A).  In *Cornier-Ortiz*, the court concluded that payments made for a legitimate purpose, for work that was indeed performed, are not necessarily *bona fide* within the meaning of § 666(c).  361 F.3d at 36.  The payments in question were part of a scheme to misuse federal housing funds in violation, among other things, of conflict-of-interest rules.  As to the applicability of the exception, the court found that "[t]he jury could easily have concluded" that the payments "were not bona fide because the [relevant] conflict of interest rules prohibited [the recipient] from participating in such a scheme."  *Id.*  It went on to note:

> A scheme designed to evade conflict of interest rules is hardly legitimate or acceptable.  That the payments were made for a legitimate purpose— to hire [an expert] to obtain funding for maintenance work that was indeed done—does not render them bona fide under the statute if they were intentionally misapplied, as they were here via sham contracts that skirted conflict of interest rules and allowed [defendant's company] to receive preferential treatment and other benefits.

*Id.*  It thus appears that the First Circuit disagrees, at least implicitly, with the reasoning in *Mills*.

In any event, the indictment in this case alleges a scheme that is different from the one in *Mills*.  The salaries of the individual probation officers are not alleged to be the bribes.  Nor are those individuals alleged to have paid bribes in order to get their jobs.  Instead, the indictment alleges that the "things of value"—that is, the bribes—that were given to state legislators were the opportunity to fill probation positions, to which those legislators were not legitimately entitled.  The fact that the probation officer openings actually existed, that individuals were hired to fill those positions, and that those officers were paid salaries for work performed, does not trigger the application of § 666(c); again, the bribe was the opportunity to fill the positions (which went to the legislators), not the salary paid for the positions (which went to other persons).   Accordingly, the indictment will not be dismissed for failure to allege the payment of a "thing of value" within the meaning of the federal bribery statute.

### 2.      Transactional Element

Defendants next contend that the indictment does not sufficiently allege the "transactional element" of 18 U.S.C. § 666.  To fall within the scope of § 666, the bribe must be made "in connection with any business, transaction, or series of transactions of [the covered] organization, government, or agency involving anything of value of $5,000 or more."  18 U.S.C. § 666(a)(2).  The $5,000 requirement "refers to the value of the 'business, transaction, or series of transactions,' not the value of the bribe." *Fernandez*, 722 F.3d at 13 (citation omitted).[9]

Again citing *Mills*, defendants contend that the salaries of the probation employees cannot fulfill the $5,000 transactional element, because those payments are *bona fide* salaries

---

[9] In *Fernandez*, the defendant bribed two state senators for their support of legislation important to his armored car business.  Although the total value of the bribes fell below the $5,000, the court held that the transactional requirement was satisfied by the potential benefit defendant's business would receive under the legislation, which amounted to millions of dollars.  722 F.3d at 12-15.

within the meaning of § 666(c).          The government contends that "the subject matter of the

bribe is the budget of the probation department and related legislation."  Govt. Mem. at 33.

Although the government does not provide a precise number, it notes that Probation "operated

with a multi million dollar budget" and that the defendants intended that the jobs provided

"would have a direct and foreseeable effect on the budget and growth of the probation

department."  *Id.*[10]

       In *Mills*, the Sixth Circuit held that the *bona fide* salary exception of § 666(c) applied to

the transactional element (as well as to the bribe element, as noted above).  140 F.3d at 633.

Thus, it held that the "values of the allegedly illegal transactions are not the salaries to be paid to

deputy sheriffs for actual performance of necessary governmental duties," but instead the value

of the transaction must be measured by the amount of the bribe.  *Id.*

       No other circuit has followed *Mills* in that respect, and its conclusions have been the

subject of some criticism.  *See, e.g.*, *Robinson*, 663 F.3d at 272 (holding that the exception set

forth in § 666(c) did not apply to the transactional element and stating that "[t]he Sixth Circuit's

reading of § 666(c) in *Mills* is hard to square with the statutory text").  As the *Robinson* court

explained:

> The natural reading of the exception is that § 666 does not target bona fide salary,
> wages, and compensation; that is, compensation paid in the ordinary course shall
> not be construed as a bribe. There is nothing in the text of § 666(c) to suggest that
> it applies more broadly to the other elements of the offense.  More to the point
> here, there is nothing in § 666(c) to suggest that bona fide salary and other
> compensation is inadmissible to prove the value of the "business" or "transaction"
> that the bribe-giver or bribe-taker sought to influence.

