IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN J. O'BRIEN, ET AL. | No. 12-CR-40026-FDS |

**SECOND MOTION TO COMPEL PRODUCTION OF EXCULPATORY INFORMATION AND FOR ORDER TO SHOW CAUSE WHY THE GOVERNMENT SHOULD NOT BE SANCTIONED FOR *BRADY* VIOLATIONS AND INACCURATE REPRESENTATIONS TO THE DEFENSE AND THE COURT**

By letter dated November 21, 2012, the defendants requested "[a]ll documents concerning recommendations, including without limitation by members of the legislature, for hiring by departments of the Trial Court other than the Probation Department." [Dkt # 69.] In a court filing on February 4, 2013, the government expressly denied that it had any responsive documents. [Dkt # 87.] In fact, responsive documents do exist, and the government has had them for nearly three years.

In ongoing efforts to review the 11,000-plus pages of documents the government produced starting in late December, the defense has learned that in February 2011, counsel for the Administrative Office of the Trial Court (AOTC) provided to the government at least two documents comprising "sponsor lists" kept by the AOTC pertaining to the hiring of court security officers. Exhibit A (FBI 302 dated 2/23/11, filed under seal pursuant to the protective order). These sponsor lists were directly responsive to defendant's discovery request, and are plainly exculpatory. To date, the government still has not turned them over to the defense.

In light of this inaccurate representation and discovery violations, as detailed below, the defendants respectfully move that the Court: 1) order the government to produce specified

1

materials; 2) continue the trial date to permit further defense investigation; and 3) order the government to show cause why sanctions should not be imposed for *Brady* violations and inaccurate representations.

## **Background**

A twelve-count indictment, returned on March 22, 2012, charged the defendants with violating the RICO and mail fraud statutes. At the time of the charged conduct, O'Brien was the Commissioner of the Massachusetts Probation Service, and Tavares and Burke were Deputy Commissioners. Broadly speaking, the original indictment and superseding indictments that followed charge the defendants with creating a "rigged" hiring system that gave preference to candidates "sponsored" by legislators while falsely representing to the Chief Justice for Administration and Management (CJAM), Robert Mulligan, that the "most qualified" candidates were being hired. Among other things, the indictment specifically alleges that as part of their "racketeering enterprise," the defendants "maintained records known as 'sponsor lists' to ensure that the sponsored candidates obtained employment." 2d Sup. Ind. at 8.

By letter dated November 21, 2012, defendants requested discovery including, *inter alia*:

> 13. All documents concerning recommendations, including without limitation by members of the legislature, for hiring by departments of the Trial Court other than the Probation Department.

[Dkt # 69.] [1] On January 24, 2013, defendants filed a motion to Compel Discovery concerning various requests, including number 13 quoted above, with which the government failed or refused to comply. [Dkt # 84.] In its Opposition to this motion, the government stated:

Defendants' Discovery Request No. 13

---

[1] Additional requests contained in defendants' discovery letter also should have triggered the production of the sponsor lists. *See* Dkt # 69, Request 16 and Request c.

> The government is not in possession of material that would be deemed responsive to this request . . . .

[Dkt # 87.]   The Court relied on the government's representation in its ruling on the Motion to Compel:

> *Requests (10), (11), (13), (14), (15), (16), (17), (21), and (22)*
>
> The government denies that it possesses information responsive to these requests.  As such, the motion is DENIED as moot with respect to requests (10), (11), (13) through (17), (21), and (22).

[Dkt # 97 at 18-19.]

The government's representation, upon which the Court relied, was inaccurate.

On December 20, 2013, the government produced more than 7,000 pages of *Jencks* materials.  Included in that production was a report (FBI 302) concerning an interview with an in-house lawyer for the Administrative Office of the Trial Court ("AOTC Counsel") on February 22, 2011.  This FBI 302 related the following material information:

. . . .

