**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                )
**UNITED STATES of AMERICA**                     )
                                                )
**v.**                                           )          **Criminal No.**
                                                )          **12-40026-FDS**
**JOHN J. O'BRIEN,**                             )
**ELIZABETH V. TAVARES, and**                    )
**WILLIAM H. BURKE, III,**                       )
                                                )
    **Defendants.**                              )
_____)

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTION FOR RECUSAL**

**SAYLOR, J.**

   This is a criminal prosecution arising out of an allegedly corrupt hiring scheme at the

Massachusetts Office of the Commissioner of Probation between 2000 and 2010.  Defendants

John J. O'Brien, Elizabeth V. Tavares, and William H. Burke, III, all former Probation officials,

are charged with conspiracy to commit racketeering, racketeering, mail fraud, conspiracy to

commit bribery, and bribery.  Essentially, the government contends that defendants engaged in a

scheme to defraud involving the process of hiring probation officers, in which individuals who

were "sponsored" by state legislators would be hired in return for favorable appropriations and

other legislation.  The government does not argue that mere patronage hiring is a crime, but

rather that defendants engaged in a rigged hiring process involving, among other things, the use

of falsified documents and deliberate misrepresentations.

   Defendant Burke, subsequently joined by defendant O'Brien, has moved that I recuse

myself from this matter under 28 U.S.C. § 455 and the Fifth Amendment.[1]  The motion was filed approximately five and one-half weeks before the scheduled start of the trial; it was also filed one week after I denied defendants' motions to dismiss and sever, and two days after I denied defendants' motions for a continuance and for sanctions against the government.  The motion for recusal is based largely on a claim of newly-discovered evidence:  that I had been a partner of Paul F. Ware, Jr., at the law firm of Goodwin Procter LLP before becoming a judge in 2004.

The principal issue is the possible appearance of impropriety under 28 U.S.C. § 455(a). Defendants also contend that because Ware will be a witness at the trial, my recusal is required under § 455(b)(2).

Last week, during a conference in this proceeding, defendants raised for the first time another issue that they contend will require my recusal.  Defendants advised that they intend to subpoena one or more of my colleagues on the United States District Court to testify as witnesses at the trial, and that I will be required to recuse myself on that basis, as well.  On January 31, 2014, I set a briefing and hearing schedule on that issue.  Rather than waiting for the outcome of that motion, which has not yet been briefed or even filed, I am issuing this opinion to address the matters that are now pending without further delay.  After briefing and hearing on the newly-raised issue, I will supplement, amend, or modify this decision as may be necessary and appropriate under the circumstances.

For the reasons set forth below, the motion for recusal, in its present form, will be denied.

---

[1]  Defendant Tavares has not joined the motion.

## I.   <u>Introduction</u>

I became a United States District Judge in June 2004.  At the time of my appointment, I was a partner at the Boston office of Goodwin Procter, a law firm with approximately 450-475 attorneys.

In May 2010, nearly six years after I became a judge, the *Boston Globe* published a "Spotlight" article exposing alleged corruption in the hiring practices of the Probation Department.  The next day, Paul Ware of Goodwin Procter was appointed as independent counsel by the Massachusetts Supreme Judicial Court in order to investigate those practices.

Ware issued a lengthy report in November 2010 that concluded, among other things, that "the hiring and promotion process in the Probation Department is corrupt and has disproportionately favored politically-connected candidates" and that the "fraudulent hiring and promotion may constitute criminal conduct."  Report of the Independent Counsel at 2, 25 (Nov. 9, 2010) ("Ware Report"), *available at* http://www.mass.gov/courts/sjc/docs/report-of-independent-counsel-110910.pdf.  A subsequent federal grand jury investigation resulted in an indictment of O'Brien, Tavares, and Burke in March 2012.  The case was assigned to me the day the indictment was returned.  At the time the motion was filed, the trial was scheduled to begin on February 24, 2014.[2]

On January 9, 2014, I denied defendants' motions to dismiss and to sever.  On January 14, I denied defendants' motions for a continuance and for sanctions for alleged *Brady* violations.  On January 16, defendants O'Brien and Burke moved for my recusal.

In their recusal motion, defendants assert that Ware's investigation and report are central

---

[2] On January 31, 2014, I continued the trial for approximately one month, until March 24, 2014, for reasons unrelated to the motion for recusal.

events in this prosecution, and that "the current [criminal] charges flowed inexorably" from his

report.  (Def. Mot. for Recusal at 9).  They also assert that the Ware investigation was part of a

"power struggle" between O'Brien and the state judiciary, particularly Chief Justice for

Administration and Management ("CJAM") Robert Mulligan, and that the real purpose of the

investigation was to give Judge Mulligan a reason to "get rid of" O'Brien.  (Def. Response at 5-

6).  Defendants argue that Ware has a "wealth of personal knowledge" as a result of that

investigation, and that he would therefore be an important witness for the defense in any trial of

this case.  (*Id.* at 4).

Defendants then point to the fact that until 2004 I had been a partner at Goodwin Procter

with Ware.  Defendants contend that a reasonable and objective observer would therefore

question my independence and integrity as the presiding judge in this case.  In particular,

defendants contend that such an observer would conclude that it would be difficult for me to

"reject" Ware's findings and conclusions in making rulings in this case.  (*See* Def. Mot. for

Recusal at 9).  According to defendants, that fact, taken in conjunction with Ware's purportedly

central role as a defense witness, requires my recusal.

There are multiple problems with defendants' argument, beginning with some of its basic

premises.

First, defendants conflate this federal criminal prosecution with the investigation and

public exposure of hiring practices in the Probation Department.  The indictment in this case

charges a criminal conspiracy that began in 2001 and ended in April 2010.  Ware was not even

appointed by the SJC until May 2010, and did not issue his report until November 2010.  Events

occurring after April 2010, with rare exceptions, are simply not relevant to this prosecution.  In

particular, Ware's investigation and report, like the *Boston Globe* article that preceded them, are essentially irrelevant and thus inadmissible.  Put simply, Ware may be a central figure in the exposure of the underlying events, but he is not a central figure in this prosecution.

Second, and as a corollary, Ware is not likely to be a significant witness in this case, if he is a witness at all.  Ware undoubtedly learned a great deal of information in the course of his investigation about practices in the Probation Department in the years leading up to April 2010.  But he was not present during the actual events.  He cannot, therefore, simply take the stand and describe what he was told by the witnesses with whom he spoke, or what he read in various documents.  That testimony would almost certainly be hearsay.  Defendants have proposed a number of possible scenarios in which they might seek to call Ware (or another attorney from Goodwin Procter) as a witness.  As discussed below, it is possible that Ware could be called for some relatively minor purpose (for example, to authenticate a document or to provide extrinsic evidence of a prior inconsistent statement).  But under no reasonably foreseeable circumstance would Ware be a critical, or even significant, witness.  And even if he does testify, this is not a bench trial; the jury—not me—will be required to pass on his credibility.