*Id.*; *see also United States v. Marmolejo*, 89 F.3d 1185, 1190 n.5 (5th Cir. 1996) (noting that the

---

[10]  Defendants further contend that the Probation budget cannot satisfy the transactional element because
"[t]he indictment does not allege that the hiring of the specified probation officers was tied to any particular
legislative action."  Def. Mem. at 47.  That issue is addressed in the subsequent section.

§ 666(c) exception "refers to the alleged wrongdoing," that is, the bribe, and collecting cases).

This Court will likewise decline to follow *Mills*. The exception set forth in § 666(c) does not apply to the transactional element, and accordingly the indictment here clearly satisfies that element. The subject matter of the bribe is sufficiently alleged to exceed $5,000, and the indictment will not be dismissed on that basis.

### 3. The Requirement of a *Quid Pro Quo*

Defendants also contend that the bribery charges under § 666 must be dismissed for failure to allege a *quid pro quo* as required by the statute.

As a general matter, federal criminal statutes draw a distinction between bribery and illegal gratuities. In *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999), a case involving alleged violations of 18 U.S.C. § 201(c)(1)(A), the Supreme Court described the difference:

> The distinguishing feature of each crime is its intent element. Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be a *quid pro quo* — a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

526 U.S. at 404-05.[11]

---

[11] Generally, 18 U.S.C. § 201 addresses bribes and gratuities paid to federal officials and 18 U.S.C. § 666 addresses bribes and gratuities paid to state and local officials. *See Fernandez*, 722 F.3d at 20-21 (discussing the legislative history of § 666). Although not identical, the sections are largely similar; the First Circuit has called § 666 "the stepchild" of § 201. *Id.* at 20. In 1984, while a case was pending before the Supreme Court that presented the question of whether § 201 applied to state and local officials, Congress enacted § 666 as part of the Comprehensive Crime Control Act. *Id.* at 21. The language of § 666 initially paralleled that of § 201's gratuity provision, but was amended in 1986 to be "much closer" to § 201's bribery provision. *Id.* at 22. Because of that close historical and linguistic relationship, courts have looked to caselaw regarding both sections in interpreting either. *See, e.g., Fernandez*, 722 F.3d 1; *Ganim*, 510 F.3d 134; *United States v. Jennings*, 160 F.3d 1006 (7th Cir. 1998).

In order to prove a bribery offense under § 666, the government must prove that the bribe-giver intended to effect a *quid pro quo*.  *See Fernandez*, 722 F.3d at 19; *United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993) (noting in a § 666 case that "[t]he essential difference between a bribe and an illegal gratuity is the intention of the bribe-giver to effect a *quid pro quo*"); *see also United States v. Ganim*, 510 F.3d 134, 148 (2d Cir. 2007).  Although the language in § 201 and § 666 differ somewhat, it appears that both statutes require an "exchange"—that is, a payment for an official act, or course of action, such as a particular vote on a particular piece of legislation.  *See Fernandez*, 722 F.3d at 22-24; *Jennings*, 160 F.3d at 1019.

Although the government must prove a *quid pro quo* involving specific official action, there need not be an item-by-item correlation of each bribe with each act.  *See United States v. McDonough*, 727 F.3d 143, 152 (1st Cir. 2013) (noting that an agreement under § 201 "need not be tied to a specific act by the recipient").  As the Fourth Circuit has stated:

> [T]he government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions).  Bribery requires the intent to effect an exchange of money (or gifts) for specific official action (or inaction), but each payment need not be correlated with a specific official act.  Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action.  In other words, the intended exchange in bribery can be "this for these" or "these for these," not just "this for that."  Further, it is not necessary for the government to prove that the payor intended to induce the official to perform a set number of official acts in return for the payments.  The quid pro quo requirement is satisfied so long as the evidence shows a "course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor."

*Jennings*, 160 F.3d at 1014 (citations omitted); *see McDonough*, 727 F.3d at 152-53 ("It is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose" (quoting *United States v. Terry*, 707 F.3d 607, 612

28

(6th Cir. 2013)); *McDonough*, 727 F.3d at 154 ("[B]ribery can be accomplished through an

ongoing course of conduct, so long as the evidence shows that the 'favors and gifts flowing to a

public official [are] *in exchange for* a pattern of official acts favorable to the donor" (quoting

*Ganim*, 510 F.3d at 149 (emphasis in original)).