> [AOTC Counsel] recently received a federal grand jury subpoena for certain documents related to the AOTC and the Massachusetts Probation Department.  Upon receipt of the subpoena [AOTC Counsel] called [TC], the Director of Trial Court Security.  [AOTC Counsel] described the request to [TC] and further specifically asked for any "list" [TC] possessed that associated the names of court officers or associate court officers with their job sponsors. [TC] responded that he, "did not think [he] had anything."  [AOTC Counsel] instructed [TC] to conduct a search.
>
> When [AOTC Counsel] called [TC] back few days later, [TC] stated that he did not have anything [AOTC Counsel] requested.  [TC] complained about searching all of the "letters" in the Security Department.  [AOTC Counsel] told [TC] that he did not care about the letters, which he understood to be candidate recommendation letters, but that he was specifically looking for, "any kind of list."  [TC] again told [AOTC Counsel] he did not have anything.
>
> Additionally [AOTC Counsel] also asked [RP], the AOTC Chief of Staff currently assigned to the ADAMS COURTHOUSE in Boston, Massachusetts, whether he possessed any lists that associated the names of court officers or

3

associate court officers with their job sponsors. [RP] stated that he would check, and in a follow-up call (date unknown), [RP] advised that he did not have anything [AOTC Counsel] asked for.

Based upon the representations made by [TC] and [RP] that all responsive documents were identified and produced, [AOTC Counsel] responded to the subpoena and stated that no requested list(s) existed. [AOTC Counsel] recalled that he mentioned to Chief Justice ROBERT MULLIGAN that he was concerned that [TC] did not conduct a thorough search of the Trial Court Security Department. MULLIGAN said he would talk to [RP] to make sure that [TC] conducted a complete search.

A couple of weeks after officially responding to the subpoena, [AOTC Counsel] received a telephone call from MULLIGAN. MULLIGAN was very upset and advised [AOTC Counsel] that the BOSTON HERALD newspaper possessed a list of candidates and their sponsors. MULLIGAN stated that he did not know how this could have happened, and, "these people just don't get it."

[AOTC Counsel] advised that it was his understanding that BOSTON HERALD representative called the Trial Court Security Office and spoke with [RC], [TC]'s Administrative Assistant. The representative told [RC] that the newspaper possessed a "list." [RC] passed the information to [TC] who called [RP], and [RP] advised MULLIGAN. [AOTC Counsel] believed that MULLIGAN called him immediately while [RP] was still in MULLIGANs office. When the telephone call between [AOTC Counsel] and [TC] ended, [AOTC Counsel] immediately called [TC] to confront him.

[AOTC Counsel] told [TC] that the BOSTON HERALD newspaper possessed a "list" and that [TC] told him he did not have a list. [TC] said something to the effect of, "No I told you I had something." [AOTC Counsel] advised that the only items [TC] told him he possessed were "letters." At that point [AOTC Counsel] tore into [TC] stating, "Do you have any idea the seriousness of this?" He told [TC] he could not believe [TC] was wrong in the first place and now he was lying to [AOTC Counsel] about it. Referring to the list [TC] admitted he possessed, [AOTC Counsel] instructed [TC] to "Get that over here now. I want that right away." [AOTC Counsel] stated that he had law license to protect and [TC] was putting it in jeopardy.

[TC] personally delivered two documents to [AOTC Counsel]'s Administrative Assistant [MS] at [AOTC Counsel]'s AOTC office. [TC] asked to speak with [AOTC Counsel]; however, at the time, [AOTC Counsel] was not interested in speaking with him. When [TC] left the AOTC offices, [MS] gave [AOTC Counsel] the documents [TC] delivered.

[TC] never contacted [AOTC Counsel], in any way, to advise that he located any documents and/or lists requested through federal grand jury subpoena

4

> [AOTC Counsel] has not seen the documents the BOSTON HERALD purports to possess; however [MR], AOTC Communications, told [AOTC Counsel] that the HERALD's "list" was dated "June 2008." The list [TC] delivered to [AOTC Counsel]s office was dated May 23, 2008.
>
> On February 18, 2011, [AOTC Counsel] and several individuals from the AOTC Human Resources Department conducted a search of the AOTC computers used by [TC], [RC], and former Administrative Assistant [MS2]. The May 23, 2008 list was located on one of the computers during the search.
>
> On February 22, 2011, AOTC conducted search of work computer used by [EC], former Administrative Assistant in the Trial Court Security Department. [EC] previously transferred from Security to Court Capital Projects; however she retained the same computer. [AOTC Counsel] advised that documents requested in the subpoena were located on [EC]'s computer. **Said documents were forwarded to the federal prosecutors.**
>
> [AOTC Counsel] would like to search [RP]'s computer to ensure that no responsive documents contained within were overlooked during [RP]'s initial search.
>
> [AOTC Counsel] considered [TC] "lazy," stating that [TC] did not want to be bothered by the subpoena compliance. [AOTC Counsel] did not get the impression that [TC] was intentionally attempting to evade production of any specific documents.
>
> [Administrative Note: [AOTC Counsel] confirmed that two computerized documents presented to him for review (one undated list of computer files beginning with "ACCO [ ].doc", and a second spreadsheet list, dated May 23, 2008 were provided to him by [TC] per [AOTC Counsel]'s instruction after MULLIGAN notified [AOTC Counsel] that the BOSTON HERALD possessed a list. **Said documents identified by [AOTC Counsel] are enclosed in 1A envelope and will be maintained in the captioned file**.]