Third, the contention that my former relationship with Ware would make it difficult for me to "pass judgment" on or "reject" his findings and conclusions is without foundation.  (*See* Def. Mot. for Recusal at 9).   My work as a judge requires me, on a nearly daily basis, to "reject" the arguments of lawyers whom I admire and respect, and with whom I have friendly relationships.  While it is certainly true that Ware and I worked together before I came on the bench, I have had very little contact with him since 2004.  And Ware is not even a party or counsel to any party in this proceeding.  No objective and reasonable observer, under the

circumstances presented here, would conclude that I might be inhibited or compromised in my

rulings in this case because of my former professional relationship with Ware, which ended more

than nine years ago.

Fourth, the timing of defendants' motion is, at a minimum, troubling.  The Ware Report

was published in November 2010.  This case was indicted in March 2012, nearly two years ago.

The basic facts of my professional background—including the fact that I spent many years in

private practice at Goodwin Procter—are a matter of public record; counsel for O'Brien, who are

Assistant Federal Public Defenders, acknowledged at the hearing that they were aware of that

background.  Nonetheless, counsel waited 96 weeks—until only five and a half weeks before the

scheduled start of trial—to seek my recusal.  Moreover, that motion was filed immediately after I

had ruled adversely to defendants on a number of significant motions, including a motion to

dismiss the indictment and a motion to continue the trial.  Although I will address the recusal

issue on its merits, the timing of the filing raises obvious concerns.

Fifth, defendants also object to the manner in which the case was first assigned to me in

March 2012, at a time when I was sitting in the Central Division in Worcester.  They contend

that the government improperly filed the case in the Central Division in order to ensure that it

would be assigned to me, and that the assignment to me is therefore suspect.  The fact of that

assignment, however, has been public knowledge for nearly two years, during which defendants

made no attempt to raise the issue or seek a transfer to a different judge.  But even more

significantly, defendants specifically agreed in a filing with the Court on April 20, 2012 that "the

case was properly assigned to the Central Division."  (Joint Mem. re Compliance with Local

Rule 40.1(e), Dkt. No. 24, at 1).  Having explicitly waived the issue in April 2012, defendants

cannot come back in January 2014 and claim that the assignment was somehow improper or unfair.

Finally, defendants point to the fact that one of the Assistant U.S. Attorneys prosecuting the case, Karin Bell, served as my law clerk for a three-month period in 2004. Defendants do not, however, cite to a single case or other authority suggesting that recusal is required when a former law clerk appears in front of a judge after the passage of nearly ten years.

In short, the facts of this case, whether viewed independently or taken as a whole, do not mandate my recusal. The recusal standard does not require some kind of idealized state of perfection, in which judges are entirely isolated, without connections past or present to the communities in which they have resided and practiced law for their entire careers. Some personal relationships are, of course, too strong, and some circumstances too troubling, to permit a judge to preside over a particular matter. But this is not such a case. Subject to whatever modifications may be required based on the new issues raised by defendants, the motion for recusal will be denied.

## II.   Factual and Procedural Background

### A.   Personal Background

1.   From 1981 to 1987, I was an associate at the Boston law firm currently known as Goodwin Procter LLP.

2.   Between 1987 and 1993, I was an Assistant United States Attorney in Boston and held a position at the United States Department of Justice in Washington.

3.   From 1993 to 2004, I was a partner at Goodwin Procter.

4.   In June 2004, I became a United States District Judge.

5.      From June 2004 to July 2012, I was assigned to the Central Division of the United

States District Court and sat principally in Worcester.

6.      Beginning in July 2012, I have been assigned to the Eastern Division of the

United States District Court and sit principally in Boston.

**B.      Paul F. Ware, Jr. and Goodwin Procter**

7.      At the time I left Goodwin Procter in 2004, it was a large firm, with

approximately 155 partners and 450-475 attorneys in total.

8.      Since 1978, Paul F. Ware, Jr., has been a partner at Goodwin Procter.

9.      Ware was already a partner when I joined the firm as a first-year associate in

1981.

10.     Kevin P. Martin is currently a partner at Goodwin Procter.  During the period

from 2001 to 2004, he was an associate at the firm.

11.     I had a professional relationship with Ware during the period I worked at

Goodwin Procter.  Although our relationship is friendly, he is not a social friend.

12.     Since 2004, I have seen Ware only rarely.  I had a chance encounter with him at

an airport some years ago when we were both traveling on vacation with our

families, and exchanged pleasantries.  In addition, I have probably seen him at an

event such as a partner retirement dinner or a funeral, although I do not remember

doing so.

13.     Counsel for O'Brien advised me on January 31, 2014, that they had recently

interviewed Ware, and that he had reported another contact with me.  Ware

reported that he, Martin, and a third Goodwin Procter partner paid a brief visit to

me in my chambers in Worcester in 2011 on their way to a proceeding in Superior Court a few blocks away.  Although I had forgotten it up to that point, I do have some memory of the visit.  The visit was arranged by the third partner, who is a friend of mine, not by Ware, and the visit was very short in duration.

14.    I also had a professional relationship with Martin while at Goodwin Procter. Martin, unlike Ware, is also a social friend.

15.    Neither Ware, nor any other attorney from Goodwin Procter, is a party to this matter.

16.    Neither Ware, nor any other attorney from Goodwin Procter, is appearing as counsel in this matter.

**C.    Karin Bell**

17.    Karin M. Bell is an Assistant United States Attorney, and one of three AUSAs prosecuting this case, along with Fred Wyshak and Robert Fisher.

18.    When I became a judge, Bell served as my judicial law clerk for a period of approximately three months, from June 21 to September 24, 2004.

19.    Bell had been an associate at Goodwin Procter for approximately nine months, from September 2003 to June 2004, prior to her clerkship.  She returned to Goodwin Procter after the clerkship, in September 2004.

20.    Bell became a AUSA in 2008.  Since that time, she has appeared in front of me on dozens of occasions, including such matters as motion hearings, guilty pleas, sentencings, and trials.

21.    Bell is not a social friend, and I have no ongoing relationship with her outside the

courtroom.

**D.**     **The Ware Report**

22.     On May 23, 2010, the *Boston Globe* ran a "Spotlight" article concerning hiring

practices in the Massachusetts Probation Department.

23.     The next day, May 24, 2010, the Supreme Judicial Court appointed Ware as

independent counsel to investigate hiring practices in the Probation Department.

24.     Ware was given the power, among other things, to subpoena witnesses.

25.     At the time Ware was appointed as independent counsel and began his

investigation, I had been a federal judge for approximately six years.

26.     Ware issued his report on November 9, 2010.

27.     The Ware Report, without appendices, is 307 pages long and contains detailed

factual findings and conclusions.

28.     The Ware Report, among other things, concluded that "the hiring and promotion

process in the Probation Department is corrupt and has disproportionately favored

politically-connected candidates."  *Id.* at 2.

29.     The Ware Report, among other things, concluded that "[t]here is credible legal

support for the conclusion that the fixing by public officials of a putatively

objective interview process for hiring and promotions in favor of politically-

connected applicants constitutes criminal conduct in violation of federal fraud

statutes."  *Id.* at 25.