Not all payments seeking favor, however, qualify as bribes under § 666.  In *Sun-*

*Diamond*, the Supreme Court held that payments made merely to "build a reservoir of good will

that might ultimately affect one or more of a multitude of unspecified acts, now and in the

future," or "buy[ing] favor," are not enough to sustain a conviction under the gratuity statute.

*Sun-Diamond*, 526 U.S. at 405 (addressing scope of federal gratuity statute, § 201(c)(1)(A)).

Because *Sun-Diamond* was interpreting the statutory language in § 201, rather than the

somewhat different language in § 666, it is unclear whether that limitation applies precisely to

the latter statute.  *See Ganim*, 510 F.3d at 146-47.[12]  Nonetheless, it appears clear that an

exchange must be contemplated, and that mere proof of an intent to cultivate a political

relationship, or to express gratitude, without more, is insufficient.  *See McDonough*, 727 F.3d at

157.

Defendants contend that the indictment fails to allege a *quid pro quo* sufficient to satisfy

the requirements of the bribery statute.  According to defendants,

The indictment alleges that the defendants gave jobs and salaries to applicants

---

[12] As then-Judge Sotomayor observed in *Ganim*:

> [T]here is good reason to limit *Sun–Diamond's* holding to the statute at issue in that case, as it was the very text of the illegal gratuity statute—'for or because of any official act'—that led the Court to its conclusion that a direct nexus was required to sustain a conviction under § 201(c)(1)(A). . . . Neither the Hobbs Act provision under which Ganim was convicted, 18 U.S.C. § 1951, nor any other of the bribery-related statutes at issue [including § 666] contain the same express statutory requirement.

510 F.3d at 146.

"sponsored" by legislators "to influence those members of the legislature who were in a position to affect the defendants through legislation, budget authorization, and in other ways."  2d Sup. Ind. at 33.  Significantly, the government does not allege that the hiring and payment of the specified probation officers represented an exchange for an official act, such as a particular vote on a particular bill.  Recognizing acts that the legislators took in the past or may take in the future does not amount to a *quid pro quo*.

Def. Mem. at 51.

The government, in response, contends that the indictment alleges a *quid pro quo* "no less than a dozen times."  Govt. Mem. at 37.  It cites two specific examples:

To maintain their positions within the enterprise, to increase the budget and resources of the enterprise, to gain tighter control over the conduct of the enterprise, and to aggrandize power to themselves, the defendants and their co-conspirators *sought to curry favor* with members of the Massachusetts legislature and others who were in a position to impact the enterprise through legislation, budget authorizations, and in other ways, by instituting a rigged hiring system that catered to requests from state legislators and others to employ and promote candidates for employment with the enterprise.

Through hiring and promoting individuals who were sponsored by members of the Massachusetts legislature, while also maintaining the facade of a merit-based hiring system, the defendants and their coconspirators *sought to influence legislators to increase the conspirators' ability to obtain favorable votes on their budget requests and other interests.*

2d Sup. Ind. at 7,  ¶¶ 14, 16 (emphasis added); *see also id.* at 10-11, ¶ 27; *id.* at 20-21, ¶ 29; *id.* at 23, ¶ 31; *id.* at 28, ¶ 51; *id.* at 33, ¶ 2; *id.* at 56, ¶ 2.

Under § 666, it is doubtful that the government could sustain its burden simply by proving an intent to "curry favor" with members of the Massachusetts legislature, as charged in paragraph 14 of the indictment.  The indictment goes further, however, and charges that defendants sought, among other things, "to influence legislators" to obtain "favorable votes on their budget requests."  *Id.* at 7, ¶ 16.  While the precise details are not set out in the indictment, it clearly charges that defendants had the intent to pay bribes in exchange for a pattern of official

acts favorable to them.  *See McDonough*, 727 F.3d at 154.

That language is sufficient to charge a *quid pro quo* as required by the bribery statute.

Whether, of course, the government's proof is sufficient to show the necessary intent is not a

question that can be resolved without trial of the underlying case.

### D.     State Bribery and Gratuity Allegations

The indictment further charges that 40 of the alleged acts of bribery also violated Mass.