Exhibit A (emphasis added).

In addition, CJAM Robert Mulligan was interviewed by the FBI on September 11, 2012 concerning a variety of topics including "Hiring Court Officers." In relevant part, the FBI 302 documenting the interview related the following material information:

> MULLIGAN recalled that at one point he had a file containing letters of recommendation and associated notes indicating who recommended (a) candidate(s). There may have been list; however MULLIGAN further stated that

5

> he did not personally maintain a list.  If a list was in fact maintained at his office, it most likely listed the [name of the candidate], recommended by "so and so so and so and so and so."
> . . . .
> MULLIGAN advised, "I suppose I would consider the power of the people [state legislators] involved, versus a 'back-bencher'. I'm sure I hired people who were recommended by people in the legislature. I'm sure I hired people recommended by people higher up in the legislature. And I'm sure I hired people who weren't recommended.

Exhibit B (FBI 302 dated 9/12/12, filed under seal pursuant to protective order) (bracketed text in original).

In response to a defense trial subpoena, the AOTC has, within the last few days, provided the defense with three court security officer "sponsor" lists (attached as Exhibit C) and is continuing to search for additional responsive documents.  Based on the descriptions in the earlier FBI 302 (Exhibit A), it would appear that these documents are not necessarily the same as those previously provided to federal prosecutors and/or the FBI.

### **Argument**[2]

The materials and witness statements concerning court security officer "sponsor lists" and hiring practices are plainly exculpatory and should have been produced within 28 days of arraignment.  Specifically, the heretofore withheld information suggests that Probation hiring practices were consistent with hiring practices in other departments of the Trial Court, *i.e.,* hiring practices relating to court security officers.  "Sponsor lists" were standard operating procedure in the Trial Court, not a nefarious Probation racketeering tool designed to "ensure that the sponsored candidates obtained employment" to which they were not entitled, as the indictment alleges.  Consideration of legislative recommendations, and weighing the relative power of

---

[2] Defendants incorporate by reference the legal principles and authorities set forth in their earlier Motion to Compel and for Order to Show Cause.  [Dkt. # 209.]

legislators, was both an understood and accepted practice. The defendants had no intent to defraud and CJAM Mulligan could not have been materially "deceived" by any purported false representation. As with prior revelations emerging from the massive December 20 *Jencks* disclosure that defendants have raised, this is just the tip of an iceberg. Additional time is required to obtain documents and to investigate leads that these facts suggest (*e.g.*, whether and how many recommended court security candidates were hired and the circumstances of those hiring decisions).

## **Conclusion**

For the foregoing reasons, the Court should order the following relief:

1. The Court should order the government to produce all documents and information responsive to the defendants' original discovery request # 13.

2. The Court should order the government to produce the documents provided to prosecutors and/or the FBI that are referenced in Exhibit A to this motion.

3. The Court should order the government to produce any and all reports of interviews or grand jury testimony of the individuals identified in Exhibit A to this motion, and of any others with knowledge concerning "sponsor lists" in other departments of the Trial Court.

4. The Court should continue the trial to a date on or after April 28, 2014.

5. The Court should order the government to file a statement explaining why it made an inaccurate representation to the Court and to the defense.

6. The Court should order the government to show cause why sanctions should not be imposed for *Brady* violations and its inaccurate representations to the defense and to the Court.

Respectfully submitted,

JOHN J. O'OBRIEN
by his attorneys

/s/ William Fick
Stylianus Sinnis, Esq.
William W. Fick, Esq.
Christine DeMaso, Esq.
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
STELLIO_SINNIS@FD.ORG
WILLIAM_FICK@FD.ORG
CHRISTINE_DEMASO@FD.ORG

ELIZABETH V. TAVARES
by her attorney,

/s/ R. Bradford Bailey
R. Bradford Bailey, Esq.
Jeffery Denner, Esq.

WILLIAM H. BURKE, III
by his attorney,

/s/ John Amabile
John Amabile, Esq.

## Certificate of Service

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 23, 2014.

/s/ William Fick