30.     The Ware Report indicates on its front page, and elsewhere, that Paul Ware is

affiliated with the law firm Goodwin Procter LLP.  *See id.* at cover page, 1, 51-

52.

31.    The Ware Report lists seven attorneys, other than Ware, who assisted in the

investigation.  *Id.* at Appendix A1.  Martin is one of the seven attorneys, and

appears to have been the principal deputy to Ware during the investigation.

32.    I have no personal knowledge of any of the events that were the subject of Ware's

investigation.

33.    I have had no substantive discussions with Ware, Martin, or anyone else at

Goodwin Procter concerning the Ware investigation.

**E.    The Indictment**

34.    At some point, the United States Attorney's Office for the District of

Massachusetts began a grand jury investigation into hiring practices in the

Probation Department.

35.    On March 22, 2012, a federal grand jury issued an indictment charging

defendants O'Brien, Tavares, and Burke with various crimes.  The indictment has

since been superseded twice.

36.    This matter was assigned to me on the day that the indictment was returned, on

March 22, 2012.

**F.    Post-Indictment Events**

37.    At the time the matter was assigned to me in March 2012, I was sitting principally

in Worcester.

38.    On April 20, 2012, in a joint filing, the parties to this case (including defendants

O'Brien and Burke) filed a Joint Memorandum Regarding Compliance with Local

Rule 40.1(E).  (Dkt. No. 24).  In that document, the parties stated that "the indictment alleges significant criminal conduct in all three divisions of Massachusetts" and the case, therefore, "could be brought in any of the three divisions."  (*Id.* at 3-4).  They further agreed "that this case was properly assigned to the Central Division."  (*Id.* at 4).

39.    When I was reassigned to Boston in July 2012, I transferred certain criminal and civil cases to Judge Timothy S. Hillman, then a newly-appointed District Judge and my successor in Worcester.  In keeping with the usual practices of the Court, I generally kept cases that were older, more complex, or both, rather than assign them to a newly-sworn judge.  This case was among the ones that I kept.

40.    Up until January 16, 2014, a period of nearly two years, no defendant raised as an issue the fact that this case was originally filed in the Central Division of the District Court and assigned to me.

41.    On May 17, 2013, after consultation with the parties, I set this case for trial beginning on January 6, 2014.

42.    On July 23, 2013, defendants jointly moved to continue the trial.  I granted that motion.

43.    On August 2, 2013, again after consultation with the parties, I set a new trial date of February 24, 2014.

44.    On October 29 and 30, 2013, all defendants moved to dismiss the indictment and to sever the cases for trial.  I held a hearing on those motions on December 13, 2013.

45. On January 8, 2014, all defendants moved to continue the trial until April 2014.

46. Also on January 8, all defendants moved for sanctions for alleged *Brady* violations, based on an alleged failure to disclose certain information, and to compel discovery.

47. On January 9, 2014, I held a pretrial conference and hearing on defendants' *Brady* and discovery motions.

48. On January 9, I advised the parties from the bench that I was denying the motion to dismiss and the motion to sever and granting the government's motion to unseal. (The written opinions as to those orders did not issue until January 17, 2014.)

49. On January 14, at a further pretrial conference, I denied defendants' motions to continue the trial and for sanctions for alleged *Brady* violations.

50. On January 15, I denied defendants' motion to compel discovery as moot in light of the production of additional materials by the government.

51. Between March 22, 2012, when the case was first assigned to me, and January 9, 2014, no defendant raised as an issue the fact that I had been a partner at Goodwin Procter before coming on the bench.

52. Between March 22, 2012, and January 16, 2014, no defendant filed a motion for recusal.

53. Counsel for defendant Burke contends that he learned for the first time on January 9, 2014, that I had been a partner at Goodwin Procter prior to becoming a judge.

54. The fact that I was a partner at Goodwin Procter prior to becoming a federal judge

13

is a matter of extensive public record.  Among other things, that fact is mentioned

in various legal almanacs and encyclopedias in which my name appears,

including, for example,

    a.    in the Massachusetts edition of *The Legal Pages*, at 117 (2011 ed.);

    b.    in the Almanac of the American Judiciary, *available at* 2014 WL 3241;

        and

    c.    in my Wikipedia entry, *available at* http://en.wikipedia.org/wiki/

        F._Dennis_Saylor_IV.

55.    Between January 9 and 15, 2014, I issued at least five rulings adverse to the

defendants, including significant rulings that denied a motion to dismiss and a

motion to continue the trial.

56.    On January 16, 2014, defendants moved for my recusal.

57.    The motion for recusal was filed approximately 96 weeks after the case was

assigned to me, and approximately five and one-half weeks before the scheduled

start of the trial.

**III.**    **<u>Analysis</u>**

    **A.**    **<u>Whether Recusal Is Required Under 28 U.S.C. § 455(b)(2)</u>**

Before turning to the possible appearance of impropriety under 28 U.S.C. § 455(a), which

employs a discretionary standard, I must first consider whether recusal is mandatory under 28

U.S.C. § 455(b)(2).

Section 455(b)(2) states that a judge "shall disqualify himself . . . [w]here in private

practice he served as a lawyer in the matter in controversy, or a lawyer with whom he previously

practiced law served during such association as a lawyer concerning the matter, or the judge or

such lawyer has been a material witness concerning it."  28 U.S.C. § 455(b)(2).  Defendants

focus on the third clause, which requires recusal where "such lawyer has been a material witness

concerning it."  They contend that because Ware was a partner of mine at Goodwin Procter, and

because he is a material witness in this case, my recusal is mandatory.

Section 455 (b)(2) "is not a model of linguistic clarity."  *Old Republic Nat. Title Ins. Co.

v. Warner*, 2013 WL 2403597, at *4 (N.D.W.Va. May 31, 2013) (citing *Faulkner v. National

Geographic Soc'y*, 296 F. Supp. 2d 488, 491 (S.D.N.Y. 2003)).  Furthermore, there are few

decisions interpreting the statute.  *See, e.g.*, *Blue Cross & Blue Shield of Rhode Island v. Delta

Dental of Rhode Island*, 248 F. Supp. 2d 39, 43 (D.R.I. 2003) (noting "scant case law

interpreting § 455(b)(2)").  There appear to be only two unpublished district court decisions

directly

interpreting the scope of the phrase "such lawyer" in third clause of the statute.  *See Old

Republic,* 2013 WL 2403597, and *United States ex rel. Cafasso v. General Dynamics C4

Systems, Inc.*, 2008 WL 169636 (D. Ariz. Jan. 16, 2008).

The courts in both *Cafasso* and *Old Republic*, after reviewing the language of the statute

and the legislative history, concluded that § 455(b)(2) does not apply whenever a former law

partner of the judge is a material witness.  Rather, both courts concluded that it applies only in

the relatively narrow circumstance where the lawyer with whom the judge practiced was a

material witness to an event that occurred during the period in which the judge and the lawyer

were together in practice.  As the court noted in *Old Republic*, § 455(b)(2) "does not mandate

recusal unless the judge's former colleague served as a witness in the matter in controversy

during the judge's tenure with the firm, or the judge's former colleague plans to testify in a current case concerning information he learned during the judge's tenure with the firm."  2013 WL 2403597, at *5; *see Cafasso*, 2008 WL 169636, at *2-4.