Gen. Laws ch. 268A, §§ 2(a)(1) and 3(a), the state bribery and gratuity statutes.  Those

violations are charged as predicate acts to the racketeering charge.  Defendants contend that the

indictment does not adequately charge violations of the Massachusetts bribery and gratuity

statutes, on the ground that there is no link alleged between any promised "thing of value" and

any official act.  Specifically, defendants argue that

> the indictment identifies no specific legislative act that these legislators took or
> that the defendants hoped they would take.  . . . These general statements that
> Probation hired 'sponsored' candidates to curry favor with the legislators do not
> suffice to allege a *quid pro quo* or the required linkage between the thing of value
> and the hoped-for official act.

Def. Mem. at 53.

The Massachusetts bribery statute, Mass. Gen. Laws ch. 268A, § 2(a)(1), provides in

relevant part as follows:

> (a) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value
> to any state . . . employee, . . . or who offers or promises any such employee . . . to give
> anything of value to any other person or entity, with intent
>
> (1) to influence any official act or act within the official responsibility of such employee
>  . . .
>
> [shall be guilty of an offense].

The Massachusetts gratuity statute, Mass. Gen. Laws ch. 268A, § 3(a), provides in

relevant part as follows:

> (a) Whoever otherwise than as provided by law for the proper discharge of official duty, directly or indirectly, gives, offers or promises anything of substantial value to any present or former state . . . employee . . . for or because of any official act performed or to be performed by such an employee . . .

[shall be guilty of an offense].

The Massachusetts bribery statute, like its federal counterparts, requires a *quid pro quo*, in which the giver corruptly intends to influence an official act through a "gift" and that "gift" motivates an official to perform an official act. "In effect, what is contemplated is an exchange, involving a two-way nexus." *Scaccia v. State Ethics Comm'n*, 431 Mass. 351, 356 (2000).

The gratuity statute is, essentially, a lesser-included offense of the bribery statute. *Id.* It prohibits the giving of an item of "substantial value" to an official "for or because of any official act performed" by the official. *Id.* at 354. The government must "prove a link between a thing of value conferred upon a public official and a specific 'official act' [or act within the official responsibility of the defendant] for or because of which it was given." *Id.* at 355 (quoting *Sun-Diamond*, 526 U.S. at 414).[13] However, the gratuity statute does not require a finding of corrupt intent—that is, an improper intent to influence official decision-making. Rather, the intent to "reward" an official for an act taken in the past, or to be taken in the future, is sufficient. *United States v. Sawyer*, 85 F.3d 713, 730 (1996). An illegal gratuity can be provided to an official as a reward for past action, to influence an official regarding a present action, or to induce an official to undertake a future action. "Only a one-way nexus need be established for a gratuity violation." *Scaccia*, 431 Mass. at 356. In *Scaccia*, the court stated:

> Certainly, a lobbyist's cultivation of friendship with legislators is legitimate and

---

[13] The Massachusetts gratuity statute was enacted into law before the federal gratuity statute, but "it is very similar to the Federal statute." *Scaccia*, 431 Mass. at 354; *see also Sawyer*, 85 F.3d at 736.

> lawful.  But when that cultivation involves hospitality or other gift giving above the permissible amount, it becomes suspect.  Coupled with an intent that the gift influence a specific act, or, in the case of the recipient, when those gifts have an influence on an official act or constitute a reward for official acts already undertaken, such gifts constitute a violation of the gratuity statute.

*Id.*; *see also Sawyer*, 85 F.3d at 741.

The indictment here satisfies the requirements of the state bribery and gratuity statutes. As addressed in the context of § 666, the indictment alleges a *quid pro quo* in which O'Brien corruptly gave things of value (opportunities to fill positions) to state employees (legislators) in return for official acts (favorable action on appropriations and other legislative acts).  2d Sup. Ind. at 20-21, ¶ 29; *id.* at 28, ¶ 51; *see also* 2d Sup. Ind. at 7,  ¶¶ 14, 16.  And a *quid pro quo* is not required for a gratuity violation, merely a linkage.  The allegations of the indictment are therefore sufficient to establish the required nexus for both statutes.  2d Sup. Ind. at 29, ¶ 52; *id.* at 22, ¶ 30.

Accordingly, the indictment adequately states the elements of the predicate state bribery and gratuity offenses, and will not be dismissed.