I agree with that interpretation of § 455(b)(2).  The third clause of the statute applies, and recusal is therefore required, only where there is an overlap in time between (1) the judge's tenure at his or her former law firm and (2) the matters about which the judge's former colleague is going to testify.  If such an overlap occurs, and the other requirements of § 455(b)(2) are satisfied, recusal is required.  *See, e.g.*, *In re Rodgers*, 537 F.2d 1196 (4th Cir. 1976) (holding that recusal was required where the defense was based in part on evidence concerning the actions of the judge's former law partner that occurred while the judge was his partner).

Here, there is no evidence that Ware was investigating defendants when I was employed by Goodwin Procter.  Indeed, it is undisputed that his investigation did not start until six years later.  Accordingly, recusal is not mandatory under § 455(b)(2).[3]

### B.      Recusal Under Section 455(a) Generally

The principal basis on which defendants seek my recusal is 28 U.S.C. § 455(a).  That statute provides that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  The focus of that provision "is not [the judge's] actual state of mind at a particular time, but the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for

---

[3] In addition, there are two other requirements for automatic recusal under § 455(b)(2).  First, the judge's former colleague must have been a "material witness."  28 U.S.C. § 455(b)(2).  Second, the judge's former colleague must have been a witness in the "matter in controversy."  *Id.*  I do not find it necessary to reach either issue in this case.

impartiality." *In re Bulger*, 710 F.3d 42, 46 (1st Cir. 2013).

Section 455(a) does not impose "the standard of 'Caesar's wife,' the standard of mere

suspicion." *In re Allied–Signal*, 891 F.2d 967, 970 (1st Cir. 1989).  Instead,

> [t]he recusal standard must be more demanding because the disqualification
> decision must reflect *not only* the need to secure public confidence through
> proceedings that appear impartial, *but also* the need to prevent parties from too
> easily obtaining the disqualification of a judge, thereby potentially manipulating
> the system for strategic reasons, perhaps to obtain a judge more to their liking.

*Bulger,* 710 F.3d at 47 (quoting *Allied–Signal*, 891 F.2d at 970) (emphasis in original) (internal

quotations omitted).

The test is an objective one, based on the factual circumstances viewed as a whole; it is

not based on the subjective state of mind of the judge, or that of the party seeking recusal.

*United States v. Voccola*, 99 F.3d 37, 42 (1st Cir. 1996) (noting that "the charge of lack of

impartiality" must be "grounded on facts that would create a reasonable doubt concerning the

judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the

litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonable man")

(quoting *United States v. Cowden*, 545 F.2d 257, 265 (1st Cir. 1976)).

Furthermore, the test is not that of a casual observer, but rather a reasonable and

objective observer who is "fully informed of all the relevant facts."  *In re United States*, 158 F.3d

26, 31 (1st Cir. 1998); *see Bulger*, 710 F.3d at 46 (question depends on "the existence of facts

that would prompt a reasonable question in the mind of a well-informed person"); *In re Boston's*

*Children First*, 244 F.3d 164, 167 (1st Cir. 2001) (issue of recusal must be analyzed from the

perspective of "an objective, knowledgeable member of the public")  (quoting *In re United*

*States*, 666 F.2d 690, 695 (1st Cir. 1981)); *see also Swan v. Barbadoro*, 520 F.3d 24, 26 (1st Cir.

2008).

"There is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987); *see also United States v. Snyder*, 235 F.3d 42, 46 (1st Cir. 2000). Judges must not "abdicate in difficult cases at the mere sound of controversy." *In re United States*, 666 F.2d at 695.

A key reason for the judge's duty to refrain from unmerited recusal is the goal that underlies § 455(a)—preservation of public confidence in the integrity of the judicial process. *See Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 858 n.7 (1988). That confidence would be damaged if litigants are permitted to use recusal "as a tactic to jettison an impartial judge whose slant on a case, as evidenced by his rulings, jeopardizes a party's chances for ultimate success." *In re Cargill, Inc.*, 66 F.3d 1256, 1263 (1st Cir. 1995); *see also In re United States*, 441 F.3d 44, 67 (1st Cir. 2006).

"[T]he analysis of allegations, the balancing of policies, and the resulting decision whether to disqualify are in the first instance committed to the district judge." *In re United States*, 666 F.2d at 695. Because "in many cases reasonable deciders may disagree, the district judge is allowed a range of discretion." *Id.*; *see also In re Allied-Signal*, 891 F.2d at 970; *In re Boston's Children First*, 244 F.3d at 167 ("[W]e allow district court judges a 'range of discretion' in the decision not to recuse. However, we note that the district court should exercise that discretion with the understanding that, 'if the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal.'") (quoting *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995)).

### C.      Whether the Motion to Recuse Was Timely

The first question under § 455(a) is whether the motion to recuse was timely filed.  *See In re United States*, 666 F.2d at 694 (holding that "a motion for disqualification [under § 455 must] be timely filed").  Among other things, the timeliness requirement allows courts to "reject what appear to be strategic motions to recuse a judge whose rulings have gone against the party."  *In re United States*, 441 F.3d at 65; *see also In re Abijoe Realty Corp.*, 943 F.2d 121, 126 (1st Cir. 1991) (denying Rule 60(b) motion "[i]n light of [the] calculated withholding of the disqualification claim").[4]

Accordingly, "in general, a party must raise the recusal issue 'at the earliest moment after acquiring knowledge of the relevant facts.'"  *In re United States*, 441 F.3d at 65 (quoting *In re Abijoe Realty Corp.*, 943 F.2d at 126) (alterations omitted); *United States v. Kelly*, 519 F. Supp. 1029, 1050 (D. Mass. 1981) ("The law is well settled that one seeking the disqualification of the judge must do so at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification.").

As noted, this case was indicted, and assigned to me, on March 22, 2012.  Counsel for defendant Burke contends that he learned for the first time on January 9, 2014—nearly two years later—that I had been a partner at Goodwin Procter prior to becoming a judge.  Counsel for defendant O'Brien, by contrast, acknowledge that they were aware that I had been at Goodwin Procter, but contend that they did not make the connection that Ware and I had been partners

---

[4] "The policy considerations supporting a timeliness requirement . . . [are] to conserve judicial resources and prevent a litigant from waiting until an adverse decision has been handed down before moving to disqualify the judge."  *Summers v. Singletary*, 119 F.3d 917, 921 (11th Cir. 1997).  Thus, it serves to prevent litigants from taking a "heads-I-win-tails-you-lose position of waiting to see whether they win and if they lose moving to disqualify a judge who voted against them."  *Schurz Communications, Inc. v. Federal Communications Comm'n*, 982 F.2d 1057, 1060 (7th Cir. 1992).

until recently.  Counsel also point out that I had not specifically stated on the record that I had

been a partner at the firm with Ware before January 9.