### E.     Vagueness and Rule of Lenity

In addition to their specific arguments as to particular charges in the indictment, defendants contend more generally that this case should never have been brought and in fairness ought to be dismissed.  Among other things, defendants argue that the charging statutes are unduly vague, and that therefore they were not put on notice their actions might constitute federal crimes; that the expansive interpretation of federal criminal statutes has led to improper overreaching by the federal government into the political affairs of the state government; and that upholding the indictment, at best, requires a series of close-call judgments in unsettled areas of the law, and that dismissal is therefore required.  *See, e.g.*, Def. Mem. at 57.

Those arguments are by no means frivolous.  The mail-fraud and bribery statutes, in particular, are far-reaching and somewhat protean, and the federal courts have struggled for decades with the questions of whether those statutes, as applied in particular contexts, are ambiguous or overbroad.  *See, e.g.*, *Fernandez*, 722 F.3d at 39-40 (Howard, J., concurring in part) (expressing concern as to ambiguity of bribery statute); *United States v. Czubinski*, 106 F.3d 1069, 1079 (1st Cir. 1997) (reversing conviction and noting that the "broad language" of the mail and wire fraud statutes might "be used to prosecute kinds of behavior that, albeit offensive to the morals or aesthetics of federal prosecutors, cannot reasonably be expected by the instigators to form the basis of a federal felony"); *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007) (reversing conviction and expressing concern as to ambiguity and overbreadth of bribery and mail-fraud statutes); *see also Skilling v. United States*, 130 S. Ct. 2896, 2935-41 (2010) (Scalia, J., concurring) (expressing concern as to vagueness of "honest services" mail-fraud statute).

Here, defendants contend that "[a]ny application of the alleged conduct to the criminal charges alleged should be rejected under the rule of lenity and vagueness doctrines."  Def. Mem. at 57.  *See Skilling*, 130 S.Ct. at 2927-28 (stating that a criminal statute is unconstitutionally vague where it does not define the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement" (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)); *id.* at 2932 (stating that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity" (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)).  Defendants note that "[i]n particular, given the repeated statements by the Massachusetts legislature that the Commissioner had exclusive hiring authority, the defendants could not have known that they

34

were required to conduct hiring in any particular way, and certainly could not have anticipated that they could be subject to federal criminal prosecution for their failure to do so." *Id.*

To the extent that defendants raise questions of law, based solely on the charging language in the indictment, the motion to dismiss on grounds of vagueness and the rule of lenity will be denied. As set forth above in some detail, the indictment is valid on its face, and the theory of prosecution has substantial support in the case law. To the extent that defendants raise issues that turn, even in part, on the evidence, those issues cannot properly be resolved on a motion to dismiss. Whether, for example, defendants "could not have known" that their hiring scheme was illegal is a fact-based question that is dependent on the evidence elicited at the trial. At this stage, at a minimum, dismissal of the indictment on that basis is inappropriate.

Defendants have made two additional arguments that merit discussion. First, they contend that the United States Attorney should not have brought this case as a matter of prosecutorial discretion. *See* Def. Mem. at 48. The short answer to that argument is that the Court's role, at least in the present context, is limited to evaluating whether the indictment properly alleges one or more federal crimes. It is the role of the United States Attorney, not the District Court, to select appropriate targets for prosecution. To the extent that the indictment properly alleges a criminal violation, it will not be dismissed.

Second, defendants have argued, in their motion papers and elsewhere, that the charged behavior—even if true—represented normal political behavior that is not worthy of public condemnation, much less federal prosecution. *See, e.g.*, Def. Mem. at 48 (the charged conduct involves "state officials . . . engaging in politics"); Def. Reply Mem. at 2 (defendants merely engaged in "politics"). At this stage of the proceedings, the government has submitted no evidence and proved no facts; the defendants are presumed innocent. This Court is in no

35

position to pass judgment on their actions.  Nonetheless, the indictment alleges, and the

government presumably expects to prove, that defendants participated in a rigged hiring scheme

extending for more than a decade, involving the use of falsified documents, that resulted in the

repeated rejection of the best-qualified candidates for positions of public trust.  Whether the

government can prove those charges remains to be seen.  But the Court will not dismiss the

indictment based on the assumption that those facts cannot be proved.

**IV.**      **Conclusion**

For the foregoing reasons, the motion to dismiss the indictment is DENIED.

**So Ordered.**


<u>/s/ F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated: January 17, 2014                United States District Judge