It is true that I did not expressly disclose the fact that I had been partners with Ware

before January 9.  I assumed that I had no reason to make such a "disclosure."  Ware is not a

party to this proceeding, nor is he counsel to any party.  I also assumed that the Ware Report was

not relevant to, and not admissible in, this proceeding, and that Ware would not be a witness;

indeed, my assumptions are not substantially different now.

In any event, the fact that I was a partner at Goodwin Procter is a matter of extensive

public record.  Counsel for O'Brien were actually aware of that fact.  At the very least, counsel

reasonably should have become aware of my former connection to the firm at some point prior to

the eve of trial.  *See National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, 959

(2d Cir. 1978) (affirming denial of a recusal motion where the judge's "former membership in

the Davis Polk firm had for years been a matter of public knowledge and that firm's

representation of [one of the parties] had been known to plaintiffs' counsel for months prior to

trial"); *see also United States v. Whorley*, 550 F.3d 326, 339 (4th Cir. 2008) ("The facts

underlying [litigant's] motion were available to him as a matter of public record at the time of his

arraignment, and he has shown no cause excusing his failure to seek recusal before the eve of

trial.").  If defense counsel believed from the outset that Ware was somehow a central figure in

this prosecution, the recusal issue could easily have been raised long ago.

Here, counsel waited 21 months before filing a motion for recusal.  That was plainly

untimely, and the motion could be denied on that basis alone.  *See, e.g.*, *Lunde v. Helms*, 29 F.3d

367, 370 (8th Cir. 1994) (motion untimely where seven or eight months elapsed between filing

of complaint and motion to recuse); *Willner*, 848 F.2d at 1028-29 (untimely where ten months elapsed); *Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1164 n.3 (5th Cir. 1982) (untimely where more than two years elapsed).  Furthermore, the motion for recusal was filed immediately after a series of rulings adverse to defendants, and less than six weeks before the scheduled beginning of the trial.  *See Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 432 (4th Cir. 2011) (waiting seven months to file recusal motion "smack[ed] of gamesmanship" where motion was filed after an adverse ruling); *Summers*, 119 F.3d at 921 (holding that "where the facts are known before a legal proceeding is held, waiting to file [a recusal] motion until the court has ruled against a party is untimely").

Although the motion is untimely, I will nonetheless proceed to the merits in light of the serious allegations raised by defendants.  *See S.E.C. v. Loving Spirit Found. Inc.*, 392 F.3d 486, 494 (D.C. Cir. 2004) (finding recusal motion untimely but also addressing its merits).

### D.    **Whether Recusal Is Required Because of Ware's Role in the Investigation**

One of defendants' core contentions is that my former relationship with Ware would make it difficult for me to "pass judgment" on or "reject" his findings and conclusions.  (*See* Def. Mot. for Recusal, at 9).  Put simply, defendants contend that (1) Ware concluded that defendants may have committed a federal crime; (2) Ware was once my law partner; and therefore (3) I would be reluctant to conclude that defendants did not commit a federal crime.

Defendants' argument is somewhat far-fetched, and without support in the case law.  As noted, it is routine for a judge to "reject" the arguments of lawyers, even lawyers whom the judge respects or admires.  Even if Ware were counsel in this case, recusal would not be required on the ground that we were once law partners.  *See, e.g.*, *Martin v. Monumental Life Ins. Co.*,

240 F.3d 223, 236 (3d Cir. 2001) (recusal not required where party represented by judge's former law partner, six years after judge left law firm); *Renteria v. Schellpeper*, 936 F. Supp. 691, 695 (D. Neb. 1996) (recusal not required after four years).  In fact, some courts have concluded that judges need not recuse themselves even when a personal friend appears as counsel in a case.  *See, e.g.*, *United States v. Kehlbeck*, 766 F. Supp. 707, 712 (S.D. Ind. 1990) ("[J]udges may have friends without having to recuse themselves from every case in which a friend appears as counsel, party, or witness."); *United States v. Murphy*, 768 F.2d 1518, 1537-38 (7th Cir. 1985) ("Many courts . . . have held that a judge need not disqualify himself just because a friend—even a close friend—appears as a lawyer.").

Obviously, there are circumstances under which recusal is proper because a friend or former colleague is appearing before the judge as a lawyer in the case.  I do not need to explore the outer limits of the ethical rules in that regard, because this case is not close to the border.  Ware is not a close friend; I have barely seen or spoken to him since 2004.  And he is not counsel to any party in this proceeding.

Furthermore, I am not being called upon to "accept" or "reject" any conclusions that he reached as a result of his investigation.  The decisions that I have been, or will be, called upon to make (such as whether the indictment states a crime or the evidence is sufficient to allow the case to go to the jury) are different decisions, made according to different standards.  Moreover, I am not the finder of fact in this case, and all of my decisions are subject, to one degree or another, to appellate review.

Under the circumstances, I will not recuse myself on the grounds that I may be required to "pass judgment" on or "reject" the findings and conclusions of my former law partner.

22

### E.   Whether I Can Consider the Likelihood That Ware May Be a Witness

The next question is whether I must recuse myself under § 455(a) if Ware is called as a witness.  (As noted, recusal is not required under § 455(b)(2) even if Ware is called to testify.)  Before I even reach that question, however, defendants have raised a threshold issue.  According to defendants, under the recent case of *In re Bulger*, 710 F.3d 42 (1st Cir. 2013), I may not even consider the likelihood that Ware could be a witness in this case when considering a motion for recusal, but instead must recuse myself more or less automatically.

In *Bulger*, the defendant claimed that an individual prosecutor in the Organized Crime Strike Force of the Department of Justice had provided him immunity to commit crimes, including multiple murders.  710 F.3d at 48-49.  Because the trial judge had been a supervisor in the United States Attorney's Office at the relevant time, the defendant moved to recuse him under § 455 on the grounds that he could be a witness in the case.  *Id.* at 44.  The trial judge denied the motion.  *Id.*

In reversing that decision, the First Circuit's analysis excluded consideration of "the merits of defendant's assertion of immunity" or the defendant's "entitlement to seek evidentiary support for that claim in testimony from [the trial judge]."  *Id.* at 46.  Defendants contend that this means the recusal analysis in this case must necessarily exclude consideration of the merits or admissibility of Ware's testimony.  Put another way, defendants contend that if they say that Ware is a critical witness in this case, I must accept that at face value, and cannot even consider the possibility that the assertion may not be accurate.

The *Bulger* court, however, also stated that "the defendant's claim and its implications cannot themselves alone suffice to require the judge's recusal, lest the law confer a veto power

on the assignment of his trial judge to any heckling defendant who merely levels a charge that

implicates a judge's defensive or vicariously defensive action." *Id.* at 46-47.  The court found

that there must be "necessary independent support for a challenge to impartiality with the

potential to produce bias" before recusal was proper.  *Id.* at 47.  It then examined that

independent support at some length, much of which was found in the "official reports and

conclusions predating [the] proceedings, and largely in the public domain, that disclosed

disquieting links between the [g]overnment and the criminal element during the years in

question, and that [could] fairly stimulate a critical attitude on the part of an independent

observer." *Id.*

> The court concluded:
>
> Given the institutional ties described here, the reasonable person might well question whether a judge who bore supervisory responsibility for prosecutorial activities during some of the time at issue could suppress his inevitable feelings and remain impartial when asked to determine how far to delve into the relationship between defendant and [g]overnment, and to preside over whatever enquiry may ultimately be conducted.  On this record, that question could not reasonably be avoided.

*Id.* at 48-49.

This case differs in at least two critical respects.  First, in *Bulger,* the trial judge *was*

*himself the disputed witness.*  He had been a supervisor at the federal prosecutor's office during

the time the federal government allegedly offered the defendant immunity.  *Id*. at 44.  The

conclusion that there was an appearance of partiality was premised on the fact that the judge

would have to decide whether he himself had to testify.  Here, no one claims that I might be a

witness in the case.  A judge making a decision about his own testimony is in a substantially

different position than a judge making a decision about whether his former law partner (with

whom he has barely exchanged words in nearly ten years) might have to testify.

Second, the court in *Bulger* did not simply accept at face value the defendant's claim that the trial judge might be a witness.  Instead, the court took considerable care to describe how defendant's claim was, at least in part, buttressed by prior judicial findings of a corrupt relationship between Bulger and the FBI.  *Id.* at 47-49.  And the court concluded that "[t]he record likewise includes enough to justify a reasonable belief that the defense's claim probably portends an enquiry into . . . [the] dealings [between Bulger and the Department of Justice]."  Thus, whether the defendant in *Bulger* could explore his immunity defense, and possibly call the judge as a witness, had at least some factual support.  Here, however, there is no independent evidence, much less the findings of a court of law, to suggest that Ware could be a substantial witness to the events in question.  He simply was not there during the events alleged in the indictment.

Defendants' position here, if adopted, would produce absurd results, and give criminal defendants an effective veto power over the choice of judge.  All a defendant would have to do is claim a need to call a witness that might trigger the judge's recusal.  If the judge were precluded from even considering the merits or admissibility of that testimony, the judge would have no option but to recuse.  Thus, for example, a defendant could claim that the judge's best friend was a witness.  If the rule were as defendants claim, the judge would have to recuse himself—even if the judge's friend knew nothing about the case, and was being used solely for the purpose of triggering a recusal.  The *Bulger* decision did not make such a radical departure from the well-established principles of judicial recusal.

In short, I have the authority (and the obligation) to examine whether Ware will be called

as a witness in this case, and to ascertain whether the nature and content of that testimony might

trigger my recusal.  Nothing in *Bulger* prevents me from making that inquiry.

### F.    Whether Recusal Is Required Because Ware May Be a Witness

The issue then becomes whether I must recuse myself if Ware is likely to testify as a

witness in this case.   As a general matter, a judge need not recuse himself or herself simply

because he or she knows a witness; indeed, some courts have concluded that judges need not

recuse themselves when friends appear as witnesses.  *See, e.g.*, *In re Beyond Innovation

Technology Co., Ltd.*, 166 Fed. Appx. 490, 491 (Fed. Cir. 2006) (holding that recusal was not

required where the expert damages witness in a patent case was "a close personal friend" of the

judge).

Again, I do not need to explore the boundaries of the recusal statute.  Ware is not a social

friend, but rather my former law partner.  I have found no case, and defendants have cited none,

suggesting that recusal is required simply because the judge's former law partner may have to

testify.  Indeed, the case law is to the contrary.  *See, e.g.*, *Cafasso*, 2008 WL 169636, at *5

(denying recusal motion under § 455(a) where former law partner was a fact witness in the

proceeding, where the judge had "not seen or spoken to [the witness] in more than nine years");

*Old Republic,* 2013 WL 2403597, at *7 (denying recusal motion under § 455(a) where former

law partner was an expert witness in the proceeding, where judge had not worked with the

lawyer for more than twenty years, "although the two remain acquainted and occasionally attend

the same social events").

The inquiry should not, however, stop there.  It is also appropriate to consider the

realistic likelihood that Ware will actually testify as a witness, and what form that testimony is

likely to take.  To the extent his testimony would not be required at all, or would be of marginal

importance, the argument against recusal is that much stronger.[5]

Defendants have identified certain specific areas of potential testimony by Ware that they

contend will be relevant and admissible.  I will consider each in turn.[6]

### 1.   Testimony Concerning Ware's Hiring and the Scope of His Investigation

Defendants first contend that Ware will be called to testify about "the circumstances

under which he was hired by CJAM Mulligan and Chief Justice Marshall."  (Def. Response, at

5).  Defendants also contend that they would elicit testimony from Ware "about his

communications with [the judges] prior to and during the course of their investigation," as well

as "his communications with the state and federal governments throughout his and their

investigations."  (*Id.*).[7]

At the outset, it is unclear why the fact of the investigation, or the existence of the

Report, is relevant at all.  Ware was hired after the charged criminal conduct had ended, and thus

his testimony bears on that conduct, if at all, only indirectly.  The Report's conclusions are

surely inadmissible; Ware concluded that defendants likely committed various federal and state

---

[5] Of course, I cannot make a definitive ruling on any evidentiary issue at this stage of the proceedings; the course of the trial will inevitably shape the issues.  Nor do defendants have any obligation to present a defense.  Nonetheless, it is appropriate under the circumstances to consider the likelihood Ware will testify and the nature of that testimony, if any, even if some degree of conjecture on my part is required.

[6] Defendants also note that Ware "testified on the record in a [state] Trial Court employee disciplinary hearing."  (Def. Mot. for Recusal, at 11).  Although defendants submitted a portion of the transcript of that proceeding, the nature of that proceeding is not part of the record in this case.  I understand the matter to have been an employee disciplinary hearing arising out of or related to the Ware investigation.  Presumably, Ware's testimony must have been relevant to a disputed issue in that proceeding; it does not follow that it is relevant here.

[7] I will assume, for present purposes, that any communications between Ware and the judges are not subject to any attorney-client privilege or other privilege or protection.

crimes.  And Ware cannot simply take the stand and repeat what he was told by witnesses or read

in documents.  Such testimony would be hearsay, and inadmissible under any reasonably

foreseeable scenario.[8]

Although not entirely clear, it appears that defendants are principally focused on four

issues in particular:  testimony as to limitations placed on the scope of Ware's investigation;

testimony as to bias of CJAM Mulligan; and testimony as to the "motives" of CJAM Mulligan

and Chief Justice Marshall; and testimony as to the influence of the Ware investigation on other

witnesses.

### a.      Limitations on the Investigation

Defendants contend that they may call Ware to testify that he "had a specific

understanding with the Supreme Judicial Court that the investigation would not encompass the

Legislature."  (Def. Mot. Recuse, at 12).

It is not at all apparent how any limitations on the scope of Ware's investigation have any

bearing on this case.  Again, it is unclear why the investigation itself is relevant.  Defendants

imply that it is significant that Ware did not investigate the legislature, because it shows that the

investigation was not designed to get at the entire truth.  But the conclusions of that investigation

are plainly inadmissible, and thus it does not matter whether those conclusions are flawed.  In

any event, the fact that limitations were placed on the scope of Ware's investigation does not

appear to be disputed; indeed, the Ware Report itself noted that "this investigation was focused

on the Probation Department, not other state agencies and not on the Legislature," and that

---

[8] Apparently, what defendants seek to do is to introduce evidence of the fact that an investigation was
conducted—without actually getting into the content or conclusions of that investigation—for the purpose of
demonstrating that the investigation was biased and unduly narrow.  It is by no means obvious why that evidence
would be admissible.

"[l]egislative conduct was not fully explored except as immediately relevant to Probation hiring." Ware Report, at 307. It is not likely that live testimony from Ware would be required to establish that fact, even if it were somehow to be relevant.

### b.      Alleged Bias of CJAM Mulligan

Defendants also contend that they expect to ask Ware about "the bias of certain government witnesses such as CJAM Robert Mulligan." (Def. Mot. for Recusal, at 11-12; *see* Def. Response, at 6-7).[9]  Defendants can, of course, seek to show that a witness is biased, and may under some circumstances introduce extrinsic evidence tending to prove such bias. That extrinsic evidence, however, must itself be admissible. A third-party witness might give evidence that the other witness made a statement (for example, "I hate the defendant and hope he goes to prison") or took some action that tends to prove the witness is biased. But a third-party witness cannot simply opine that the witness is biased, or otherwise give irrelevant or improper testimony.

Here, it is at least possible that some testimony by Ware may be relevant and admissible as to the issue of bias. Defendants have not indicated what that anticipated testimony will be, and thus I can only consider the question in the abstract. At a minimum, it would appear that any such testimony by Ware would be relatively limited (for example, testimony that Judge Mulligan made a particular statement in the course of the investigation that evidenced bias). Ware obviously could not be called to testify about the inner workings of Judge Mulligan's mind, but only as to statements or events that he actually perceived. In any event, that

---

[9] According to the Report, Ware was hired by the SJC, not CJAM Mulligan. Presumably, defendants will have to show a link between Judge Mulligan and the SJC for the hiring of Ware to be relevant evidence of Judge Mulligan's bias.

testimony, if it occurs at all, is likely to be discrete and relatively short in duration, and would

not require me to pass on Ware's credibility.

> c.   **Alleged Motives of CJAM Mulligan and Chief Justice Marshall**

At the hearing, defendants argued that Ware might testify about the "motives" of CJAM

Mulligan and Chief Justice Margaret Marshall in instituting the investigation.  Why those

motives are relevant is not clear, and even if that evidence is relevant, it is not apparent what

Ware's testimony would add.

To the extent that defendants seek to establish that Judge Mulligan and Chief Justice

Marshall are biased witnesses, Ware's testimony will either be unnecessary or relatively narrow,

as noted above.  To the extent that defendants seek to establish that Judge Mulligan and Chief

Justice Marshall knew about the charged hiring practices, and were not actually deceived or

victimized by the scheme, that evidence is likely to be irrelevant.  *See, e.g.*, *United States v.*

*Camuti*, 78 F.3d 738, 742 (1st Cir. 1996) (noting that the crime of mail fraud "[does] not require

that the victims be pure of heart or even that they have been effectively deceived by the charged

misrepresentations," and that "[m]ateriality issues aside, all that matters is that the

representations were deliberately made by the defendant"); *United States v. Allard*, 926 F.2d

1237, 1242 (1st Cir. 1991) (noting that "[i]t is not necessary to establish that the intended victim

[of a mail fraud] was *actually* defrauded") (emphasis in original); *System Management, Inc. v.*

*Loiselle*, 112 F. Supp. 2d 112, 114-15 (D. Mass. 2000) (detrimental reliance is not an element of

the crime of mail fraud); *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 82 (D. Mass. 1998)

(same); *see also United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980) ("If a scheme to

defraud has been or is intended to be devised, it makes no difference whether the persons the

schemers intended to defraud are gullible or skeptical, dull or bright."). In any event, Ware will not be permitted to opine as to their motives in hiring him.

### d. Alleged Influence on Witnesses

Finally, defendants assert that Ware's investigation "shaped, prejudiced, and informed" the "opinions, memories, and understandings" of the individuals he interviewed. (Def. Response, at 7). According to defendants, testimony from Ware about his interviews may therefore be needed "to expose potential bias on behalf of many government witnesses." (*Id.*). Again, the possibility exists that Ware might provide extrinsic evidence of bias or lack of credibility of a particular witness. For example, if a witness changed his or her testimony after speaking with Ware, or after reading the Ware Report, and denied having done so, conceivably Ware could provide extrinsic evidence of that (such as a prior inconsistent statement). Again, it is hard to foresee the likelihood that such testimony will be required, but if it is, the testimony presumably will be narrowly focused and relatively brief.

### 2. Testimony Concerning Other Topics

Defendants have also identified various other specific purposes for which Ware might be called as a witness, as follows:

### a. Authentication of Documents

Defendants state that they may call Ware (or his colleagues) "to authenticate and understand the basis of certain data compilations in the Ware Report." They contend that the Ware Report (or, more accurately, a portion of it) is admissible as a government report under Fed. R. Evid. 803(8)(iii). (Def. Mot. for Recusal, at 11). Even assuming that any or all of that Report is relevant and otherwise admissible, it is not likely that Ware will have to be called as a

witness for authentication purposes.  It is unlikely that the government would dispute the

authenticity of the Report, and even if it did, the reports of public authorities are normally either

self-authenticating or relatively easy to authenticate.  *See, e.g.*, Fed. R. Evid. 901(b)(7); Fed. R.

Evid. 902(1), (2), (4).  And even if live testimony were somehow required, it is likely that any

number of the attorneys who worked on the report could authenticate it.

### b.    Chain of Custody of Documents

Defendants state that Ware might also be called upon "to explore the collection and chain

of custody of key documents."  (Def. Response, at 6).  Again, it is unlikely that there would be a

genuine dispute as to the collection and chain of custody of a document, and if there were, it is

not likely that Ware himself (as opposed to, say, a paralegal or junior attorney) actually collected

and maintained the document at issue.

### c.    "Case Agent" Testimony

Defendants liken Ware to a "case agent" who "was the first investigator to gather and

review relevant documents and to interview, subpoena, and elicit testimony from witnesses."

(Def. Response, at 4).  They contend that such agents "routinely testify" in criminal cases, and

that accordingly Ware may do so here.  Defendants expressly disclaim, however, any intent to

use Ware as a summary witness under Fed. R. Evid. 1006.  *(Id.)*.

To the extent that case agents routinely testify, it is because they observed or heard

relevant events (such as an undercover drug buy) and therefore can testify from personal

knowledge.  Again, Ware did not observe or participate in any of the conduct alleged in the

indictment.  At a minimum, it seems unlikely that he will be called to the stand by either party to

testify as to his personal knowledge as to how the investigation was conducted.

### d.    "Origin of the Charges" Testimony

Defendants also contend that the testimony is relevant, in part, "to explain the origins of the charges." (*Id.*).   Again, it is unclear what is meant by that.  If defendants seek to prove that this prosecution was the product of the Ware investigation, and is therefore somehow tainted because that investigation was unfair or one-sided, such evidence is inadmissible.

Under the United States Constitution, the executive power is vested in the President of the United States.  U.S. Const. art. II, § 1.  That executive power includes, among other things, the general power to determine which laws to enforce and against whom to enforce them.  *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Wayte v. United States*, 470 U.S. 598, 607 (1985).  Specific prosecutorial authority is committed by law to the Attorney General and United States Attorneys.  28 U.S.C. §§ 503, 509, 547.

"[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Armstrong*, 517 U.S. at 464 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)); *see United States v. Goodwin*, 457 U.S. 368, 380 n.11 (prosecutor has "broad discretion" to select the charges against an accused).  Furthermore, the "decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607.  As the Supreme Court has explained:

> Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Id.* Judicial inquiry of prosecutorial decisions also threatens "the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465.  "Examining the basis of a

prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id.* (quoting *Wayte*, 470 U.S. at 607.[10]

Accordingly, defendants will not be permitted to challenge the charging decisions of the United States Attorney during the trial of this case, and therefore Ware cannot testify in support of such a challenge.

### e.    "Theory of the Defense" Testimony

Finally, defendants contend that Ware's testimony concerning the investigation would also be used "to present the theory of the defense."  (Def. Response, at 5; *see id.* at 7).  That, too, is impermissible.  Witnesses are not there to present the theories of either side; they are there to testify as to facts.  Nor are counsel permitted to ask argumentative questions.  Defendants will have an opportunity during their opening statements and closing arguments to present their theories of the defense; they may not call Ware for that purpose.

*    *    *

In short, I cannot state definitively at this stage of the proceeding that Ware will not testify as a witness under any circumstances.  Nonetheless, any such testimony seems likely to be limited to relatively discrete and narrow topics, and not central either to the prosecution or the defense.  And under no circumstance would I be called upon to assess Ware's credibility as a

---

[10] Although prosecutorial discretion is broad, "it is not 'unfettered.'"  *Wayte*, 470 U.S. at 608 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)).  Prosecutorial selectivity in the enforcement of criminal laws is subject to constitutional restraints, and thus "may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"  *Armstrong*, 517 U.S. at 464 (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)).  Defendants here have not raised any issue of selective or vindictive prosecution, or any other such claim of constitutional dimension arising out of the prosecutorial decision in this case.

witness; that is for the jury to decide, if in fact he does become a witness.

Thus, under the circumstances presented here, no reasonably objective observer would conclude that I could not fairly preside over the trial because of the possibility Paul Ware may testify as a witness.

### G.      Whether Recusal Is Required Because the Case Was Originally Filed in Worcester

Defendants also object that the government's decision to file the case in Worcester, which led to the assignment of this case to me, "creates the appearance of possible forum shopping."  (Def. Mot. for Recusal, at 10).

As noted, this case was filed in the Central Division in Worcester.  Local Rule 40.1(E) governs the assignment of criminal cases within the District of Massachusetts, which is divided into three divisions:  Eastern, Central, and Western.  The rule states, in relevant part, as follows:

> Criminal cases shall be assigned to that division in which the most significant criminal conduct related to the alleged violations occurred within the District of Massachusetts.

On April 20, 2012 all parties—including all defendants—filed a joint statement with the Court indicating that "the indictment alleges significant criminal conduct in all three divisions of Massachusetts" and the case, therefore, "could be brought in any of the three divisions."  (Joint Mem. re Compliance with Local Rule 40.1(E), Dkt. No. 24, at 3-4).  They further agreed "that this case *was properly assigned* to the Central Division."  (*Id.* at 4) (emphasis added).  Since that time, no party has moved for a change of venue, including when the case was transferred to the Eastern Division.

Defendants thus explicitly assented to the assignment of this case to Worcester; their present challenge is both waived and untimely.  Accordingly, the assignment of the case presents

no basis for recusal under § 455(a).

### H.      Whether Recusal Is Required Because Karin Bell Is One of the Prosecutors

Defendants further contend that recusal is required because one of the three Assistant United States Attorneys assigned to this matter is my former law clerk, Karin Bell.  As noted, attorney Bell clerked for me for three months in the summer of 2004, when I first became a judge.  Again, she is not a social friend, and I have no ongoing contact with her outside the courtroom.

"It is common knowledge in the profession that former law clerks practice regularly before judges for whom they once clerked." *In re Martinez-Catala*, 129 F.3d 213, 221 (1st Cir. 1997).  The mere fact that an attorney once served as a clerk for a judge is not sufficient to make a reasonable person question the judge's impartiality.  *See id.* at 221-22 (denying mandamus to recuse judge where defense attorney included former law clerk); *United States v. Bosch*, 951 F.2d 1546, 1548 (9th Cir. 1991) (finding no plain error where judge refused to recuse himself because prosecutor was former law clerk absent showing of actual bias); *United States v. Hollister*, 746 F.2d 420, 425 (8th Cir. 1984) (holding that judge need not recuse himself where prosecutor was his former law clerk); *Varela v. Jones*, 746 F.2d 1413, 1415-17 (10th Cir. 1984) (upholding denial of recusal motion where defense attorney was former law clerk);  *Wolfson v. Palmieri*, 396 F.2d 121, 123-24 (2d Cir. 1968) (finding judge's decision not to recuse from criminal case where former law clerk was assistant prosecutor was "so plainly right as to require no discussion"); *see also United States v. Mavroules*, 798 F. Supp. 61, 63 (D. Mass. 1992) ("There is no bar to former law clerks appearing before their judge with respect to a matter that was not in chambers during the clerkship.").  Nonetheless, many courts, including the First

Circuit, require that a former clerk not appear before the judge for whom she clerked for a limited period of time. *See* 1st Cir. R. 46 (prohibiting appearances within one year of the clerkship's end).

Here, attorney Bell completed her three-month clerkship more than nine years ago. I have found no case holding, or even suggesting, that recusal is required after such a short clerkship and such a lengthy period of subsequent time. Accordingly, recusal on that basis is not required.

## I.     Whether the Facts, Taken in Combination, Require Recusal

Finally, I must consider the possibility that all of the issues raised by defendants, taken as a whole, mandate recusal even if no individual issue is sufficient standing alone. *See Allied Signal*, 129 F.3d at 221 (noting that in recusal cases, "the whole is sometimes greater than the sum of the parts"). Under the circumstances, I cannot make that finding. Taking all of the factors into account—including, in particular, the timing of the motion to recuse; the general lack of relevance of Ware's investigation to the trial of this case; and my lack of a current social friendship with Ware—recusal is not warranted.

## IV.   Conclusion

For the foregoing reasons, defendants' motion for recusal is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  February 6, 2014